## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

COMPAÑÍA DE INVERSIONES MERCANTILES S.A.,

      Petitioner,

v.

GRUPO CEMENTOS DE CHIHUAHUA, S.A.B. de C.V.,
and GCC LATINOAMÉRICA, S.A. DE C.V.,

      Respondents.

---

### PETITION TO CONFIRM A FOREIGN ARBITRAL AWARD

---

Petitioner Compañia de Inversiones Mercantiles S.A. ("CIMSA"), by and through its undersigned attorneys, brings this action to confirm an arbitral award against respondents Grupo Cementos de Chihuahua, S.A.B. de C.V. ("GCC") and GCC Latinoamérica S.A. de C.V. ("GCC Latinoamérica").  As and for its Petition, CIMSA alleges as follows:

### NATURE OF THE ACTION

1.      This is an action to confirm a foreign arbitral award pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"), codified at 9 U.S.C. § 201 *et seq*.  On April 15, 2015, a duly constituted tribunal of three arbitrators, seated in La Paz, Bolivia, awarded CIMSA $36,139,223, plus interest, as a result of Respondents' breach of contract.  Respondents have failed to pay the award.

## THE PARTIES

2.      CIMSA is a Bolivian corporation with its principal place of business in Bolivia.

3.      GCC is a Mexican corporation with its principal place of business in Mexico.

4.      GCC Latinoamérica is a Mexican corporation with its principal place of business in Mexico.  GCC Latinoamérica is a wholly-owned subsidiary of GCC.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 9 U.S.C. § 203 and 28 U.S.C. § 1331.

6.      This Court has specific personal jurisdiction over both GCC and GCC Latinoamérica pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure, based upon their contacts with the United States in connection with the parties' underlying commercial dispute. In addition, for purposes of this confirmation proceeding, the Court has *quasi in rem* jurisdiction over GCC based upon its ownership of property in the District of Colorado.[1]

7.      Venue is proper in this District pursuant to 9 U.S.C. § 204 and 28 U.S.C. § 1391(b).

## STATEMENT OF FACTS

### A.      The Parties' Commercial Relationship

8.      On September 22, 2005, defendant GCC Latinoamérica acquired a 47% interest in Bolivia's largest cement company, Sociedad Boliviana de Cemento, S.A.

---

[1]      CIMSA is not presently in possession of information indicating that GCC Latinoamérica owns property in the District of Colorado.  Thus, at this time, CIMSA seeks *quasi in rem* jurisdiction over GCC only.  CIMSA reserves its right to amend this Petition, however, in the event it comes to learn that GCC Latinoamérica also owns property in the District.

("SOBOCE").  (*See* Declaration of Samuel Doria Medina, executed Sept. 24, 2015 ("Doria Medina Decl.") at ¶ 7).  At the time, CIMSA was SOBOCE's controlling shareholder.  (Doria Medina Decl. ¶ 2).  On the same day GCC Latinoamérica acquired the shares, it entered into a shareholder's agreement (the "2005 Shareholders' Agreement") with CIMSA, as SOBOCE's two principal shareholders.  GCC guaranteed GCC Latinoamérica's obligations under the 2005 Shareholders' Agreement.  (Doria Medina Decl. ¶ 7).

9.     Clause 6.3 of the 2005 Shareholders' Agreement provided CIMSA a right of first refusal with respect to GCC Latinoamérica's shares in SOBOCE.  Pursuant to Clause 6.3, each party was entitled to transfer its shares to a third party after a period of five years, provided, however, that the transferring party gave written notice to other party of the third party offer, and afforded the other party an opportunity to purchase the shares on the same or better terms within 30 days.  (Doria Medina Decl. ¶ 10).  The underlying dispute between the parties arises from Respondents' breach of the right of first refusal in Clause 6.3.  (Doria Medina Decl. ¶¶ 24-29).

10.    The 2005 Shareholders' Agreement also contained a mandatory submission to arbitration, Clause 29.  That provision required the parties to submit all disputes arising under the agreement to arbitration before the Comisión Interamericana de Arbitraje Comercial ("CIAC").

11.    In 2010 and 2011, the parties engaged in negotiations regarding the terms of an agreement whereby CIMSA would acquire GCC Latinoamérica's shares in SOBOCE pursuant to the terms of the 2005 Shareholders' Agreement.  (Doria Medina Decl. ¶¶ 11-19).  Initially unbeknownst to CIMSA, however, Respondents began negotiating in parallel with a third-party, Consorcio Cementero del Sur, S.A ("CCS").  CCS, a Peruvian cement manufacturer, is a competitor of SOBOCE.  (Doria Medina Decl. ¶ 20).  On August 18, 2011, in violation of

CIMSA's right of first refusal under the 2005 Shareholders' Agreement, Respondents sold the shares to CCS.  (Doria Medina Decl. ¶ 26).

**B.**     **Arbitration of the Parties' Commercial Dispute**

12.     On November 16, 2011, pursuant to Clause 29.3 of the 2005 Shareholders' Agreement, CIMSA submitted a notice of arbitration to CIAC against Respondents.  (Doria Medina Decl. ¶ 27).

13.     On December 6, 2011, Respondents appointed their chosen arbitrator, Professor Eduardo Zuleta.  On February 7, 2012, CIMSA appointed its chosen arbitrator, Professor Fernando Salazar-Paredes.  Mr. Zuleta and Mr. Salazar-Paredes jointly appointed Professor Juan Fernández-Armesto as president of the Tribunal.  On May 30, 2012, the Arbitral Tribunal was duly constituted in accordance with the 2005 Shareholders' Agreement.  (Doria Medina Decl. ¶ 28).

14.     On September 13, 2013, the Tribunal issued a Partial Award on the Merits, in which it held that Respondents breached CIMSA's right of first refusal by selling GCC Latinoamérica's shares in SOBOCE to CCS (the "Partial Award").  It also found Respondents had breached their obligation to act in good faith during the negotiations regarding CIMSA's exercise of its right of first refusal.  (Doria Medina Decl. ¶ 29).

15.     On April 15, 2015, the Tribunal issued a Final Award on Damages (the "Final Award"), in which it awarded to CIMSA the following monetary award:  (1) $34,129,893.50 in damages; (2) $450,000 and $1,559,329.37 for arbitration costs and expenses; and (3) annual interest at a rate of 6%.  (Doria Medina Decl. ¶ 30).

**C.**     <u>Respondents' Contacts with the United States Establish Specific Jurisdiction</u>

       16.     Over the course of the parties' commercial relationship, and to further that relationship, Respondents directed their activities at several jurisdictions within the United States through purposeful and sustained contacts. Those contacts establish a basis for specific personal jurisdiction pursuant to Fed. R. Civ. P. 4(k)(2), the federal long arm statute, where, as here, Respondents are not subject to general jurisdiction in any state of the United States. *See e.g. Archangel Diamond Corp. Liquidating Trust v. OAO Lukoil*, 75 F. Supp. 3d 1343, 1361 (D. Colo. 2014); *Pandaw Am., Inc. v. Pandaw Cruises India Pvt. Ltd.*, 842 F. Supp. 2d 1303, 1311 (D. Colo. 2012). The parties' dispute over the 2005 Shareholder Agreement specifically arises out of their extensive negotiations of that agreement in the United States, and their subsequent negotiations and meetings in the United States regarding CIMSA's right of first refusal and Respondents' breach thereof.

      (1)     <u>Negotiation of the 2005 Shareholders' Agreement in Miami, Florida</u>

       17.     While none of the parties or their principals are residents of the United States, they unanimously elected to conduct their business negotiations over the 2005 Shareholder Agreement in the United States. They held a business summit in a Miami hotel on March 25, 2005. (Doria Medina Decl. ¶ 4).

       18.     The parties sent their most senior principals and officers to Miami to negotiate. CIMSA was represented by Samuel Doria Medina, its principal, who was also President of SOBOCE at that time. SOBOCE was also represented by Armando Gumucio, its General Manager. GCC and GCC Latinoamérica sent Manuel Milán, GCC's General Director, and Luis Jorge Amaya González, its Manager of Corporate Planning. (Doria Medina Decl. ¶¶ 3-4).

19.     At that meeting, CIMSA informed Respondents that it was looking for a new strategic partner to replace a departing SOBOCE shareholder, which made 47% of SOBOCE's shares available for Respondents' purchase.  CIMSA's representatives gave a PowerPoint presentation regarding the Bolivian economy, the country's cement industry, and SOBOCE's economic and financial outlook.  CIMSA provided Respondents with its appraisal of SOBOCE's enterprise value, and provided documentation of its calculations by which it had arrived at its appraisal.  (Doria Medina Decl. ¶ 5).

20.     On the basis of the information provided to Respondents at the March 25 meeting in Miami, by letter dated April 12, 2005, Mr. Milán (of GCC ) submitted GCC Latinoamérica's formal offer to purchase the 47% interest in SOBOCE for a purchase price of $58,587,500.  The letter made reference to the March 25 meeting, and formalized the agreement the parties had reached in the Miami negotiations.  The purchase price was based entirely upon the appraisal presentation given by CIMSA in Miami.  The Miami meeting was the foundational event in GCC/GCC Latinoamérica's decision to acquire the SOBOCE shares, and set the groundwork for the 2005 Shareholders' Agreement.  (Doria Medina Decl. ¶¶ 6-7).

(2)     Respondents' United States Bank Accounts

21.     GCC paid for the SOBOCE shares through a bank account located in the United States.  (Doria Medina Decl. ¶ 8).

22.     Moreover, pursuant to their rights under the 2005 Shareholders' Agreement, both CIMSA and GCC Latinoamérica were entitled to receive annual payments of shareholder dividends from SOBOCE.  Each year from 2005 to 2011, Respondents directed SOBOCE to distribute the dividends due to them — approximately $21 million in total — to the same Wells Fargo account held in the name of GCC Latinoamérica in San Francisco, California.  (Doria Medina Decl. ¶ 9).

(3)     2010 Meetings in Miami Over the Right of First Refusal

23.     In September 2009, Respondents informed CIMSA of their intention to sell GCC Latinoamérica's shares in SOBOCE upon the expiration of the five year holding period set forth in Clause 6.3 of the Shareholders' Agreement.  CIMSA's principal, Mr. Doria Medina, expressed CIMSA's desire to purchase the shares, assuring Respondents that CIMSA would be able procure the capital needed to effectuate the transaction by the first half of 2010.  He proposed a meeting between the parties to discuss the mechanics of the sale.  (Doria Medina Decl. ¶¶ 11-12).

24.     The parties again elected to conduct their negotiations at a summit in Miami, Florida.  On December 29 and 30, 2009, Jaime Fernández (GCC's Director of Planning) met with Juan Carlos Requena (Chairman of SOBOCE, and authorized representative of CIMSA) in Miami.  On the basis of this meeting, the parties began to negotiate the terms of an agreement pursuant to which CIMSA would purchase GCC Latinoamérica's interest in SOBOCE.  (Doria Medina Decl. ¶¶ 13-14).

25.     A substantial portion of these negotiations occurred in Miami over the course of February and March 2010 (Doria Medina Decl. ¶ 14):

- On February 2, Mr. Fernández (GCC) and Mr. Requena (CIMSA) met again in Miami.  At this meeting, the parties discussed the terms of Respondents' sales proposal and CIMSA's purchase proposal.

- On February 22-23, CIMSA and GCC sent senior representatives to meet in Miami.  This meeting was the first time the parties discussed the purchase price of the shares.

- On March 2, the parties sent senior representatives to meet in Miami.  At this meeting, Mr. Requena outlined the terms of CIMSA's purchase proposal.

- On March 10-12 Gonzalo Belaúnde (Chief Financial Officer of SOBOCE), Armando Gumucio (Chief Executive Officer of SOBOCE and Secretary of the Board of Directors of SOBOCE), Jaime Fernández (Director of Planning of GCC), and Luis Amaya (Planning Manager of GCC) met in Miami.  At this meeting, SOBOCE executives explained the projections they used to arrive at the equity value assigned to SOBOCE in the March 2 purchase proposal.

- The parties again met in Miami on March 29 and 30.  During these meetings, the parties resolved key conflicts regarding the purchase price, timing, and other terms of the sale.  The meetings were again attended by the companies' most senior representatives: Mr. Amaya González, Mr. Milán, and Federico Terrazas Becerra (a GCC board member), represented Respondents, and Mr. Doria Medina, Mr. Gumucio, and Mr. Requena represented CIMSA.

- On April 23, 2010, the parties' representatives, as well as legal counsel for both parties, convened in Miami.  During this meeting, the parties came to an agreement regarding the fundamental terms of the sale.  On May 28, 2010, the parties signed an agreement in La Paz, Bolivia (the "2010 Shareholders' Agreement").

26.    A few days before the transaction was scheduled to close, however, the Government of Bolivia expropriated a substantial division of SOBOCE's business.  Thus, as a result of the expropriation, the parties were unable to effectuate the sale under the terms of the 2010 Shareholders' Agreement.  (Doria Medina Decl. ¶ 15).

(4)    2011 Negotiations in Houston, Texas, Over the Right of First Refusal, Retention of New York Counsel and Choice of New York Law

27.    The parties resumed negotiations over a revised acquisition of GCC Latinoamérica's SOBOCE shares in June 2011.  During a preliminary conference call, CIMSA

affirmed its desire to purchase the shares, and GCC expressed its flexibility as to the manner and timing of payment.  The parties agreed to conduct an in-person meeting among principals, and selected Houston, Texas as the location for their discussions.  (Doria Medina Decl. ¶ 17).

28.     Thus on June 24, 2011, Mr. Doria Medina met with Mr. Terrazas Torres, Chairman of GCC's board, in Houston.  It was one of the few meetings Mr. Terrazas Torres attended in person.  (Doria Medina Decl. ¶ 17).

29.     At the meeting, CIMSA proposed two alternative payment structures for Respondents' analysis.  Under the first proposal, CIMSA would pay Respondents $40 million within six months plus a variable amount depending upon SOBOCE's receipt of compensation from the Government of Bolivia for the 2010 expropriation.  Under the second proposal, CIMSA offered a fixed price of $70 million, $40 million payable within six months of the agreement, and the remaining $30 million payable up to eighteen months after the first payment.  (Doria Medina Decl. ¶ 18).

30.     In the weeks following the Houston meeting, the parties continued negotiations via telephone and email, discussing the proposals presented at the Houston meeting. (Doria Medina Decl. ¶ 19).

31.     On July 5, 2011, GCC notified CIMSA that CCS had made a firm offer to purchase the shares.  In its letter, GCC indicated that CIMSA had the right of first refusal to purchase the shares according to the "same price and conditions" of the CCS offer.  (Doria Medina Decl. ¶ 20).

32.     Upon receipt of GCC's letter, CIMSA contacted GCC to confirm its willingness to purchase the shares, but requested a longer payment schedule than the 90-day period set forth in the CCS offer.  GCC indicated that, assuming the parties could reach an

agreement on all other relevant terms, it would accept the six month payment term proposed at the Houston meeting.  (Doria Medina Decl. ¶ 21).

33.     The parties thus continued to negotiate over the course of the following months, expanding upon the second proposal presented at the Houston meeting.  By early August 2011, the parties had nearly finalized the terms of the transaction, and GCC instructed CIMSA to hire New York counsel to draft a final agreement.  GCC retained the New York-based law firm Cleary Gottlieb Steen & Hamilton LLP, and CIMSA retained New York-based firm Curtis, Mallet-Prevost, Colt and Mosle LLP.  The parties agreed that the final agreement would be governed by New York law.  (Doria Medina Decl. ¶ 22).

34.     A key issue during the negotiations was Respondents' demand that CIMSA provide a guarantee to ensure its compliance with the longer payment schedule. Respondents requested that CIMSA place 4% of its SOBOCE shares in a trust held by a U.S. bank to be designated by Respondents.  A few days prior to closing, purportedly upon advice of their New York counsel, Respondents requested that CIMSA also pledge the shares to them as security for CIMSA's obligations under their agreement.  CIMSA consented.  Nevertheless, later that day, GCC inexplicably demanded that CIMSA pledge 27% of its SOBOCE shares.  (Doria Medina Decl. ¶ 23).

35.     CIMSA interpreted GCC's demand as an attempt to deliberately encumber the parties' negotiations in order to sell the shares to CCS.  Accordingly, on August 4, 2011, CIMSA sent a letter formally exercising its right of first refusal under the terms proposed at the Houston meeting and negotiated over the course of the months that followed.  On August 12, 2011, CIMSA received GCC's response, in which GCC claimed that CIMSA's exercise of its right of first refusal was invalid because it had not met the 30-day payment requirement under

Article 6.3 of the 2005 Shareholders' Agreement, despite GCC's clear acceptance of the six-month payment schedule on numerous occasions over the course of the parties' negotiations. (Doria Medina Decl. ¶¶ 24-25).

36.     GCC proceeded to sell the shares to CCS on August 18, 2011, only fourteen days after CIMSA's letter and six days after GCC's response.  (Doria Medina Decl. ¶ 26).  The Tribunal, in ruling for CIMSA, concluded that Respondents had breached the 2005 Shareholder Agreement by failing to negotiate with CIMSA in good faith following the Houston meeting, *i.e.*, by leading CIMSA to believe that the longer payment schedule proposed by CIMSA in Houston would be acceptable to GCC, and then selling to CCS on the purported ground that CIMSA's longer payment schedule was unacceptable.  (Doria Medina Decl. ¶ 29).

37.     In sum, Respondents' purposeful and extensive contacts with the United States in connection with the 2005 Shareholders' Agreement, and specifically with regard to their breach of the right of first refusal in Clause 6.3 thereof, render them subject to personal jurisdiction under Fed. R. Civ. P. 4(k)(2).

**D.     GCC's Assets in the District Establish *Quasi in Rem* Jurisdiction**

38.     Wholly apart from the Court's jurisdiction under Fed. R. Civ. P. 4(k)(2), the Court also has the power to exercise *quasi in rem* jurisdiction over GCC in an action to enforce an already-determined obligation owing from GCC to CIMSA.  *See Shaffer v. Heitner*, 433 U.S. 186, 210 n.36 (1977); *see also* Restatement (Third) of Foreign Relations Law of the U.S., § 487 cmt. c (1987) ("an action to enforce a foreign arbitral award requires jurisdiction over the award debtor *or his property*") (emphasis supplied).  GCC owns substantial property in

the District of Colorado to support an exercise of *quasi in rem* jurisdiction for purposes of confirming and enforcing the award.[2]

39.     GCC describes itself in its financial literature as a "holding company." Through its sales of cement in the United States and Mexico, it earns approximately $1 billion per year.  In its most recent consolidated financial statements, GCC announced that it derives more than 70 percent of its income from sales in the United States alone.  (*See* Declaration of G. Hertzberg, executed Sept. 24, 2015 ("Hertzberg Decl.") at ¶ 9).

40.     GCC operates its U.S. business through GCC of America, Inc. ("GCC America"), a Delaware corporation headquartered in Denver, Colorado.  GCC owns GCC America through another GCC subsidiary, Cementos de Chihuahua, S.A. de C.V. ("Cementos"), a Mexican corporation.  GCC America, in turn, owns and operates through various subsidiaries in the United States, including GCC Energy, LLC (owner of a Colorado coal mine); GCC Dacotah, Inc. (based in South Dakota); GCC Rio Grande, Inc. (New Mexico/Colorado); and GCC Alliance Concrete, Inc. (Iowa).  (Hertzberg Decl. ¶ 10).

41.     GCC has availed itself of the public debt markets in the United States. GCC has issued a $250 million bond offering to United States investors, and at relevant times borrowed under a $450 million revolving credit facility from three U.S. banks.  (Hertzberg Decl. ¶ 11). (GCC announced on July 27, 2015 that it refinanced a portion of that line through a syndicate of banks, including the U.S. banks Citigroup Capital Markets and J.P. Morgan Chase Bank. *Id.*)  GCC America is a guarantor of those obligations.  *Id.*  Upon information and belief, GCC utilizes its corporate borrowings to capitalize its U.S. operations, which in turn creates obligations due from GCC America to GCC, in the form of intercompany payables due to GCC

---

[2]     CIMSA does not, at this time, seek to impose *quasi in rem* jurisdiction over GCC Latinoamérica.  *See* n.1, *supra*.

from GCC America.  GCC uses the cash flow from its U.S. operations to satisfy its obligations to its bondholders and facility lenders.  Those intercompany payables due from GCC America, which are substantial, are assets of GCC within the United States, and are subject to attachment here.  *See, e.g., Great Falls Transfer & Storage Co. v. Pan American Petroleum Corp.*, 353 F.2d 348, 349 (10th Cir. 1965) ("[F]or the purpose of garnishment a debt has no fixed situs and may be reached in any jurisdiction in which the person owing it may be found and subjected to process").

42.     GCC America owes additional intercompany payables to GCC.  The U.S. trademark "GCC" is registered to GCC.  (Hertzberg Decl. ¶ 12).  Upon information and belief, GCC licenses the GCC mark to GCC America and its subsidiaries in exchange for regular payments of royalties and fees, which are the property of GCC and held for its benefit at GCC America's Denver headquarters.  Such royalties and fees are typically charged to U.S. subsidiaries by foreign parents or affiliates as part of a corporate tax strategy designed to remove as much revenue as possible from the U.S. operation to countries with more favorable tax structures.  Here, GCC enjoys a more favorable tax structure in Mexico than in the United States.

43.     GCC also owns a patent in the United States for cement composition. (Hertzberg Decl. ¶ 13).  Upon information and belief, and pursuant to the same tax strategy, GCC licenses the patent and/or the methodologies identified therein to GCC America and its subsidiaries in exchange for substantial royalties and fees due to GCC and payable through GCC America from its Denver headquarters.

44.     Thus, upon information and belief, GCC America owes substantial inter-company debts to GCC, in the form of accounts payable, intellectual property royalties, and other inter-company fees and obligations.  Those assets of GCC are located in Denver and are

subject to attachment.  To the extent any of the intercompany payables due from GCC America to GCC are paid through Cementos, Cementos is a mere conduit for such payments, and has no legal or equitable interest in such amounts.

45.     CIMSA has, contemporaneously with the filing of this Petition, moved this Court for a writ of attachment against GCC pursuant to Section 102 of the Colorado Rules of Civil Procedure ("CRCP 102"), and will at an appropriate time initiate process to garnish GCC America's debts to GCC pursuant to C.R.C.P. Section 103(5).  The writ of garnishment in aid of attachment will require GCC America to serve an answer specifically identifying any property owned by or owed to GCC within its custody or control.  CIMSA reserves the right to amend this Petition upon receipt of such answer from GCC America.

## CAUSE OF ACTION FOR CONFIRMATION OF THE AWARD

46.     CIMSA repeats and realleges paragraphs 1 through 46 as if fully set forth herein.

47.     The 2005 Shareholders' Agreement between CIMSA and Respondents contained a valid arbitration provision under which the parties agreed to submit to arbitration all disputes arising under the contract.  A duly certified copy of the arbitration provision is attached hereto as Exhibit A, and a duly certified translation of the arbitration provision is attached hereto as Exhibit B.

48.     The 2005 Shareholders' Agreement, and the arbitration provision contained therein, is "an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration" for purposes of Article II of the New York Convention.

49.     On April 10, 2015, a duly constituted Arbitral Tribunal awarded CIMSA (1) $34,129,893.50 in damages; (2) $450,000 and $1,559,329.37 for arbitration costs and expenses; and (3) annual interest at a rate of 6%.  A duly certified copy of the Award is attached hereto as Exhibit C,[3] and a duly certified translation of the Award is attached hereto as Exhibit D.

50.     The Award falls under the New York Convention under Article I and 9 U.S.C. § 202 because it was rendered in Bolivia, a signatory nation, and arises out of a legal relationship between foreign entities.

51.     Pursuant to Clause 29.3 of the 2005 Shareholders' Agreement, Article 29.2 of the Rules of the CIAC, and Article III of the New York Convention, the Award is final and binding on Respondents.

52.     Respondents failed to fulfill their payment obligations under the Final Award.

53.     Pursuant to 9 U.S.C. § 207, this Court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention."

54.     Respondents have no defenses to recognition and enforcement under Article V of the New York Convention.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court issue an Order:

(a)     confirming the Final Award in favor of CIMSA and against GCC and GCC Latinoamérica;

---

[3]     Included with the Award is the Tribunal's Decision on the Interpretation and Correction of the Final Arbitral Award on Damages, dated June 24, 2015.

(b)      entering judgment for CIMSA and against GCC and GCC Latinoamérica

in the amount of the Final Award, plus accumulated interest from the entry of the Final Award;

(c)      awarding CIMSA annual interest at a rate of 6%; and

(d)      granting such other and further relief, including attorneys' fees and costs,

as the Court may deem just and proper.

Dated:  September 25, 2015
         Denver, Colorado

FOX ROTHSCHILD LLP

By:      _____
         Neal S. Cohen
         1225 17th Street
         Suite 2200
         Denver, CO  80202
         Tel.: (303) 446-3864
         Fax:  (303) 292-1300

         *Counsel for CIMSA*

CURTIS, MALLET-PREVOST,
  COLT & MOSLE LLP

Eliot Lauer
Gabriel Hertzberg
Sylvi Sareva
101 Park Avenue
New York, New York 10178
Tel:  (212) 696-6192
Fax:  (212) 697-1559

*Co-counsel for CIMSA*

22446100