# EXHIBIT C
# (PART 1 OF 5)

COMISIÓN INTERAMERICANA DE
ARBITRAJE COMERCIAL

Caso No. 50 180 T 00867 11

COMPAÑÍA DE INVERSIONES MERCANTILES S.A.
*Demandante*

c.

GCC LATINOAMÉRICA, S.A. DE C.V.

y

GRUPO CEMENTOS DE CHIHUAHUA, S.A.B. DE C.V.
*Demandadas*

# LAUDO FINAL SOBRE DAÑOS

### TRIBUNAL ARBITRAL

Juan Fernández-Armesto - Presidente
Fernando Salazar-Paredes - Árbitro
Eduardo Zuleta - Árbitro

**SECRETARIA ADMINISTRATIVA**
Krystle M. Baptista

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

## INDICE DE CONTENIDO

**INDICE DE CONTENIDO** ........................................................................2

**LISTA DE TÉRMINOS DEFINIDOS** ...........................................................5

**I   PERSONAS QUE HAN PARTICIPADO EN ESTE ARBITRAJE**...............9

    **1.   Demandante** .................................................................................9

    **2.   Demandadas**................................................................................10

        A.   Tribunal Arbitral ....................................................................11

        B.   Administración ......................................................................12

        C.   Secretaria Administrativa .....................................................13

**II   HISTORIA PROCESAL**......................................................................14

    **1.   Introducción**..............................................................................14

    **2.   Primera etapa**...........................................................................14

    **3.   Incidente de nulidad** ................................................................16

    **4.   Segunda Etapa** .........................................................................16

    **5.   Solicitud de suspensión del procedimiento**............................18

    **5.1.   Hechos y posición de las Partes** ..........................................18

    **5.2.   Análisis del Tribunal** .............................................................19

        A.   La Juez Provisional carece de competencia para dictar una medida anti-arbitraje ..............................................................................20

        B.   La anulación del Laudo Parcial Final y la ejecución del Laudo Final sobre Daños ..............................................................................22

        C.   Las Demandadas ya tuvieron la oportunidad de suspender el arbitraje...23

**III   HECHOS** ...........................................................................................25

    **1.   *Dramatis Personae*** ..................................................................25

    **2.   La disputa**..................................................................................25

    **3.   Las valoraciones de Soboce hechas en 2010**...........................26

    **4.   El Acuerdo 2010**........................................................................26

    **5.   La expropiación de Fancesa** ....................................................27

    **6.   La transmisión de los Títulos**..................................................27

    **7.   La venta de CIMSA de sus participaciones en Soboce** ...........28

**IV   BREVE RESUMEN DE LA POSICIÓN DE LAS PARTES**..........................30

**V   PRETENSIONES DE DAÑOS DE LAS PARTES** ......................................32

    **1.   Pretensiones de la Demandante**...............................................32

    **2.   Pretensiones de las Demandadas**.............................................32

**VI   INTRODUCCIÓN Y MARCO JURÍDICO** ............................................33

1.    Régimen legal general ................................................................34

2.    Régimen contractual particular ...............................................35

3.    Requisitos para el resarcimiento de daños.............................35

3.1.  Daño directo e inmediato .........................................................36

3.2.  Daño previsible ..........................................................................36

3.3.  Daño cierto .................................................................................36

VII  PRIMER DAÑO RECLAMADO: DIFERENCIA DE VALOR DE LOS
TÍTULOS ...........................................................................................38

1.    Daño directo e inmediato .........................................................38

A.    Causa...............................................................................38

B.    Efecto ..............................................................................39

C.    Nexo causal.....................................................................39

1.2.  Capacidad de pago de CIMSA ...................................................40

A.    Posición de la Demandante...........................................40

B.    Posición de las Demandadas.........................................41

C.    Decisión del Tribunal ....................................................43

2.    Daño previsible ..........................................................................47

3.    Daño cierto .................................................................................49

VIII SEGUNDO DAÑO RECLAMADO: LA PRIMA DE CONTROL DEL
PAQUETE MAYORITARIO ............................................................50

1.    Posición de las Partes ...............................................................50

2.    Daño cierto .................................................................................52

3.    Daño directo e inmediato .........................................................54

IX   TERCER DAÑO RECLAMADO: GASTOS LEGALES ...................56

1.    Posición de las Partes ...............................................................56

2.    Decisión del Tribunal ...............................................................57

X    UNA CUESTIÓN PREVIA: LA TEORÍA DE LA PÉRDIDA DEL CHANCE59

1.    Posición de las Partes ...............................................................59

2.    Análisis del Tribunal .................................................................60

A.    La doctrina de la pérdida de la chance........................60

B.    Decisión del Tribunal ....................................................61

XI   CUANTIFICACIÓN DEL PRIMER DAÑO RECLAMADO.....................63

1.    La fecha de valoración ..............................................................63

A.    Posición de las Partes....................................................63

B.    Decisión ..........................................................................64

2.    Naturaleza jurídica de la reclamación....................................65

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

   **3.**     **Valuación de los peritos** .......................................................................**66**

       A.    Informe del Dr. Daniel Flores.............................................................67

       B.    Cálculo alternativo..............................................................................70

       C.    Sensibilidad de daños ........................................................................73

   **4.**     **Decisión**.................................................................................................**74**

       A.    Soboce *stand alone* ...........................................................................74

       B.    Fancesa .................................................................................................76

       C.    Contra-argumentos de las Demandadas..............................................78

**XII**   **COSTAS**......................................................................................................**80**

   **1.**     **Posición de la Demandante** ................................................................**80**

   **2.**     **Posición de las Demandadas** ..............................................................**80**

   **3.**     **Decisión del Tribunal** ........................................................................**81**

       A.    Costes del Procedimiento ...................................................................83

       B.    Gastos de Defensa...............................................................................84

**XIII**  **INTERESES** ...............................................................................................**86**

**XIV**  **RESUMEN**...................................................................................................**88**

**XV**   **DECISIÓN**..................................................................................................**90**

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

## LISTA DE TÉRMINOS DEFINIDOS

**Acuerdo 2005**    Acuerdo de Accionistas para la Sociedad Boliviana de Cemento, S.A. firmado el 22 de septiembre de 2005 entre CIMSA, los accionistas de CIMSA, SOBOCE, GCC y Grupo (Doc. C -1).

**Acuerdo 2010**    Acuerdo de Accionistas entre CIMSA y GCC de 28 de mayo de 2010 (Docs. C- 91 y R- 35).

**Audiencia**    Audiencia de prueba de la Segunda Etapa desarrollada en la ciudad de Atlanta del 30 de junio al 2 de julio de 2014.

**Auto**    Auto judicial de 4 de diciembre de 2014, emitido por la Juez Provisional del Juzgado Octavo Civil del Distrito Judicial Morelos (Chihuahua) en la que se dicta una medida cautelar provisional anti-arbitraje (Doc. R- 891).

**Belaúnde**    Declaración testifical de Gonzalo Belaúnde Sánchez de 6 de diciembre de 2012. (Doc. C -248).

**C.C.**    Código Civil de Bolivia, Decreto Ley n° 12760 del 6 de agosto de 1975 con las modificaciones de las leyes n° 2089 de 6 de mayo de 200 y n° 004 del 31 de marzo de 2010.

**Cabanellas II**    Segunda declaración pericial de Guillermo Cabanellas de 31 de marzo de 2014 (Doc. R -541).

**Carta CIMSA**    Carta de CIMSA de 1 de agosto de 2011, recibida por GCC el 4 de agosto de 2011, en la que CIMSA expresó su voluntad de adquirir la totalidad del capital accionario de GCC en Soboce (Doc. C-70).

**CCS**    Consorcio Cementero del Sur, S.A.

**Chiossone III**    Tercera declaración pericial de Orlando Chiossone, de 3 de junio de 2014. (Doc. R- 722).

**CIAC**    Comisión Interamericana de Arbitraje Comercial.

**CIMSA o Demandante**    Compañía de Inversiones Mercantiles S.A.

**Conclusiones Demandante**    Memorial posterior a la Audiencia de la Segunda Etapa, presentado el 12 de agosto de 2014 (C-76).

**Conclusiones Demandadas**    Memorial posterior a la Audiencia de la Segunda Etapa, presentado el 12 de agosto de 2014 (R-77).

**Contestación**    Escrito de contestación a la demanda de daños de 31 de marzo de 2014 (R- 55).

| | |
|---|---|
| **Costas Demandante** | Escrito de Costas de la Demandante de 22 de agosto de 2014 (C-80). |
| **Costas Demandadas** | Escrito de Costas de la Demandada de 22 de agosto de 2014 (R-79). |
| **Costes del Procedimiento** | Provisiones de fondos desembolsadas ante CIAC por las Partes. |
| **Demanda** | Escrito de demanda de daños de 10 de enero de 2014 (C-48). |
| **Demandadas** | GCC Latinoamérica, S.A. de C.V. y Grupo Cementos de Chihuahua, S.A.B. de C.V. |
| **Doria Medina II** | Segunda declaración testifical de Samuel Doria Medina Auza de 9 de enero de 2014 (Doc. C- 625). |
| **Doria Medina III** | Tercera declaración testifical de Samuel Doria Medina Auza de 29 de abril de 2014 (Doc. C- 762). |
| **Dúplica** | Escrito de dúplica de las Demandadas de 4 de junio de 2014 (R-60). |
| **FCD** | Método de valoración de flujos de caja descontados. |
| **Fernández II** | Segunda declaración testifical de Jaime Ricardo Fernández Horcasitas de 31 de marzo de 2014 (Doc. R -540). |
| **Ferrari I** | Informe pericial legal de Franco Ferrari de 27 de marzo de 2014 (Doc. R- 569). |
| **Ferrari II** | Segundo informe pericial legal de Franco Ferrari de 3 de junio de 2014 (Doc. R- 762). |
| **Flores I** | Primer informe pericial del Dr. Daniel Flores (Econ One Research Inc.), de 10 de julio de 2012 (Doc. C-67) |
| **Gastos de Defensa** | Gastos generados por la defensa letrada de las Partes y que incluyen: honorarios y gastos de letrados, honorarios de peritos y gastos de las dos audiencias. |
| **GCC** | GCC Latinoamérica, S.A. de C.V. |
| **Gerencia** | Gerencia de Soboce. |
| **Grupo/ Grupo Chihuahua** | Grupo Cementos de Chihuahua, S.A.B. de C.V. |
| **Hoja de Términos** | Documento acordado por las Partes el 15 de abril de 2010, que sirvió de base al Acuerdo 2010. |

| | |
|---|---|
| **LAB** | Ley de Arbitraje y Conciliación No. 1770, de 10 de marzo de 1997 (Doc. C-27). |
| **Laudo Parcial Final** | Laudo parcial final sobre responsabilidad, de 13 de septiembre de 2013, que puso fin a la Primera Etapa del procedimiento. |
| **Laudo Final sobre Daños** | El presente Laudo Final sobre Daños, que pone fin a la Segunda Etapa del procedimiento. |
| **M** | Millones. |
| **Messineo y Melendo** | Messineo, F. y Melendo. S.: Manual de Derecho Civil y Comercial (Ediciones Jurídicas Europa- América 1979) Tomo IV. |
| **Morales Guillén** | Morales Guillén, C., Código Civil: Concordado y Anotado con Arreglo a la Edición Oficial, Tercera edición revisada y ampliada, Editorial Gisbert y Cia. S.A., 1991, Tomo I. |
| **Nishizawa** | Segundo informe pericial legal de Santiago A. Nishizawa Takano, de 29 de abril de 2014 (Doc. C- 764). |
| **Oferta de CCS** | Carta de Vito Rodríguez, Presidente Ejecutivo de CCS, a Manuel Mián Reyes, Director Gerente de GCC de 4 de julio de 2011 indicando que presentaba una oferta firme de compra (Doc. C-65 y Doc. R-36). |
| **OP** | Orden Procesal. |
| **Paquete Mayoritario** | Paquete de acciones de CIMSA en Soboce, consistente en el 51,35% del capital social de Soboce. |
| **Paquete Minoritario o Títulos** | Participación accionarial de GCC en SOBOCE que fue transferida a CCS, correspondiente a los títulos de acciones con números 009, 013 y 015, representativas del 47,02% del Capital social de SOBOCE. (Doc. C 68). |
| **Partes** | CIMSA, GCC y Grupo. |
| **Prima de Control Actual** | Prima de control del Paquete Mayoritario a agosto de 2011. |
| **Prima de Control Hipotética** | Prima de control que según la Demandante hubiera tenido el Paquete Mayoritario si hubiera adquirido los Títulos. |
| **Primera Etapa** | Primera de las dos etapas en las que el presente procedimiento quedó bifurcado de conformidad con lo establecido en la OP nº 3. |
| **Reglamento CIAC** | Reglamento de procedimientos de la CIAC modificado y vigente a partir del 1 de abril de 2002 con las modificaciones vigentes desde el 1 de julio de 2008. |

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

| | |
|---|---|
| **Réplica** | Escrito de escrito de réplica de la Demandante de 30 de abril de 2014 (C-57). |
| **Romero Sandoval** | Sandoval, R.: Derecho de Obligaciones, Editorial "Los amigos del libro", 1990. |
| **Segunda Etapa** | Segunda de las dos etapas en las que el presente procedimiento quedó bifurcado de conformidad con lo establecido en la OP n° 3. |
| **Soboce** | Sociedad Boliviana de Cemento, S.A. |
| **SPA** | Share Purchase Agreement firmado entre CCS, GCC y Grupo como Garante el 18 de agosto de 2011 (Doc. C-198). |
| **Spiller II** | Segundo informe pericial del Dr. Pablo T. Spiller (Compass Lexecon, LLC) de 31 de marzo de 2014 (Doc. R-581). |
| **Spiller III** | Tercer informe pericial del Dr. Pablo T. Spiller (Compass Lexecon, LLC) de 4 de junio de 2014 (Doc. R- 763). |
| **SSPA** | Supplementary Share Purchase Agreement firmado entre CCS, GCC y Grupo como Garante el 18 de agosto de 2011 (Doc. C-199). |
| **TA** | Transcripción de la Audiencia. |
| **US$** | Dólares de los Estados Unidos de América. |

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

## I   PERSONAS QUE HAN PARTICIPADO EN ESTE ARBITRAJE

**1.   DEMANDANTE**

1.   La parte demandante es la COMPAÑÍA DE INVERSIONES MERCANTILES S.A. [la **"Demandante"** o **"CIMSA"**] una sociedad anónima constituida conforme a las leyes del Estado Plurinacional de Bolivia con domicilio social en:

Compañía de Inversiones Mercantiles S.A.
Calle Mercado 1045
La Paz, Bolivia
Teléfono: (+591) (2) 211-1316
Fax: (+591) (2) 211-1923

2.   Se encuentra representada en este arbitraje por:

**Samuel J. Doria Medina Auza**
**María Luisa Doria Medina de Guamán**
*Compañía de Inversiones Mercantiles S.A.*
Calle Mercado 1045
La Paz, Bolivia
Teléfono: (+591) (2) 240-6547
Fax:  (+591) (2) 240-7472
Correo electrónico   samueldm@comversa.com.bo
                     mluisadm53@hotmail.com

**Gonzalo Mendieta Romero**
**Marcela Rada Arispe**
*Mendieta, Romero & Asociados*
Calle Fernando Guachalla 342,
Edificio Víctor, Oficina 603
La Paz, Bolivia
Teléfono:  (+591) (2) 244-1499
Fax:  (+591) (2) 244-1517
Correo electrónico:  gmendieta@mendieta-law.com
                     mrada@mendieta-law.com

**Mark H. O'Donoghue, Esq.**
*Curtis, Mallet-Prevost, Colt & Mosle LLP*
101 Park Avenue
Nueva York, NY 10178-0061
Estados Unidos de América
Teléfono:  (+1) 212-696-6000
Fax:  (+1) 212-697-1559
Correo electrónico:  modonoghue@curtis.com

**Javier Jiménez Gutiérrez**
*Curtis, Mallet-Prevost, Colt & Mosle S.C.*
Rubén Darío 281, Piso 9
115 México, D.F.

México
Teléfono:  (+52) 55-5282-1100
Fax:  (+52) 55-5282-0061
Correo electrónico:  jjimenez@curtis.com

**Bernardo M. Cremades, Jr.**
*B. Cremades & Asociados*
c. Goya, 18 (planta 2)
28001 Madrid
España
Teléfono:  (+34) 91-423-7200
Fax: (+34) 91-576-9794
Correo electrónico:  bcr@bcremades.com

2. DEMANDADAS

3. La parte demandada la componen:

- GCC LATINOAMÉRICA, S.A. DE C.V. ["**GCC**"], una sociedad anónima constituida conforme a las leyes de los Estados Unidos Mexicanos, con domicilio social en:

GCC Latinoamérica, S.A. de C.V.
Vicente Suárez y Sexta
Col. Nombre de Dios, 31110
Chihuahua, Chihuahua, México
Teléfono: (+52) 614-442-3100
Fax: (+52) 614-424-3377

- GRUPO CEMENTOS DE CHIHUAHUA, S.A.B. DE C.V. ["**Grupo Chihuahua**" o "**Grupo**"], una sociedad anónima constituida conforme a las leyes de los Estados Unidos Mexicanos, con domicilio social en:

Grupo Cementos de Chihuahua, S.A.B. de C.V.
Vicente Suárez y Sexta
Col. Nombre de Dios, 31110
Chihuahua, Chihuahua, México
Teléfono: (+52) 614-442-3100
Fax: (+52) 614-424-3377

4. En adelante, toda referencia a GCC y a Grupo, conjuntamente, se hará a las "**Demandadas**".

5. Se encuentran representadas en este arbitraje por:

**Manuel Antonio Milán Reyes**
**Sergio Sáenz**
*Grupo Cementos de Chihuahua, S.A.B. de C.V.*
*GCC Latinoamérica, S.A. de C.V.*
Vicente Suárez y Sexta
Col. Nombre de Dios, 31110

10

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

Chihuahua, Chihuahua, México
Teléfono: (+52) 614-442-3100
Fax: (+52) 614-424-3377
Correo electrónico: mmilan@gcc.com
                    ssaenzg@gcc.com

**Ramiro Guevara**
**Jorge Luis Inchauste**
*Guevara & Gutiérrez S.C.*
Calle 15 No. 7715
esquina Calle Sánchez Bustamante,
Torre Ketal, piso 4 oficina No. 2
La Paz, Bolivia
Teléfono: (+591) (2) 277-0808
Fax: (+591) (2) 279-6462
Correo electrónico: rguevara@gg-lex.com
                    jinchauste@gg-lex.com

**José I. Astigarraga, Esq.**
**Eduardo J. De la Peña Bernal, Esq.**
**Cristina Cárdenas**
*Astigarraga Davis Mullins & Grossman, P.A.*
701 Brickell Avenue, 16th Floor
Miami, FL 33131
Estados Unidos de América
Teléfono: (+1) 305-372-8282
Fax: (+1) 305-372-8202
Correo electrónico: jastigarraga@astidavis.com
                    edelapena@astidavis.com

**Luis Alejandro Salinas Vilela**
Asesoramiento Jurídico Integral
Calle Loayza Esq. Mercado
Edif. Virgen de Copacabana N°7
La Paz, Bolivia
Teléfono: (+591 2) 2203330
Fax: (+591 2) 2203330
Correo electrónico: asalinas@integral.com.bo

6.    Toda referencia a la Demandante y las Demandadas conjuntamente se hará, en
      adelante, a las **"Partes"**.

**A.    Tribunal Arbitral**

7.    El Tribunal Arbitral está constituido por:

         - D. Juan Fernández-Armesto, como Presidente, quien fue nombrado el 2 de
           mayo de 2012 de común acuerdo por los Árbitros designados por las
           Partes. El Presidente del Tribunal Arbitral fue confirmado por la Comisión
           Interamericana de Arbitraje Comercial ["**CIAC**"] el 30 de mayo de 2012.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

- D. Fernando Salazar-Paredes, designado el 7 de febrero de 2012 por la Demandante.

- D. Eduardo Zuleta, designado por las Demandadas el 6 de diciembre de 2011[1].

Los Árbitros Salazar-Paredes y Zuleta fueron confirmados como coárbitros por la CIAC el 3 de abril de 2012.

8.   Los datos de contacto de los miembros del Tribunal Arbitral son:

**Juan Fernández-Armesto**
*Armesto & Asociados*
c/ General Pardiñas, 102 (8°Izq.)
28006 Madrid, España
Teléfono: (+34) 91-562-1625
Correo electrónico: jfa@jfarmesto.com

**Fernando Salazar-Paredes**
*Salazar & Asociados*
Av. San Martín (Equipetrol Norte),
esq. calle "i", N° 27
Edificio Aranjuez, Piso 5°
Santa Cruz de la Sierra, Bolivia
Teléfono: (+591) 3-342-0009
Correo electrónico: fernando@salazarbolivia.com

**Eduardo Zuleta**
*Gómez-Pinzón Zuleta Abogados S.A.*
Calle 67 No. 7-35
Of. 1204 Edificio Caracol
Bogotá D.C., Colombia
Teléfono: (+571) 319-2900
Correo electrónico: ezuleta@gpzlegal.com

**B.   Administración**

9.   La administración de este arbitraje acumulado está encomendada a la Comisión Interamericana de Arbitraje Comercial (CIAC), con los siguientes datos de contacto:

**Carolina Cárdenas-Venino**
Administradora de casos de la CIAC
**Adriana Polanía**
Directora general
**Rafael Bernal G.**
Presidente

---

[1] Inicialmente, CIMSA designó como coárbitro en la notificación de arbitraje a D. Gustavo Fernández Saavedra, el cual – según ha informado CIMSA – posteriormente declinó continuar como coárbitro debido a razones de salud y por consideraciones familiares.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

Correos electrónicos: CardenasC@adr.org
adriana@polanias.com
rafael.bernal@ccb.org.co

## C.   Secretaria Administrativa

10.   De conformidad con el para. 22 de la Orden Procesal n° 1, la Secretaria
Administrativa del Tribunal Arbitral fue durante la primera etapa del
procedimiento Dña. Alba Briones. Mediante comunicación A-40 de 10 de febrero
de 2014, el Tribunal designó secretaria a Dña. Krystle M. Baptista Serna para la
segunda etapa del procedimiento, con los siguientes datos de contacto:

**Krystle M. Baptista Serna**
*Armesto & Asociados*
c/ General Pardiñas, 102 (8°Izq.)
28006 Madrid, España
Teléfono: (+34) 91-562-1625
Correo electrónico: kbs@jfarmesto.com

13

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

## II  HISTORIA PROCESAL

1. **INTRODUCCIÓN**

11. El 16 de noviembre de 2011 CIMSA inició un procedimiento de arbitraje contra GCC y Grupo.

12. El lugar del arbitraje es el municipio de La Paz, Bolivia[2]. El idioma es el español[3]. La ley aplicable es la boliviana[4] y el procedimiento se rige por el Reglamento de Procedimientos de la CIAC [en adelante, el **"Reglamento CIAC"**], de conformidad con el Convenio Arbitral[5]. El Reglamento CIAC es el vigente a partir del 1 de abril de 2002, con las modificaciones introducidas desde el 1 de julio de 2008.

13. En la Orden Procesal ["**OP**"] n° 1 las Partes y el Tribunal acordaron la bifurcación del procedimiento en dos etapas. En la OP n° 3 el Tribunal determinó que en la primera etapa se analizarían las cuestiones de naturaleza jurídica y en la segunda se resolverían las cuestiones relativas a daños y perjuicios, costas e intereses [en adelante, las referencias a las dos etapas del procedimiento se harán a la **"Primera Etapa"** y a la **"Segunda Etapa"**].

2. **PRIMERA ETAPA**

14. La historia procesal de la Primera Etapa ha quedado reflejada en el Laudo Parcial Final sobre Responsabilidad emitido por el Tribunal Arbitral el 13 de septiembre de 2013 [el **"Laudo Parcial Final"**]; y el Tribunal la da por incorporada a este laudo.

15. En el Laudo Parcial Final, el Tribunal Arbitral llegó a las siguientes conclusiones[6]:

> "528. En resumen, el Tribunal estima que el comportamiento de GCC no advirtiendo a CIMSA de que el ejercicio de la opción era inválido, negando a CIMSA un plazo de 30 días hábiles para pagar los Títulos y vendiendo éstos a CCS antes de que dicho plazo hubiera transcurrido, comporta un incumplimiento de las exigencias de buena fe establecidas por el Derecho boliviano y de las obligaciones dimanantes de la cláusula 6.3. del Acuerdo 2005.
>
> 529. Conviene resaltar que lo que CIMSA ha perdido a consecuencia de la actuación de GCC, es la oportunidad de adquirir los Títulos por un precio de 75 M USD, pagaderos al contado en un plazo de 30 días hábiles a partir del 4 de julio de 2011 – la fecha de ejercicio de la Carta CIMSA. El Tribunal cuantificará en la siguiente fase de este arbitraje los daños y perjuicios

---

[2] Carta de la Dra. Carolina Cárdenas, CIAC, a las Partes, de 17 de enero de 2012 y Orden Procesal n° 1, párr. 25.

[3] OP n° 1, párr. 26.

[4] OP n° 1, párr. 32.

[5] OP n° 1, párr. 30.

[6] Laudo Parcial Final, IX.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

previstos o previsibles irrogados por la privación de esa oportunidad, que según alegación de la Demandante obedecen a los siguientes conceptos[7]:

- Gastos legales derivados de los procedimientos iniciados para lograr la nulidad o subsidiariamente la declaración de incumplimiento por GCC;

- El lucro cesante o daño que la Demandante ha sufrido al no haber podido adquirir los Títulos por 75 M USD en agosto de 2011, consistente en la diferencia entre el valor real de los Títulos en esa fecha y el precio al que tenía derecho a adquirirlos (75 M USD);

- El daño emergente consistente en la disminución del valor de las acciones de CIMSA en Soboce al no haber podido eliminar la limitación de control que pesa sobre ellas a favor del accionista minoritario."

16. Y decidió por unanimidad[8]:

"1. En cuanto a la demanda,

1.1. Declara que no es competente para para decidir sobre la nulidad de la transferencia de los Títulos de GCC a CCS;

1.2. Declara que GCC ha incumplido el Acuerdo 2005, en los términos descritos en el para. 528 *supra*.

2. En cuanto a la reconvención,

2.1 Declara que no es competente para decidir sobre la reconvención planteada por las Demandadas.

3. De naturaleza procesal,

3.1. Ordena la continuación del procedimiento en los términos señalados en los paras. 595 y 596 *supra*, para la cuantificación de los daños reclamados por la Demandante en los términos señalados en los paras. 529 y 530 *supra*".

17. Sentada la conclusión de que las Demandadas no se habían atenido a las exigencias de buena fe establecidas por el Derecho boliviano ni a las obligaciones dimanantes de la cláusula 6.3 del Acuerdo 2005, el Tribunal decidió en el Laudo Parcial Final abrir la Segunda Etapa del procedimiento, dedicada a la:

- cuantificación de los daños y perjuicios a pagar por las Demandadas a CIMSA, tomando en consideración la individualización de daños realizada por la Demandante; y

- decisión sobre intereses y costas.

18. Como complemento de su decisión y, por petición de las Demandadas, el Tribunal Arbitral emitió una Decisión sobre interpretación y corrección del Laudo Parcial Final el 18 de noviembre de 2013.

---

[7] Demanda, paras. 232 a 241 y 245 a 291.
[8] Laudo Parcial Final, X.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

3.  **INCIDENTE DE NULIDAD**

19.  El 29 de noviembre de 2013, el Lic. Salinas presentó, en nombre de las Demandadas, un "Escrito de anulación de laudo arbitral", incorporado al expediente como comunicación R-47. El Tribunal Arbitral le dio traslado a la Demandante[9], y el 24 de diciembre de 2013 la Demandante presentó su "Contestación al escrito de solicitud de anulación de laudo arbitral", incorporada al expediente como comunicación C-45.

20.  El 6 de febrero de 2014, el Tribunal Arbitral emitió la OP n° 10 admitiendo a trámite la resolución del recurso de anulación por el órgano competente, y dispuso el envío del expediente al juez.

4.  **SEGUNDA ETAPA**

21.  En el Laudo Parcial Final, el Tribunal señaló que los daños y perjuicios sufridos por CIMSA se podrían mitigar hasta quedar prácticamente anulados, si GCC (previo acuerdo con CCS) fuera capaz de otorgar a CIMSA la oportunidad de adquirir los Títulos en las condiciones del derecho de primera opción incluido en la cláusula 6.3 del Acuerdo 2005 (es decir, permitiendo a la Demandante adquirir los Títulos, previo pago de US$ 75 M al contado en una plazo de 30 días hábiles)[10].

22.  Ante la evidente falta de interés de las Demandadas por mitigar los daños en la forma sugerida por el Tribunal, se abrió la Segunda Etapa. En la OP n° 9, de 27 de septiembre de 2013, el Tribunal Arbitral estableció el calendario procesal para la Segunda Etapa y resolvió que la audiencia tendría lugar los días 30 de junio a 2 de julio de 2014, ambos inclusive (la "**Audiencia**").

Escritos de alegaciones

23.  De conformidad con el calendario procesal establecido en la OP n° 9, la Demandante presentó su escrito de demandada de daños ["**Demanda**"] el 10 de enero de 2014 y las Demandadas presentaron su contestación sobre daños ["**Contestación**"] el 31 de marzo de 2014; ambos escritos fueron incorporados al expediente como C-48 y R-55, respectivamente.

24.  La Demandante entregó su escrito de réplica sobre daños ["**Réplica**"] el 30 de abril de 2014 y las Demandadas presentaron su escrito de dúplica sobre daños ["**Dúplica**"] el 4 de junio de 2014[11]; ambos escritos se incorporaron al expediente como C-57 y R-60, respectivamente.

---

[9] Comunicación A 37.
[10] Laudo Parcial Final, para. 596
[11] Mediante Com. R-59 las Partes expresaron su acuerdo en conceder a las Demandadas una pequeña prórroga para la presentación de la Réplica, cuya presentación estaba prevista para el 2 de junio de 2014 en la OP n°9.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

Audiencia de prueba

25. Las Partes acordaron que la Audiencia debía celebrarse en la ciudad de Atlanta[12]. La mayor parte de los detalles organizativos fue pactada por las Partes quienes sometieron al Tribunal un borrador de OP n° 11.

26. Durante la Audiencia se interrogó a los siguientes testigos y peritos:

- Manuel Milán Reyes

- Jaime Fernández Horcasitas

- Martha Rodríguez Rico

- Pablo Spiller

- Orlando Chiossone

- Daniel Flores

27. La Audiencia fue grabada y transcrita y, tras su celebración, el 25 de julio de 2014 las Partes comunicaron un texto definitivo de la transcripción conjuntamente aprobado y corregido [en adelante, la "**TA**"].

Escritos de conclusions y costas

28. Al final de la Audiencia, el Tribunal Arbitral les pidió a las Partes que – si lo consideraban necesario – acordaran la fecha de presentación simultánea de unos breves memoriales posteriores a la Audiencia de la Segunda Etapa. Las Partes acordaron la presentación de memoriales de conclusiones[13].

29. Y lo hicieron simultáneamente, el 12 de agosto de 2014, quedando incorporados al expediente como C-76 y R-77 [en adelante, "**Conclusiones Demandante**" y "**Conclusiones Demandada**", respectivamente].

30. Por acuerdo[14] de las Partes, los escritos de costas se presentaron el 22 de agosto de 2014, quedando incorporados al expediente como C-80 y R-79 [en adelante, "**Costas Demandante**" y "**Costas Demandada**"].

Cierre de la instrucción

31. El 16 de febrero de 2015 el Tribunal Arbitral declaró cerrada la instrucción de la Segunda Etapa del Procedimiento.

---

[12] El acuerdo quedó reflejado en las Com. R-53 y C-54.
[13] El acuerdo quedó reflejado en las Com. R-74 y C-73.
[14] El acuerdo quedó reflejado en las Com. R-74 y C-73.

17

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

5.   SOLICITUD DE SUSPENSIÓN DEL PROCEDIMIENTO

5.1.   HECHOS Y POSICIÓN DE LAS PARTES

32.   El 9 de diciembre de 2014 el letrado Salinas, en representación de las Demandadas, presentó la comunicación R-86, adjuntando lo que aseguraba era un Auto judicial de 4 de diciembre de 2014, emitido por la Juez Provisional del Juzgado Octavo Civil del Distrito Judicial Morelos (Chihuahua, México) en el marco del procedimiento especial mercantil [el "**Auto**"], que indicaba sumariamente:

> "Se decretan provisionalmente y hasta en tanto se resuelva en definitiva sobre la adopción de las medidas cautelares solicitadas, o la resolución final y definitiva del recurso de anulación referido, lo que ocurra primero, lo siguiente:
>
> a)   La suspensión de la segunda etapa del arbitraje para la cuantificación de daños y perjuicios …
>
> b)   Que los señores miembros del Tribunal de Arbitraje, se abstengan de dictar el segundo laudo parcial final de cuantificación de daños y perjuicios, hasta tanto se resuelva en definitiva sobre la adopción de las medidas cautelares solicitadas o la resolución final y definitiva del recurso de anulación;
>
> c)   La suspensión de las acciones iniciadas o por iniciar tendientes[sic] al reconocimiento, ejecución u homologación de cualquier laudo final emitido en el arbitraje internacional… ".

33.   En resumen: GCC, la parte incumplidora, según el Laudo Parcial Final, habría solicitado y obtenido unas medidas cautelares de una juez mexicana, para paralizar la continuación de este arbitraje. No consta que la Demandante haya sido notificada o que haya participado en el proceso judicial.

34.   El 23 de diciembre de 2014, la Demandante presentó la comunicación C- 82, en la que expuso los argumentos por los que consideraba que el Tribunal no debía acatar el Auto. La Demandante argumentó que:

-   El Auto no era vinculante para el Tribunal, porque la juez mexicana carecía de competencia sobre el procedimiento arbitral;

-   El Auto era una medida dilatoria de las Demandadas y su aceptación por el Tribunal Arbitral causaría un perjuicio procesal considerable a la Demandante, y que

-   el Tribunal tenía el deber de resolver la controversia con celeridad.

35.   El 21 de enero de 2015, el letrado Salinas, en representación de las Demandadas, presentó la comunicación R-88, en la que – sin ser requerido por el Tribunal – replicó a los argumentos expuestos en la comunicación C-82 de la Demandante. En concreto alegó que:

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

- El Auto no podía ser ignorado por el Tribunal, pues la Juez Provisional era competente para dictar medidas cautelares, aunque careciera de jurisdicción en la sede arbitral; las Demandadas entendían que la Juez Provisional era competente porque eran los jueces mexicanos los que serían competentes en una eventual ejecución del laudo;

- La Orden Judicial no era una medida dilatoria, sino que busca garantizar la seguridad jurídica de las Demandadas; una práctica permitida por la legislación boliviana, que no impide que un juez ordene al tribunal arbitral la suspensión del procedimiento arbitral;

- El Tribunal tiene la obligación de dictar un laudo ejecutable, por lo que debe primar el principio de seguridad jurídica sobre el principio de celeridad.

36. Un día después, mediante la comunicación C-86, la Demandante contestó los argumentos de expuestos por las Demandadas, básicamente reiterando la posición ya manifestada.

## 5.2. ANÁLISIS DEL TRIBUNAL

37. El Tribunal debe determinar si está en la obligación de acatar las medidas cautelares dictadas por la Juez Provisional del Juzgado Octavo Civil del Distrito Judicial Morelos (Chihuahua, México).

38. Como nota introductoria resulta necesario diferenciar las medidas cautelares dictadas en auxilio de los tribunales arbitrales y aquéllas conocidas como *anti-arbitration injunctions* o medidas anti-arbitraje: órdenes de jueces que prohíben a una parte que inicie o continúe con el procedimiento arbitral. Las medidas dictadas en el Auto pertenecen a esta última categoría, en cuanto pretenden que el Tribunal paralice el procedimiento y evitar que se dicte este Laudo Final sobre Daños.

39. La doctrina considera que las medidas anti-arbitraje son indeseables, puesto que resultan incompatibles con los principios del arbitraje internacional[15]. En palabras del jurista mexicano Francisco González de Cossío[16]:

> "En México, no es posible que estas medidas puedan lícitamente tener lugar. El motivo es doble: (a) en derecho mexicano no existe el instrumento de órdenes anti-reclamación; y (b) el derecho arbitral no solo no lo contempla, sino que no lo permite. Si bien han existido algunas anomalías, son justamente eso – excepciones. Además, de ocurrir, las medidas anti-arbitraje serían violatorias del principio de *compétence- compétence*, la obligación del juez de referir a las partes al arbitraje, el deber de las partes de litigar de buena fe y el principio de eficiencia de los procedimientos arbitrales. Lo que es más existe una corriente de opinión que considera que un tribunal arbitral no estaría vinculado por dichas medidas, que tiene no sólo la facultad de ignorarlas – ¡sino la obligación!".

---

[15] Lew, J., *Anti-Suit Injunctions Issued by National Courts to Prevent Arbitration Proceedings*, en Emmanuel Gaillard (ed.), Anti-Suit Injunctions in International Arbitration (Juris Publishing. Inc., 2005), p. 26 (Doc. C-958).
[16] González de Cossío, F., El Arbitraje y la Judicatura, Editorial Porrúa, 2007, p. 126 (Doc. C-942).

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

40. En el presente caso, el Tribunal concuerda con los argumentos expresados por la Demandante, y desestima la petición de las Demandadas de suspender el procedimiento arbitral por tres razones:

- En primer lugar, la Juez Provisional de Chihuahua carece de competencia para dictar una medida anti-arbitraje y, en concreto, para solicitar la suspensión del procedimiento arbitral (A);

- En segundo lugar, la existencia de un presunto procedimiento de anulación en Bolivia y el hecho de que este Laudo [en adelante "**Laudo Final sobre Daños**"] pueda ser ejecutado en México no otorgan competencia a los tribunales mexicanos para interferir con el procedimiento arbitral (B);

- En tercer lugar, las Demandadas tuvieron la oportunidad de suspender el procedimiento tras la Primera Fase y no hicieron uso de tal prerrogativa (C).

41. El Tribunal analizará en detalle cada una de estas razones.

**A. La Juez Provisional carece de competencia para dictar una medida anti-arbitraje**

42. El Tribunal Arbitral tiene el mayor de los respetos por los tribunales de justicia ordinarios, incluidos, por supuesto los de Chihuahua. Sin embargo, por acuerdo de las Partes, el lugar del arbitraje es el municipio de La Paz, Bolivia y la ley aplicable la boliviana[17]. El Juzgado de Chihuahua es manifiestamente incompetente para interferir en el presente arbitraje y para decretar *inaudita parte* la suspensión provisional del procedimiento.

43. En efecto, el Art. 9 de la Ley de Arbitraje y Conciliación No. 1770, de 10 de marzo de 1997 ["**LAB**"] dispone que[18]:

"I. En las controversias que se resuelvan con sujeción a la presente ley, solo tendrá competencia el tribunal arbitral correspondiente. Ningún otro tribunal o instancia podrán intervenir, salvo que sea para cumplir tareas de auxilio judicial.

II. La autoridad judicial competente para prestar auxilio, en los casos establecidos será la calificada por ley para conocer la causa o controversia en materia civil o comercial, en ausencia de arbitraje. En defecto de ella, será la del lugar donde debe realizarse el arbitraje si se hubiera previsto, a falta de ello y a elección del demandante, el del lugar de celebración del convenio arbitral o el del domicilio del demandado, o el de cualquiera de ellos, si son varios".

44. Por lo tanto, de conformidad con lo establecido en la LAB – y tal y como admiten las Demandadas[19] – la competencia exclusiva para dirimir la presente controversia la tiene el Tribunal Arbitral, careciendo todo otro tribunal de justicia u órgano

---

[17] Ver para. 12 *supra*.
[18] LAB, art. 9.
[19] Com. R-88, p. 7.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

judicial de competencia para intervenir, *excepto* para prestar auxilio judicial. Y los únicos tribunales autorizados para prestar ese auxilio son los que, en ausencia de cláusula arbitral, tendrían competencia material y, subsidiariamente, los del lugar del arbitraje – es decir, en ambos supuestos los de La Paz[20].

45. Además, en Derecho boliviano no existe disposición legislativa que permita a un juez ordenar a un tribunal arbitral la suspensión del procedimiento de arbitraje[21]:

- La LAB sólo permite la intervención de los tribunales de justicia para prestar tareas de auxilio a los tribunales arbitrales, pero nunca para dictar medidas cautelares que interfieran en el procedimiento;

- Además, la LAB otorga esa competencia de auxilio a los tribunales de justicia de la Paz.

46. Estas conclusiones se ven confirmadas por la doctrina internacional más reputada, que afirma que el arbitraje puede continuar, a pesar de las medidas anti-arbitraje y que considera muy difícil encontrar circunstancias en las que estaría justificada la intervención de un juez en el arbitraje para paralizarlo:

> *"The explanation as to why arbitrators can continue with an arbitration notwithstanding an order from a court is the fact that, fundamentally, the tribunal's authority comes from the parties' agreement to arbitrate. The tribunal is a creature of contract"*[22].

> *"I find it difficult to imagine circumstances in which there would be a justification for a court to intervene in an arbitration, to stop the arbitration. I do not want to say that this should be an absolute rule. There are, and will continue to be, exceptions. But I have not been involved in any case where such an action has been in any way justified"*[23].

47. Es más, la doctrina se ha pronunciado en contra de que los tribunales arbitrales acaten las medidas anti-arbitraje dictadas por los tribunales judiciales (incluso de

---

[20] La LAB aun contiene reglas subsidiarias adicionales, que en el presente caso son irrelevantes, pues la cláusula arbitral prevé que el lugar del arbitraje debe ser La Paz.

[21] Al contrario, las disposiciones que versan sobre la suspensión de procedimientos – en particular por haberse iniciado un procedimiento de anulación – prevén el cese de los procedimientos judiciales en pro de la continuación del arbitraje[21]. Así lo dispone, el Art. 66.2 de la LAB: "El Juez cuando se le solicite la anulación de un laudo, podrá suspender las actuaciones de nulidad cuando corresponda y así lo solicite una de las partes, por el plazo que estime pertinente a fin de dar al Tribunal Arbitral la oportunidad de reanudar las actuaciones arbitrales o adoptar cualquier otra medida que a su juicio elimine las causas motivantes del recurso de anulación." La misma regla parecer estar presente en México en el artículo 1459 del Código de Comercio Mexicano: "Artículo 1459.- El juez, cuando se le solicite la anulación de un laudo, podrá suspender las actuaciones de nulidad, cuando corresponda y así lo solicite una de las partes, por el plazo que determine a fin de dar al tribunal arbitral la oportunidad de reanudar las actuaciones arbitrales o de adoptar cualquier otra medida que a juicio del tribunal arbitral elimine los motivos para la petición de la nulidad." (Doc. C- 943).

[22] Lew, J., *Anti-Suit Injunctions Issued by National Courts to Prevent Arbitration Proceedings*, *en* Emmanuel Gaillard (ed.), Anti-Suit Injunctions in International Arbitration (Juris Publishing. Inc., 2005), p. 35 (Doc. C-958).

[23] *Ibid*, p. 39.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

la propia sede arbitral – con mayor razón, por lo tanto, las de fuera de la sede) cuando éstas pretendan entorpecer la labor del tribunal arbitral[24]:

> *"Then there are the problems of local courts which issue injunctions at the seat of arbitration to prevent arbitral tribunals carrying out their task. Some tribunals continue with the arbitral proceedings despite the injunction (even when they are within the territorial jurisdiction of the court concerned) on the basis that the injunction is not justified. In effect, these arbitrators "delocalize" their arbitration by refusing to accept the rulings of the local court under the lex arbitri…".*

48. De lo anterior resulta que el Auto emitido por la Juez Provisional de Chihuahua ha sido dictado por un órgano que carece manifiestamente de competencia en relación con este arbitraje, y que su contenido es contrario a lo que ordena la LAB, la ley a la que el presente arbitraje está sujeto. En consecuencia, carece de toda potestad vinculante para el Tribunal Arbitral.

**B.   La anulación del Laudo Parcial Final y la ejecución del Laudo Final sobre Daños**

49. El Laudo Parcial Final fue dictado en La Paz, y la competencia para declarar su nulidad reside únicamente en los tribunales de justicia de esa localidad – nunca en los de Chihuahua. Por ello, la interferencia por la Juez de Chihuahua, dictando una medida cautelar basada en la existencia de un presunto procedimiento de anulación en Bolivia es, a todas luces, injustificada y representa una extralimitación flagrante de su propia competencia.

50. Las Demandadas alegan que la Juez Provisional de Chihuahua es competente para ordenar la suspensión del procedimiento porque son los jueces mexicanos los que serían competentes en una eventual ejecución del laudo. Las Demandadas se apoyan en la aplicación analógica de preceptos que – tanto en la legislación boliviana como en la mexicana – permitirían suspender la ejecución del laudo cuando está pendiente un procedimiento de anulación[25].

51. El Tribunal no puede aceptar tal alegación. Las reglas sobre ejecución – y la posibilidad de suspender el procedimiento arbitral en ese contexto – son totalmente irrelevantes en este momento procesal del arbitraje.

52. Una lectura cuidadosa del art. 84 de la LAB[26] – o de su homólogo mexicano[27] – evidencia que no puede aplicarse de manera analógica a la presente situación. Ese artículo, que permite suspender la ejecución de un laudo, presupone:

---

[24] Redfern, A. y Hunter, M., *Law and Practice of International Commercial Arbitration*, Sweet & Maxwell, 2004, para. 2-30 (Doc. C-961).
[25] Art. 84 de la LAB y artículo 1463 del Código de Comercio Mexicano.
[26] El Art. 84 de la LAB prevé:
"I. La Corte Suprema de Justicia de la Nación sólo aceptará las oposiciones a la ejecución forzosa del laudo, que se fundamenten documentadamente en el cumplimiento del propio laudo o en la existencia de recurso de anulación pendiente.
II. En el caso anterior, acreditada la existencia de un recurso de anulación pendiente de resolución, la Corte Suprema de Justicia de la Nación suspenderá la ejecución del laudo hasta que dicho recurso sea resuelto".

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

- La existencia de un laudo ejecutable que no ha sido acatado voluntariamente;

- El inicio de un procedimiento de ejecución forzosa.

Sin embargo, bajo ningún concepto permite prohibir al Tribunal Arbitral que dicte el laudo que será objeto, precisamente, de tal ejecución forzosa.

53. El presente procedimiento arbitral no se encuentra en fase de ejecución del laudo, sino en fase de dictación del Laudo Final sobre Daños. La alegación de las Demandadas de que la Segunda Etapa es propiamente la ejecución del laudo[28] resulta incomprensible jurídica y fácticamente. Y en lo que se refiere a la eventual ejecución del Laudo Final sobre Daños, ésta será posterior, y exigirá:

- Que la parte condenada no cumpla con el laudo voluntariamente y

- Que la parte victoriosa solicite su ejecución forzosa; sólo entonces podrá plantearse ante los tribunales mexicanos – o los de cualquier otro país en que la parte condenada tenga bienes cuando se decida pedir la ejecución– la suspensión de la ejecución del Laudo Final sobre Daños.

## C.   Las Demandadas ya tuvieron la oportunidad de suspender el arbitraje.

54. Finalmente, la solicitud hecha por las Demandadas a la Juez Provisional de Chihuahua es especialmente improcedente, porque las Partes y el Tribunal habían convenido un procedimiento especial, en el seno del propio arbitraje, para ejercitar su derecho a pedir la suspensión de la Segunda Etapa.

55. En efecto, en su decisión A 35 el Tribunal Arbitral otorgó a las Demandadas la oportunidad[29] de solicitar la suspensión de la Segunda Etapa del procedimiento arbitral:

> "Finalmente, el Tribunal Arbitral recuerda a las Partes el acuerdo alcanzado en cuanto al momento oportuno para presentar una eventual solicitud de suspensión de la Segunda Etapa del Procedimiento, que será el momento en el que el Tribunal Arbitral declare la concesión del recurso, en su caso. Si el Tribunal declarase la concesión del recurso, las Demandadas dispondrán de un plazo de dos semanas desde ese momento, para presentar tal solicitud fundamentada de suspensión, si lo estimasen oportuno. A continuación, la Demandante dispondrá de un plazo de dos semanas para contestar a la solicitud de suspensión".

56. El 6 de febrero de 2014 el Tribunal emitió la OP n° 10, en la que concedió el recurso de anulación y recordó a las Partes que cualquier eventual solicitud de

---

[27] La misma regla parecer estar presente en México en el artículo 1463 del Código de Comercio Mexicano: "Artículo 1463.- Si solicitó a un juez del país en que, o conforme a su derecho, fue dictado el laudo, su nulidad o suspensión, el juez al que se solicita el reconocimiento o la ejecución de laudo podrá, si lo considera procedente, aplazar su decisión y a instancia de la parte que pida el reconocimiento o la ejecución del laudo, podrá también ordenar a la otra parte que otorgue garantías suficientes".

[28] Com. R-88, p. 7.

[29] A-35, para. 3.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

suspensión del procedimiento arbitral se regiría por lo ordenado en el parágrafo citado de la comunicación A-35[30].

57. Las Demandadas no hicieron uso de la posibilidad brindada por el Tribunal Arbitral y se centraron en la tramitación del recurso de anulación. Sin embargo, hasta la fecha del presente laudo, el Tribunal no tiene constancia de que el recurso haya sido resuelto[31].

\* \* \*

58. <u>En resumen</u>: al someterse a la cláusula arbitral, y al elegir como sede del arbitraje La Paz, las Partes aceptaron que toda disputa se resolvería por un tribunal arbitral, y que la competencia subsidiaria correspondería a los tribunales de justicia de la capital boliviana. La potestad de este Tribunal Arbitral surge de ese consentimiento, y de ella se deriva el deber de los árbitros de cumplir el mandato recibido y de dictar un laudo final que culmine el proceso, sin permitir interferencias ni dilaciones, ajustándose únicamente al ordenamiento jurídico elegido por las Partes.

59. El Auto dictado *inaudita parte,* por un juez manifiestamente incompetente, al margen de todo procedimiento, y con un contenido que contraviene frontalmente la LAB, no puede impedir que los árbitros cumplan con su mandato y dicten este Laudo. En consecuencia, el Tribunal continuará su labor y dictará el Laudo Final sobre Daños.

---

[30] OP n° 10, para. 77.

[31] Las Demandadas presentaron el recurso de anulación, pero el 5 de junio de 2014, el Juez Octavo de Partido en lo Civil y Comercial de La Paz dictó un auto anulando la presentación del recurso de anulación del Laudo Parcial Final por parte de los Demandadas (Doc. C-946). Las Demandadas apelaron el auto y el recurso fue admitido a trámite; sin embargo, el Tribunal desconoce si se ha sido resuelto en favor de las Demandadas.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

## III HECHOS

60. El relato fáctico contenido en el Laudo Parcial Final se da por reproducido aquí[32]. Puesto que esta Segunda Etapa del procedimiento está dedicada exclusivamente a cuantificar los daños reclamados por la Demandante, el Tribunal resume a continuación únicamente los hechos más transcendentes para dichos efectos, así como las decisiones más importantes adoptadas en el Laudo Parcial Final.

### 1. *DRAMATIS PERSONAE*

61. La Demandante en este arbitraje es la Compañía de Inversiones Mercantiles, S.A. ["**CIMSA**"], una sociedad anónima de inversiones de nacionalidad boliviana.

62. Las Demandadas son GCC Latinoamerica, S.A. de CV ["**GCC**"], una compañía cementera de nacionalidad mexicana, y su matriz Grupo Chihuahua.

63. GCC y CIMSA eran accionistas de la Sociedad Boliviana de Cemento, S.A. ["**Soboce**"], que se alega es la mayor empresa productora de cemento de Bolivia. Dicha relación quedó regulada mediante un acuerdo de accionistas firmado el 22 de septiembre de 2005 ["**Acuerdo 2005**"], al que concurrió también Grupo Chihuahua como garante de las obligaciones de GCC.

64. Así, el capital social de Soboce se encontraba repartido de la siguiente forma:

- CIMSA tenía la participación mayoritaria con 51,35% [el "**Paquete Mayoritario**"];

- GCC tenía una participación minoritaria con 47,02% [en adelante, las referencias a la participación de GCC en Soboce se harán a los "**Títulos**" o el "**Paquete Minoritario**" ]; y,

- adicionalmente el 1,63% era propiedad de otros socios (Samuel, María Luisa, María Lourdes y Silvia Doria Medina).

65. El Acuerdo 2005 regula la relación de los accionistas de Soboce entre ellos. Su cláusula 6.3 establece ciertas limitaciones a la libre transferencia de acciones a terceros, otorgándole a CIMSA un derecho de primera opción de compra[33].

66. Posteriormente, GCC transfirió los Títulos a una empresa peruana Consorcio Cementero del Sur, S.A. ["**CCS**"], que ostenta la titularidad de las acciones desde entonces[34].

### 2. LA DISPUTA

67. La presente disputa surge porque GCC decidió vender los Títulos a CCS – y no a CIMSA. CIMSA sostiene que la transmisión contravino el derecho de opción que le otorgaba el Acuerdo 2005 y reclama que GCC y Grupo Chihuahua la

---

[32] Laudo Parcial Final, pág. 31 *et seq.*

[33] *Vid.* para. 330 *et seq.* de Laudo Parcial Final para un análisis detallado de la cláusula 6.3. del Acuerdo 2005.

[34] Laudo Parcial Final, para. 16.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

indemnicen por incumplimiento contractual. Las Demandadas, por su parte, piden que se desestimen las pretensiones de la Demandante.

## 3. LAS VALORACIONES DE SOBOCE HECHAS EN 2010

68. Cuando en 2010 GCC quiso desprenderse de sus Títulos, en cumplimiento con el Acuerdo 2005, contactó a CIMSA y las Partes comenzaron a negociar formalmente las condiciones para la adquisición por CIMSA de la participación de GCC en Soboce.

69. En marzo del mismo año, la gerencia de Soboce realizó una serie de valuaciones aplicando el método de flujos de caja descontados ["FCD"], para determinar el valor de la participación de GCC en Soboce, y tomando como referente varios escenarios futuros[35].

70. El siguiente cuadro resume el monto total arrojado por estas valuaciones[36]:

| Escenario | Valuación del 47% de Soboce |
|---|---|
| Sin plantas del Gobierno | US$ 119,07 |
| 1 planta del Gobierno | US$ 109,31 |
| 2 plantas del Gobierno | US$ 106,03 |
| 1 planta del Gobierno y Soboce adelantando inversiones | US$ 97,44 |

Cantidades en US$ M

71. Tomando estas valoraciones como punto de partida, el 15 de abril de 2010 las Partes acordaron una hoja de términos [la "**Hoja de Términos**"], delimitando las principales características de la transacción[37].

72. Según esta Hoja de Términos, GCC le vendería a CIMSA el 44,5128% del capital accionario de Soboce, por un precio de aproximadamente US$ 100M[38]. Posteriormente, GCC le vendería una participación residual del 2,5052% aplicando un múltiplo de 5,42 veces EBITDA para establecer el precio[39].

73. Las negociaciones para la compra por CIMSA de las acciones de GCC en Soboce continuaron hasta alcanzar un acuerdo definitivo el 28 de mayo de 2010 [el "**Acuerdo 2010**"][40].

## 4. EL ACUERDO 2010

74. En el Acuerdo 2010 las Partes acordaron un precio de US$ 99,7M por la compraventa de 44,5128% de las acciones de GCC en Soboce[41] (*pro memoria:*

---

[35] *Vid.* Presentación Soboce, marzo 2010, Doc. R-458.
[36] *Vid.* Réplica; para. 563; Segundo informe pericial del Dr. Pablo T. Spiller (Compass Lexecon, LLC) de 31 de marzo de 2014 (Doc. R-581) ["**Spiller II**"], tabla V; Segunda declaración del Sr. Jaime Fernández de 31 de marzo de 2014 (Doc. R-540) ["**Fernández II**"], para. 6; Modelo de Valuación Soboce - Sin Planta del Gobierno (Doc. R-555), Modelo de Valuación Soboce - 2 Plantas del Gobierno (Doc. R-556), Modelo de Valuación Soboce - Adelanto de Inversión de Soboce (Doc. R-557).
[37] Hoja de Términos, (Doc. R-56); Réplica, para. 561; Dúplica, para. 419; Fernández II, para. 7.
[38] Hoja de Términos, punto 8 (Doc. R-56).
[39] Este múltiplo sería luego previsto en la cláusula 7.2.b del Acuerdo 2010.
[40] Acuerdo 2010 (Doc. C-91); Réplica, para. 562; Dúplica, para. 420.
[41] Acuerdo 2010, Cláusula 5.2.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

esta cifra correspondía a la valoración prevista por las Partes en la Hoja de Términos, la cual asignaba al 44,5128% de las acciones de GCC en Soboce un monto aproximado de US$ 100M).

5.   LA EXPROPIACIÓN DE FANCESA

75.   Soboce era propietaria del 33,34% del capital social de Fancesa, otro importante fabricante de cemento en Bolivia. Mientras CIMSA y GCC negociaban la adquisición del paquete de acciones de Soboce, el 1 de septiembre de 2010 el Decreto Supremo Nº 616[42] expropió la participación accionarial que Soboce tenía en Fancesa. El Decreto Supremo ordena que el Gobierno Departamental de Chuquisaca debería indemnizar a Soboce por la expropiación. Sin embargo, según aceptan ambas Partes, a la fecha de emisión de este Laudo, ni se ha fijado la cuantía indemnizatoria, ni se ha realizado pago alguno.

6.   LA TRANSMISIÓN DE LOS TÍTULOS

76.   Al parecer, la expropiación desanimó a los inversores que se había comprometido a suscribir los valores de titularización con los que CIMSA pretendía financiar la compra de los Títulos, motivo por el cual el Acuerdo de 2010 no llegó a ejecutarse.

77.   Tras la frustración del Acuerdo de 2010, el 2 de junio de 2011 GCC reiteró a CIMSA su deseo de liquidar su posición en Soboce[43]. Unos días después, GCC informó que, tras el fallido intento de vender sus acciones a CIMSA, intentaría vender su participación en Soboce a un tercero[44]. El Sr. Doria Medina, representante de CIMSA, indicó entonces su intención de buscar financiación para poder comprar los Títulos[45] y las Partes iniciaron de nuevo negociaciones[46].

78.   En ese contexto, J.P. Morgan puso a GCC en contacto con un posible comprador de los Títulos, CCS, con el que comenzó a negociar en paralelo.

79.   El 4 de julio de 2011 CCS emitió una oferta de compra [la "**Oferta de CCS**"][47], que puso en marcha el procedimiento de opción de compra pactado en la cláusula 6.3 del Acuerdo 2005[48].

80.   Al día siguiente, GCC notificó a CIMSA la oferta recibida de CCS para que ésta pudiese hacer uso, en los 30 días siguientes, del derecho de primera opción que el Acuerdo 2005 le concedía[49]. Durante esos 30 días CIMSA y GCC negociaron la adquisición de los Títulos y, antes de que este plazo venciese, CIMSA le

---

[42] Decreto Supremo Nº616 de 1 de septiembre de 2010, art. 2 (Doc. C-83).
[43] Primera declaración testifical de Martha Rodríguez Rico, de 1 de febrero de 2013, (Doc. R 274), para. 74; Laudo Parcial Final, para. 105
[44] Contestación y Reconvención, para. 90 (R-12).
[45] Contestación y Reconvención, para. 92 (R-12), Dúplica, paras. 242 y 243.
[46] Laudo Parcial Final, paras. 106-108.
[47] Oferta de CCS (Doc. C-65).
[48] Laudo Parcial Final, para. 419.
[49] Carta de Manuel Milán Reyes (GCC) a Samuel Doria Medina (CIMSA) (Doc. R-22).

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

comunicó a GCC firmemente su voluntad de adquirir la totalidad de capital accionario en Soboce que GCC deseaba transferir [la **"Carta CIMSA"**][50].

81.  GCC reaccionó mediante carta de 12 de agosto de 2011[51], en la que en esencia realizaba tres manifestaciones:

- Negaba que la Carta CIMSA constituyera un ejercicio válido de la opción de compra contractual;

- Anunciaba que iba a proceder de inmediato a la venta de los Títulos a CCS; y

- solicitaba la colaboración de CIMSA para llevar cabo una auditoria prevista en la Oferta de CCS.

82.  Ese mismo día, Samuel Doria Medina, representante de la Demandante, envió una carta a Manuel Milán Reyes, Director General de GCC, indicando que había ejercido válidamente su derecho de primera opción y alertando de las consecuencias que tendría el incumplimiento de GCC de la opción de compra establecida en el Acuerdo 2005[52].

83.  El 18 de agosto de 2011 GCC efectivamente transmitió sus acciones a CCS[53].

84.  En el Laudo Parcial Final el Tribunal calificó la conducta de CIMSA como un incumplimiento del Acuerdo 2005 y de la buena fe: al no advertir a CIMSA de que el ejercicio de la opción era inválido, negar a CIMSA un plazo de 30 días hábiles para pagar los Títulos y vender éstos a CCS antes de que dicho plazo hubiera transcurrido, GCC violó los términos del derecho de primera opción de CIMSA.

## 7.   LA VENTA DE CIMSA DE SUS PARTICIPACIONES EN SOBOCE

85.  El 16 de diciembre de 2014, más de tres años después de los hechos que dieron lugar a esta controversia, CIMSA, la Demandante en este arbitraje, vendió el Paquete Mayoritario a CCS, la empresa que también había adquirido el Paquete Minoritario. La Demandante confirmó en su comunicación C-88 los aspectos más relevantes de la transacción, que además son de dominio público.

86.  La venta de las participaciones de CIMSA no ha alterado el curso del presente arbitraje: ninguna de las Partes ha modificado sus pretensiones. Además, tal y como señaló el Tribunal en su comunicación A-68, los nuevos hechos son irrelevantes a efectos de la presente litis, pues carecen de identidad objetiva y subjetiva con ella: el arbitraje está trabado entre CIMSA y las Demandadas, y no involucra a CCS – cuya incorporación al arbitraje fue rechazada por el Tribunal

---

[50] Carta CIMSA (Doc. C-70).

[51] Carta de Manuel Milán Reyes a Samuel Doria Medina de 11 de agosto de 2011 (recibida el 12 de agosto de 2011) (Doc. C-28).

[52] Carta de Samuel Doria Medina a Manuel Milán Reyes de 12 de agosto de 2011 (Doc. C-116), p. 3.

[53] Carta de Manuel Milán Reyes a María Luisa Doria Medina de 18 de agosto de 2011 (Doc. C -30), Grupo Cementos de Chihuahua S.A.B. de C.V., Resultados del Tercer Trimestre de 2011, 28 de octubre de 2011 (Doc. C-71) y GCC vende su participación accionaria en compañía de cemento Boliviana, Grupo Cementos de Chihuahua S.A.B. de C.V., 19 de agosto de 2001(Doc. C-72).

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

Arbitral[54], y su objeto es la venta del Paquete Minoritario en 2011, no del Paquete Mayoritario en 2014.

---

[54] En la OP n° 4 el Tribunal rechazó expresamente la solicitud de la Demandante de incorporar a CCS al presente arbitraje. Las Demandadas se opusieron con vehemencia a la incorporación de CCS en su escrito R- 23. Ver OP n°4, §93.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

## IV BREVE RESUMEN DE LA POSICIÓN DE LAS PARTES

87. CIMSA pide una reparación integral del daño que alega haber sufrido por la violación de su derecho de primera opción. La finalidad de la indemnización debe ser poner a la víctima del incumplimiento contractual en la situación más cercana posible a la que estaría si no se hubiese producido[55]. Por ello solicita tres tipos de daños:

- El primer motivo es el daño por US$ 188,29M que la Demandante dice haber sufrido al no haber podido adquirir los Títulos por US$ 75M en agosto de 2011; el daño se cuantificaría como la diferencia entre el valor real de los Títulos y el precio al que tenía derecho a adquirirlos (US$ 75M);

- El segundo motivo es el daño por importe de US$ 35,97M que dice haber sufrido por la disminución del valor del Paquete Mayoritario en Soboce, al no haber podido eliminar los derechos políticos reforzados de los que dispone un accionista minoritario en virtud de los estatutos de Soboce – cosa que sí hubiera podido hacer si hubiera adquirido los Títulos; el daño se cuantificaría como la diferencia entre el valor que el Paquete Mayoritario tiene por sí sólo y el valor que tendría en combinación con el Paquete Minoritario;

- El tercer motivo son los gastos legales derivados de procedimientos judiciales (distintos de este arbitraje) iniciados, según alega, como consecuencia del incumplimiento de las Demandadas, por un importe de US$ 75.000.

88. Argumenta la Demandante que el corazón de la Segunda Etapa debe consistir en enfrentar las valuaciones presentadas por los peritos de las Partes y determinar el verdadero valor de los Títulos[56]. Según la Demandante, es necesario determinar el valor real de mercado de los Títulos a una fecha determinada de acuerdo con los siguientes pasos:

- Valorando a Soboce a dicha fecha y asignando a los Títulos el 47,02 por ciento de dicho valor;

- Sumando la parte que corresponde por la expropiación de Fancesa; y.

---

[55] En apoyo a su posición, la Demandada cita a Marcel Planiol: "la indemnización debe representar tan exactamente como sea posible el daño realmente sufrido por el acreedor"; Rafael Rojina Villegas: "tendrá el acreedor derecho a exigir [...] el pago de los daños compensatorios, es decir, el equivalente en dinero a la merma realmente sufrida en su patrimonio por el incumplimiento, más las ganancias que pudo obtener y no obtuvo por virtud del mismo"; Gert Kummerow: "El momento relevante para la determinación del contenido del daño es el momento de la sentencia", entre otros. La Demandante también cita un número de precedentes judiciales bolivianos que consagran el principio de que la cuantificación del daño ha de ser hecha al momento de la sentencia: Sentencia 24/2006 de 19 de julio de 2006: "daños a calificar en ejecución de sentencia"; Sentencia 22/2008 de diciembre de 2008 "pago de costas y responsabilidad civil a ser averiguables en ejecución de sentencia". Demanda, paras. 127-140.
[56] Réplica, para. 33.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

- Sumando el monto en que se hubiese apreciado la participación de CIMSA en Soboce si se hubiese convertido en el propietario de la totalidad de las acciones[57] (*i.e.* la prima de control de la que CIMSA se habría beneficiado).

89. Las Demandadas por su parte niegan categóricamente que la conducta de GCC le haya causado un daño a CIMSA: al no ser el incumplimiento de GCC la causa de los daños reclamados por CIMSA, no corresponde que se condene a GCC al pago de resarcimiento alguno[58]. Añaden que CIMSA no ha probado que los daños reclamados sean consecuencia directa, inmediata y necesaria del incumplimiento imputado a GCC, ni tampoco que fueran previsibles, y por tanto resarcibles bajo la ley boliviana[59].

90. Las Demandadas también alegan que CIMSA, en todo caso, habría carecido de recursos para pagar el precio de US$ 75M en 30 días hábiles y así adquirir los Títulos, y que por lo tanto no puede haber sufrido daño alguno[60].

---

[57] TA día 1, p. 49:18-22.
[58] Contestación, para. 368.
[59] Contestación, para. 560.
[60] Contestación, para. 404, 449.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

## V   PRETENSIONES DE DAÑOS DE LAS PARTES

### 1.   PRETENSIONES DE LA DEMANDANTE

91.   La Demandante solicitó al Tribunal que[61]:

> "1. Ordene a los Demandados a resarcir a CIMSA las costas de todos los procedimientos judiciales y arbitrales (distintos al presente procedimiento) derivados del incumplimiento contractual de GCC por una cantidad que debe estimarse al momento del laudo de la segunda etapa del procedimiento;
>
> 2. Ordene a los Demandados a resarcirle a CIMSA el lucro cesante por una cuantía no menor a US$ 188,29 millones;
>
> 3. Ordene a los Demandados a resarcirle a CIMSA el daño emergente por una cuantía no menor a US$35,97 millones;
>
> 4. Condene a los Demandados a pagar todas las costas y demás gastos legales derivados del presente procedimiento de arbitraje; y
>
> 5. Exprese que todas las cantidades otorgadas a CIMSA devenguen un interés del 6% anual desde la fecha del laudo arbitral de la segunda etapa del procedimiento".

### 2.   PRETENSIONES DE LAS DEMANDADAS

92.   Las Demandadas solicitaron al Tribunal que[62]:

> "a. Tenga por presentado este Memorial de Contestación;
>
> b. Declare la improcedencia de la reclamación de daños y perjuicios planteada por CIMSA;
>
> c. Deniegue todas aquellas pretensiones y solicitudes planteadas por CIMSA;
>
> d. Tras la emisión del laudo de Segunda Etapa, emplace las partes para una determinación de cuál es la parte ganadora y cuantificación de las costas y gastos legales derivados del proceso arbitral consistente con los argumentos planteados por GCC aquí;
>
> e. Otorgue todo aquél remedio a que GCC tenga derecho".

---

[61] Conclusiones Demandante, para. 82.
[62] Contestación, para. 686; Dúplica, para. 860; Conclusiones Demandadas, para. 75.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

## VI  INTRODUCCIÓN Y MARCO JURÍDICO

93.  El Tribunal determinó en la Primera Etapa que las Demandadas incumplieron el Acuerdo 2005[63]:

> "El Tribunal estima que el comportamiento de GCC no advirtiendo a CIMSA de que el ejercicio de la opción era inválido, negando a CIMSA un plazo de 30 días hábiles para pagar los Títulos y vendiendo éstos a CCS antes de que dicho plazo hubiera transcurrido, comporta un incumplimiento de las exigencias de buena fe establecidas por el Derecho boliviano y de las obligaciones dimanantes de la cláusula 6.3 del Acuerdo 2005".

94.  En esta Segunda Etapa el Tribunal debe decidir si esos daños reclamados por la Demandante son resarcibles aplicando Derecho boliviano, y, de serlo, determinar la indemnización que resulte procedente[64]:

> "Sentada la conclusión que las Demandadas no se han atenido a las exigencias de buena fe establecidas por el Derecho boliviano y de las obligaciones dimanantes de la cláusula 6.3. del Acuerdo 2005, el Tribunal decide abrir la Segunda Etapa del procedimiento, en la que: cuantificará los daños y perjuicios a pagar por las Demandadas a CIMSA, tomando en consideración la individualización de daños realizada por la Demandante en los párrafos 232 al 241 y 245 al 288 de la Demanda y descritas en el párrafo 529 del presente laudo; y decidirá sobre costas".

95.  El Tribunal acometerá la tarea de la siguiente forma:

- En primer lugar, analizará el marco jurídico del resarcimiento de daños, para posteriormente determinar si los daños reclamados son resarcibles en Derecho boliviano (VII,VIII y IX);

- En segundo lugar, establecerá cuál es el criterio de valoración que debe seguirse para determinar el monto resarcible de los daños (X);

- En tercer lugar, calculará la indemnización correspondiente por aquellos motivos invocados por la Demandante determinados como resarcibles (XI);

- Finalmente, decidirá sobre las peticiones de costas (XII) e intereses (XIII).

96.  Al analizar las reclamaciones el Tribunal ha tomado en cuenta los numerosos y extensos escritos de las Partes y la totalidad de los alegatos fácticos y legales sobre cada una de sus pretensiones; si bien, en este Laudo el Tribunal sólo se referirá expresamente a los argumentos que considera determinantes para su decisión.

---

[63] Laudo Parcial Final, para. 528.
[64] Laudo Parcial Final, para. 595.

97. El Tribunal analizará a continuación si el daño reclamado por CIMSA es susceptible de ser resarcido bajo Derecho boliviano: el régimen legal y el régimen pactado por las Partes.

## 1. RÉGIMEN LEGAL GENERAL

98. El Código Civil boliviano ["**C.C.**"] disciplina el incumplimiento de las obligaciones contractuales y establece que la parte incumplidora deberá indemnizar a su contraparte por los daños causados, salvo fuerza mayor. En concreto el artículo 339 establece:

> "El deudor que no cumple exactamente la prestación debida está obligado al resarcimiento del daño si no prueba que el incumplimiento o el retraso en el cumplimiento es atribuible a imposibilidad de ejecutar la prestación por una causa que no le es imputable".

99. El autor Carlos Morales Guillén señala al comentar este artículo que ante el incumplimiento de una obligación contractual, la legislación boliviana otorga como alternativas, bien la ejecución forzosa o, en su defecto, la indemnización[65]:

> "De la constitución de la obligación deriva, como efecto inmediato, el *deber de prestación*, o sea, de *cumplimiento exacto*, al que corresponde *simétricamente* (Messineo) el derecho del acreedor a la prestación. Cuando no ocurre esto, por razón del incumplimiento, la ley establece dos soluciones: *la ejecución forzosa...*O a falta del cumplimiento específico por este medio, la *satisfacción de su equivalente pecuniario* como *resarcimiento del daño* ocasionado con el incumplimiento...".

100. El Tribunal, de conformidad con tales alternativas, dispuso en su Laudo Parcial Final que los daños y perjuicios sufridos por la Demandante podrían anularse casi totalmente si GCC (previo acuerdo con CCS) otorgara a CIMSA la oportunidad de adquirir los Títulos previo pago de US$ 75M en un plazo de 30 días hábiles[66]. Esta opción no se ha materializado, por lo que el resarcimiento de los daños debe darse por la vía de la indemnización pecuniaria[67].

El resarcimiento del daño

101. Los artículos 344 y siguientes C.C. se refieren al resarcimiento del daño.

102. El Art. 344 C.C. establece que el daño por incumplimiento de obligaciones comprende la pérdida sufrida por el acreedor y la ganancia de que ha sido privado, es decir, el daño emergente y el lucro cesante:

> Art. 344. (Resarcimiento del daño).- El resarcimiento del daño, en razón del incumplimiento o del retraso, comprende la pérdida sufrida por el acreedor y la ganancia de que ha sido privado, con arreglo a las disposiciones siguientes.

---

[65] Morales Guillén, C., Código Civil: Concordado y Anotado con Arreglo a la Edición Oficial, Tercera edición revisada y ampliada, Editorial Gisbert y Cia. S.A., 1991, Tomo I, ["**Morales Guillén**"], pp. 478-479 (Doc. R-811).
[66] Laudo Parcial Final, para. 596.
[67] Ver A-68, para. 12.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

103. Los artículos 345 y 346 C.C. fijan los requisitos para que los daños sean resarcibles:

> Art. 345 (Daño Previsto).-El resarcimiento sólo comprende el **daño previsto** o que ha podido preverse, si el incumplimiento o retraso no se debe a dolo del deudor.

> Art. 346 (Daños inmediatos y directos).- Aunque haya dolo del deudor, el resarcimiento no debe comprender, en cuanto a la pérdida experimentada por el acreedor y la ganancia de que ha sido privado, sino lo que sea **consecuencia inmediata y directa del incumplimiento** [la negrilla es del Tribunal].

104. Por lo tanto, bajo el derecho boliviano, para que un daño sea resarcible ha de ser directo e inmediato, previsible y, como veremos *infra*, cierto.

## 2.   RÉGIMEN CONTRACTUAL PARTICULAR

105. En la cláusula 22 del Acuerdo de 2005 las Partes acordaron las consecuencias que tendría un incumplimiento del contrato[68]:

> "Cada Parte indemnizará y mantendrá a toda otra Parte (una "Perona Indemnizada") libre de cualesquier y toda pérdida, costos, reclamos, daños, responsabilidades, penalidades, lesiones o gastos (incluyendo honorarios razonables de abogados) de cualesquier clase o naturaleza, cometidas, impuestas o adjudicadas en contra de tal Parte, que se presenten, relacionen o resulten del incumplimiento del presente Acuerdo o de cualesquier transacción que se relacione y que se encuentren [sic] contemplada en el presente Acuerdo; con excepción de aquellas pérdidas, costos, reclamos, acciones, daños, responsabilidades, multas, penalidades, lesiones o gastos que sean consecuencia directa de la negligencia grave o dolo de las Personas Indemnizadas".

106. Es decir, las Partes previeron que toda parte que incumpla las obligaciones asumidas en el Acuerdo 2005 deberá indemnizar a la contraparte el daño derivado del incumplimiento, salvo que fuera atribuible a la negligencia grave o al dolo de la parte dañada.

107. El régimen legal pactado por las Partes en la cláusula 22 del Acuerdo 2005 no excluye ni modifica la aplicación de los requisitos legales, sino que resulta compatible con ellos. Por lo tanto, cualquier daño indemnizable contractualmente debe cumplir con los requisitos que establece la legislación boliviana para el resarcimiento de los daños.

## 3.   REQUISITOS PARA EL RESARCIMIENTO DE DAÑOS

108. A continuación el Tribunal analizará con mayor  detalle los tres requisitos que establece la legislación boliviana para entender que un daño es resarcible.

---

[68] Cláusula 22 del Acuerdo 2005 (Doc. C-1).

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

### 3.1. DAÑO DIRECTO E INMEDIATO

109. Los comentaristas bolivianos explican que el daño es directo cuando tiene una "estrecha relación de causalidad entre el hecho dañoso y el cálculo de la reparación"[69].

110. Partiendo de la norma establecida en el Art. 346 del C.C., la doctrina señala que el incumplimiento contractual debe ser la condición *sine qua non* para la materialización del daño[70]:

> "[D]ebe existir un *nexo, o relación, inmediato de causa a efecto ... y el evento [daño]...*, de manera que se pueda inferir de él que el daño *no se habría verificado sin aquel acto*; el cual acto, pues, debe ser *premisa necesaria* para la verificación del daño... para que sea resarcible el daño inmediato y directo – basta una mera relación de condicionalidad (ser el daño consecuencia del incumplimiento)".

111. La carga de probar la relación de causalidad entre el incumplimiento contractual y el daño corresponde a la víctima. Como señala el autor boliviano Raúl Romero Sandoval, en caso de incumplimiento contractual el[71]

> "vínculo de causalidad entre el incumplimiento de la obligación y el daño deber ser probado por la víctima".

### 3.2. DAÑO PREVISIBLE

112. Además, bajo el derecho boliviano – Art. 345 C.C. – el resarcimiento sólo comprende el daño previsto o que ha podido preverse, siempre que el incumplimiento no se deba al dolo del deudor.

113. El tratadista boliviano Carlos Morales Guillén precisa[72]:

> "Se dice que un daño es previsto cuando su eventualidad no pudo ser ignorada por el deudor, a tenor del objeto o las estipulaciones del contrato".

### 3.3. DAÑO CIERTO

114. Por último, la doctrina y la jurisprudencia han sostenido que para que un daño sea resarcible debe ser cierto, puesto que reparar un daño hipotético equivaldría a enriquecer injustamente a la víctima. Es decir, satisfechos los requisitos legales de inmediatez y previsibilidad, la Demandante debe probar la existencia cierta del daño.

---

[69] Morales Guillén, p. 491 (Doc. C-398).
[70] Messineo, F. y Melendo. S.: Manual de Derecho Civil y Comercial (Ediciones Jurídicas Europa-América 1979) Tomo IV, ["**Messineo y Melendo**"], p. 247. (Doc. C- 923) [la cursiva es el propio autor, no del Tribunal].
[71] Romero Sandoval, R: Derecho de Obligaciones, Editorial "Los amigos del libro", 1990 ["**Romero Sandoval**"], p. 144. (Doc. C- 456).
[72] Morales Guillen, p. 491 (Doc. C-398).

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

115. El Tribunal Supremo de Bolivia ha sido claro al establecer la necesidad de que el daño sea cierto y en definir ese concepto[73]:

> "La doctrina especializada ha establecido como principio general, que el daño por sí mismo no genera derecho al resarcimiento, sino que éste debe cumplir ciertos presupuestos, tales como la certeza. La doctrina y la jurisprudencia han declarado en forma uniforme que para que un daño sea resarcible debe ser cierto.
>
> El daño debe ser cierto, antítesis de lo puramente hipotético, eventual, conjetural, debe haber certidumbre en cuanto [sic] a su existencia misma cuando se trata de daño actual; o suficiente probabilidad de acuerdo al curso natural y ordinario de los acontecimientos de que el mismo llegue a producirse, como previsible prolongación o agravación de un perjuicio, ya en alguna medida existente, esto en la hipótesis del daño futuro.
>
> En ese mismo sentido; daño cierto equivale a daño existente, a daño no imaginario y que tiene consistencia. En definitiva, un daño que se puede probar".

\* \* \*

116. La Demandante afirma que el incumplimiento de las Demandadas le ha causado un daño directo, inmediato, previsible y cierto, que se materializaría en tres tipos de daños:

- El primero sería la diferencia entre el valor real de los Títulos y el precio al que tenía derecho a adquirirlos (*i.e.* US$ 75M);

- El segundo consistiría en la falta de revalorización del Paquete Mayoritario de CIMSA en Soboce, al no haber podido eliminar los derechos políticos reforzados que los estatutos de Soboce otorgan a un accionista minoritario;

- El tercero serían los gastos legales causados por el incumplimiento contractual de las Demandadas.

117. El Tribunal Arbitral va a analizar cada una de las categorías de daños para determinar si cumplen con los requisitos establecidos en el Derecho boliviano para ser resarcibles, a saber: si son efecto directo e inmediato, previsible y cierto del incumplimiento. Dado el grado de detalle requerido, el Tribunal dedicará secciones específicas a cada tipo de daño:

- diferencia de valor de los Títulos (VII);

- prima de control absoluta sobre el Paquete Mayoritario (VIII);

- y gastos legales (IX).

---

[73] Dúplica, para. 559-60; citando Auto Supremo 578/2013 de 11 de noviembre de 2013 (Doc. R-676).

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

# VII PRIMER DAÑO RECLAMADO: DIFERENCIA DE VALOR DE LOS TÍTULOS

118. Tres son los requisitos que deben cumplirse: el daño debe ser directo e inmediato (1.), debe ser también previsible (2.) y debe ser cierto (3.). A continuación el Tribunal analizará los requisitos legales para el primer tipo de daño reclamado por la Demandante. El Tribunal concluirá que tales requisitos se cumplen, y cuantificará el daño concreto en un capítulo posterior (XI).

## 1.   DAÑO DIRECTO E INMEDIATO

119. El precio al que GCC vendió los Títulos fue US$ 75M; y ése es el precio por el que CIMSA los hubiera podido adquirir. La Demandante asegura que ese precio era muy inferior al precio de mercado o precio real de los Títulos. CIMSA pretende resarcirse por esta diferencia de valor.

120. El argumento central de las Demandadas consiste en rechazar rotundamente que CIMSA hubiera logrado obtener la financiación suficiente para poder comprar los Títulos; no habiendo podido comprarlos, nunca se habría producido el daño.

121. En otras palabras: la discusión gira en torno a si el nexo causal entre incumplimiento y daño fue interrumpido por la falta de financiación.

122. Para que el Tribunal aprecie la existencia de un nexo o relación de causalidad es necesario que exista una causa (A.), un efecto (B.) y un enlace lógico entre ambos (C.).

## A.   Causa

123. La conducta de las Demandadas (no advirtiendo a CIMSA de que el ejercicio de la opción era inválido, negando a CIMSA un plazo de 30 días hábiles para pagar los Títulos y vendiendo éstos a CCS antes de que dicho plazo hubiera transcurrido) es contraria a la cláusula 6.3 del Acuerdo 2005 y a las obligaciones de buena fe establecidas en el Derecho boliviano, y constituye la causa inicial. La existencia del incumplimiento fue establecida en el Laudo Parcial Final y es *res judicata*. El Laudo Parcial Final decidió[74]:

> "En resumen, el Tribunal estima que el comportamiento de GCC no advirtiendo a CIMSA de que el ejercicio de la opción era inválido, negando a CIMSA un plazo de 30 días hábiles para pagar los Títulos y vendiendo éstos a CCS antes de que dicho plazo hubiera transcurrido, comporta un incumplimiento de las exigencias de buena fe establecidas por el Derecho boliviano y de las obligaciones dimanantes de la cláusula 6.3. del Acuerdo 2005."

124. Como resultado de su análisis, el Tribunal decidió que en esta Segunda Etapa cuantificaría los daños y perjuicios previstos y previsibles irrogados por la

---

[74] Laudo Parcial Final, para. 528.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

privación a CIMSA de la oportunidad de adquirir los Títulos por un precio de US$ 75M, pagaderos al contado en un plazo de 30 días hábiles[75].

## B.   Efecto

125. El efecto de la conducta de las Demandadas descrita en el para. 123 *supra*, fue que CIMSA no pudo ejercer su derecho de primera compra y adquirir los Títulos por US$ 75 M. Por lo tanto, como titular de un derecho contractual de adquisición preferente, si en la fecha en que a CIMSA le fue vulnerado su derecho a adquirirlos[76], los Títulos tenían un valor de mercado superior al precio de venta, la Demandante sufrió pérdidas equivalentes a la diferencia entre US$ 75 M y el valor real de mercado.

## C.   Nexo causal

126. El tercer elemento de la causalidad es la existencia de un nexo causal, la cadena que lleva de la causa al efecto. El nexo causal puede analizarse desde dos ángulos:

- El <u>aspecto positivo</u> requiere que el perjudicado pruebe que una cadena lógica directa e inmediata une la causa inicial (el incumplimiento de las Demandadas) con el efecto final (la pérdida sufrida o el lucro dejado de obtener por CIMSA);

- Mientras que el <u>aspecto negativo</u> permite a la parte incumplidora romper la cadena mostrando que el efecto fue causado – parcial o totalmente – no por sus propios actos, sino por la intervención de otras causas, como una causa atribuible a la víctima, a un tercero o a una *force majeure.*

127. En palabras del autor boliviano Raúl Romero Sandoval[77]:

"La causalidad se manifiesta en el proceso de responsabilidad, de dos maneras distintas, una positiva y otra negativa. En forma positiva, si la víctima quiere obtener una condena a la indemnización, deberá acreditar la existencia de una relación de causalidad entre el daño que ha justificado y el hecho, culpable o no, al que la ley une la declaración de responsabilidad. En forma negativa, cuando el demandado puede soslayar la relación de causalidad que en él culmina, probando la mediación de una causa extraña e inimputable (caso fortuito, fuerza mayor o culpa de la víctima)".

128. Aún hay que realizar otra distinción preliminar: los nexos causales pueden ser puros o transitivos[78]. Existe un nexo causal puro cuando el daño deriva directamente del incumplimiento, sin que existan elementos intermediarios. En la práctica esta situación es poco frecuente, porque resulta muy complicado probar que un determinado factor es la causa única e inmediata de un resultado. Normalmente, el vínculo entre el incumplimiento y el daño es más complejo, e intervienen elementos adicionales para formar la cadena de eventos.

---

[75] Laudo Parcial Final, para. 529.
[76] Ver para. 260 *infra*.
[77] Romero Sandoval, p. 127. (Doc. R-674).
[78] La terminología proviene de Brigitte Bollecker-Stern: *"Le prejudice dans la théorie de la responsabilité international"*, 1973, p. 186.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

129. El Tribunal está de acuerdo con las Demandadas en que en este caso – para usar la terminología precisa – el nexo causal no es puro, sino que es transitivo: el nexo tiene eslabones intermedios entre el incumplimiento y el daño, que son elementos adicionales que configuran la cadena causal. Pero el mero hecho de que sea necesario considerar estas eventualidades no hace desaparecer el nexo causal; simplemente dificultan su apreciación.

130. Así la Demandante debe demostrar con una razonable certidumbre que estos elementos adicionales se habrían cumplido. En concreto, debe convencer al Tribunal de que habría sido capaz de obtener los fondos necesarios para adquirir los Títulos dentro de un margen temporal prefijado.

131. CIMSA ha aportado prueba para intentar explicar cómo habría obtenido la financiación; las Demandadas, por su parte, niegan con rotundidad que eso hubiera podido ser posible.

132. El Tribunal Arbitral se posiciona con CIMSA: aunque se trate de realizar valoraciones en un campo hipotético de lo que pudiera haber ocurrido en el pasado, el Tribunal está razonablemente satisfecho de que la prueba apunta a que CIMSA habría logrado reunir el capital requerido. A continuación, un análisis detallado de la prueba aportada.

## 1.2. CAPACIDAD DE PAGO DE CIMSA

### A. Posición de la Demandante

133. La Demandante acepta que CIMSA carecía en agosto de 2011 de US$ 75M en caja. Pero argumenta que habría podido obtener financiación por ese importe en el plazo de 30 días hábiles del que disponía para ejercer la opción. Los argumentos que presenta CIMSA en sustento de su posición son los siguientes:

134. Primero, CIMSA no hubiese tenido que financiar íntegramente los US$ 75M, sino una cantidad menor debido a la caja de Soboce[79]. Así, CIMSA podía haber utilizado el 100% de la caja de Soboce (US$ 19,42M) sin poner en riesgo la compañía[80]. El resultado es que sólo hubiese tenido que financiar US$ 55,58M externamente.

135. Segundo, existían alternativas plausibles para obtener financiación antes del 14 de septiembre de 2011[81]:

- Financiación puente u otro esquema de financiamiento como un *leveraged buy-out*; y/o

- Incorporación de un socio estratégico de carácter industrial o financiero cuya inyección de capital le permitiese adquirir los Títulos[82].

---

[79] Conclusiones Demandante, para. 3.
[80] Conclusiones Demandante, para. 4.
[81] Réplica, para. 312 y 342.
[82] Segunda declaración testifical de Samuel Doria Medina Auza de 9 de enero de 2014. (Doc. C- 625) ["**Doria Medina II**"], para. 21-39, citado en Réplica, para. 70.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

136. Tercero, obtener la financiación era viable porque los Títulos se estaban ofreciendo a un precio inferior a su valor de mercado[83].

137. Cuarto, mediante la adquisición de los Títulos, CIMSA hubiese gozado del 98% del capital social de Soboce, por lo que podía haber utilizado todas esas acciones o los activos de Soboce como garantía para financiar la adquisición[84].

138. Alternativamente, CIMSA contaba con activos que podía otorgar en garantía por un valor de al menos US$ 168M: las acciones de CIMSA en Soboce, las acciones del Hotel DM Andino y Bolivia Foods, S.A., y de materializarse la compra, también las acciones de GCC en Soboce [85].

139. Alega CIMSA que si no recurrió a estos mecanismos es porque tenía una "expectativa legítima", surgida durante el periodo de negociaciones, de que GCC le permitiría adquirir los Títulos en unas condiciones más ventajosas que las pactadas en el Acuerdo 2005[86].

**B.    Posición de las Demandadas**

140. Las Demandadas sostienen que CIMSA no habría podido obtener los recursos necesarios para pagar en efectivo los US$ 75M en el plazo de 30 días hábiles desde el 4 de agosto de 2011:

- CIMSA no demostró su capacidad de pago para ejercer la opción, y

- Los informes del Dr. Spiller, Consultor Senior de Compass Lexecon, y del Sr. Chiossone[87], experto en banca de inversión en America Latina, demuestran que era "altamente improbable" que CIMSA pudiese pagar los Títulos en plazo.

**a.    Informe del Dr. Spiller**

141. El Dr. Spiller expone que hubiera sido altamente improbable que CIMSA hubiera sido capaz de generar los recursos necesarios en plazo[88]. CIMSA carecía de financiamiento propio y externo. Los argumentos del Dr. Spiller son los siguientes:

142. Primero, no hay evidencia documental que demuestre la posibilidad concreta de acceso de CIMSA a financiamiento externo en un monto suficiente para cubrir la totalidad del precio. Según el Dr. Spiller, esta situación se deriva de la imposibilidad de CIMSA de acceder antes del 14 de septiembre de 2011[89]:

---

[83] Réplica, para. 343.
[84] Tercera declaración testifical de Samuel Doria Medina Auza de 29 de abril de 2014 (Doc. C- 762) ["**Doria Medina III**"], para. 21 citado en Réplica, para. 46.
[85] Alegatos de Apertura de CIMSA, p. 14 (Doc. C-934); Doria Medina II, para. 11, citado en Réplica, para. 57; Conclusiones Demandante, para. 4.
[86] Doria Medina III, para. 8-9 citado en Réplica, para. 47.
[87] Segunda declaración pericial de Orlando Chiossone, de 31 de marzo de 2014. (Doc. R- 621). Tercera declaración pericial de Orlando Chiossone, de 3 de junio de 2014. (Doc. R- 722) ["**Chiossone III**"].
[88] Spiller II, para. 4.
[89] Spiller II, para.35-42.

- al mercado de capitales para titularizar sus flujos futuros, emitir bonos o pagarés;

- a suficiente financiamiento bancario a través de bancos bolivianos o internacionales.

143. Segundo, la imposibilidad de CIMSA de concretar alianzas estratégicas con potenciales socios del sector cementero o del sector financiero: no hay evidencia alguna de ninguna alianza de este tipo durante la transacción frustrada del año 2010, ni durante el período de negociaciones en el año 2011[90].

144. Tercero, no hay evidencia documental que demuestre que la familia Doria Medina o CIMSA hubieran utilizado sus fondos propios. En particular, no hay evidencia del valor de otros activos de CIMSA o del Sr. Doria, como pueden ser las inversiones en Bolivian Foods S.A. y el Hotel DM Andino. Los únicos fondos sobre los cuales existe evidencia documental, indicando que podrían haberse utilizado como fuente de recursos para la adquisición de la participación de GCC en Soboce, ascendían a US$ 4M[91].

**b.    Informe del Dr. Orlando Chiossonne**

145. En su informe pericial el Dr. Olando Chiossonne concluye que era "altamente improbable" que CIMSA hubiese sido capaz de conseguir el financiamiento necesario en menos de 30 días hábiles. Chiossone llega a las siguientes conclusiones[92]:

- Soboce no tenía la capacidad para obtener más deuda financiera, dado que tenía ya de por sí un alto nivel de apalancamiento;

- La empresa mostraba en los primeros seis meses de 2011 un decrecimiento en el EBITDA;

- Los bancos bolivianos no ofrecían financiación en las cantidades y los plazos necesarios;

- Los bancos extranjeros difícilmente hubieran estado dispuestos a ofrecer la financiación, debido a las condiciones del mercado en Bolivia y al nivel de riesgo político en el país;

- La obtención de fondos por medio de la venta de activos pertenecientes a CIMSA y al Sr. Doria no hubiera sido suficiente para financiar la transacción, y era altamente improbable que la venta de dichos activos se concluyera en menos de 30 días hábiles, tomando en cuenta la falta de actividad en el mercado y los procedimientos necesarios para cerrar los procesos de venta;

---

[90] Spiller II, para. 4.
[91] Spiller II, para. 4.
[92] Chiossonne II, p. 35.

- La emisión de bonos en el mercado local exigía unos requisitos complejos, en parte controlados por terceros, haciendo altamente improbable que el proceso se cerrara en menos de 30 días hábiles;

- Era altamente improbable que un socio estratégico o financiero se hubiese interesado en Soboce, dado el peligro de expropiación en Bolivia y que se ofrecía adquirir una posición minoritaria.

## C.   Decisión del Tribunal

146. La voluntad de CIMSA de adquirir las acciones de GCC es un hecho probado. La Demandante no sólo se aseguró un derecho de adquisición preferente en el Acuerdo de 2005, sino que en numerosas ocasiones manifestó su voluntad de adquirir los Títulos:

- Durante las negociaciones que tuvieron lugar en el 2010,

- Durante las negociaciones de los meses de junio, julio y agosto de 2011 y

- Mediante la Carta CIMSA de 4 de agosto de 2011, en la que ésta expresó "su decisión de adquirir la totalidad de capital accionario de Soboce que GCC desea transferir", haciendo "uso definitivo de su primera opción de adquirir la participación de GCC en Soboce en el precio y condiciones (materialmente iguales y sin condiciones precedentes) que las que figuran en la carta de intención" de CCS[93].

147. Sin embargo, es evidente que la mera voluntad no bastaba para adquirir los Títulos. Hacía falta también una sustancial suma de dinero.

148. En el Laudo Parcial Final, dentro del análisis del argumento principal de CIMSA, que fue desestimado, el Tribunal puso de manifiesto sus dudas acerca de la capacidad de pago de CIMSA[94].

149. El Tribunal debe determinar ahora con mayor certeza – y tras analizar al detalle la prueba adicional aportada por las Partes – si es razonable asumir que CIMSA hubiera obtenido la financiación necesaria en el plazo de 30 días hábiles, a partir del 4 de agosto de 2011.

150. En esta Segunda Etapa, las Demandadas han insistido en que la causa de que CIMSA no haya adquirido los Títulos fue su incapacidad de pago y de obtener financiación. CIMSA, por su parte, ha adjuntado pruebas adicionales para refutar la alegación de las Demandadas. El Tribunal Arbitral ha valorado la prueba según las reglas de la sana crítica y está convencido de que CIMSA podría haber obtenido la financiación que precisaba para ejercer su derecho de primera compra. Ello por tres razones:

- CIMSA sólo debía financiar una parte de la operación (a.);

---

[93] Carta CIMSA (Doc. C-70).
[94] Laudo Parcial Final, paras. 467, 471.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

- CIMSA acudía al mercado para obtener financiación con bienes cuyo valor triplicaba la cantidad que debía solicitar (b.); y

- en última instancia, la familia Doria Medina hubiera financiado la compra con su patrimonio personal (c.).

151. El Tribunal analizará con detalle cada una de estas razones:

**a. Capital disponible**

152. Las Demandadas admiten y – el Tribunal da por cierto – que CIMSA hubiera tenido acceso a entre un 23% y un 36% del capital necesario para adquirir los Títulos. En particular:

- Entre US$ 10 M[95] y 19,4 M[96] en flujos de caja de Soboce;

- US$ 4,5 M en flujos de caja de Esmical[97];

- US$ 2,5 M provenientes de financiación del Banco Bisa[98];

- US$ 0,14 M resultantes de la línea de crédito de CIMSA disponible al mes de agosto[99]; y

- US$ 0,5 M en pagarés emitidos por CIMSA[100].

153. Es decir, CIMSA contaba de forma incontrovertida con un capital disponible de entre US$ 17,64 M y US$ 27,04 M. Ello implica que debía obtener financiación por un monto adicional aproximado de entre US$ 57 M y US $ 47 M.

**b. Financiación externa**

154. El Tribunal está razonablemente convencido de que CIMSA hubiera tenido acceso a más fuentes de financiación. En concreto, CIMSA podría haber obtenido más préstamos bancarios, puesto que para obtener un financiamiento de aproximadamente US$ 55M[101] contaba con garantías por valor de al menos US$168M:

- las acciones de CIMSA en Soboce que estaban valoradas – si se toma como válido el precio de US$75M por el 47,02% – en US$ 81,90M;

---

[95] En su tercer informe pericial el Sr. Chiossone admite que CIMSA podría utilizar al menos US$10 M de la caja de Soboce, Chiossone III, pp. 6-7. Por su parte, el Dr. Spiller acepta que la caja de Soboce contaba con 16,4 M (Spiller II, para. 60).

[96] Declaración testifical de Gonzalo Belaúnde Sánchez de 6 de diciembre de 2012. (Doc. C -248) ["**Belaúnde**"], para. 77 (sumatoria del saldo final más los dividendos pagados en el cuadro denominado SOBOCE-FLUJO EJECUTADO AJUSTADO).

[97] Chiossone III, pp. 13-14; además, durante la Audiencia el Sr. Chiossone reconoció que Esmical contaba con una "disposición de cash importante" que podría haber reducido la necesidad de financiación [TA día 3, p. 1065:7-19; p. 1100:15-18].

[98] Spiller II, para. 59.

[99] Spiller II, para. 59.

[100] Spiller II, para. 59.

[101] Esta cantidad resulta de restar de US$ 75M los US$19,7M que el perito de las Demandadas admite como cierto [Spiller II, para. 60].

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

- las acciones de CIMSA en Bolivian Foods, S.A. y en Hotel DM Andino, a las que las Demandadas asignan un valor de US$ 11,1 M[102];

- la adquisición financiada de los Títulos le hubiera permitido a CIMSA disponer del 47,02% adicional de las acciones de Soboce que también podrían haber sido usadas como garantía, y que por lo menos tendría un valor de US$ 75M[103].

155. El propio perito de las Demandadas – el Sr. Chiossone – admitió en la Audiencia que CIMSA no tenía restricciones en sus activos ni acuerdos que limitaran su capacidad de endeudamiento[104].

156. Y aunque, el Tribunal es consciente de que el plazo para obtener la financiación era ciertamente estrecho, dada la buena relación que el Sr. Doria Medina tenía con los bancos[105], es altamente probable que la financiación hubiera llegado a tiempo, sin perjuicio de que ello implicara una mayor retribución del prestamista.

c.    **El patrimonio de D. Samuel Doria Medina y su familia**

157. Resta otra fuente de financiación adicional por analizar: el patrimonio personal de la familia Doria Medina, una de las mayores fortunas de Bolivia y con bienes personales desplegados a nivel mundial[106].

158. Las Demandadas han cuestionado la disponibilidad de esta fuente de financiación a la vista de que durante todo el proceso de negociación con GCC, el Sr. Doria Medina se negó reiteradamente a invertir fondos propios para financiar la compra. Su propósito siempre fue que CIMSA obtuviera los fondos por sí sola,  y la financiación se garantizara con las propias acciones de Soboce y los flujos de dividendos generados por la empresa cementera.

159. El Tribunal estima que las circunstancias del comienzo de la negociación y aquellas existentes con una posible venta a CCS en ciernes son radicalmente distintas. La irrupción de CCS, un competidor directo, como posible comprador del Paquete Minoritario en Soboce tuvo que suponer un revulsivo para el Sr. Doria. Hasta ese momento, el que tenía necesidad de vender era GCC, mientras que CIMSA no tenía especial interés en comprar – estaba satisfecha con el *statu quo*. La posibilidad de que CCS pudiera adquirir el paquete trastornó la situación y puso al Sr. Doria en situación de *Zugzwang*: la pasividad ya no le beneficiaba, tenía la imperiosa necesidad de adquirir las acciones en el plazo y al precio que se le ofrecían. Si las Demandadas hubieran cumplido con su obligación de respetar el derecho de primera compra, GCC habría puesto al Sr. Doria frente al ultimátum de comprar y pagar no más tarde del 14 de septiembre, o en caso contrario, consentir la entrada de CCS. El Tribunal está convencido que, en ese caso, como

---

[102] Spiller II, para. 57, n. 74 y 76; Estados financieros de CIMSA al 31 de diciembre de 2011 y 2010 (Doc. R-340), p. 10 del pdf; Balance General DM Hotel Andino al 31 de diciembre de 2011 (Doc. C-686), p. 1.
[103] El análisis del Tribunal arroja un valor de los Títulos de US$ 109.129.893,50 en agosto de 2011. Ver para 317 *infra*.
[104] TA día 3, p.1026:11-20.
[105] Doria Medina III, para. 10-14.
[106] Doria Medina III, para. 12

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

se desprende de su testimonio, el Sr. Doria hubiera vencido su reticencia a usar su propio peculio y hubiera decidido financiar con fondos propios la adquisición.

160. El Sr. Doria tenía un especial interés en evitar la entrada de un competidor directo como CCS, que pondría a CIMSA en una situación "excepcionalmente gravosa"[107], porque no renunciaría a sus derechos de veto en Soboce, y con quien se preveía una relación complicada[108].

161. Por lo tanto, el Tribunal Arbitral acepta como fuente fiable de financiación adicional el patrimonio personal no sólo del Sr. Samuel Doria Medina, sino de su familia[109].

**d.    Contra-argumentos de las Demandadas**

162. Las Demandadas han hecho hincapié en la existencia de elementos que pondrían en duda la capacidad de pago de CIMSA.

163. En primer lugar, las Demandadas alegan que CIMSA estaba obligada a encontrar aproximadamente US$ 55 M en 30 días hábiles – una tarea muy ardua; buena prueba de ello sería que en el año 2010 CIMSA ya había sido incapaz de conseguir los fondos para comprar los Títulos en cumplimiento del Acuerdo 2010[110].

164. Lo que realmente ocurrió entonces es que CIMSA había previsto titularizar los dividendos futuros de Soboce para financiar la adquisición de los Títulos. Sin embargo, la expropiación de Fancesa desbarató una operación financiera que hasta ese momento parecía viable[111]. El propio Tribunal Arbitral lo puso de manifiesto en el Laudo Parcial Final al analizar la frustración del Acuerdo 2010[112]:

> "102. El borrador de adenda al Acuerdo 2010 nunca se llegó a firmar, y la transmisión de las acciones nunca se llegó a consumar. Al parecer, la expropiación desanimó a las Administradoras de Fondos de Pensiones que se habían comprometido a suscribir los valores de titularización con los que CIMSA pretendía financiar la compra. Ante la dificultad para conseguir la financiación prevista, CIMSA informó a la Bolsa Boliviana de Valores de su deseo de no continuar con el trámite de la titularización de dividendos futuros de Soboce."

165. En segundo lugar, las Demandadas alegan que durante los meses de junio y julio de 2011 CIMSA habría contemplado diversos esquemas de financiamiento externo, que pusieron en evidencia sus dificultades para obtener crédito.

---

[107] Demanda, para. 76; Doc. C-77, p.42; ver también Doria Medina II, para. 18.

[108] La relación complicada entre CIMSA y CCS se concretó posteriormente en numerosos procedimientos judiciales y conflictos entre los accionistas, ver Laudo Parcial Final para. 216, 217.

[109] Sólo en los años 2010 y 2011 la familia había obtenido dividendos de entre US$3 y US$ 5M anuales, en su capacidad de socios de CIMSA.

[110] Laudo Parcial Final, para. 102-104.

[111] Belaúnde, paras. 17, 25. Si bien no queda constancia escrita de lo que manifestaron las AFP sí que existen correos electrónicos entre Juan Carlos Requena, de Soboce, y Manuel Milán, de GCC, en los que discuten acerca de la preocupación expresada por éstas y la necesidad de averiguar si aún tendrían interés total o parcial (Docs. C-295 y C-296 de 29 de septiembre de 2010).

[112] Laudo Parcial Final, para. 102.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

166. El Tribunal concuerda con las Demandadas en que CIMSA barajó numerosas opciones para obtener financiación que, por diversos motivos, tuvo que descartar. Ello es coherente con el deseo del Sr. Doria Medina de que CIMSA obtuviera los fondos por sí sola, y que la financiación se garantizara con las propias acciones de Soboce. Sin embargo, el fracaso de los medios de financiación contemplados como "preferidos", no implica que ante la imposibilidad de obtener financiación por fuentes externas, el Sr. Doria Medina no estuviera finalmente dispuesto a utilizar su propio patrimonio y el de su familia para alcanzar los US$ 75M[113].

167. El Tribunal también es consciente de que los planes de financiación de CIMSA presuponían que podría contar con tres meses para adquirir los Títulos, tal como se había ofrecido a CCS[114]. Sin embargo, el análisis de la evidencia muestra[115] que, ante el escenario contractual de pago en 30 días hábiles, CIMSA hubiera adoptado una postura más agresiva para obtener financiación externa, aunque esto supusiera condiciones de financiación menos favorables.

168. En tercer lugar, las Demandadas alegan que la obtención de créditos bancarios, bien en Bolivia, bien en el exterior, se enfrentaba a dificultades: CIMSA, una sociedad holding, no representaba un buen riesgo crediticio, y al estar situada en Bolivia, se añadía un alto riesgo país.

169. El Tribunal ya ha explicado que considera probado que CIMSA contaba con activos que podía haber ofrecido en garantía a los bancos para obtener financiación. En particular – y a pesar de la expropiación de Fancesa – Soboce era una empresa que había incrementado exponencialmente su capacidad de producción y venta de cemento y otros productos en los años precedentes[116], y para la que no era descabellado hacer previsiones favorables.

170. Además, la amenaza de la entrada de un competidor a Soboce supuso un revulsivo personal para el Sr. Doria Medina, que le hubiera llevado a ofrecer una remuneración al inversor ajeno que compensara por el riesgo país[117].

171. En resumen, el Tribunal considera que la Demandante contaba con una probabilidad creíble de aprovechar la oportunidad de adquirir los Títulos por US$ 75M en el plazo de 30 días hábiles desde el 4 de agosto de 2011.

172. Con esto queda probado el nexo causal entre el incumplimiento y el daño y, que la alegada falta de financiación no es suficiente para romper ese nexo causal. La previsibilidad del daño, que es otro requisito a cumplir, será analizada a continuación.

## 2.   DAÑO PREVISIBLE

173. Como se ha indicado *supra*, en Derecho boliviano – art. 345 C.C. – el resarcimiento sólo comprende el daño previsto o que ha podido preverse, siempre que el incumplimiento no se deba al dolo del deudor. La carga probatoria del dolo

---

[113] Doria Medina III, para. 9.
[114] Laudo Parcial Final, para. 505-507.
[115] Doria Medina II, paras.7 -8; Doria Medina III, para. 10.
[116] Memoria financiera 2010 de Soboce, p. 40 (Doc. C- 77).
[117] Doria Medina III, para. 16.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

corresponde al acreedor – en este caso: la Demandante – y el Tribunal no encuentra probado, que las Demandadas hayan actuado con dolo o que su conducta sea equivalente al dolo[118]. En consecuencia, el daño indemnizable será solamente aquel que fue previsto o pudo preverse.

174. El art. 345 del C.C. no se refiere a la previsibilidad de un determinado sujeto, motivo por el cual ha de entenderse que se trata de la previsibilidad de las partes del contrato, según las reglas de la experiencia[119]. Adicionalmente, no es controvertido que la prueba de la imprevisibilidad del daño incumbe al deudor[120], en este caso las Demandadas.

175. El Tribunal está convencido de que era previsible que el incumplimiento de las Demandadas derivara eventualmente en un daño a CIMSA, y que éste se manifestara en la diferencia entre el precio pactado para la adquisición de los Títulos (US$ 75 M) y su valor real de mercado. Y, de hecho, el daño fue previsto por todos los actores.

176. El argumento de las Demandadas de que el daño no era previsible resulta insostenible a la luz de lo pactado en el Acuerdo 2005 y de los hechos probados:

- Las Demandadas conocían la cláusula 6.3 del Acuerdo 2005, de manera que era perfectamente previsible que si la incumplían, estarían obligados a compensar a CIMSA por los daños causados *ex* cláusula 22 del Acuerdo. Es decir, las Partes – en su condición de socios de Soboce – establecieron contractualmente una expectativa legítima de que ante la eventualidad de una venta de acciones gozarían de un derecho de adquisición preferente, cuyo incumplimiento tendría las consecuencias contempladas en la cláusula 22 del Acuerdo 2005 y en la ley boliviana.

- Es más, si se evalúa la previsibilidad – como sugiere el perito de las Demandadas – en el momento de la conducta respecto de la cual se determinan responsabilidades[121], no quedan dudas de la previsibilidad de los daños: la propia Demandante advirtió a las Demandadas de las consecuencias que tendría la privación de la oportunidad de adquirir los títulos días antes de la venta a CCS:

"(...) deberíamos convenir prontamente el contrato de compraventa respectivo. Cualquier acción en contrario de GCC o de terceros,

---

[118] En el Laudo Parcial Final el Tribunal dictaminó que la conducta de las Demandadas comportaba un incumplimiento de las exigencias de buena fe establecidas por el Derecho boliviano y de las obligaciones dimanantes de la cláusula 6.3 del Acuerdo 2005. Sin embargo, las conductas omisivas de las Demandadas que dieron lugar al incumplimiento del deber de buena fe, no implican que las conductas hayan sido dolosas, simplemente no cumplieron con la obligación legal de actuar de buena fe. La mala fe o el dolo implican una *mens rea* de perjudicar que no ha sido probada en este caso.

[119] Nishizawa, para. 69, citando a Messineo y Melendo (Doc. C-923); Segunda declaración pericial de Guillermo Cabanellas de 31 de marzo de 2014 (Doc. R -541) ["**Cabanellas II**"], para. 46, citando a López Mesa y Trigo Represas (Doc. R-575).

[120] Messineo y Melendo, p.248 (Doc. C-923 y R-679). La cita completa es: "la *prueba* de la *imprevisibilidad* del daño incumbe al *deudor*, como prueba que puede valer para disminuir (en su interés) la entidad del resarcimiento debido por él, cuando el acreedor haya dado, por propia cuenta, la prueba del *daño*".

[121] Cabanellas II, para. 53, 66.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

fundados en derechos que GCC reconozca en violación del Acuerdo de Accionista implicará responsabilidades consecuentes..."[122]

- La previsibilidad del daño era tan real para las Demandadas que firmaron un contrato con CCS – el *Supplementary Share Purchase Agreement* [el "SSPA"] –, cuya finalidad era protegerse en caso de que CIMSA iniciase reclamaciones por la transferencia de los Títulos. En esencia, CCS asumió el riego económico que pudiera surgir de una posible reclamación de CIMSA contra GCC[123]. El propio Director General del Grupo, el Sr. Manuel Milán, admitió en su segunda declaración testifical la previsibilidad de los daños[124]:

> "208. El contenido del Supplementary SPA obedece y se firmó como consecuencia de la actitud amenazante que CIMSA arguyó en su comunicación de 12 de agosto y en el mail de Samuel Doria Medina de fecha 28 de julio. Fue un ejercicio seguido por hombres de negocio prudentes para prever escenarios ocasionados por una postura beligerante que CIMSA adoptó, sin implicar aceptación sobre la viabilidad de los mismos."

## 3. DAÑO CIERTO

177. La Demandante asegura que los daños que reclama son ciertos y, en concreto, señala que su perito habría probado que el precio de venta de los Títulos era inferior al precio de mercado. Las Demandadas y su perito lo niegan.

178. Como se analizará *infra*, el Tribunal llegará a la conclusión de que el precio de US$ 75M era inferior al valor de mercado de los Títulos. Por esta sola razón, no pueden aceptarse los argumentos de las Demandadas acerca de la incertidumbre del daño.

\* \* \*

179. En resumen, el Tribunal considera probado que existe un nexo causal entre el incumplimiento de las Demandadas y los daños causado a CIMSA, y que los daños eran perfectamente previsibles y ciertos. Por lo tanto, se trata de daños resarcibles según la legislación boliviana.

---

[122] Carta de Samuel Doria Medina a Manuel Milán Reyes de 12 de agosto de 2011, p. 3 (Doc. C-116).
[123] Ver Laudo Parcial Final paras. 209-212.
[124] Segunda declaración de Manuel Milán Reyes de 11 de febrero de 2013, para. 208 (Doc. R-272).

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

## VIII SEGUNDO DAÑO RECLAMADO: LA PRIMA DE CONTROL DEL PAQUETE MAYORITARIO

180. *Pro memoria*: CIMSA pide una reparación integral del daño que alega haber sufrido por la violación de su derecho de primera opción y que se concreta en tres tipos de daños:

- El primer tipo de daño es el daño que la Demandante dice haber sufrido al no haber podido adquirir los Títulos por US$ 75M en agosto de 2011 y cuya resarcibilidad ha sido analizada por el Tribunal en la sección VII precedente;

- El segundo tipo de daño está relacionado con la cuantía de la prima de control generada por las acciones de Soboce propiedad de CIMSA; en la actualidad CIMSA ya es propietaria del Paquete Mayoritario que, al otorgarle el control de la sociedad, ya lleva aparejado una prima de control ["**Prima de Control Actual**"]; la Demandante arguye que si hubiera adquirido los Títulos, habría alcanzado una mayoría suficiente para modificar los estatutos de Soboce y eliminar los derechos políticos reforzados de los que dispone un accionista minoritario; hecho esto, la prima asociada a su Paquete Mayoritario (no a los Títulos que pretendía adquirir a las Demandadas) se habría incrementado hasta constituir la "**Prima de Control Hipotética**"; CIMSA reclama la diferencia entre la Prima de Control Actual y la Hipotética;

- El tercer motivo son los gastos legales derivados de procedimientos judiciales (distintos de este arbitraje) iniciados, según alega, como consecuencia del incumplimiento de las Demandadas.

181. A continuación el Tribunal analizará si el segundo tipo de daño reclamado por la Demandante es resarcible en Derecho boliviano.

## 1. POSICIÓN DE LAS PARTES

182. Comienza la Demandante su alegato recordando que en cumplimiento del Acuerdo 2005, Soboce había modificado sus estatutos sociales, precisamente para otorgar a los accionistas minoritarios ciertos derechos de control y de veto[125].

183. CIMSA alega que el incumplimiento contractual de las Demandadas y la imposibilidad de adquirir los Títulos le causó un perjuicio adicional, que consistiría en una pérdida de valor de su Paquete Mayoritario en Soboce: si CIMSA hubiese adquirido los Títulos, habría alcanzado la mayoría suficiente para modificar los estatutos y eliminar así los derechos de veto y control de los accionistas minoritarios[126], algo que ahora no puede hacer con su participación del 51,35%[127].

---

[125] Demanda, para. 176; Laudo Parcial Final, para. 71-74.
[126] Demanda, para. 91.
[127] Demanda, para. 46.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

184. El perito de la Demandante, Dr. Flores, explica que el Paquete Mayoritario tiene un menor valor por sí solo (pues está sujeto a una limitación de control en beneficio de los accionistas minoritarios), que el valor que habría podido alcanzar en combinación con el Paquete Minoritario (pues habría podido deshacerse de esa limitación de control)[128]. El perito considera que la adquisición del Paquete Minoritario hubiera permitido eliminar el descuento al que estaría sometida la Prima de Control Actual del Paquete Mayoritario, hasta alcanzar la Prima de Control Hipotética, y de esta forma CIMSA se beneficiaría de un incremento en el valor de su Paquete Mayoritario[129].

185. Basándose en el informe del Dr. Flores, la Demandante concluye que el daño que ha sufrido como consecuencia del incumplimiento de las Demandadas, actualizado a julio de 2014, ascendería a US$ 35,97M[130].

186. Las Demandadas, por su parte, niegan que CIMSA haya sufrido daño alguno, puesto que la cadena causal es compleja y de ella se infiere una consecuencia remota, indirecta e improbable[131]:

- Remota: pues sólo surgiría un daño patrimonial concreto si, como consecuencia de no contar CIMSA con la casi totalidad del capital de Soboce, y no haber podido así limitar el derecho de veto de los minoritarios, CIMSA sufriera un perjuicio injusto;

- Indirecta: porque aunque se cumpliera toda la cadena, los hipotéticos daños repercutirían en Soboce, y sólo luego e indirectamente sobre CIMSA;

- Improbable: porque CIMSA, para imputar el hipotético daño y su responsabilidad, presupone una pluralidad de hechos altamente improbables.

187. Las Demandadas también alegan que los derechos preexistentes de CIMSA – su participación en Soboce – permanecen inalterados, tanto desde el punto de vista de la proporción del capital como desde el ángulo de los derechos económicos y políticos[132].

188. Además, para las Demandadas el daño era imprevisible, porque la situación financiera de CIMSA no le habría permitido adquirir los Títulos[133] y porque las supuestas prerrogativas de los accionista minoritarios no constituían daño alguno para CIMSA y, por lo tanto no podía preverse en el momento del incumplimiento que esos daños serían objeto de reclamación[134].

189. El Tribunal analizará a continuación si el daño reclamado por la Demandante reúne los requisitos exigidos para poder ser indemnizado; y, en esta ocasión,

---

[128] Primer informe pericial del Dr. Daniel Flores (Econ One Research Inc.), de 10 de julio de 2012 (Doc. C-67) ["**Flores I**"], para. 50.
[129] Flores I, paras. 50-54, 59.
[130] Conclusiones Demandante, para. 79.
[131] Cabanellas II, para. 28 (Doc. R-541).
[132] Contestación, para. 445; T, p. 293, l. 4-18 ; Cabanellas II. Doc. R-541, para. 23.
[133] Dúplica, paras. 595-598.
[134] Dúplica, para. 601.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

invertirá el orden de su análisis verificando primero la certeza del daño (2.) y, posteriormente, si es directo e inmediato (3.). Alcanzada la conclusión de que el daño no es ni cierto ni directo, será innecesario analizar su previsibilidad.

## 2. DAÑO CIERTO

190. CIMSA en esencia alega que la Prima de Control Actual que genera su Paquete Mayoritario es más baja que la Prima de Control Hipotética que podría obtener si alcanzara el control absoluto y omnímodo de la sociedad:

   - si hubiera adquirido los Títulos a CCS, habría detentado el 98% de Soboce y con ello un control absoluto;

   - en el ejercicio de este control habría modificado los estatutos de Soboce para eliminar los privilegios de los que gozaban los accionistas minoritarios;

   - lo que habría revalorizado el valor del Paquete Mayoritario (del que CIMSA ya era propietaria), al incrementarse la Prima de Control, pasando de la Prima de Control Actual a la Hipotética;

   - ese incremento de Prima de Control es la reclamación planteada por la Demandante.

191. La Demandante asegura que los daños que reclama son ciertos[135].

192. Las Demandadas por el contrario aseguran que CIMSA no ha podido demostrar que haya sufrido pérdida alguna en el valor de su Paquete Mayoritario como consecuencia del incumplimiento de las Demandadas[136].

193. El Tribunal concuerda con las Demandadas y no considera probado que CIMSA efectivamente haya sufrido una pérdida en su patrimonio.

194. El daño reclamado por la Demandante está relacionado con el control que un accionista puede ejercer sobre la empresa en que participa: en compraventas cuyo objeto son paquetes accionariales que lleven aparejado el control sobre la sociedad vendida, en ocasiones se incluye un sobre-precio denominado 'prima de control', que refleja las ganancias adicionales que el accionista de control puede extraer mediante prácticas de *túneling*[137].

195. En nuestro caso, CIMSA ya ostenta un control sobre Soboce, que lleva aparejado una Prima de Control Actual, pero solicita la Prima de Control Hipotética que hubiera podido obtener si hubiera comprado los Títulos y hubiera pasado a detentar un poder absoluto en la sociedad.

196. Quien reclama un daño tiene la carga de demostrar su certeza.

---

[135] Réplica, para. 351.
[136] Réplica, para. 628-635.
[137] El concepto procede del artículo seminal "Tunneling" (NBER Working Paper No. 7523) de Simon Johnson, Rafael La Porta, Florencio Lopez-de-Silanes, and Andrei Shleifer.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

197. Sin embargo, CIMSA no presenta prueba alguna que permita determinar y cuantificar con un mínimo de rigor la alegada Prima de Control Hipotética. El perito de la Demandante cita los estudios del Dr. Pratt como soporte para alegar que hay una diferencia entre Prima de Control Actual y Prima de Control Hipotética y que ella equivaldría a una horquilla de entre el 5 y el 15% del valor del Paquete Mayoritario[138]. Sin embargo, este cálculo es absolutamente especulativo e incierto, como reconoce el propio Dr. Pratt[139]:

> *"If starting with a control value, some discount for lack of absolute control usually is warranted. <u>There are no empirical studies available to help quantify the amount of the discount</u>, but such discounts usually fall in the range of 5 to 15 percent".*

198. No se ha aportado estudio o prueba alguna que muestre de manera convincente que los estudios empíricos – que según el Dr. Pratt no existen en el mercado de los EEUU– existan en el mercado boliviano. La mera experiencia personal del Dr. Pratt, obtenida en los EEUU, que estima que estos descuentos *"usually"* ascienden a una horquilla de entre el 5 y el 15%, es manifiestamente insuficiente para justificar la cuantía de una Prima de Control Hipotética en una sociedad boliviana.

199. Más aún, CIMSA ya tenía el control de Soboce– en cuanto detentaba la mayoría de sus acciones– y lo que existían eran determinadas prerrogativas a favor de GCC respecto de algunos, que no todos, los derechos del accionista. En consecuencia no basta con probar que en las ventas de paquetes mayoritarios se dan primas de control, sino que es necesario demostrar – no sólo especular – qué impacto tendrían las limitaciones de derechos en el valor del Paquete Mayoritario y cuál sería la diferencia de valor entre la Prima de Control Actual y la Prima de Control Hipotética. El Tribunal no encuentra probado ni el impacto, ni el valor.

200. Existe un segundo argumento: si se analiza el daño solicitado por la Demandante, no como una "pérdida sufrida", sino como un lucro cesante o "ganancia de que se ha sido privado" [140]– el otro tipo de daño resarcible en virtud del art. 344 del C.C. – se alcanzará la misma conclusión. La Demandante no ha demostrado cual es la presunta utilidad que dejó de recibir por no haber concretado la alegada Prima de Control Hipotética. El daño no es cierto, sino que es totalmente hipotético, un mero "sueño de ganancia"[141].

201. En resumen, el Tribunal concluye que la Demandante no ha logrado cumplir con la carga de la prueba que le incumbe, y no ha sido capaz de demostrar la certeza del tipo de daño que reclama.

---

[138] Flores I, para. 54.
[139] Pratt, S., *Business Valuation: Discounts And Premiums*, John Wiley & Sons, 2009, p.23 (Doc. C-193) [el subrayado es del Tribunal].
[140] Para una discusión del Tribunal en relación con la definición de lucro cesante y daño emergente ver para. 267 *infra*.
[141] López Mesa, M. y Trigo Represas, F., Tratado de la Responsabilidad Civil - Cuantificación del Daño, La Ley, Buenos Aires, 2006, p. 81(Doc. R-575) citando a Díez Picazo, que a su vez cita a Dernburg.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

3. **DAÑO DIRECTO E INMEDIATO**

202. Las Demandadas afirman que este daño tampoco cumple con el requisito de causalidad[142].

203. El Tribunal concuerda: la Demandante no ha demostrado la existencia de un nexo directo e inmediato que una el incumplimiento de las Demandadas con el daño alegado, es decir, con el incremento de la Prima de Control Actual hasta convertirse en la Prima de Control Hipotética.

204. El nexo causal no es ni puro[143] ni transitivo[144]. Para que se materialice el daño alegado es necesario que intervenga una cadena de múltiples eventos. El Tribunal ya ha determinado que CIMSA habría podido obtener la financiación necesaria y, por lo tanto, habría podido adquirir los Títulos. Sin embargo, a partir de ese momento, y para que se materializara el daño alegado por la Demandante, la siguiente concatenación de hechos adicionales también tendría que haber podido ocurrir con razonable certeza:

- Tendría que haberse convocado y celebrado una junta extraordinaria de accionistas con el objeto de modificar los estatutos,

- que aquellos aprobaran la modificación,

- que la modificación fuera aprobada por el Registro de Comercio de Bolivia,

- que la eliminación de los privilegios de los que gozaban los accionistas minoritarios generara la alegada Prima de Control Hipotética en beneficio del accionista mayoritario, y

- aún así, la Prima de Control Hipotética solo se materializaría si CIMSA revendiera sus acciones de Soboce a un tercero, pues una prima de control (es decir, la cuantía en la que el precio de un paquete de acciones excede de su valor intrínseco) es una mera expectativa en tanto no se enajenen los títulos.

205. El alegado daño económico no es pues una consecuencia directa e inmediata del incumplimiento, sino que exige que se asuma la ocurrencia de una larga cadena de hechos hipotéticos entre el acto ilícito y la generación del daño, existiendo altas probabilidades de que sobrevengan hechos inesperados, que desbaraten la cadena causal.

206. En resumen, el Tribunal no considera probado que exista un nexo causal entre el incumplimiento de las Demandadas y el daño por la no obtención de la Prima de Control Hipotética reclamado por CIMSA.

\* \* \*

---

[142] Contestación, para. 452.
[143] Ver para. 128 *supra*.
[144] Ver para. 128 *supra*.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

207. <u>En conclusión</u>, el Tribunal Arbitral desestima la segunda reclamación de daños de la Demandante, consistente en la petición de ser resarcida en una cantidad igual a la diferencia entre la Prima de Control Actual y la Prima de Control Hipotética.

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

## IX   TERCER DAÑO RECLAMADO: GASTOS LEGALES

208. Resta por analizar el último tipo de daño reclamado por la Demandante, que consistiría en los gastos legales derivados de procedimientos judiciales (distintos de este arbitraje) iniciados, según alega, como consecuencia del incumplimiento de las Demandadas.

### 1.   POSICIÓN DE LAS PARTES

209. En su Memorial de Daños y Costas la Demandante reclamaba los daños y perjuicios derivados de los siguientes procedimientos legales (distintos de este arbitraje) iniciados como consecuencia del incumplimiento de las Demandadas[145]:

- Solicitud de auxilio judicial de CIMSA ante el Juez Tercero de Partido Civil-Comercial de la Ciudad de La Paz para que se adoptasen medidas precautorias sobre los Títulos[146];

- Acción de amparo constitucional interpuesta en diciembre de 2011 por CCS contra Soboce y los directivos de Soboce, citando a CIMSA como tercero interesado, solicitando entre otros que se registrase la transferencia de los Títulos en el libro de registro de accionistas de Soboce[147];

- Recurso de anulación   presentado por las Demandadas el 29 de noviembre de 2013[148].

210. En su escrito de cuantificación de costas y gastos, la Demandante ajustó su petitorio:

> "Nótese que en relación con los procedimiento relacionados con el presente arbitraje, CIMSA solamente reclama la cantidad de US$ 75.000 pagadera al Estudio de Abogados Von Borries Blanco. Esta cantidad únicamente comprende el procedimiento iniciado en violación del Acuerdo de Accionistas de 2005 para anular el Laudo Parcial. CIMSA desiste de las reclamaciones de costas de los demás procedimientos derivados del incumplimiento de los Demandados en 2011 (distintos al presente procedimiento de arbitraje)".

211. Por lo tanto, la pretensión de la Demandante de recuperar los gastos legales incurridos como consecuencia del incumplimiento de las Demandadas, se reduce a la cantidad de US$ 75.000 relativa al procedimiento iniciado para anular el Laudo Parcial Final. La Demandante clarifica que los gastos legales solicitados bajo este rubro serán reducidos en la medida en que CIMSA haya obtenido exitosamente la adjudicación de costas judiciales en el procedimiento (a fin de evitar doble resarcimiento).

---

[145] Demanda, para. 89-157.
[146] Auto del Juez Cuarto de Partido de lo Civil y Comercial del Distrito Judicial de La Paz, de 5 de diciembre de 2011 (Doc. C-681).
[147] Resolución 137/2011 sobre Acción de Amparo Constitucional, de 31 de diciembre de 2011 (Doc. R-23).
[148] Escrito de Anulación de Laudo Arbitral de 29 de noviembre de 2013 (Doc. R-47bis).

Laudo sobre Final sobre Daños

212. La Demandante invoca la cláusula 22.1 del Acuerdo 2005 como apoyo jurídico para su pretensión:

> "Cada Parte indemnizará y mantendrá a toda otra Parte ... libre de ... lesiones o gastos (incluyendo honorarios razonables de abogados) de cualesquier clase o naturaleza, cometidas, impuestas o adjudicadas en contra de tal Parte...".

213. Sostiene la Demandante que el carácter abierto de la cláusula transcrita permite el resarcimiento de gastos "cometidos" no sólo en el presente procedimiento, sino en cualquier otro iniciado por CIMSA.

214. Por su parte, las Demandadas sostienen que los daños reclamados por gastos legales por procedimientos distintos a los de este arbitraje son improcedentes. Específicamente, las Demandadas señalan que el Tribunal no tiene competencia para resolver sobre costas y gastos legales impuestos en procesos diferentes al presente arbitraje, que se encuentran sometidos a autoridades bolivianas. De acuerdo con el art. 4(6) del Código de Procedimiento Civil, la imposición de costas es una facultad privativa del juez boliviano[149].

## 2. DECISIÓN DEL TRIBUNAL

215. La Demandante reclama los daños legales soportados como consecuencia del incumplimiento de las Demandadas. En particular, la Demandante reclama US$ 75.000, cantidad pagadera al despacho de abogados que defiende a la Demandante en el procedimiento de anulación del Laudo Parcial Final. Las Demandadas, por su parte, consideran que el Tribunal carece de competencia para resolver sobre tal reclamación, puesto que – según alegan – la imposición de costas es una facultad de orden público atribuida en exclusiva al juez boliviano; por lo tanto, de aceptar la pretensión de la Demandante, advierte al Tribunal de que incurriría en un supuesto de anulación del laudo.

216. Para resolver esta cuestión el Tribunal tiene que determinar si los gastos legales son un daño resarcible bajo la legislación boliviana y si el Tribunal tiene competencia para otorgarlos. Sólo si los gastos legales incurridos por la Demandante para su defensa en el procedimiento de anulación del Laudo Parcial Final son daños directos e inmediatos, previsibles y ciertos, tendrá que determinar su competencia para otorgarlos.

217. Los daños legales que reclama la Demandante son los gastos de abogados incurridos por la Demandante para defenderse en el procedimiento de anulación del Laudo Parcial Final. ¿Puede entenderse que estos gastos son consecuencia directa e inmediata del incumplimiento de las Demandadas?

218. La respuesta a esa pregunta debe ser en sentido negativo y por ello el Tribunal desestima la pretensión de la Demandante.

219. La facultad de las Demandadas de solicitar la anulación del Laudo Parcial Final es un derecho recogido en la LAB[150]. No existe un nexo causal directo entre el

---

[149] Dúplica, para. 522-530.
[150] Art. 62 de la LAB.

incumplimiento de las Demandadas – según se expresa en el para.123 *supra.* – y los gastos incurridos por la Demandante para defenderse en el procedimiento de anulación. Y ello porque se trata de un daño extremadamente remoto: numerosos hechos se interponen en la cadena causal desde el momento del incumplimiento hasta el daño, que impiden que pueda considerarse como directo.

220. En palabras del tratadista boliviano Morales Guillén se trataría de un daño indirecto[151]:

> "no se toma en consideración dada la consecuencia lejana del hecho para el cálculo de la reparación habida cuenta de la relación de causalidad demasiado incierta entre el hecho y el deber de reparación".

221. En todo caso, el daño es, a todas luces, imprevisible: en el momento en que la Demandada le negó a CIMSA indebidamente su derecho de adquisición preferente no era previsible que este hecho fuera a dar lugar a una controversia que derivaría en un arbitraje, en el que se dictaría un laudo parcial que le daría la razón a CIMSA, que posteriormente contra ese laudo parcial se comenzaría una acción de nulidad, que le generaría a CIMSA unos costes de representación letrada.

222. Habiendo determinado que los gastos legales reclamados por la Demandante no son directos, inmediatos ni previsibles, la competencia del Tribunal para otorgarlos resulta irrelevante.

223. En conclusión, el Tribunal considera que los gastos legales reclamados por la Demandante no son resarcibles de conformidad con la legislación boliviana, por no derivarse directa e inmediatamente del incumplimiento de las Demandadas.

* * *

224. En resumen, de los tres rubros de daños pretendidos por la Demandante, el Tribunal Arbitral ha aceptado uno como daño directo, previsible y cierto del incumplimiento de la Demandada; y ha rechazado los otros dos por no reunir ninguno de los requisitos exigidos por el Derecho boliviano.

---

[151] Morales Guillén, p. 491 (Doc. C-398).

CIMSA v. GCC- CIAC Caso No. 50 180 T 00867 11
Laudo sobre Final sobre Daños

# X   UNA CUESTIÓN PREVIA: LA TEORÍA DE LA PÉRDIDA DEL CHANCE

225. El Tribunal  estableció en el Laudo Parcial Final que el daño que CIMSA ha sufrido consiste en la pérdida de[152]

> "la oportunidad de adquirir los Títulos por un precio de 75 M USD, pagaderos al contado en un plazo de 30 días hábiles a partir del 4 de agosto de 2011 – la fecha de ejercicio de la Carta CIMSA".

226. Las Partes han interpretado la palabra "oportunidad" de manera diferente. Ello ha conducido a que mantengan opiniones contrapuestas sobre cómo debe valorarse el daño. Las Demandadas proponen hacer uso de la doctrina de la pérdida del chance; mientras que la Demandante niega su aplicación y defiende que el daño será igual al valor intrínseco del derecho de opción del que fue privada.

## 1.   POSICIÓN DE LAS PARTES

227. La Demandante niega que la doctrina de la pérdida de chance sea aplicable al caso[153]. El experto legal de la Demandante, el Dr. Nishizawa, considera que lo que ha perdido la Demandante es un derecho de adquisición preferente, de índole contractual, que tiene asociado un valor[154]. Según la Demandante, al hacer nugatorio ese derecho, las Demandadas causaron un daño que ha quedado acreditado y que tan sólo resta su cuantificación[155].

228. Por su parte, las Demandadas presentan un informe legal del abogado argentino Dr. Guillermo Cabanellas, quien entiende que el incumplimiento de GCC que dio lugar a la pérdida de la oportunidad de adquirir los títulos es una conducta pre-contractual que habría impedido la formación de un contrato[156]. Basándose en el Derecho comparado, el perito alega que la responsabilidad por el incumplimiento de una mera expectativa es menos intensa que por un incumplimiento contractual, y por lo tanto, en el primer caso existe una limitación al resarcimiento[157].

229. Las Demandadas aseguran que la doctrina de la pérdida del chance se aplica en situaciones contractuales y precontractuales[158] y aportan un informe legal del Prof. Franco Ferrari, que analiza la doctrina de la pérdida de chance bajo el Derecho italiano[159], que tendría relevancia como fuente inspiradora del Derecho boliviano.

230. El Prof. Ferrari explica que los académicos y tribunales italianos tratan los daños derivados de la pérdida de oportunidad de la misma manera que un perjuicio real

---

[152] Laudo Parcial Final, para. 528.
[153] Réplica, paras. 469 -478.
[154] Segundo informe pericial legal de Santiago A. Nishizawa Takano, de 29 de abril de 2014. (Doc. C-764), paras. 126-133["Nishizawa"].
[155] Réplica, paras. 421-422.
[156] Cabanellas II, para. 56.
[157] Cabanellas II, paras. 57-61.
[158] Dúplica, para. 672.
[159] Informe pericial legal de Franco Ferrari, de 27 de marzo de 2014. (Doc. R- 569), para 37 *et seq*. ["Ferrari I"]