# EXHIBIT D

INTER-AMERICAN COMMERCIAL
ARBITRATION COMMISSION

Case No. 50 180 T 00867 11

COMPAÑÍA DE INVERSIONES MERCANTILES S.A.
*Plaintiff*

vs.

GCC LATINOAMÉRICA, S.A. DE C.V.

and

GRUPO CEMENTOS DE CHIHUAHUA, S.A.B. DE C.V.
*Defendants*

_____

**FINAL AWARD ON
DAMAGES**
_____

**ARBITRATION TRIBUNAL**

Juan Fernández-Armesto  -  President
Fernando Salazar-Paredes  -  Arbitrator
Eduardo Zuleta  -  Arbitrator

**ADMINISTRATIVE ASSISTANT**
Krystle M. Batista

## TABLE OF CONTENTS

| | | |
|---|---|---:|
| **TABLE OF CONTENTS** | | **2** |
| **LIST OF TERMS** | | **5** |
| **I** | **PARTICIPANTS IN THE ARBITRATION** | **9** |
| | **1. Plaintiff** | **9** |
| | **2. Defendants** | **10** |
| | A. Arbitration tribunal | 11 |
| | B. Administration | 12 |
| | C. Administrative Assistant | 13 |
| **II** | **PROCEDURAL HISTORY** | **14** |
| | **1. Introduction** | **14** |
| | **2. First Stage** | **14** |
| | **3. Motion for dismissal** | **16** |
| | **4. Second Stage** | **16** |
| | **5. Application for a stay of the proceedings** | **18** |
| | **5.1. Facts and position of the Parties** | **18** |
| | **5.2. Tribunal's Analysis** | **19** |
| | A. The Pro Tem Judge has no jurisdiction to issue an anti-arbitration injunction | 20 |
| | B. The annulment of the Final Partial Award and the execution of the Final Award on Damages | 22 |
| | C. The Defendants already had the opportunity to suspend the arbitration | 23 |
| **III** | **FACTS** | **25** |
| | **1. *Dramatis Personae*** | **25** |
| | **2. Dispute** | **25** |
| | **3. 2010 Soboce valuations** | **26** |
| | **4. 2010 Agreement** | **26** |
| | **5. Fancesa expropriation** | **27** |
| | **6. Transfer of the Securities** | **27** |
| | **7. CIMSA sale of its Soboce shares** | **28** |
| **IV** | **BRIEF OVERVIEW OF THE PARTIES' POSITION** | **30** |
| **V** | **PARTIES' DAMAGE CLAIMS** | **32** |
| | **1. Plaintiff's claims** | **32** |
| | **2. Defendant's claims** | **32** |
| **VI** | **INTRODUCTION AND LEGAL FRAMEWORK** | **33** |

**1. General legal framework**     **34**
**2. Specific contractual arrangements**     **35**
**3. Requirements for compensation for damages**     **35**
**3.1. Direct and immediate damage**     **36**
**3.2. Foreseeable damage**     **36**
**3.3. Certain damage**     **36**
**VII    FIRST CLAIM FOR DAMAGE: DIFFERENCE IN VALUE OF THE SECURITIES**     **38**
    **1. Direct and immediate damage**     **38**
      A. Cause     38
      B. Effect     39
      C. Causal link     39
    **1.2. CIMSA's ability to pay**     **40**
      A. Plaintiff's position     40
      B. Defendants' position     41
      C. Tribunal's decision     43
    **2. Foreseeable damage**     **47**
    **3. Certain damage**     **49**
**VIII   SECOND CLAIM FOR DAMAGES: MAJORITY STAKE'S CONTROL PREMIUM**     **50**
    **1. The Parties' position**     **50**
    **2. Certain damage**     **52**
    **3. Direct and immediate damage**     **54**
**IX    THIRD CLAIM FOR DAMAGES: LEGAL FEES**     **56**
    **1. The Parties' position**     **56**
    **2. Tribunal's decision**     **57**
**X     A PREVIOUS QUESTION: THEORY OF LOSS OF CHANCE**     **59**
    **1. The Parties' position**     **59**
    **2. Tribunal's analysis**     **60**
      A. Theory of loss of chance     60
      B. Tribunal's decision     61
**XI    QUANTIFICATION OF FIRST CLAIM FOR DAMAGES**     **63**
    **1. Valuation date**     **63**
      A. The Parties' position     63
      B. Decision     64
    **2. Legal nature of the claim**     **65**

**3. Experts' valuation** **66**
    A. Dr. Daniel Flores' report 67
    B. Alternative calculation 70
    C. Damage sensitivity 73
**4. Decision** **74**
    A. *Soboce stand-alone* 74
    B. Fancesa 76
    C. Defendants' counter-arguments 78
**XII** **COSTS** **80**
    **1. Plaintiff's position** **80**
    **2. Defendants' position** **80**
    **3. Tribunal's decision** **81**
        A. Costs of the proceedings 83
        B. Expenses of the defense 84
**XIII** **INTEREST** **86**
**XIV** **SUMMARY** **88**
**XV** **DECISION** **90**

## LIST OF TERMS

**2005 Agreement** Shareholders' agreement for Sociedad Boliviana de Cemento, S.A., signed on September 22, 2005, between CIMSA, the shareholders of CIMSA, SOBOCE, GCC, and Grupo (Doc. C-1).

**2010 Agreement** Shareholders' agreement between CIMSA and GCC of May 28, 2010 (Docs. C-91 and R-35).

**Hearing** Second Stage evidentiary hearing in the city of Atlanta from June 30 to July 2, 2014.

**Court order** Court order of December 4, 2014, issued by Judge Pro Tem of the Eighth Civil Court of Morelos (Chihuahua) Judicial District, in which an anti-arbitration precautionary injunction was issued (Doc. R-891).

**Belaúnde** Witness statement of Gonzalo Belaúnde Sánchez of December 6, 2012. (Doc. C-248)

**C.C.** Bolivia Civil Code. Decree-Law No. 12760 of August 6, 1975, with the amendments to Laws No. 2089 of May 6, 200 [sic] and No. 004 of March 31, 2010.

**Cabanellas II** Second expert statement of Guillermo Cabanellas of March 31, 2014 (Doc. R-541).

**CIMSA letter** CIMSA letter of August 1, 2011, received by GCC on August 4, 2011, in which CIMSA expressed its desire to acquire all of GCC's share capital in Soboce (Doc. C-70).

**CCS** Consorcio Cementero del Sur, S.A.

**Chiossone III** Third expert statement of Orlando Chiossone of June 3, 2014. (Doc. R-722).

**CIAC** Inter-American Commission of Commercial Arbitration.

**CIMSA or Plaintiff** Compañía de Inversiones Mercantiles S.A.

**Plaintiff's Findings** Brief after second stage hearing, submitted on August 12, 2014 (C-76).

**Defendants' Findings** Brief after the second stage hearing, submitted on August 12, 2014 (R-77).

**Statement of defense** Statement of defense against the claim for damages of March 31, 2014 (R-55).

| | |
|---|---|
| **Plaintiff's Expenses** | Statement of Plaintiff's expenses of August 22, 2014 (C-80). |
| **Defendants' Expenses** | Statement of Defendants' expenses of August 22, 2014 (R-79). |
| **Cost of the Proceedings** | Provisions of funds paid to CIAC by the Parties. |
| **Claim** | Statement of damage claim of January 10, 2014 (C-48). |
| **Defendants** | GCC Latinoamérica, S.A. de C.V. and Grupo Cementos de Chihuahua, S.A.B. de C.V. |
| **Doria Medina II** | Second witness statement of Samuel Doria Medina Auza of January 9, 2014 (Doc. C-625). |
| **Doria Medina III** | Third witness statement of Samuel Doria Medina Auza of April 29, 2014 (Doc. C-762). |
| **Rejoinder** | Defendants' rejoinder brief of June 4, 2014 (R-60). |
| **FCD** | Discounted cash flow valuation method. |
| **Fernández II** | Second witness statement of Jaime Ricardo Fernández Horcasitas of March 31, 2014 (Doc. R-540). |
| **Ferrari I** | Legal expert statement of Franco Ferrari of March 27, 2014 (Doc. R-569). |
| **Ferrari II** | Second legal expert statement of Franco Ferrari of June 3, 2014 (Doc. R-762). |
| **Flores I** | First expert statement of Dr. Daniel Flores (Econ One Research Inc.) of July 10, 2012 (Doc. C-67) |
| **Defense fees** | Fees generated by the defense counsel of the Parties, including: defense counsel fees and expenses, expert fees, and costs of the two hearings. |
| **GCC** | GCC Latinoamérica, S.A. de C.V. |
| **Management** | Soboce Management. |
| **Grupo/Grupo Chihuahua** | Grupo de Cementos de Chihuahua, S.A.B. de C.V. |
| **Term Sheet** | Document agreed upon by the Parties on April 15, 2010, which served as the basis for the 2010 Agreement. |

| | |
|---|---|
| **LAB** | Arbitration and Conciliation Act No. 1770, of March 10, 1997 (Doc. C-27). |
| **Final Partial Award** | Final partial award on liability, of September 13, 2013, which concluded the First Stage of the proceedings. |
| **Final Award on Damages** | This present final award on damages, which concludes the Second Stage of the proceedings. |
| **M** | Millions. |
| **Messineo and Melendo** | Messineo, F. and Melendo, S.; Manual de Derecho Civil y Comercial [Civil and Commercial Law Manual], (Ediciones Jurídicas Europa-América) Volume IV. |
| **Morales Guillén** | Morales Guillén, C., Código Civil: Concordado y Anotado con Arreglo a la Edición Oficial [Civil Code: According to an annotated in accordance with the Official Edition], Third revised and expanded edition, Editorial Gisbert y Cia. S.A., 1991, Volume I. |
| **Nishizawa** | Second expert's legal report by Santiago A. Nishizawa Takano, of April 29, 2014. (Doc. C-764). |
| **CCS offer** | Letter by Vito Rodríguez, Executive Chairman of CCS, to Manuel Mi[l]án Reyes, General Manager of GCC, of July 4, 2011, stating that he was making a firm purchase offer (Doc. C-65 and Doc. R-36). |
| **PO** | Procedural Order. |
| **Majority Stake** | Block of CIMSA shares in Soboce consisting of 51.35% of Soboce's share capital. |
| **Minority Stake or Securities** | GCC's stake in SOBOCE, which was transferred to CCS, corresponding to securities with numbers 009, 013, and 015, representing 47.02% of SOBOCE's share capital. (Doc. C-68) |
| **Parties** | CIMSA, GCC, and Grupo |
| **Current Control Premium** | Control premium of the Majority Stake as of August 2011. |
| **Hypothetical Control Premium** | Control premium that, according to the Plaintiff, the Majority Stake would have had if it had acquired the Securities. |
| **First Stage** | First of the two stages in which these proceedings split in accordance with what was established in PO No. 3. |
| **CIAC Rules of Procedure** | The CIAC's rules of procedure, amended and valid as of April 1, 2002, with amendments in force since July 1, 2008 |

**Rejoinder**   Plaintiff's rejoinder brief of April 30, 2014. (C-57).

**Romero Sandoval** Sandoval, R.: Derecho de Obligaciones [Law of Obligations], "Los amigos del libro" Publisher, 1990.

**Second Stage**  Second of the two stages in which these proceedings split in accordance with what was established in PO No. 3.

**Soboce**   Sociedad Boliviana de Cemento, S.A.

**SPA**    Share Purchase Agreement signed between CCS, GCC, and Grupo as Guarantor on August 18, 2011. (Doc. C-198).

**Spiller II**   Second expert report by Dr. Pablo T. Spiller (Compass Lexecon, LLC) of March 31, 2014. (Doc. R-581).

**Spiller III**   Third expert report by Dr. Pablo T. Spiller (Compass Lexecon, LLC) of June 4, 2014. (Doc. R-763).

**SSPA**    Supplementary Share Purchase Agreement signed between CCS, GCC, and Grupo as Guarantor on August 18, 2011. (Doc. C-199).

**HT**     Hearing transcripts.

**US$**    United States of America dollars.

## I  PARTICIPANTS IN THE ARBITRATION

1. **PLAINTIFF**

1. The plaintiff is COMPANÍA DE INVERSIONES MERCANTILES S.A. [the **"Plaintiff"** or **"CIMSA"**], a limited company incorporated under laws of the Plurinational State of Bolivia with registered offices in:

   Compañía de Inversiones Mercantiles S.A.
   Calle Mercado 1045
   La Paz, Bolivia
   Telephone: (+591) (2) 211-1316
   Fax: (+591) (2) 211-1923

2. Represented in this arbitration by:

   **Samuel J. Doria Medina Auza**
   **María Luisa Doria Medina de Guamán**
   *Compañía de Inversiones Mercantiles S.A.*
   Calle Mercado 1045
   La Paz, Bolivia
   Telephone: (+591) (2) 240-6547
   Fax: (+591) (2) 240-7472
   Email: samueldm@comversa.com.bo
   mluisadm53@hotmail.com

   **Gonzalo Mendieta Romero**
   **Marcela Rada Arispe**
   *Mendieta, Romero & Asociados*
   Calle Fernando Guachalla 342,
   Edificio Víctor, Oficina 603
   La Paz, Bolivia
   Telephone: (+591) (2) 244-1499
   Fax: (+591) (2) 244-1517
   Email: gmendieta@mendieta-law.com
   mrada@mendieta-law.com

   **Mark H. O'Donoghue, Esq.**
   *Curtis, Mallet-Prevost, Colt & Mosle LLP*
   101 Park Avenue
   New York, NY 10178-0061
   United States of America
   Telephone: (+1) 212-696-6000
   Fax: (+1) 212-697-1559
   Email: mdonoghue@curtis.com

   **Javier Jiménez Gutiérrez**
   *Curtis, Mallet-Prevost, Colt & Mosle S.C.*
   Rubén Darío 281, Piso 9
   115 México D.F.

Mexico
Telephone: (+52) 55-5282-1100
Fax: (+52) 55-5282-0061
Email: jjimenez@curtis.com

**Bernardo M. Cremades, Jr.**
*B. Cremades & Asociados*
C/ Goya, 18 (planta 2)
28001 Madrid
Spain
Telephone: (+34) 91-423-7200
Fax: (+34) 91-576-9794
Email: bcr@bcremades.com

## 2. DEFENDANTS

3.     The defendants are:

-     GCC LATINOAMÉRICA, S.A. DE CV [**"GCC"**], a limited company incorporated under the laws of the United States of Mexico with registered offices in:

      GCC Latinoamérica, S.A. de C.V.
      Vicente Suárez y Sexta
      Col. Nombre de Dios, 31110
      Chihuahua, Chihuahua, Mexico
      Telephone: (+52) 614-442-3100
      Fax: (+52) 614-424-3377

-     GRUPO CEMENTOS DE CHIHUAHUA, S.A.B. DE C.V. (**"Grupo Chihuahua"** or **"Grupo"**), a limited company incorporated under the laws of the United Mexican States with registered offices in:

      Grupo Cementos de Chihuahua, S.A.B. de C.V.
      Vicente Suárez y Sexta
      Col. Nombre de Dios, 31110
      Chihuahua, Chihuahua, Mexico
      Telephone: (+52) 614-442-3100
      Fax: (+52) 614-424-3377

4.     Hereinafter, GCC and Grupo will be referred to jointly as the **"Defendants"**.

5.     They are represented in this arbitration by:

**Manuel Antonio Milán Reyes**
**Sergio Sáenz**
*Grupo Cementos de Chihuahua, S.A.B. de C.V.*
*GCC Latinoamérica, S.A. de C.V.*
Vicente Suárez y Sexta
Col. Nombre de Dios, 31110

Chihuahua, Chihuahua, Mexico
Telephone: (+52) 614-442-3100
Fax: (+52) 614-424-3377
Email: mmilan@gcc.com
        ssaenzg@gcc.com

**Ramiro Guevara**
**Jorge Luis Inchauste**
*Guevara & Gutiérrez S.C.*
Calle 15 No. 7715
esquina Calle Sánchez Bustamante,
Torre Ketal, piso 4 oficina No. 2
La Paz, Bolivia
Telephone: (+591) (2) 277-0808
Fax: (+591) (2) 279-6462
Email: rguevara@gg-lex.com
        jinchauste@gg-lex.com

**José I. Astigarraga, Esq.**
**Eduardo J. De la Peña Bernal, Esq.**
**Cristina Cárdenas**
*Astigarraga Davis Mullins & Grossman, P.A.*
701 Brickell Avenue, 16th Floor
Miami, FL 33131
United States of America
Telephone: (+1) 305-372-8282
Fax: (+1) 305-372-8202
Email: jastigarraga@astidavis.com
        edelapena@astidavis.com

**Luis Alejandro Salinas Vilela**
Comprehensive Legal Advice
Calle Loayza Esq. Mercado
Edif. Virgen de Copacabana No. 7
La Paz, Bolivia
Telephone: (+591) (2) 2203330
Fax: (+591) (2) 2203330
Email: asalinas@integral.com.bo

6.  Hereinafter, the Plaintiff and the Defendants, jointly, will be referred to as the **"Parties"**.

**A.    Arbitration Tribunal**

7.  The Arbitration Tribunal is made up of:

    -   Mr. Juan Fernández-Armesto, President, appointed on May 2, 2012, by mutual agreement of the arbitrators designated by the Parties. The Inter-American Commission of Commercial Arbitration [**"CIAC"**] confirmed the President of the Arbitration Tribunal on May 30, 2012.

- Mr. Fernando Salazar-Paredes, appointed by the Plaintiff on February 7, 2012.

- Mr. Eduardo Zuleta, appointed by the Defendants on December 6, 2011[1].

Arbitrators Salazar-Paredes and Zuleta were confirmed as co-arbitrators by CIAC on April 3, 2012.

8.  The contact information of the members of the arbitration tribunal are:

   **Juan Fernández-Armesto**
   *Armesto & Asociados*
   c/ General Pardiñas, 102 (8°Izq.)
   28006 Madrid, Spain
   Telephone: (+34) 91-562-1625
   Email: jfa@jfarmesto.com

   **Fernando Salazar-Paredes**
   *Salazar & Asociados*
   Av. San Martín (Equipetrol Norte),
   esq. calle "i", No. 27
   Edificio Aranjuez, Piso 5°
   Santa Cruz de la Sierra, Bolivia
   Telephone: (+591) 3-342-0009
   Email: fernando@salazarbolivia.com

   **Eduardo Zuleta**
   *Gómez-Pinzón Zuleta Abogados S.A.*
   Calle 67 No. 7-35
   Of. 1204 Edificio Caracol
   Bogotá D.C., Colombia
   Telephone: (+571) 319-2900
   Email: ezuleta@gpzlegal.com

**B.  Administration**

9.  This arbitration's administration has been entrusted to the Inter-American Commission of Commercial Arbitration (CIAC). The contact information is:

   **Carolina Cárdenas-Venino**
   Administrator of CIAC cases
   **Adriana Polanía**
   Director General
   **Rafael Bernal G.**
   President

---

[1]Initially, CIMSA appointed Mr. Gustavo Fernández Saavedra as co-arbitrator in the arbitration notification. As confirmed by CIMSA, he later declined to continue exercising as arbitrator for health and family reasons.

Email: CardenasC@adr.org
adriana@polanias.com
rafael.bernal@ccb.org.co

**C.** **Administrative Assistant**

10. In compliance with paragraph 22 of Procedural Order No. 1, the Arbitration Tribunal's Administrative Assistant was, during the first stage of the proceedings, Mrs. Alba Briones. By means of communication A-40 issued on February 10, 2014, the Tribunal appointed Mrs. Krystle M. Baptista Serna for the second stage of the proceedings. The following is her contact information:

**Krystle M. Baptista Serna**
*Armesto & Asociados*
c/ General Pardiñas, 102 (8ºIzq.)
28006 Madrid, Spain
Telephone: (+34) 91-562-1625
Email: kbs@jfarmesto.com

## II **PROCEDURAL HISTORY**

### 1. **INTRODUCTION**

11. On November 16, 2011, CIMSA initiated arbitration proceedings against GCC and Grupo.

12. The place of arbitration is the municipality of La Paz, Bolivia[2]. The language is Spanish[3]. The applicable law is Bolivian law[4], and the proceedings are governed by the Rules of Procedure of the CIAC, [hereinafter, the **"CIAC Rules"**], in accordance with the Arbitration Agreement[5]. The CIAC Rules have been in effect since April 1, 2002, and include the amendments introduced as of July 1, 2008.

13. In Procedural Order [**"PO"**] No. 1 the Parties and the Tribunal agreed on the division of the proceedings into two stages. In PO No. 3 the Court determined that in the first stage, questions of a legal nature would be analyzed while in the second stage, matters related to damages, costs, and interest would be resolved [hereinafter, the two stages of the proceedings will be referred to as the **"First Stage"** and the **"Second Stage"**].

### 2. **FIRST STAGE**

14. The procedural history of the First Stage is reflected in the Final Partial Award on Liability issued by the arbitration tribunal on September 13, 2013 [the **"Final Partial Award"**]; the Tribunal deems it to be included in this award.

15. In the Final Partial Award, the arbitration tribunal reached the following conclusions[6]:

> "528. In short, it is the opinion of the Tribunal that GCC's behavior – the failure to notify CIMSA that exercising the refusal right was invalid, denying CIMSA a period of 30 business days to pay for the Securities, and selling them to CCS before this time period elapsed – entails a breach of the good faith requirements established by Bolivian law and the obligations pursuant to Clause 6.3 of the 2005 Agreement.
>
> 529. It is worth noting that what CIMSA has lost as a result of GCC's actions is the opportunity to acquire the Securities at a price of USD 75 M, payable in cash within 30 days starting July 4, 2011 – the exercise date of the CIMSA Letter. In the next stage of this arbitration the Tribunal will quantify the anticipated or expected

---

[2] Letter from Dr. Carolina Cárdenas, CIAC, to the Parties, dated January 17, 2012, and Procedural Order No. 1, paragraph 25.
[3] PO No. 1, paragraph 26.
[4] PO No. 1, paragraph 32.
[5] PO No. 1, paragraph 30.
[6] Final Partial Award, IX.

damages occasioned by the denial of that opportunity, which, according to the plaintiff, are as follows[7]:

- Legal costs arising from the proceedings initiated to achieve the invalidity or alternatively, the declaration on non-compliance by GCC;

- Loss of income or damage that the Plaintiff has suffered as a result of not being able to acquire the Securities for USD 75 M in August of 2011, consisting in the difference between the actual value of the securities on that date and the price at which it had the right to acquire them (USD 75 M);

- Consequential damage consisting in the decrease in the value of CIMSA's shares in Soboce as a result of not having been able to eliminate the control limitation weighing on them in favor of the minority shareholder."

16. And it was unanimously decided[8]:

"1. In regard to the claim, the Tribunal declares

1.1. that it is not competent to decide on the invalidity of the transfer of the Securities from GCC to CCS;

1.2. that GCC breached the 2005 Agreement, in the terms described in paragraph 528 above.

2. As for the counter claim, the Tribunal declares

2.1. that it lacks the jurisdiction to decide on the counter claim brought by the Defendants.

3. Of a procedural nature, the Tribunal

3.1. orders the continuation of the proceedings in the terms indicated in paragraphs 595 and 596 above for quantification of the damages claimed by the Plaintiff in the terms indicated in paragraphs 529 and 530 above."

17. Having clarified the conclusion that the Defendants failed to meet the good faith requirements established by Bolivian law, in addition to the obligations pursuant to Clause 6.3 of the 2005 Agreement, the Tribunal decided, in the Final Partial Award, to open the Second Stage of the proceedings, which are devoted to:

- quantification of the damages to be paid by the Defendants to CIMSA, taking into consideration the individualization of the damage made by the Plaintiff; and

- decision regarding interest and costs.

18. As a complement to its decision, and at the Defendants' request, the Arbitration Tribunal issued a decision on the interpretation and correction of the Final Partial Award on November 18, 2013.

---

[7] Claim, paragraphs 232 to 241 and 245 to 291.
[8] Final Partial Award, X.

### 3. MOTION FOR DISMISSAL

19. On November 29, 2013, Mr. Salinas introduced, on the Defendants' behalf, an "Application for nullification of the arbitration award", which is included in the file as communication R-47. The Arbitration Tribunal served notice to the Plaintiff[9], and on December 24, 2013, the Plaintiff submitted its "Reply to the application for nullification of the arbitration award", which is included in the file as communication C-45.

20. On February 6, 2014, the Arbitration Tribunal issued PO No. 10, admitting the decision of the appeal for nullification by the competent court, and ordered that the file be sent to the judge.

### 4. SECOND STAGE

21. In the Final Partial Award, the Tribunal indicated that the damage suffered by CIMSA could be mitigated to the point of practically being eliminated, if GCC (upon an agreement with CCS) was capable of granting CIMSA the opportunity to acquire the Securities under the conditions of the right of first refusal included in Clause 6.3 of the 2005 Agreement (that is, allowing the Plaintiff to acquire the Securities, upon payment in cash of USD 75 M within 30 business days)[10].

22. In the face of the Defendants' evident lack of interest in mitigating the damages in the manner suggested by the Tribunal, the Second Stage was opened. In PO No. 9, dated September 27, 2013, the Arbitration Tribunal established the procedural calendar for the Second Stage, deciding that the hearing would be held from June 30 to July 2, 2014, inclusive (the **"Hearing"**).

Written pleading

23. In accordance with the procedural calendar established in PO No. 9, the Plaintiff submitted its claim for damages [**"Claim"**] on January 10, 2014, and the Defendants submitted their defense plea regarding damages [**"Defense Plea"**] on March 31, 2014; both documents were included in the files as C-48 and R-55, respectively.

24. The Plaintiff submitted its statement of reply regarding damages [**"Reply"**] on April 30, 2014, and the Defendants submitted their rejoinder regarding damages [**"Rejoinder"**] on June 4, 2014[11]; both documents were included in the file as C-57 and R-60, respectively.

---

[9] Communication A 37.
[10] Final Partial Award paragraph 596.
[11] By means of Com. R-59, the Parties expressed their agreement in granting the Defendants a small extension for the presentation of the Rejoinder, the submission of which was foreseen for June 2, 2014, in PO No. 9.

Evidentiary Hearing

25. The Parties agreed that the Hearing should take place in the city of Atlanta[12]. The Parties negotiated most of the organizational details, submitting a draft of PO No. 11 to the Tribunal.

26. During the Hearing the following witnesses and experts were questioned:

- Manuel Milán Reyes

- Jaime Fernández Horcasitas

- Martha Rodríguez Rico

- Pablo Spiller

- Orlando Chiossone

- Daniel Flores

27. The Hearing was recorded and transcribed and, after it was held, on July 25, 2014, the Parties communicated a definitive version of the transcription jointly approved and corrected [hereinafter, the **"AT"**].

Final pleading and costs

28. At the conclusion of the hearing, the Arbitration Tribunal asked the Parties – if they deemed it necessary – to agree on the date of the simultaneous presentation of briefs subsequent to the Second Stage Hearing. The Parties agreed to the submission of a final pleading brief[13].

29. And they did so simultaneously on August 12, 2014. Said briefs were included in the file as C-76 and R-77, respectively [hereinafter, **"Plaintiff Findings"** and **"Defendant Findings"**], respectively.

30. By agreement[14] between the Parties, the statements of costs were presented on August 22, 2014. These statements were included in the file as C-80 and R-79, respectively [hereinafter, **"Plaintiff Costs"** and **"Defendant Costs"**].

Closing of the proceedings

31. On February 16, 2015, the Arbitration Court declared the proceedings of the Second Stage of the Proceedings to be closed.

---

[12] The agreement is reflected in Com. R-53 and C-54.
[13] The agreement is reflected in Com. R-74 and C-73.
[14] The agreement is reflected in Com. R-74 and C-73.

**5. APPLICATION FOR STAY OF THE PROCEEDINGS**

**5.1. FACTS AND POSITION OF THE PARTIES**

32. On December 9, 2014, attorney Salinas, on the Defendants' behalf, introduced communication R-86, attaching what he insisted was a judicial order dated December 4, 2014, issued by the Judge Pro Tem of the Eighth Civil Court of the Morelos Judicial District (Chihuahua, Mexico) within the framework of the special commercial proceedings [the **"Order"**], which indicated, in brief:

> "The following is provisionally decreed, until the adoption of the requested preventive measures is definitively decided upon, or the final and definitive decision of the aforementioned appeal for nullification is made, whichever occurs first:
>
> a) Suspension of the second stage of the arbitration for the quantification of damages…
>
> b) That the members of the Arbitration Tribunal abstain from issuing the second final partial award on quantification of damages until the adoption of the requested preventive measures is definitively decided upon, or the final and definitive decision of the mentioned appeal for nullification is made;
>
> c) Suspension of actions initiated or to be initiated concerning recognition, execution, or approval of any final award issued in international arbitration…."

33. In short: GCC, the party in breach, according to the Final Partial Award, requested and obtained interim measures from a Mexican judge to halt the continuation of this arbitration. It has not been shown that the Plaintiff was notified or that the Plaintiff participated in this judicial procedure.

34. On December 23, 2014, the Plaintiff submitted communication C-82, presenting the reasons why, in its opinion, the Tribunal should not comply with the Order. The Plaintiff argued that:

- The Order was not binding for the Tribunal, because the Mexican judge lacked jurisdiction regarding arbitration proceedings;

- The Order was a delay tactic on the part of the Defendants, and its acceptance by the Arbitration Court would cause the Plaintiff considerable procedural damage; and that

- the Tribunal had a responsibility to resolve the dispute quickly.

35. On January 21, 2015, attorney Salinas, on the Defendants' behalf, introduced communication R-88, in which – without being required to do so by the Tribunal – he replied to the arguments expressed in the Plaintiff's communication C-82. Specifically, he stated that:

- The Tribunal could not ignore the Order, for the Judge Pro Tem had the jurisdiction to issue interim measures, even though he lacked jurisdiction in the seat of arbitration; the Defendants believed that the Judge Pro Tem had jurisdiction because the Mexicans judges were the ones who would have jurisdiction in the event of an execution of the award;

- The Judicial Order was not an instance of procedural delay, but sought to guarantee the legal protection of the Defendants, a practice permitted by Bolivian law, which does not prevent a judge from ordering an arbitration tribunal to suspend arbitration proceedings;

- The Tribunal is obligated to issue an enforceable award. Thus, it must give priority to the principle of legal protection over the principle of celerity.

36. One day later, by means of communication C-86, the Plaintiff responded to the arguments set forth by the Defendants, basically reiterating the previously stated position.

## 5.2. <u>ANALYSIS OF THE TRIBUNAL</u>

37. The Court must determine if it is obligated to abide by the interim measures issued by the Judge Pro Tem of the Eighth Civil Court of the Morelos Judicial District (Chihuahua, Mexico).

38. As an introductory note, it is necessary to differentiate between the interim measures issued in aid of the arbitration courts and those known as *anti-arbitration injunctions*: orders from judges that prohibit a party from initiating or continuing with arbitration proceedings. The injunctions issued in the Order belong in this last category, insofar as their intention is for the Tribunal to cease the proceedings and prevent this Final Award on Damages from being issued.

39. Legal theorists consider anti-arbitration injunctions to be undesirable, since they are incompatible with the principles of international arbitration[15]. In the words of Mexican legal expert Francisco González Cossío[16]:

> "In Mexico, these injunctions cannot occur lawfully. The reason is two-fold: (a) in Mexican law the instrument for anti-claim orders does not exist; and (b) arbitration law neither provides for nor permits it. While there have been some anomalies, they are precisely that – exceptions. In addition, if they were to occur, anti-arbitration injunctions would violate the principle of *compétence - compétence*, the obligation of the judge to refer the parties to arbitration, the responsibility of the parties to litigate in good faith, and the principle of efficiency of arbitration procedures. What is more, there is a current of opinion that believes that an arbitration tribunal would not be bound by these measures, that not only is it empowered to ignore them but that it is obligated to!"

---

[15] Lew, J., *Anti-Suit Injunctions Issued by National Courts to Prevent Arbitration Proceedings*, in Emmanuel Gaillard (ed.). Anti-Suit Injunctions in International Arbitration (Juris Publishing, Inc., 2005), p. 26 (Doc. C-958).
[16] González de Cossío, F., El Arbitraje y la Judicatura, Editorial Porrúa, 2007, p. 126 (Doc. C-942).

40. In the present case, the Tribunal concurs with the arguments set forth by the Plaintiff and thus dismisses the Defendants' request to suspend the arbitration proceedings for three reasons:

- In the first place, the Judge Pro Tem of Chihuahua lacks the jurisdiction to issue an anti-arbitration injunction and, specifically, to request the suspension of arbitration proceedings. (A):

- In the second place, the existence of alleged nullification proceedings in Bolivia and the fact that this Award [hereinafter, **"Final Award on Damages"**] can be executed in Mexico do not grant the Mexican court's jurisdiction to interfere with the arbitration proceedings (B):

- In the third place, the Defendants had the opportunity to suspend the proceedings after the First Stage and did not make use of this prerogative (C).

41. The Court will now analyze each of the reasons in detail.

## A. The Judge Pro Tem lacks the jurisdiction to issue an anti-arbitration injunction

42. The Arbitration Tribunal has the utmost respect for the ordinary courts of justice, including, needless to say, the courts of Chihuahua. However, by agreement of the Parties, the place of arbitration is the municipality of La Paz, Bolivia, and the applicable law is Bolivian law. The Chihuahua Judge clearly lacks the jurisdiction to interfere in this arbitration and to issue the provisional suspension of the proceedings *inaudita parte*.

43. Indeed, Art. 9 of Arbitration and Conciliation Act No. 1770, of March 10, 1997 [**"LAB"**] states that[18]:

"I. In disputes that are resolved according to this law, solely the corresponding arbitration court has jurisdiction. No other court may intervene, unless it is a matter of fulfilling tasks of judicial assistance.

II. The judicial authority with the jurisdiction to provide assistance, in the established cases, will be the authority qualified by law to hear the case or settle disputes in civil and commercial matters, in the absence of arbitration. In the absence of this authority, it will be the authority of the place of arbitration if this had been anticipated; in the absence of it and at the plaintiff's discretion, that of the place of conclusion of the agreement or that of the defendant's domicile, or that of any of them, if they are multiple."

44. Thus, in accordance with the LAB – and as the Defendants admit[19] – the exclusive competence to settle the dispute rests with the Arbitration Tribunal, as any other court of justice or judicial

---

[17] See paragraph 12 *above.*
[18] LAB, Art. 9.
[19] Com. R-88, p. 7.

body lacks the jurisdiction to intervene, *except* to provide legal assistance. And the only courts authorized to provide this aid are ones that, in the absence of an arbitration clause, would have material jurisdiction and, alternatively, those of the place of arbitration – that is, in both cases the courts of La Paz[20].

45. Furthermore, there is no legislative provision in Bolivian Law that permits a judge to order an arbitration court to suspend arbitration proceedings[21]:

- The LAB only permits the intervention of the courts of justice in cases where they are providing assistance to the arbitration tribunals, never to issue preventive injunctions that interfere with the proceedings;

- In addition, the LAB grants this jurisdiction to provide aid to the courts of justice of La Paz.

46. These conclusions are supported by the most highly respected international legal theory, which states that the arbitration may continue, despite anti-arbitration injunctions, and that it considers finding circumstances where the intervention of a judge in the arbitration to stop arbitration proceedings to be highly rare:

> *"The explanation as to why arbitrators can continue with an arbitration notwithstanding an order from a court is the fact that, fundamentally, the tribunal's authority comes from the parties' agreement to arbitrate. The tribunal is a creature of contract"[22].*

> *"I find it difficult to imagine circumstances in which there would be a justification for a court to intervene in an arbitration, to stop the arbitration. I do not want to say that this should be an absolute rule. There are, and will continue to be, exceptions. But I have not been involved in any case where such an action has been in any way justified"[23].*

47. What is more, legal theory has expressed its opposition to arbitration tribunals' complying with the anti-arbitration injunctions issued by the judicial courts (even the

---

[20] The LAB still contains additional subsidiary rules, which in this case are irrelevant, for the arbitration clause provides that the place of arbitration must be La Paz.

[21] To the contrary, the provisions that concern the suspension of proceedings – in particular due to the initiation of nullification proceedings – provide for the closing of judicial proceedings in favor of continuing the arbitration[21]. Thus states Art. 66.2 of the LAB: "The judge, when he receives the request to set aside an award, can suspend the nullification actions where appropriate, and one of the parties requests it, for the period of time that he deems appropriate in order to give the arbitration tribunal the opportunity to renew the arbitration actions or adopt any other measure that, in its judgment, eliminates the motives for the action for annulment." The same rule appears to be present in Mexico in Article 1459 of the Mexican Commercial Code: "Article 1459.- The judge, when he receives the request to set aside an award, can suspend the nullification actions where appropriate, and one of the parties requests it, for the period of time that he deems appropriate in order to give the arbitration tribunal the opportunity to renew the arbitration actions or adopt any other measure that, in its judgment, eliminates the motives for the application for annulment." (Doc. C-943).

[22] Lew, J., *Anti-Suit Injunctions Issued by National Courts to Prevent Arbitration Proceedings,* in Emmanuel Gaillard (ed.), Anti-Suit Injunctions in International Arbitration (Juris Publishing, Inc., 2005), p. 35 (Doc. C-958).

[23] *Ibid.* p. 39.

seat of arbitration itself – all the more, therefore, those outside of the seat of arbitration) when their intention is to hinder the work of the arbitration tribunal[24]:

> *"Then there are the problems of local courts which issue injunctions at the seat of arbitration to prevent arbitral tribunals carrying out their task. Some tribunals continue with the arbitral proceedings despite the injunction (even when they are within the territorial jurisdiction of the court concerned) on the basis that the injunction is not justified. In effect, these arbitrators "delocalize" their arbitration by refusing to accept the rulings of the local court under the* lex arbitri…*"*

49. It follows that the order issued by the Judge Pro Tem of Chihuahua was issued by a court that clearly lacked jurisdiction in relation to this arbitration, and that its content runs contrary to the LAB, the law to which this arbitration is subject. Consequently, it lacks all binding power for the Arbitration Tribunal.

## B. Setting aside the Final Partial Award and enforcement of the Final Award on Damages

49. The Final Partial Award was issued in La Paz, and the authority to set it aside rests solely with the courts of justice of La Paz – never with the Chihuahua courts. Thus, the interference by the Chihuahua Judge, who issued an interim measure based on the existence of alleged annulment proceedings in Bolivia is, clearly, unjustified and represents a flagrant overstepping of his jurisdiction.

50. The Defendants claim that Judge Pro Tem of Chihuahua has the jurisdiction to order the suspension of the proceedings because Mexican judges would be the competent judges in the event of an enforcement of the award. The Defendants base their argument on the analogous application of rules that – both in Bolivian law and Mexican law – would permit suspending the enforcement of the award when annulment proceedings are pending[25].

51. The Court cannot accept this argument. The rules on enforcement – and the possibility of suspending arbitration proceedings in this context – are totally irrelevant at this procedural moment of the arbitration.

52. A careful reading of Art. 84 of the LAB[26] – or its Mexican equivalent[27] – reveals that it cannot be applied analogously to the present case. This article, which permits suspending the enforcement of an arbitral award, presupposes:

---

[24] Redfern, A. and Hunter, M., *Law and Practice of Commercial Arbitration*. Sweet & Maxwell, 2004, paragraphs 2-30 (Doc. C-961).

[25] Art. 84 of the LAB and Article 1463 of the Mexican Commercial Code.

[26] Art. 84 of the LAB states:
"I. The Supreme Court of Justice of the Nation will only accept oppositions to the enforcement of the award that are based, in a well-informed manner, on compliance with the award itself or on the existence of a pending action for annulment.
II. In the above case, having confirmed the existence of an action for annulment pending ruling, the Supreme Court of Justice of the Nation will suspend the enforcement of the arbitral award until the aforesaid action is resolved."

- The existence of an enforceable award that has not been complied with voluntarily;

- The initiation of enforcement proceedings.

However, under no circumstances does it permit prohibiting the Arbitration Tribunal that issues the arbitration award that will be the object, precisely, of this enforcement.

53. These arbitration proceedings are not in the enforcement stage of the award but in the stage of rendering the Final Award on Damages. The Defendants' argument that enforcement of the award[28] is actually the essence of the Second Stage is legally and factually incomprehensible. And as concerns the enforcement of the Final Award on Damages, this will occur later, and will require:

- That the losing party not comply with the award voluntarily and

- That the winning party request its enforcement; only then can the suspension of the enforcement of the Final Award on Damages be brought before the Mexican courts – or the courts of any country where the losing party has assets when it is decided to request the enforcement.

**C. The Defendants already had the opportunity to suspend the arbitration.**

54. Finally, the Defendants' request to the Judge Pro Tem of Chihuahua is particularly inappropriate, because the Parties and the tribunal had agreed on special proceedings, in the seat of arbitration, to exercise their right to request the suspension of the Second Stage.

55. In effect, in its ruling A 35, the Arbitration Tribunal granted the Defendants the opportunity to request the suspension of the Second Stage of the arbitration proceedings[29]:

> "Lastly, the Arbitration Tribunal reminds the Parties of the agreement reached regarding the appropriate time to submit an application for suspension of the Second Stage of the proceedings, which will be when the Arbitration Tribunal grants the appeal, where applicable. If the Tribunal grants the appeal, the Defendants will have two weeks from that time to submit this justified suspension application. The Plaintiff will then have two weeks to reply to the application for suspension."

56. On February 6, 2014, the Tribunal issued PO No. 10, granting the action for annulment and reminding the Parties that any application for

---

[27] The same rule appears to be present in Mexico in Article 1463 of the Mexican Commercial Code: "Article 1463.- If the request was made to a judge in a country where, or per its laws, the arbitral award, its annulment, or suspension was issued, the judge that receives the request for recognition or enforcement of the award may, if he deems it necessary, postpone his decision and, at the request of the party requesting recognition or enforcement of the award, he may also order the other party to provide sufficient guarantees."

[28] Com. R-88, p. 7.

[29] A-35, paragraph 3.

suspension of arbitration proceedings will be governed by what is set forth in the aforementioned paragraph of communication A-35[30].

57. The Defendants did not make use of the possibility provided by the Arbitration Tribunal. Instead, they focused their efforts on the action for annulment. However, up to the date of this award, the Tribunal has no record that the appeal has been resolved[31].

***

58. <u>In short</u>: submitting to the arbitral clause, and choosing La Paz as the seat of arbitration, the Parties accepted that any dispute would be settled by an arbitration tribunal, and that subsidiary jurisdiction would correspond to the courts of justice of the Bolivian capital. The authority of this Arbitration Tribunal arises from this consent, and the obligation of the arbiters to comply with this mandate and to issue a final award that ends the proceedings, without permitting interferences or delays, and complying solely with the legal system chosen by the Parties, derives from that authority.

59. The order issued *inaudita parte*, by a judge that clearly lacks jurisdiction, apart from any proceedings, and whose content blatantly contravenes the LAB, may not prevent the arbiters from complying with their mandate and issuing this Award. Consequently, the Tribunal will continue its work and issue the Final Award on Damages.

---

[30] PO No. 10, paragraph 77.

[31] The Defendants filed the action for annulment, but on June 5, 2014, the Eighth District Judge of the Civil and Commercial Court of La Paz issued an order invalidating the presentation of the action for annulment of the Final Partial Award by the Defendants (Doc. C-946). The Defendants appealed the order, and the appeal was declared admissible. However, the Tribunal does not know if the appeal was settled in the Defendants' favor.

## III FACTS

60. The factual account contained in the Final Partial Award is reproduced here[32]. As this Second Stage of the proceedings is devoted exclusively to quantifying the damage claimed by the Plaintiff, the Tribunal summarizes below only the most significant facts for this purpose, as well as the most important decisions adopted in the Final Partial Award.

## 1. *DRAMATIS PERSONAE*

61. The Plaintiff in this arbitration is Compañía de Inversiones Mercantiles, S.A. [**"CIMSA"**], a Bolivian public limited investment company.

62. The Defendants are GCC Latinoamerica, S.A. de CV [**"GCC"**], a Mexican concrete company, and its parent company Grupo Chihuahua.

63. GCC and CIMSA were shareholders in Sociedad Boliviana de Cemento, S.A. [**"Soboce"**], which allegedly is the largest cement manufacturing company in Bolivia. This relationship was regulated by an agreement signed on September 22, 2005 [**"2005 Agreement"**], in which Grupo Chihuahua also appeared as guarantor of GCC's obligations.

64. Thus, Soboce's share capital was distributed as follows:

- CIMSA was the majority shareholder with 51.35% [the **"Majority Stake"**];

- GCC was a minority shareholder with 47.02% [hereinafter, the references to GCC's holdings in Soboce will be made to the **"Securities"** or the **"Minority Stake"**]; and,

- additionally, 1.63% was owned by other partners (Samuel, María Luisa, María Lourdes, and Silvia Doria Medina).

65. The 2005 Agreement regulates the relationship between Soboce shareholders. Its Clause 6.3 establishes certain limitations on the free transfer of shares to third parties, granting CIMSA a right of first refusal[33].

66. Later, GCC transferred the Securities to a Peruvian company, Consorcio Cementero del Sur, S.A. [**"CCS"**], which has enjoyed ownership of the shares since then[34].

## 2. THE DISPUTE

67. The present dispute arose because GCC decided to sell the Securities to CCS, not to CIMSA. CIMSA alleges that the transfer contravened the first refusal right that the 2005 Agreement granted it and claims that GCC and Grupo Chihuahua

---

[32] Final Partial Award, pg. 31 *et seq*.
[32] *Vid.* paragraph 330 *et seq.* of Final Partial Award for a detailed analysis of Clause 6.3 of the 2005 Agreement.
[34] Final Partial Award, paragraph 16.

should compensate it for their breach of contract. The Defendants, however, request that the Plaintiff's claims be dismissed.

## 3. 2010 SOBOCE VALUATIONS

68. When, in 2010, GCC wanted to shed its shares, in compliance with the 2005 Agreement, it contacted CIMSA, and the Parties began formal negotiations for CIMSA's acquisition of GCC's holdings in Soboce.

69. In March of the same year, Soboce's management carried out a series of valuations applying the discounted cash flow ["**DCF**"] method to determine the value of GCC's holdings in Soboce, and taking as a reference various future scenarios[35].

70. The following table summarizes the total amount yielded by these valuations[36]:

| Scenario | Valuation of 47% of Soboce |
|---|---|
| Without government plants | US$ 119.07 |
| 1 Government plant | US$ 109.31 |
| 2 Government plants | US$ 106.03 |
| 1 Government plant and Soboce making investments | US$ 97.44 |

Amounts in US$ millions

71. Taking these valuations as a point of departure, on April 15, 2010, the Parties agreed on a term sheet ["**Term Sheet**"], specifying the main characteristics of the transaction[37].

72. According to the Term Sheet, GCC would sell 44.5128% of Soboce's share capital to CIMSA for approximately US$ 100M[38]. Subsequently, GCC would sell it a residual stake of 2.5052% applying a multiple of 5.42 times EBITDA to establish the price[39].

73. The negotiations for the purchase by CIMSA of GCC's shares in Soboce continued until a definitive agreement was reached on May 28, 2010 [the "**2010 Agreement**"][40].

## 4. THE 2010 AGREEMENT

74. In the 2010 Agreement the Parties agreed on a price of US$ 99.7M for the sale of 44.5128% of GCC's shares in Soboce[41] (*pro memoria*:

---

[35] *Vid.* Soboce presentation, March 2010, Doc. R-458.

[36] *Vid.* Reply, paragraph 563; Second expert report of Dr. Pablo Spiller (Compass Lexecon, LLC) of March 31, 2014 (Doc. R-581) ["**Spiller II**"], table V; Second statement of Mr. Jaime Fernández of March 31, 2014 (Doc. R-540) ["**Fernández II**"], paragraph 6; Soboce Valuation Model – Without Government Plant (Doc. R-555). Soboce Valuation Model – 2 Government Plants (Doc. R-556), Soboce Valuation Model – Soboce Investment Advance (Doc. R-557).

[37] Term Sheet (Doc. R-56); Reply, paragraph 561; Rejoinder, paragraph 419; Fernández II, paragraph 7.

[38] Term Sheet, point 8 (Doc. R-56).

[39] This multiple would later be provided for in Clause 7.2.b of the 2010 Agreement.

[40] 2010 Agreement (Doc. C-91); Reply, paragraph 562; Rejoinder, paragraph 420.

[41] 2010 Agreement, Clause 5.2.

this amount corresponded to the valuation provided by the Parties in the Term Sheet, which assigned an amount of approximately US$ 100M to 44.5128% of GCC's shares in Soboce).

## 5. EXPROPRIATION OF FANCESA

75. Soboce was the owner of 33.34% of the share capital of Fancesa, another important cement manufacturer in Bolivia. While CIMSA and GCC negotiated the acquisition of Soboce's block of shares, on September 1, 2010, Supreme Decree No. 616[42] expropriated Soboce's stake in Fancesa. The Supreme Decree orders that the Departmental Government of Chuquisaca should compensate Soboce for the expropriation. However, as both Parties agree, on the date of the issuing of this award, the compensatory amount still has not been set, nor has any payment been made.

## 6. TRANSFER OF THE SECURITIES

76. Apparently, the expropriation discouraged the investors that had committed to subscribing the securitization notes with which CIMSA intended to finance the purchase of the Securities, which is the reason why the 2010 Agreement was not executed.

77. After the failure of the 2010 Agreement, on June 2, 2011 GCC reiterated to CIMSA its desire to liquidate its position in Soboce[43]. Several days later, GCC reported that, after the failure to sell its shares to CIMSA, it would attempt to sell its holdings in Soboce to a third party[44]. Mr. Doria Medina, CIMSA's representative, indicated at the time his intention to seek financing for the purchase of the Securities[45], and the Parties commenced new negotiations[46].

78. In this context, J.P. Morgan put GCC in contact with a potential buyer of the Securities, CCS, with which it began parallel negotiations.

79. On July 4, 2011, CCS issued a purchase offer [the **"Purchase Offer"**][47], which set in motion the purchase option procedure established in Clause 6.3 of the 2005 Agreement[48].

80. The following day, GCC notified CIMSA of CCS's offer so that the CIMSA could exercise, within 30 days, the first refusal option that the 2005 Agreement granted it[49]. During these 30 days, CIMSA and GCC negotiated the acquisition of the Securities and, before this deadline expired, CIMSA

---

[42] Supreme Decree No. 616 of September 1, 2010, Art. 2 (Doc. C-83).
[43] First witness statement of Martha Rodríguez Rico, of February 1, 2013, (Doc. R 274), paragraph 74; Final Partial Award, paragraph 105.
[44] Statement of Defense and Counterclaim, paragraph 90 (R-12).
[45] Statement of Defense and Counterclaim, paragraph 92 (R-12), Rejoinder, paragraphs 242 and 243.
[46] Final Partial Award, paragraphs 106-108.
[47] CCS Offer (Doc. C-65)
[48] Final Partial Award, paragraph 419.
[49] Letter from Manuel Milán Reyes (GCC) to Samuel Doria Medina (CIMSA) (Doc. R-22).

communicated unequivocally to GCC its desire to acquire the totality of the share capital in Soboce that GCC wished to transfer [the **"CIMSA Letter"**][50].

81. GCC responded in a letter dated August 12, 2011[51], in which, essentially, it made three declarations:

- It denied that the CIMSA Letter constituted a valid exercise of the contractual purchase option;

- It announced that it was going to proceed immediately to the sale of the Securities to CCS; and

- It requested CIMSA's collaboration in carrying out an audit provided for in CCS's offer.

82. That same day, Samuel Doria Medina, the Plaintiff's representative, sent a letter to Manuel Milán Reyes, Managing Director of GCC, indicating that the Plaintiff had validly exercised its right of first refusal and warning him of the consequences that GCC's breach of the purchase option established in the 2005 Agreement would have[52].

83. On August 18, 2011, GCC effectively transferred its shares to CCS[53].

84. In the Final Partial Award, the Tribunal assessed GCC's behavior as a breach of the 2005 Agreement and of good faith: failing to notify CIMSA that the exercise of the option was invalid, denying CIMSA a timeframe of 30 business days to pay for the Securities, and selling these Securities to CCS before this period of time had elapsed, GCC violated the terms of CIMSA's first refusal right.

## 7. CIMSA'S SALE OF ITS HOLDINGS IN SOBOCE

85. On December 16, 2014, more than three years after the events that gave rise to this dispute, CIMSA, the Plaintiff in this arbitration, sold the Majority Stake to CCS, the company that also acquired the Minority Stake. The Plaintiff confirmed the most significant aspects of the transaction in Communication C-88, which are also in the public domain.

86. The sale of CIMSA's holdings has not altered the course of the present arbitration: none of the Parties has modified its claims. In addition, as the Tribunal indicated in communication A-68, the new facts are irrelevant insofar as the present lawsuit is concerned, for they lack both an objective and subjective identity: the arbitration is between CIMSA and the Defendants and does not involve CCS – whose incorporation in the arbitration was rejected by the Arbitration

---

[50] CIMSA letter (Doc. C-70).
[51] Letter from Manuel Milán Reyes to Samuel Doria Medina of August 11, 2011 (received August 12, 2011) (Doc. C-28).
[52] Letter from Samuel Doria Medina to Manuel Milán Reyes of August 12, 2011 (Doc. C-116), p.3.
[53] Letter from Manuel Milán Reyes to María Luisa Doria Medina of August 18, 2011 (Doc. C-30). Grupo Cementos de Chihuahua S.A.B. de C.V., Third Quarter 2011 Results, October 28, 2011 (Doc. C-71), and GCC sells its shareholdings in Bolivian cement company, Grupo Cementos de Chihuahua S.A.B. de C.V., August 19, 2001 (Doc. C-72).

Tribunal[54], and its purpose is the sale of the Minority Stake in 2011, not the Majority Stake in 2014.

---

[54] In PO No. 4, the Tribunal expressly rejected the Plaintiff's application to include CCS in the present arbitration. The Defendants vehemently opposed the inclusion of CCS in document R-23. See PO No. 4, ξ93.

## IV OVERVIEW OF THE POSITION OF THE PARTIES

87. CIMSA requests comprehensive compensation for the damage that it alleges it suffered due to the violation of its right of first refusal. The objective of the compensation must be to place the victim of the contractual breach in the closest situation possible to what it would have been in if the breach had not occurred[55]. Thus, it requests compensation for three types of damage:

- The <u>first petition</u> involves the damage for US$ 188.29M, which the Plaintiff claims to have suffered as a result of not acquiring the Securities for US$ 75M in August of 2011; the damage would be quantified as the difference between the actual value of the Securities and the price at which it had the right to acquire them (US$ 75M);

- The <u>second petition</u> involves the damage for US$ 35.97M, which the Plaintiff claims to have suffered as a result of the decrease in the value of the Majority Stake in Soboce, having been unable to eliminate the reinforced political rights that a minority shareholder possesses by virtue of the Soboce's bylaws – something that, in fact, it would have been able to do if it had acquired the Securities; the damage would be quantified as the difference between the actual value that the Majority Stake itself has and the value that it would have in combination with Minority Stake;

- The <u>third petition</u> involves the legal costs arising from the judicial proceedings (distinct from this arbitration), begun, the Plaintiff alleges, as the result of the breach on the part of the Defendants, for US$ 75,000.

88. The Plaintiff argues that the essence of the Second Stage should consist in addressing the valuations submitted by the Parties' expert witnesses and determining the true value of the Securities[56]. According to the Plaintiff, it is necessary to determine the real market value of the Securities on an established date in accordance with the following steps:

- Assessing the value of Soboce on that date and assigning 47.02 percent of this value to the Securities;

- Adding the part that corresponds as a result of the Fancesa expropriation; and

---

[55] In support of its position, the Defendant cites Marcel Planiol: "the compensation must represent as precisely as possible the real damage that the creditor suffered"; Rafael Rojina Villegas: "the creditor will have the right to demand […] payment for compensatory damages, that is, the monetary equivalent of the diminishment in its equity due to the breach, plus the earnings that it could have obtained, and did not obtain, because of the breach"; Gert Kummerow: "The relevant moment for determining the content of the damage is the ruling," among others. The Plaintiff also cites a number of Bolivian judicial precedents that enshrine the principle that the quantification of damage must occur at the time of the ruling: Ruling 24/2006 of July 19, 2006: "damages to be qualified in the enforcement of the judgment"; Ruling 22/2008 of December 2008 "payment of costs and civil liability to be determined in the enforcement of the judgment". Claim, paragraphs 127-140.
[56] Reply, paragraph 33.

- Adding the amount at which CIMSA's holdings in Soboce would have been appraised if it had become the owner of all the shares[57] (*i.e.,* the control premium from which CIMSA would have benefitted).

89. The Defendants, for their part, categorically deny that GCC's behavior caused any damage to CIMSA: as GCC's breach is not the cause of the damage claimed by CIMSA, it does not follow that GCC should be ordered to make any payment of damages[58]. They add that CIMSA has not proven that the damages being claimed are the direct, immediate, and necessary consequence of the breach imputed to GCC, nor that they were foreseeable, and thus the object of indemnification under Bolivian law[59].

90. The Defendants also allege that CIMSA, in any event, would have the lacked the resources to pay the US$ 75M in 30 business days and thus acquire the Securities, and that, consequently, it cannot have suffered any damage[60].

---

[57] AT day 1, p. 49:18-22.
[58] Defense Plea, paragraph 368.
[59] Defense Plea, paragraph 560.
[60] Defense Plea, paragraph 404, 449.

## V DAMAGE CLAIMS OF THE PARTIES

### 1. PLAINTIFF'S CLAIMS

91. The Plaintiff requested that the Tribunal[61]:

"1. Order the Defendants to compensate CIMSA for the costs of all judicial and arbitration proceedings (not including these proceedings) arising from GCC's contractual breach for an amount that should be determined at the time of the award of the second stage of the proceedings;

2. Order the Defendants to compensate CIMSA for the loss of earnings for an amount no less than US$ 188.29 million;

3. Order the Defendants to compensate CIMSA for consequential damage for an amount no less than US$35.97 million;

4. Sentence the Defendants to pay all the costs and other legal expenses arising from the present arbitration proceedings; and

5. Indicate that all the amounts awarded to CIMSA accrue 6% annual interest from the date of the arbitral award of the second stage of the proceedings".

### 2. DEFENDANTS' CLAIMS

92. The Defendants requested that the Tribunal[62]:

"a. Consider this Response Brief to have been presented;

b. Declare CIMSA's claim for damages to be impermissible;

c. Deny all of CIMSA's claims and applications;

d. After the issuing of the Second Stage award, summons the parties in order to determine which party is the winning party and to quantify the legal costs and expenses arising from the arbitration proceedings consisting in the arguments presented by GCC here:

e. Grant any and all recourse to which GCC is entitled".

---

[61] Defendant Findings, paragraph 82.
[62] Defense, paragraph, 686; Rejoinder, paragraph 860; Defendant Findings, paragraph 75.

## VI **INTRODUCTION AND LEGAL FRAMEWORK**

93. The Tribunal decided, in the First Stage, that the Defendants were in breach of the 2005 Agreement[63]:

> "The Tribunal considers that GCC's behavior, consisting in failing to notify CIMSA that exercising the right of first refusal was invalid, denying CIMSA a time frame of 30 business days to pay for the Securities and selling them to CCS before this period of time had elapsed, entails a breach of the good faith requirements established by Bolivian Law and the obligations pursuant to Clause 6.3 of the 2005 Agreement."

94. In the Second Stage the Tribunal must decide if this damage claimed by the Plaintiff is recoverable applying Bolivian Law and, if so, determine the appropriate compensation[64]:

> "Having concluded that the Defendants did not comply with the good faith requirements established by Bolivian law and the obligations pursuant to Clause 6.3 of the 2005 Agreement, the Tribunal has decided to open the Second Stage of the proceedings, in which: it will quantify the damage to be paid by the Defendants to CIMSA, taking into consideration the individualization of the damages made by the Plaintiff in paragraphs 232 to 241 and 245 to 288 of the Claim and described in paragraph 529 of the present award; and it will also decide on costs."

95. The Tribunal will carry out this task in the following manner:

- First of all, it will examine the judicial framework of compensation for damages so as to later determine if the damage claimed is recoverable under Bolivian Law (VII, VIII, and IX);

- Second, it will establish the valuation criteria that must be followed to determine the recoverable amount of the damage (X);

- Third, it will calculate the corresponding compensation for the reasons that the Plaintiff considers recoverable (XI);

- Last, it will decide on the request for costs (XII) and interest (XIII).

96. When analyzing the claims, The tribunal has considered the numerous and extensive documents contributed by the Parties as well as the entirety of the factual and legal arguments of each of their claims; that said, in this Award the Tribunal will only refer expressly to the arguments that it considers decisive for its decision.

---

[63] Final Partial Award, paragraph 528.
[64] Final Partial Award, paragraph 595.

97. The Tribunal will now analyze whether the damage claimed by CIMSA is subject to compensation under Bolivian Law: the legal system and framework agreed to by the Parties.

## 1. GENERAL LEGAL FRAMEWORK

98. The Bolivian Civil Code ["**C.C.**"] punishes breach of contractual obligations establishing that the party in breach shall compensate its counterpart for the damage caused, save in the case of force majeure. Specifically, Article 339 states:

> "The debtor that does not exactly satisfy the amount due shall make compensation for the damage if the debtor does not prove that the breach or delay in the fulfillment of the obligation is attributable to the impossibility of making the payment for reasons that are not attributable to it."

99. The author Carlos Morales Guillén indicates, when commenting on this article, that in the face of the breach of a contractual obligation, Bolivian law grants as alternatives either enforcement or, in its absence, compensation[65]:

> "From the constitution of the obligation arises, as an immediate effect, the *obligation to perform*, that is, *exact fulfillment*, to which the creditor's right to payment corresponds *symmetrically* (Messineo). When this does not occur, due to the breach, the law provides two solutions: *enforcement*… Or if specific fulfillment does not occur through enforcement, payment of its *pecuniary equivalent* as *compensation for damage* caused by the breach shall apply…."

100. The Tribunal, in accordance with these alternatives, stated, in its Final Partial Award, that the damage suffered by the Plaintiff could be annulled almost completely if GCC (on agreement with CCS) granted CIMSA the opportunity to acquire the Securities through a payment of US$ 75M within 30 business days[66]. This alternative did not materialize, and so the compensation for damages must take place through pecuniary compensation[67].

Compensation for damage

101. Articles 344 *et seq* of the C.C. refer to compensation for damages.

102. Article 344 of the C.C. states that damage due to breach of obligations includes the loss suffered by the creditor and the earnings of which the creditor has been deprived, that is, consequential damage and loss of earnings:

> Art. 344 (Compensation for damage).- Compensation for damage, by virtue of the breach or the delay, includes the damage suffered by the creditor and the earnings of which the credit has been deprived, in accordance with the following provisions.

---

[65] Morales Guillén, C., Civil Code: In accordance with and annotated pursuant to the Official Edition, Third Edition, revised and expanded. Editorial Gisbert y Cia S.A., 1991, Volume I, [**"Morales Guillén"**], pp. 478-479 (Doc. R-811).
[66] Final Partial Award, paragraph 596.
[67] See A-68, paragraph 12.

103. Articles 345 and 346 of the C.C. establish the requirements for recoverable damage:

> Art. 345 (Foreseeable Damage).- The compensation only includes **foreseeable damage** or damage that could have been foreseen, if the breach or delay is not due to the debtor's willful malice.

> Art. 346 (Immediate and direct damage).- Although there is willful malice on the debtor's part, the compensation shall not include the loss suffered by the creditor and the earnings of which he has been deprived but rather the **immediate consequence and direct consequence of the breach** [Tribunal's emphasis].

104. Thus, under Bolivian law, in order for damage to be recoverable, it must be direct or immediate, foreseeable, and as we will see *below*, certain.

## 2. INDIVIDUAL CONTRACTUAL FRAMEWORK

105. In Clause 22 of the 2005 Agreement the Parties agreed to what the consequences would be in the event of a contractual breach[68]:

> "Each party shall compensate and hold any other Party (a "Compensated Person") harmless from any and all losses, costs, claims, damages, liabilities, penalties, injuries, or expenses (including reasonable legal fees) of any kind or nature, committed, imposed, or awarded against this Party, that are presented, related to, or have arisen from a breach of the present Agreement, or any other transaction related to those claims, actions, damages, liabilities, penalties, fines, injuries, or expenses that are the direct consequence of the willful negligence or malice of the Compensated Persons."

106. That is to say, the Parties anticipated that any party that is in breach of the obligations assumed in the 2005 Agreement must compensate the counterparty for the damage caused by the breach, unless the damage is attributable to willful negligence or malice on the part of the damaged party.

107. The legal framework agreed by the Parties in Clause 22 of the 2005 Agreement does not exclude or modify the application of legal requirements but rather is compatible with them. Thus, any contractually compensatory damage must meet the requirements that Bolivian law establishes for compensation for damages.

## 3. REQUIREMENTS FOR COMPENSATION FOR DAMAGE

108. Below, the Tribunal will analyze in more detail the three requirements that Bolivian law establishes in order to understand where damage is recoverable.

---

[68] Clause 22 of the 2005 Agreement (Doc. C-1).

**3.1 DIRECT AND IMMEDIATE DAMAGE**

109. Bolivian commentators explain that damage is direct when there is a "close causal relation between the damaging act and the calculation of the compensation."[69]

110. On the basis of the rule established in Art. 346 of the C.C., legal doctrine indicates that a breach of contract must be the condition *sine qua non* for the materialization of the damage[70]:

> "[T]here must be an immediate cause and effect nexus, or relation… and the event [damage]… in such a way that it can be inferred from it that the damage would not have been verified without that act, for it must be a necessary premise for the verification of the damage… in order for the immediate and direct damage to be recoverable – a mere relation of conditionality sufficing (the damage that is the consequence of the breach)."

111. The responsibility of proving the causal relation between the contractual breach and the damage corresponds to the victim. As the Bolivian author Raúl Romero Sandoval points out, in the event of breach of contract the[71]

> "causal link between the breach of the obligation and the damage must be proven by the victim."

**3.2 FORESEEABLE DAMAGE**

112. Moreover, under Bolivian law – Art. 345 C.C. – the compensation only includes foreseeable damage or that which could have been foreseen, provided that the breach is not the result of willful malice on the debtor's part.

113. Bolivian author Carlos Morales Guillén states[72]:

> "It is said that damage is foreseen when its eventuality could not be ignored by the debtor, in view of the purpose or stipulations of the contract."

**3.3 CERTAIN DAMAGE**

114. Finally, legal doctrine and case law have maintained that for damage to be recoverable, it must be certain, since compensating for hypothetical damage would equate to the unjust enrichment of the victim. In other words, the legal requirements of immediacy and foreseeability satisfied, the Plaintiff must prove the certain existence of the damage.

---

[69] Morales Guillén, p. 491 (Doc. C-398).

[70] Messineo, F. and Melendo, S.: Manual of Civil and Commercial Law (Ediciones Jurídicas Europa-América 1979) Volume IV. [**"Messineo y Melendo"**], p. 247 (Doc. C-923) [author's emphasis, not the Tribunal's].

[71] Romero Sandoval, R: Obligations Law, Editorial "Los amigos del libro", 1990 [**"Romero Sandoval"**], p. 144 (Doc. C-456).

[72] Morales Guillen, p. 491 (Doc. C-398).

115. The Supreme Court of Bolivia has been clear in establishing the need that the damage be certain and in defining this concept[73]:

> "Specialized legal doctrine has established as a general principle that damage in itself does not generate a right to compensation, but that the damage must meet certain requirements, such as certainty. Legal doctrine has uniformly declared that for damage to be recoverable, it must be certain.
>
> The damage must be certain, the antithesis of purely hypothetical, possible, or conjectural. There must be certainty regarding [sic] its very existence where it concerns actual damage; or sufficient probability must exist according to the natural and ordinary course of events that the damage causes, as foreseeable prolongation or aggravation of the damage, already in some measure existing – this in the hypothesis of future damage.
>
> In the same sense, certain damage is equivalent to existing damage, to non-imaginary damage, and damage that is consistent. In short, damage that can be proven."

***

116. The Plaintiff alleges that the Defendants' breach caused it direct, immediate, foreseeable, and certain damage, which would be materialized in three types of damage:

- The first would be the difference between the actual value of the Securities and the price at which it had the right to acquire them (*i.e.*, US$ 75M);

- The second would consist in the lack of revaluation of CIMSA's Majority Stake in Soboce, not having been able to eliminate the enforced political rights that Soboce's bylaws grant to a minority shareholder;

- The third would be the legal expenses generated by the Defendants' contractual breach.

117. The Arbitration Tribunal will analyze each of the damage types so as to determine whether they meet the requirements established by Bolivian Law to be recoverable, to wit: if they are an immediate and direct effect, foreseeable, and certain, of the breach. Given the degree of detail required, the Tribunal will devote specific sections to each category of damage:

- difference in the value of the Securities (VII);

- absolute control premium of the Majority Stake (VIII);

- and legal expenses (IX).

---

[73] Rejoinder, paragraph 559-60; quoting Supreme Order 578/2013 of November 11, 2013 (Doc. R-676).

## VII **FIRST CLAIM FOR DAMAGE: DIFFERENCE OF VALUE OF THE SECURITIES**

118. Three requirements must be met: the damage must be direct and immediate (1.), it must also be foreseeable (2.), and it must be certain (3.). Below the Tribunal will analyze the legal requirements for the first type of damage claimed by the Plaintiff. The Tribunal will determine whether these requirements are met and will quantify the specific damage in a subsequent chapter (XI).

## 1. **DIRECT AND IMMEDIATE DAMAGE**

119. The price at which GCC sold the Securities was US$ 75M; and that is the price at which CIMSA could have acquired them. The Plaintiff insists that this price was much lower than the market or actual value of the Securities. CIMSA intends to recover the difference in that amount.

120. The Defendants' central argument consists in categorically rejecting that CIMSA would have obtained sufficient financing to be able to purchase the Securities; since they would not have been able to purchase them, the damage would never have occurred.

121. In other words: the argument hinges on whether the causal link between the breach and the damage was interrupted by the lack of financing.

122. In order for the Tribunal to recognize a causal nexus or relation it is necessary that there be a cause (A), an effect (B) and a logical link between them (C.).

### A. Cause

123. The Defendants' behavior (not notifying CIMSA that the exercise of the refusal right was invalid, denying CIMSA a time frame of 30 business to pay for the Securities, and selling them to CCS before that period of time had elapsed) runs contrary to Clause 6.3 of the 2005 Agreement and the good faith obligations established in Bolivian Law, and constitutes the initial cause. The existence of the breach was established in the Final Partial Award and is *res judicata*. The Final Partial Award stated[74]:

> "In short, it is the belief of the tribunal that GCC's behavior – failing to notify CIMSA that the exercise of the right was invalid, denying CIMSA a time frame of 30 business days to pay for the Securities, and selling them to CCS before that period of time had elapsed, entails a breach of the good faith requirements established by Bolivian Law and the obligations pursuant to Clause 6.3 of the 2005 Agreement."

124. As a result of its analysis [sic], the Tribunal decided, in the Second Stage, to quantify the foreseeable and projected damage caused by

---

[74] Final Partial Award, paragraph 528.

denying CIMSA the opportunity to acquire the Securities for US$ 75M, payable in cash within 30 business days[75].

## B. Effect

125. The effect of the Defendant's behavior described in paragraph 123 *above* was that CIMSA could not exercise its right to first refusal and acquire the Securities for US$ 75M. Thus, as holder of a preferential acquisition right, if on the date when CIMSA's right to acquire the Securities was violated[76], the Securities had a market value greater than the sales price, the Plaintiff suffered damage equal to the difference between US$ 75M and the actual market value.

## C. Causal link

126. The third casual element is the existence of a causal link, the chain of events that leads from the cause to the effect. The causal nexus can be analyzed from two angles:

-   The <u>positive aspect</u> requires that the damaged party prove that a direct and immediate logical chain of events joins the initial cause (the Defendants' breach) to the final effect (the loss suffered or the earnings not obtained by CIMSA);

-   While the <u>negative aspect</u> allows the party in breach to break the chain demonstrating that the effect was caused – partially or wholly – not as result of its own actions but through the intervention of other causes, such as a cause attributable to the victim, to a third party, or to *force majeure*.

127. In the words of Bolivian author Raúl Romero Sandoval[77]:

"Causality is manifested in the process of liability in two ways, one positive and the other negative. In the positive manner, if the victim wishes to obtain a compensation judgment, it must prove the existence of a causal relation between the damage that it has claimed and the act, liable or not, to which the law joins the statement of liability. In the negative manner, it is when the defendant can bypass the causal relation that culminates in it, proving the mediation of an external and non-attributable cause (unforeseeable event, force majeure, or culpability of the victim)."

128. Another preliminary distinction needs to be made: the causal nexuses can be pure or transitive[78]. A pure causal nexus exists where the damage derives directly from the breach, without any intermediary elements. In practice, this situation is infrequent, because it is very complicated to prove that a determining factor is the sole and immediate cause of a result. Normally, the link between the breach and the damage is more complex, and additional elements intervene to form the chain of events.

---

[75] Final Partial Award, paragraph 529.
[76] See paragraph 260 below.
[77] Romero Sandoval, p. 127 (Doc. R-674).
[78] The terminology comes from Brigitte Bollecker-Stern: "*Le préjudice dans la théorie de la responsabilité internationale*", 1973, p. 186.

129. The Tribunal agrees with the Defendants in that in this case – to use the precise terminology – the causal nexus is not pure but transitive: the nexus has intermediate links between the breach and the damage, which are additional elements that make up the causal chain. But the mere fact that it is necessary to consider these possibilities does not cause the causal nexus to disappear: they simply make appreciating it more difficult.

130. Thus, the Plaintiff must demonstrate with reasonable certainty that these additional elements have been fulfilled. Specifically, the Plaintiff must convince the Tribunal that it would have been able to obtain the necessary funds to acquire the Securities within the pre-established time period.

131. CIMSA has contributed evidence in an attempt to explain how it would have obtained financing; the Defendants, meanwhile, categorically deny that this would have been possible.

132. The Arbitration Tribunal sides with CIMSA: while it is a matter of making valuations in a hypothetical field of what could have happened in the past, the Tribunal is reasonably satisfied that the evidence suggests that CIMSA would have been able to obtain the required capital. Below is a detailed analysis of the evidence provided.

## 1.2. CIMSA'S ABILITY TO PAY

### A. Plaintiff's Position

133. The Plaintiff agrees that in August of 2011, CIMSA lacked US$ 75M in cash. But it argues that it would have been able to obtain financing for this amount within the 30 business days that it had to exercise the right. The arguments that CIMSA presents to support its position are the following:

134. First, CIMSA would not have had to finance the entire US$ 75M, but rather a lesser amount due to Soboce's cash flow[79]. Thus, CIMSA could have used Soboce's cash flow (US$ 19.42M) without putting the company at risk[80]. The result is that it only would have had to finance US$ 55.58 externally.

135. Second, there were plausible alternatives for obtaining financing before September 14, 2011[81]:

   - Financing bridge or another financing framework such as a *leveraged buy-out*; and/or

   - Incorporation of a strategic partner of an industrial or financing nature whose injection of capital would allow it to acquire the Securities[82].

---

[79] Plaintiff Findings, paragraph 3.
[80] Plaintiff Findings, paragraph 4.
[81] Reply, paragraphs 312 and 342.
[82] Second witness statement of Samuel Doria Medina Auza of January 9, 2014. (Doc. C-625) [**"Doria Medina II"**], paragraphs 21-39, cited in Reply, paragraph 70.

136. Third, obtaining financing was a viable option because the Securities were being offered at a lower price than their market value[83].

137. Fourth, through the acquisition of the Securities, CIMSA would have enjoyed 98% of Soboce's share capital. Consequently, it could have used all of those shares or Soboce's assets as collateral to finance the acquisition[84].

138. Alternatively, CIMSA had assets that it could have put up as collateral amounting to at least US$ 168M: CIMSA's shares in Soboce, the Hotel DM Andino, and Bolivia Foods, S.A. shares, and with the purchase, also GCC's shares in Soboce[85].

139. CIMSA alleges that if it did not turn to these mechanisms it is because it had a "legitimate expectation", which emerged during the negotiations, that GCC would allow it to acquire the Securities under more advantageous conditions than the ones negotiated in the 2005 Agreement[86].

## B. Defendants' Position

140. The Defendants argue that CIMSA would not have been able to obtain the resources needed to pay the US$ 75M in cash within 30 business days of August 4, 2011:

- CIMSA did not demonstrate its payment ability in order to exercise the right [sic] , and

- The reports of Dr. Spiller, Senior Consultant at Compass Lexecon, and Mr. Chiossone[87], an expert in investment banking in Latin America, show that it was "highly unlikely" that CIMSA would have been able to the pay for the Securities on time.

## a. Dr. Spiller's Report

141. Dr. Spiller states that it would have been highly improbable that CIMSA would have been able to generate the necessary resources in a timely manner[88]. CIMSA lacked its own and external financing. Dr. Spiller's arguments are the following:

142. First, there is no documentary evidence that demonstrates the concrete possibility of CIMSA's having access to external financing at an amount needed to cover the entire price. According to Dr. Spiller, this situation arises from CIMSA's impossibility of access before September 14, 2011[89]:

---

[83] Reply, paragraph 343.
[84] Third witness statement of Samuel Doria Medina Auza of April 29, 2014 (Doc. C-762) ["**Doria Medina III**"], paragraph 21, quoted in Reply, paragraph 46.
[85] CIMSA's Opening Pleadings, p. 14 (Doc. C-934): Doria Medina II, paragraph 11, quoted in Reply, paragraph 57: Plaintiff Findings, paragraph 4.
[86] Doria Medina III, paragraphs 8-9, quoted in Reply, paragraph 47.
[87] Second witness statement of Orlando Chiossone, of March 31, 2014 (Doc. R-621). Third witness statement of Orlando Chiossone, of June 3, 2014 (Doc. R-722) ["**Chiossone III**"].
[88] Spiller II, paragraph 4.
[89] Spiller II, paragraph 35-42.

- to the capital markets for securitizing its future cash flows, issuing bonds or promissory notes;

- to sufficient bank financing through Bolivian or international banks.

143. <u>Second</u>, the impossibility of CIMSA being able to establish strategic alliances with potential partners from the concrete sector or financial sector: there is no evidence whatsoever of any alliance of this kind during the failed transaction in 2010, nor during the negotiations period in 2011[90].

144. <u>Third</u>, there is no documentary evidence that the Doria Medina family or CIMSA would have used their own funds. In particular, there is no evidence of the value of other assets owned by CIMSA or Mr. Doria, such as investments in Bolivian Foods, S.A. or Hotel DM Andino. The only funds for which documentary evidence exists, indicating that they could have been used as a source of funding for the acquisition of GCC's stake in Soboce, were US$ 4M[91].

**b. Dr. Orlando Chiossone's Report**

145. In his expert report, Dr. Orlando Chiossone concludes that it was "highly unlikely" that CIMSA would have been able to obtain the necessary financing within 30 business days. Mr. Chiossone reaches the following conclusions[92]:

- Soboce did not have the ability to obtain more financial debt, given that it already had a high level of leverage;

- The company showed an EBITDA decrease in the first six months of 2011;

- Bolivian banks did not offer financing in the necessary amounts and time frames;

- Foreign banks would have been averse to offering financing, due to the conditions of the Bolivian market and the high level of risk in the country;

- Obtaining funds through the sale of assets belonging to CIMSA and Mr. Doria would not have been sufficient to finance the transaction. Moreover, it was highly improbable that the sale of these assets would have been completed within 30 business days, taking into account the lack of activity in the market and the necessary paperwork involved in closing sales processes;

---

[90] Spiller II, paragraph 4.
[91] Spiller II, paragraph 4.
[92] Chiossone II, p. 35.

- The issuing of bonds in the local market necessitated some rather complex requirements, partly controlled by third parties, making it highly unlikely that the process would be concluded in less than 30 business days;

- It was highly unlikely that a strategic or financial partner would have been interested in Soboce, given the danger of expropriation in Bolivia and that the offer was to acquire a minority position.

## C. **Tribunal's Decision**

146. CIMSA's desire to acquire the GCC shares is a proven fact. The Plaintiff not only secured a preferential acquisition right in the 2005 Agreement, but on numerous occasions it stated its desire to acquire the Securities:

- During the negotiations that were held in 2010.

- During the negotiations in the months of June, July, and August of 2011

- By means of the CIMSA Letter dated August 4, 2011, in which CIMSA expressed "its decision to acquire the entirety of Soboce's share capital that GCC wishes to transfer", making "definitive use of its first refusal right to acquire GCC's stake in Soboce at the price and under the conditions (materially equal and without preceding conditions) that appear in CCS's letter of intent.[93]"

147. However, it is clear that mere desire did not suffice to acquire the Securities. A substantial sum of money was also needed.

148. In the Final Partial Award, in the analysis of CIMSA's main argument, which was dismissed, the Tribunal expressed its doubts regarding CIMSA's ability to pay[94].

149. The Tribunal must now determine with greater certainty – after analyzing in depth the additional proof provided by the Parties – if it is reasonable to assume that CIMSA would have obtained the necessary financing within 30 business days, starting August 4, 2011.

150. In this Second Stage, the Defendants have insisted that the reason why CIMSA did not acquire the Securities was its inability to pay and obtain financing. CIMSA, for its part, has attached additional proof to refute the Defendants' allegation. The Arbitration Court has assessed the proof according to the rules of sound criticism and is convinced that CIMSA could have obtained the financing needed to exercise its right of first refusal. There are three reasons for this:

- CIMSA only had to finance part of the transaction (a.);

---

[93] CIMSA Letter (Doc. C-70).
[94] Final Partial Award, paragraphs 467, 471.

-   CIMSA turned to the market to obtain financing with assets whose value tripled the amount that it needed to request (b.); and

-   as a last resort, the Doria Medina family would have financed the purchase with its personal equity (c.).

151. The Tribunal will analyze each of these reasons in depth:

**a. Available capital**

152. The Defendants admit – and the Tribunal confirms – that CIMSA would have had access to between 23% and 36% of the capital needed to acquire the Securities. In particular:

-   Between US$ 10M[95] and 19.4M[96] in Soboce cash flows;

-   US$ 4.5M in Esmical cash flows[97];

-   US$ 2.5M from Banco Bisa financing[98];

-   US$ 0.14M from the CIMSA's credit line available as of the month of August[99]; and

-   US$ 0.5M in promissory notes issued by CIMSA[100].

153. In other words, CIMSA incontrovertibly had available capital between US$ 17.64M and US$ 27.04M. This means that it needed to acquire financing amounting to approximately between US$ 57M and US$ 47M.

**b. External financing**

154. The tribunal is reasonably convinced that CIMSA would have had access to more sources of financing. Specifically, CIMSA could have obtained more bank loans, since in order to obtain financing amounting to approximately US$ 55M[101], it possessed guarantees amounting to at least US$ 168M:

-   CIMSA's shares in Soboce were valued – if the price of US$ 75M for 47.02% is considered valid – at US$ 81.90M;

---

[95] In his third witness statement Mr. Chiossone admits that CIMSA could have used at least US$ 10M of Soboce's cash flow, Chiossone III, pp. 6-7. For his part, Dr. Spiller accepts that Soboce's cash fund had 16.4 M in it (Spiller II, paragraph 60).
[96] Witness statement of Gonzalo Belaúnde Sánchez of December 6, 2012. (Doc. C-248) [**"Belaúnde"**], paragraph 77 (sum of final balance plus dividends paid in the table named SOBOCE-ADJUSTED EXECUTED CASH FLOW).
[97] Chiossone II, pp. 13-14; in addition, during the hearing Mr. Chiossone acknowledged that Esmical had "significant cash available" that could have reduced the need for financing [AT day 3, p. 1065:7-19; p. 1100:15-18].
[98] Spiller II, paragraph 59.
[99] Spiller II, paragraph 59.
[100] Spiller II, paragraph 59.
[101] This amount comes from subtracting the US$ 19.7M that the Defendants' expert recognizes as certain from US$ 75M [Spiller, paragraph 60].

- CIMSA's shares in Bolivian Foods, S.A., and in Hotel DM Andino, to which the Defendants assign a value of US$ 11.1M[102];

- the financed acquisition of the Securities would have enabled CIMSA to hold an additional 47.02% of Soboce shares, which also could have been used as collateral, and which at least would have a value of US$ 75M[103].

155. The Defendants' own expert – Mr. Chiossone – admitted in the hearing that CIMSA did not have any restrictions on its assets or agreements that would limit its debt capacity[104].

156. And while the Tribunal is aware that the deadline to obtain financing was certainly tight, given the good relationship that Mr. Doria Medina had with the banks[105], it is highly probable that the financing would have arrived in time, notwithstanding the fact that this would entail greater compensation by the lender.

### c. Equity of Mr. Samuel Doria Medina and his family

157. Another additional source of financing remains to be analyzed: the personal equity of the Doria Medina family, one of the largest fortunes in Bolivia with personal assets deployed globally[106].

158. The Defendants have questioned the availability of this source of financing in view of the fact that during the entire negotiation process with GCC, Mr. Doria Medina refused repeatedly to invest his own funds in financing the purchase. His intention was always that CIMSA would obtain the funds on its own and that the financing would be guaranteed with the Soboce shares and dividend cash flows generated by the cement company.

159. The Tribunal considers that the circumstances of the commencement of the negotiation and those existing with a possible sale to CCS in progress are radically different. The eruption of CCS, a direct competitor, as a possible buyer of the Minority Stake in Soboce could not have been appealing to Mr. Doria. Until that time, it was GCC that needed to sell, while CIMSA had no particular interest in buying – it was satisfied with the *status quo*. The possibility that CCS could acquire the stake disturbed the situation and put Mr. Doria in a *Zugzwang* position: passivity no longer benefitted him; he had the imperious need to acquire the shares within the time frame and at the price he was being offered. If the Defendants had fulfilled their obligation to respect the right of first refusal, GCC would have given Mr. Doria an ultimatum to purchase and pay no later than September 14, or otherwise consent to the entrance of CCS. The Tribunal is convinced that, in that case, as

---

[102] Spiller II, paragraph 57, n. 74 and 76: CIMSA financial statements as of December 31, 2011 and 2010 (Doc. R-340), pdf. p. 10: DM Hotel Andino General Balance Sheet as of December 31, 2011 (Doc. C-686), p.1.

[103] The analysis of the Tribunal yields a value for the Securities of US$ 109,129,893.50 in August of 2011. See paragraph 317 below.

[104] AT day 3, p. 1026:11-20.

[105] Doria Medina III, paragraphs 10-14.

[106] Doria Medina III, paragraph 12.

can be gathered from his testimony, Mr. Doria would have overcome his reluctance to use his own resources and would have decided to finance the acquisition with his own funds.

160. Mr. Doria had a special interest in avoiding the entrance of a direct competitor such as CCS, which would have put CIMSA in an "exceptionally serious"[107] situation, because it would not relinquish its veto rights in Soboce, and with which a complicated relationship was expected[108].

161. Therefore, the Arbitration Tribunal accepts the personal equity not only of Mr. Samuel Doria Medina but that of his family as a reliable source of additional financing[109].

**d. Defendants' Counter-Arguments**

162. The Defendants have emphasized the existence of elements that place CIMSA's payment ability in doubt.

163. <u>In the first place</u>, the Defendants allege that CIMSA was obligated to obtain approximately US$ 55M in 30 business days – a very arduous task; solid proof of this is that in 2010, CIMSA had already been incapable of obtaining the funds to purchase the Securities in compliance with the 2010 Agreement[110].

164. What actually occurred then is that CIMSA had anticipated securitizing Soboce's future dividends to finance the acquisition of the Securities. However, the Fancesa expropriation disrupted a financial transaction that, until then, seemed viable[111]. The Arbitration Tribunal said as much in the Final Partial Award when analyzing the failure of the 2010 Agreement[112]:

> "102. The draft of the addendum to the 2010 Agreement was never signed, and the transfer of the shares never took place. Apparently, the expropriation caused the pension fund administrators, who had agreed to subscribe the securitization with which CIMSA planned to finance the purchase, to lose heart. In the face of the difficulty in obtaining the anticipated financing, CIMSA informed the Bolivian Stock Market of its desire not to continue with the securitization of Soboce's future dividends."

165. <u>In the second place</u>, the Defendants allege that during the months of June and July of 2011, CIMSA contemplated diverse external financing schemes, which made clear its difficulty in obtaining credit.

---

[107] Claim, paragraph 76: Doc. C-77. P. 42; see also Doria Medina II, paragraph 18.

[108] The complicated relationship between CIMSA and CCS was later concretized in numerous judicial proceedings and disputes between the shareholders, see Final Partial Award paragraphs 216, 217.

[109] Only in 2010 and 2011, the family had obtained dividends of between US$ 3 and US$ 5M a year, in its capacity as a CIMSA partner.

[110] Final Partial Award, paragraphs 102-104.

[111] Belaúnde, paragraphs 17, 25. While there is no written record of what the AFPs stated, emails do exist between Juan Carlos Requena, of Soboce, and Manuel Milán, of GCC, in which they discuss their concern and the necessity to determine if they would still have a total or partial interest (Docs. C-295 and C-296 of September 29, 2010).

[112] Final Partial Award, paragraph 102.

166. The Tribunal agrees with the Defendants that CIMSA explored numerous options for obtaining financing, which, for different reasons, it had to rule out. This is consistent with Mr. Doria Medina's desire that CIMSA obtain funds on its own and that the financing be guaranteed with the Soboce shares. However, the failure of the financing means envisaged as "preferred" does not imply that in the face of the impossibility of obtaining financing from external sources, Mr. Doria Medina would not ultimately be willing to use his own equity, and that of his family, to reach the US$ 75M[113].

167. The Tribunal is also aware that CIMSA's financing plans presupposed that it would have three months to acquire the Securities, as CCS had been offered[114]. Nevertheless, the analysis of the evidence shows[115] that, faced with the contractual payment scenario of 30 business days, CIMSA would have adopted a more aggressive posture to obtain external financing, even though this would have entailed less favorable financing conditions.

168. In the third place, the Defendants allege that the obtaining of bank credits, whether in Bolivia or abroad, involved difficulties: CIMSA, a holding company, was not a good credit risk, and that it was located in Bolivia entailed the additional handicap of a high risk country.

169. The Tribunal has already explained that, in its judgment, it has been established that CIMSA had assets that it could have offered as collateral to banks to obtain financing. In particular – and despite the Fancesa expropriation – Soboce was a company that had exponentially increased its production capacity and sales of cement and other products in the preceding years[116]. Thus, making favorable forecasts was not farfetched.

170. In addition, the threat posed by the entry of one of Soboce's competitors represented a personal affront to Mr. Doria Medina that would have led him to offer remuneration to an external investor that would have compensated for the country risk factor[117].

171. In short, the Tribunal considers that the Plaintiff had a credible likelihood of taking advantage of the opportunity to acquire the Securities for US$ 75M within 30 business days, starting August 4, 2011.

172. With this, the causal nexus between the breach and the damage is established, and the alleged lack of financing is not sufficient to break this causal link. The predictability of the damage, which is another requirement to be met, will be analyzed below.

## 2. FORESEEABLE DAMAGE

173. As indicated above, in Bolivian Law – Art. 345 of the C.C. – compensation only includes foreseeable damage or damage that could have been foreseen, provided that the breach is not due to willful malice on the debtor's part. The burden of proof of willful malice

---

[113] Doria Medina III, paragraph 9.
[114] Final Partial Award, paragraphs 505-507.
[115] Doria Medina III, paragraphs 7-8; Doria Medina III, paragraph 10.
[116] Soboce 2010 financial report, p. 40 (Doc. C-77).
[117] Doria Medina III, paragraph 16.

corresponds to the creditor – in this case: the Plaintiff – and the Tribunal does not consider it established that the Defendants acted with willful malice or that their behavior is equivalent to willful malice[118]. Consequently, the recoverable damage will be only that which was foreseeable or could be foreseen.

174. Art. 345 of the C.C. does not refer to the predictability of a determined subject, which is the reason why it must be understood that it concerns the predictability of the parties to the contract, according to the rules of experience[119]. Additionally, it is not disputed that proof of the unpredictability of the damage is incumbent on the debtor[120], in this case the Defendants.

175. The Tribunal is convinced that it was foreseeable that the Defendants' breach would eventually result in damage to CIMSA, and that this damage would be manifested in the difference between the price negotiated for the acquisition of the Securities (US$ 75M) and its real market value. And, in fact, the damage was foreseeable by all interested parties.

176. The Defendants' argument that the damage was not foreseeable is not sustainable in light of what was agreed in the 2005 Agreement and the proven facts:

- The Defendants were aware of Clause 6.3 of the 2005 Agreement, such that it was perfectly foreseeable that if they were in breach of it, they would be obligated to compensate CIMSA for the damage caused *ex* Clause 22 of the Agreement. In other words, the Parties – in their condition as Soboce partners – contractually established a legitimate expectation that faced with the possibility of a sale of shares, they would enjoy a right of preferential acquisition, the breach of which would entail the consequences foreseen in Clause 22 of the 2005 Agreement and in Bolivian law.

- Not only that, if the predictability is assessed – as the Defendants' expert suggests – at the time of the behavior with regard to which liabilities are determined[121], no doubt remains concerning the foreseeability of the damage: the Plaintiff warned the Defendants of the consequences of denying it the opportunity to acquire the securities days before the sale to CCS:

  "(…) we should promptly agree on the respective sales contract. Any contrary action on the part of GCC or third parties,

---

[118] In the Final Partial Award the tribunal ruled that the Defendants' behavior entailed a breach of the good faith requirements established by Bolivian Law and of the obligations pursuant to Clause 6.3 of the 2005 Agreement. However, the Defendants' omissive behavior that gave rise to the breach of the good faith obligation does not imply that the behavior was malicious, but simply that they did not comply with the legal obligation to act in good faith. Bad faith or willful malice entails a *mens rea* of damage that has not been proven in this case.

[119] Nishizawa, paragraph 69, citing Messineo and Melendo (Doc. C-923); Second expert statement of Guillermo Cabanellas of March 31, 2014 (Doc. R-541) [**"Cabanellas II"**], paragraph 46, citing López Mesa and Trigo Represas (Doc. R-575).

[120] Messineo and Melendo, p. 248 (Doc. C-923 and R-679). The complete quotation is: "the *proof* of the *unpredictability* of the damage is incumbent upon the *debtor*, as proof that can be valid for diminishing (in its interest) the entity of the compensation owed by it, when the creditor has provided, on its own, proof of the *damage*".

[121] Cabanellas II, paragraph 53, 66.

based on rights that GCC recognizes in violation of the Shareholders' Agreement, will entail consequential liabilities…"[122]

- The predictability of the damage was so real for the Defendants that they signed a contract with CCS – the *Supplementary Share Purchase Agreement* [the **"SSPA"**] –, the purpose of which was to protect themselves in the event that CIMSA filed claims for the transfer of the Securities. In essence, CCS assumed the economic risk that could arise from a possible CIMSA claim against GCC[123]. The Managing Director of the Group, Mr. Manuel Milán, acknowledged the predictability of the damage in his second witness statement[124]:

  "208. The content of the Supplementary SPA is due to and was signed as a consequence of the threatening attitude that CIMSA argued in its communication of August 12 and in Samuel Doria Medina's email of July 28. It was an exercise followed by prudent businessmen to prevent scenarios caused by a belligerent posture that CIMSA adopted, without implying the acceptance of their viability."

## 3. CERTAIN DAMAGE

177. The Plaintiff insists that the damage it claims is certain and, concretely, points out that its expert proved that the sales price of the Securities was less than the market price. The Defendants and their expert reject this.

178. As will be analyzed *below*, the Tribunal will come to the conclusion that the price of US$ 75M was below the market value of the Securities. For this reason alone, the Defendants' arguments concerning the uncertainty of the damage cannot be accepted.

***

179. <u>In short</u>, the Tribunal considers it to be established that a causal nexus exists between the Defendants' breach and the damage caused to CIMSA, and that the damage was clearly foreseeable and certain. Thus, the damage is recoverable according to Bolivian law.

---

[122] Letter from Samuel Doria Medina to Manuel Milán Reyes of August 12, 2011, p. 3 (Doc. C-116).
[123] See Final Partial Award paragraphs 209-212.
[124] Second statement of Manuel Milán Reyes dated February 11, 2013, paragraph 208 (Doc. R-272).

### VIII SECOND CLAIM FOR DAMAGE: CONTROL PREMIUM OF THE MAJORITY STAKE

180. *Pro memoria*: CIMSA seeks comprehensive compensation for the damage that it alleges to have suffered due to the violation of its right of first refusal and that is concretized in three types of damage:

- The first type of damage is the damage that the Plaintiff says to have suffered as a result of not having been able to acquire the Securities for US$ 75M in August of 2011, and the compensation that the Tribunal has analyzed in above section VII;

- The second type of damage is related to the amount of the control premium generated by the Soboce shares owned by CIMSA; currently, CIMSA is the owner of the Majority Stake, which, granting it control of the company, already involves a control premium [**"Current Control Premium"**]; the Plaintiff argues that if it had acquired the Securities, it would have attained a sufficient majority to amend Soboce's bylaws and eliminate the enforced political rights that the minority shareholder possesses; as a result, the premium associated with its Majority Stake (not with the Securities that it intended to acquire from the Defendants) would have increased to the point where it would have constituted the **"Hypothetical Control Premium"**; CIMSA claims the difference between the Actual and the Hypothetical Control Premium;

- The third type of damage is for the legal costs arising from the judicial proceedings (distinct from this arbitration) initiated, as the Plaintiff alleges, as a result of the Defendants' breach.

181. Below, the Tribunal will analyze whether the second type of damage claimed by the Plaintiff is recoverable in Bolivian law.

### 1. POSITION OF THE PARTIES

182. The Plaintiff begins its argument recalling that in compliance with the 2005 Agreement, Soboce had amended its bylaws precisely so as to grant minority shareholders certain control and veto rights[125].

183. CIMSA alleges that the Defendants' contractual breach and the impossibility of acquiring the Securities caused it additional damage, which consisted in a loss in value of its Majority Stake in Soboce: if CIMSA had acquired the Securities, it would have attained a sufficient majority to amend the bylaws and eliminate the veto and control rights of minority shareholders[126], something that it is now unable to do with its 51.35% holding[127].

---

[125] Claim, paragraph 176; Final Partial Award paragraphs 71-74.
[126] Claim, paragraph 91.
[125] Claim, paragraph 46.

184. The Plaintiff's expert witness, Dr. Flores, explains that the Majority Stake has less value in itself (given that it is subject to a control limitation in benefit of minority shareholders) than the value that it would have had in combination with the Minority Stake (given that it would have been possible to remove that control limitation).[128] The expert considers that the acquisition of the Minority Stake would have permitted eliminating the discount to which the Actual Control Premium of the majority stake would be subject, until the Hypothetical Control Premium is reached, and in this way CIMSA would benefit from an increase in the value of its Majority Stake[129].

185. Based on the report of Dr. Flores, the Plaintiff concludes that the damage that it has suffered as a result of the Defendants' breach, updated as of July of 2014, is US$ 35.97M[130].

186. The Defendants, for their part, deny that CIMSA has suffered any damage, since the causal chain is complex and a remote, indirect, and unlikely consequence is being inferred from it[131]:

- Remote: asset damage would only occur if, as a result of CIMSA not having nearly the entirety of Soboce's capital, and not having been able in this way to limit the veto of right of the minority shareholder, CIMSA suffered unjust damage;

- Indirect: because although the entire chain is fulfilled, the hypothetical damage would impact Soboce, and only later and indirectly CIMSA;

- Unlikely: because CIMSA, to impute hypothetical damage and liability for it, assumes a plurality of highly unlikely events.

187. The Defendants also allege that CIMSA's preexisting rights – its holding in Soboce – remain unchanged, both from the point of view of capital and from the vantage point of economic and political rights[132].

188. In addition, for the Defendants the damage was unforeseeable, because CIMSA's financial situation would not have permitted it to acquire the Securities[133] and because the supposed prerogatives of the minority shareholders did not constitute any damage for CIMSA. Consequently, it could not have been foreseeable that, at the time of the breach, this damage would be the object of a claim[134].

189. Below, The tribunal will analyze whether the damage claimed by the Plaintiff meets the requirements for being recoverable: This time,

---

[128] First expert report of Dr. Daniel Flores (Econ One Research Inc.), of July 10, 2012 (Doc. C-67) [**"Flores I"**], paragraph 50.
[129] Flores I, paragraphs 50-54, 59.
[130] Plaintiff Findings, paragraph 79.
[131] Cabanellas II, paragraph 28 (Doc. R-541).
[132] Reply, paragraph 445; T. p. 293, 1, 4-18; Cabanellas II. Doc. R-541, paragraph 23.
[133] Rejoinder, paragraphs 595-598.
[134] Rejoinder, paragraphs 601.

it will invert the order of its analysis verifying, first, the certainty of the damage (2.) and, later, whether it is direct and immediate (3.). Arriving at the conclusion that the damage is neither certain nor direct, it will be necessary to analyze its predictability.

## 2. CERTAIN DAMAGE

190. CIMSA, in essence, alleges that the Current Control Premium that its Majority Stake generates is lower than the Hypothetical Control Premium that it would have obtained if it had attained absolute and all-embracing control of the company:

- if it had acquired the Securities from CCS, it would have held 98% of Soboce and thus absolute control of the company:

- in the exercise of this control it would have amended Soboce's bylaws so as to eliminate the privileges that the minority shareholders enjoyed;

- which would have reappraised the value of the Majority Stake (of which CIMSA already was the owner), by increasing the Control Premium, moving from the Actual to the Hypothetical Control Premium;

- this increase in the control premium is the claim brought by the Plaintiff.

191. The Plaintiff insists that the damage being claimed is certain[135].

192. The Defendants, to the contrary, insist that CIMSA has not been able to demonstrate that it suffered any loss whatsoever in the value of its Majority Stake as a result of the Defendants' breach[136].

193. The Tribunal agrees with the Defendants and does not consider that CIMSA effectively has suffered a loss in its equity.

194. The damage claimed by the Plaintiff is related to the control that a shareholder can exercise over the company in which it has a stake: in sales involving blocks of shares that include control over the sold company, at times an over-price called a "control premium" is included, which reflects the additional earnings that the controlling shareholder can extract through *tunneling* practices[137].

195. In our case, CIMSA already has control over Soboce, which involves a Current Control Premium, but it requests the Hypothetical Control Premium that it would have obtained if it had purchased the Securities and had come to hold absolute power in the company.

196. Whoever makes a claim for damage is responsible for demonstrating its certainty.

---

[135] Reply, paragraph 351.
[136] Reply, paragraph 628-635.
[137] The concept is from the seminal article "Tunneling" (NBER Working Paper No. 7523) by Simon Johnson, Rafael La Porta, Florencio Lopez-de-Silanes, and Andrei Shleifer.

197. However, CIMSA has not presented any proof that would allow for determining and quantifying the alleged Hypothetical Control Premium with a measure of rigor. The Plaintiff's expert cites Dr. Pratt's studies as support for alleging that there is a difference between the Actual Control Premium and the Hypothetical Control Premium, and that this would equate to a price range between 5 and 15% of the value of the Majority Stake[138]. Yet, this calculation is purely speculative and uncertain, as Dr. Pratt himself acknowledges[139]:

> *"If starting with a control value, some discount for lack of absolute control usually is warranted. <u>There are no empirical studies available to help quantify the amount of the discount</u>, but such discounts usually fall in the range of 5 to 15 percent."*

198. No study or evidence has been provided that would demonstrate convincingly that the empirical studies – which according to Dr. Pratt do not exist in the US market – exist in the Bolivian market. Dr. Pratt's mere personal experience, obtained in the United States, which considers that these discounts "*usually*" are in a range between 5 and 15%, is clearly insufficient to justify the amount of a Hypothetical Control Premium in a Bolivian company.

199. Even more, CIMSA already had control of Soboce – inasmuch as it held a majority of its shares – and there were determined prerogatives in favor of GCC with respect to some, but not all, of the shareholder rights. Consequently, it is not enough to prove that sales of the majority stakes result in control premiums, but it is necessary to demonstrate – not merely speculate – the impact that the limitations of rights would have on the value of the Majority Stake and what the difference would be in the value between the Current Control Premium and the Hypothetical Control Premium. The Tribunal considers neither the impact nor the value to be established.

200. There is a second argument: if the damage requested by the Plaintiff is analyzed not as a "loss suffered" but as loss of earnings or "earnings of which it has been deprived"[140] – the other type of recoverable damage by virtue of Art. 344 of the C.C. –, we will arrive at the same conclusion. The Plaintiff has not demonstrated what is the presumed use that it ceased to receive as a result of not having secured the alleged Hypothetical Control Premium. The damage is not certain but rather totally hypothetical, a mere "dream of earnings"[141].

201. <u>In short</u>, the tribunal concludes that the Plaintiff has not met the requirement of proof that is incumbent upon it and has not demonstrated the certainty of the type of damage it claims.

---

[138] Flores I, paragraph 54.

[139] Pratt, S., *Business Valuation: Discounts and Premiums*, John Wiley & Sons, 2009, p.23 (Doc. C-193) [Tribunal's emphasis].

[140] For a discussion of the Tribunal in relation to the definition of loss of earnings and consequential damage, see paragraph 267 *below*.

[141] López Mesa, M. and Trigo Represas, F., Treaty on Civil Liability – Quantification of Damage, The Law, Buenos Aires, 2006, p. 81 (Doc. R-575) quoting Díez Picazo, who, in turn, quotes Demburg.

## 3. **DIRECT AND IMMEDIATE DAMAGE**

202. The Defendants state that this damage does not meet the requirement of causality[142].

203. The Tribunal agrees: the Plaintiff has not demonstrated the existence of a direct and immediate nexus that connects the Defendants' breach to the alleged damage, that is, to the increase in the Current Control Premium to the point where it becomes the Hypothetical Control Premium.

204. The causal nexus is neither pure[143] nor transitive[144]. For the alleged damage to materialize, the intervention of a chain of multiple events is necessary. The Tribunal has already established that CIMSA would have been able to obtain the necessary financing and, thus, would have been able to acquire the Securities. However, starting at that time, and so that the damage alleged by the Plaintiff would materialize, the following chain of additional events also would have had to have been able to occur with reasonable certainty:

- An extraordinary shareholders' meeting would have had to have convened and been held with the aim of amending the bylaws,

- the shareholders would have had to approve the amendment,

- the Commercial Registry of Bolivia would have had to approve the amendment,

- the elimination of privileges that the minority shareholder enjoyed would have had to generate the alleged Hypothetical Control Premium in favor of the majority shareholder, and

- even still, the Hypothetical Control Premium would have only materialized if CIMSA had resold its Soboce shares to a third party, for a control premium (that is, the amount at which the price of a block of shares exceeds its intrinsic value); that is a mere expectation insofar as the securities are not disposed of.

205. The alleged economic damage is not, then, a direct and immediate consequence of the breach, but rather it requires that we assume the occurrence of a long chain of hypothetical events between the unlawful act and the generation of the damage, with the extreme likelihood of unexpected events that would interrupt the causal chain.

206. In short, the Tribunal does not consider it proven that there is a causal nexus between the Defendants' breach and the damage due to not having obtained the Hypothetical Control Premium claimed by CIMSA.

\*\*\*

---

[142] Defense Plea, paragraph 452.
[143] See paragraph 128 *above*.
[144] See paragraph 128 *above*.

207. <u>In conclusion</u>, the Tribunal dismisses the Plaintiff's second claim for damage consisting in the request to be compensated for an amount equal to the difference between the Current Control Premium and the Hypothetical Control Premium.

## IX THIRD CLAIM FOR DAMAGE: LEGAL COSTS

208. We must now analyze the last type of damage claimed by the Plaintiff. This consists in the legal costs arising from the judicial proceedings (distinct from this arbitration) initiated, as the Plaintiff alleges, as a result of the Defendants' breach.

### 1. POSITION OF THE PARTIES

209. In the Plaintiff's Damage and Cost Report, the Plaintiff claimed the damage arising from the following judicial proceedings (distinct from this arbitration) initiated as a result of the Defendants' breach[145]:

- CIMSA's request for legal aid presented to the Third Judge of the Civil-Commercial Court of the City of La Paz so that interim measures would be taken regarding the Securities[146];

- Action seeking constitutional protection [*amparo*] filed in December of 2011 by CCS against Soboce and Soboce executives, citing CIMSA as an interested third party, requesting, among others, that the transfer of the Securities be recorded in Soboce's shareholder register[147];

- Application for annulment presented by the Defendants on November 29, 2013[148].

210. In the document quantifying costs and expenses, the Plaintiff adjusted its request:

"Note that in relation to the proceedings related to the present arbitration, CIMSA only claims the amount of US$ 75,000, payable to the Von Borries Blanco Law Firm. This amount only includes the proceedings initiated in violation of the 2005 Shareholders' Agreement to annul the Partial Award. CIMSA abandons the claims for costs of the other proceedings arising from the Defendants' breach in 2011 (distinct from these arbitration proceedings)."

211. Thus, the Plaintiff's claim for recovering the legal costs incurred as a result of the Defendants' breach is reduced to the amount of US$ 75,000, in relation to the proceedings initiated to annul the Final Partial Award. The Plaintiff clarifies that the legal expenses requested under this heading will be reduced insofar as CIMSA has obtained successfully the awarding of the judicial costs in the proceedings (so as to avoid double compensation).

---

[145] Claim, paragraphs 89-157.
[146] Order of the Fourth Judge of the Civil and Commercial Court of the Judicial District of La Paz, December 5, 2011 (Doc. C-681).
[147] Decision 137/2011 on the Constitutional *Amparo* Action, December 31, 2011 (Doc. R-23).
[148] Application for Annulment of Arbitral Award of November 29, 2013 (Doc. R-47bis).

212. The Plaintiff invokes Clause 22.1 of the 2005 Agreement as judicial support for its claim:

> "Each Party shall compensate and keep any other Party … free from ... injuries or expenses (including reasonable legal fees) of any kind or nature, committed, imposed, or awarded against the other Party…."

213. The Plaintiff argues that the open character of the transcribed clause allows for compensation of costs "committed" not only in the present proceedings but also in any other proceedings initiated by CIMSA.

214. For their part, the Defendants argue that the damage claimed for legal costs for proceedings distinct from this arbitration is inappropriate. Specifically, the Defendants state that the Tribunal does not have the jurisdiction to decide on the legal costs and expenses imposed in processes distinct from this arbitration, which are subject to the Bolivian authorities. In accordance with Art. 4(6) of the Code of Civil Procedure, the authority to impose costs rests exclusively with the Bolivian judge[149].

## 2. DECISION OF THE TRIBUNAL

215. The Plaintiff claims the legal damage sustained as a result of the Defendants' breach. In particular, the Plaintiff claims US$ 75,000, an amount payable to the law firm that defended the Plaintiff in the proceedings for the annulment of the Final Partial Award. The Defendants, meanwhile, consider that the tribunal lacks the jurisdiction to rule on this claim, since – as they allege – the imposition of costs is a public order power attributed exclusively to the Bolivian judge; thus, if the Plaintiff's claim is admitted, they inform the Tribunal that it would result in a situation of annulment of the award.

216. To resolve the question, the Tribunal must determine if the legal costs are considered recoverable damage under Bolivian law and if the Tribunal has the jurisdiction to award them. Only if the Tribunal considers that the legal costs incurred by the Plaintiff for its defense in the annulment proceedings for the Final Partial Award are direct and immediate damage, foreseeable and certain, will it have to determine its jurisdiction to award them.

217. The legal claims that the Plaintiff claims are the attorney fees incurred by the Plaintiff for its defense in the annulment proceedings for the Final Partial Award. Can we view these fees as the direct and immediate consequence of the Defendants' breach?

218. The answer to this question must be "no", and consequently the tribunal dismisses the Plaintiff's claim.

219. The Defendants' power to request the annulment of the Final Partial Award is a right reflected in the LAB[150]. There is no direct casual nexus between the

---

[149] Rejoinder, paragraphs 522-530.
[150] Art. 62 of the LAB.

the Defendants' breach – as stated in paragraph 123 *above* – and the costs incurred by the Plaintiff to defend itself in the annulment proceedings. And this is so because it concerns extremely remote damage: numerous events intervene in the causal chain from the moment of the breach until the damage, which disallows considering the damage as direct.

220. In the words of Bolivian author Morales Guillén, it would be a matter of indirect damage[151]:

> "it is not taken into consideration given the remote result of the event in the calculation of the compensation on account of the overly uncertain causal connection between the event and the obligation to compensate."

221. In any event, the damage is, clearly, unpredictable: when the Defendant unduly denied CIMSA its preferential acquisition right it was not foreseeable that this event would give rise to a dispute that would result in arbitration proceedings in which a partial award would be issued that would justify CIMSA's arguments, that an application for annulment against this award would later be initiated, and that it would generate legal costs for CIMSA.

222. Having determined that the legal costs claimed by the Plaintiff are not direct, immediate, or foreseeable, the Tribunal's authority to award them is irrelevant.

223. <u>In conclusion</u>, the Tribunal is of the opinion that the legal costs claimed by the Plaintiff are not recoverable pursuant to Bolivian law, as they do not arise directly and immediately from the Defendants' breach.

***

224. <u>In short</u>, of the three categories of damage claimed by the Plaintiff, the Arbitration Tribunal has admitted one as direct, foreseeable, and certain damage regarding the breach and has rejected the other two since neither one meets the requirements under Bolivian Law.

---

[151] Morales Guillén, p. 491 (Doc. C-398).

## X A PRELIMINARY QUESTION: THEORY OF THE LOSS OF CHANCE

225. In the Final Partial Award, the Tribunal established that the damage that CIMSA suffered consists in the loss of[152]

> "the opportunity to acquire the Securities for USD 75M, payable in cash within 30 business of August 4, 2011 – the exercise date of the CIMSA Letter."

226. The Parties have interpreted the word "opportunity" differently. This has led to their maintaining disparate opinions as to how to appraise the damage. The Defendants propose making use of the doctrine of the loss of chance, while the Plaintiff rejects its application and holds that the damage will be equal to the intrinsic value of the refusal right of which it was deprived.

## 1. POSITION OF THE PARTIES

227. The Plaintiff rejects the notion that the doctrine of loss of chance is applicable to the case[153]. The Plaintiff's legal expert, Dr. Nishizawa, considers that what the Plaintiff has lost is a right of preferential acquisition, of a contractual nature, with which a value is associated[154]. According to the Plaintiff, making this right nugatory, the Defendants caused a type of damage that has been verified, and that all that remains now is to quantify it[155].

228. For their part, the Defendants submit a legal report from the Argentine lawyer Dr. Guillermo Cabanellas, who believes that the breach on the part of GCC that gave rise to the loss of the opportunity to acquire the securities is a type of pre-contractual behavior that would have prevented the formulation of a contract[156]. Basing his argument on comparative law, the expert alleges that liability for the breach of a mere expectation is less severe than for a contractual breach, and therefore in the first case there is a limitation on the compensation[157].

229. The Defendants insist that the doctrine of loss of chance applies in contractual and pre-contractual situations[158]. They provide a legal report prepared by Prof. Franco Ferrari, which analyzes the doctrine of loss of chance in Italian Law[159], which would have relevance as a source of inspiration in Bolivian Law.

230. Prof. Ferrari explains that Italian academics and courts treat damage arising from the loss of opportunity in the same way as actual and

---

[152] Final Partial Award, paragraph 528.
[153] Reply, paragraphs 469-478.
[154] Second legal expert witness report of Santiago A. Nishizawa Takano, of April 29, 2014 (Doc. C-764), paragraphs 126-133 [**"Nishizawa"**].
[155] Reply, paragraphs 421-422.
[156] Cabanellas II, paragraph 56.
[157] Cabanellas II, paragraphs 57-61.
[158] Rejoinder, paragraph 672.
[159] Legal expert report of Franco Ferrari, of March 27, 2014, (Doc. R-569), paragraph 37 *et seq.* [**"Ferrari I"**].

concrete damage. Thus, loss of opportunity is only subject to compensation if the affected party demonstrates that it had a plausible possibility of taking advantage of it. In practice, it is common to require statistical proof reflecting a possibility of greater than 50%[160].

231. And in this case, as the Defendants allege, CIMSA would not have been able to prove that it would have been able to obtain the necessary resources to acquire the Securities. Consequently, even within the context of loss of chance, GCC should not be ordered to pay any compensation whatsoever[161].

## 2. ANALYSIS OF THE TRIBUNAL

232. The valuation of the loss of a right of refusal is a matter not without complications. In order to analyze it, the Tribunal will proceed as follows: it will analyze the content of the doctrine of loss of chance or opportunity in Bolivian Law (A.) and it will determine if it applies to the present case (B.).

### A. The doctrine of loss of chance

233. The parties concur that Bolivian Law is silent regarding the legal valuation of the loss of an opportunity[162] and also that Bolivian Civil Law derives from Italian Law[163], which is why it is common practice to refer to Italian case law and doctrine to supplement the Bolivian system.

Position of the Defendants

234. Applying this general principle, and in the face of a legal loophole in Bolivian law, jurisprudence, and doctrine, the Defendants refer to the doctrine of loss of opportunity (or loss of chance) developed in Italian Law.

235. According to Prof. Ferrari, the Defendants' expert witness, Italian legal doctrine establishes that the loss of an opportunity can only be subject to compensation if the party deprived of the opportunity demonstrates that there was a credible possibility of taking advantage of it[164]. Additionally, the aggrieved party must prove the existence of a causal relation, such that the committed seller's breach caused the recipient of the promise to lose the possibility of the opportunity materializing[165]. If these requirements are met, the Italian courts assess the compensation as a fraction of the damage, calculated as the

---

[160] Ferrari I, paragraph 39 and n. 21; other decisions only require a not insignificant probability of a positive result – which must be determined case by case – based on the fact of not being able *a priori* to reasonably identify a specific percentage.
[161] Defense Plea, paragraph 542.
[162] Defense Plea, paragraph 534: the Plaintiff does not indicate any Bolivian legal or case law provision that addresses the matter.
[163] Defense Plea, footnote 501: Claim, paragraph 130.
[164] Ferrari I, paragraph 39
[165] Ferrari I, paragraph 39.

probability that the result would have come to pass if the committed seller's breach had not occurred[166].

<u>Plaintiff's Position</u>

236. The Plaintiff, to the contrary, believes that the doctrine of loss of opportunity should not be applied in this case and that the Tribunal should calculate the compensation as the comprehensive value of the right of first refusal of which CIMSA has been deprived[167].

**B. Decision of the Tribunal**

237. On this point, the Tribunal sides with the Plaintiff. The doctrine of loss of opportunity is not relevant to quantifying the compensation owed.

238. <u>In the first place</u>, because – even though the Parties agree that Bolivian Law derives from Italian Law – the Defendants have not provided any proof that the doctrine of loss of opportunity is substantive law in Bolivia. The Tribunal must settle "the dispute subject to the legal rules selected by the parties, as applicable to the substance of the dispute"[168]: Bolivian law. However, the Defendants have provided neither Bolivian legal doctrine nor case law that supports the application of the doctrine of loss of chance.

239. <u>In the second place</u>, the Defendants seek to strengthen their argument by stressing the fact that the Final Partial Award mentions, in paragraph 529, that what the Plaintiff has lost is the "opportunity" to purchase the Securities. Yet, as the Plaintiff's legal expert points out[169], the use of this word by the Tribunal does not imply that the latter is of the opinion that what CIMSA has lost is a mere expectation, nor that it considers the doctrine of loss of chance to be applicable.

240. The Tribunal unequivocally stated in the Final Partial Award that the Defendants' breach deprived the Plaintiff of the exercise of a contractual preferential acquisition right[170]:

> "It thus sufficed that CIMSA announced in a timely manner the exercise of **its preferential acquisition right** in order for its **right to pay for the shares** within 30 business days **to emerge *ex contractu*** (adopting the most restrictive interpretation proposed by GCC). Selling the shares on August 18, 2011, before the deadline expired, **GCC deprived CIMSA of the possibility of exercising the right of preferential acquisition**, under the terms provided for in the 2005 Agreement, and thus it incurred a breach of its obligation, formalized in Clause 6.3 of the 2005 Agreement, for it failed to make the Securities available before the right of refusal had expired." [emphasis added]

241. In fact, the tribunal specified in note 484 of the Final Partial Award

---

[166] Ferrari I, paragraph 42
[167] Claim, paragraph 129: Reply, paragraphs 418-422.
[168] Art. 73 of CIAC Rules.
[169] Nishizawa II, paragraph 127
[170] Final Partial Award, paragraph 521 [emphasis added by the Arbitration Court].

> "Viewing the sale to CCS as a contractual breach makes unnecessary an analysis of whether this action also entailed a violation of the prohibition contained in Art. 1.282 of the C.C."

242. Thus, the analysis made by Dr. Cabanellas, the Defendants' expert, and by virtue of which the doctrine of the loss of chance is invoked, does not apply to the concrete case. Dr. Cabanellas argues[171]:

> "In the same sense López Mesa and Trigo Represas point out that the compensation covers 'the <u>pre-contractual liability</u>, the so-called negative interest or of trust, consisting in the damage suffered from having believed in the conclusion or validity of a business deal and that, consequently, would not have been sustained if it had been known that the contract would be thwarted or would end up being invalid,' adding to it the 'loss of a chance, due to the fact that it is thwarted on account of its own nature, is always problematic to carry out'." [emphasis added]

243. The Defendants' expert does not appear to differentiate between the two legal relationships – one pre-contractual and another contractual – that were being executed by the Parties at the time of the Defendants' breach. The Tribunal did, however, outline this clear difference[172]:

> "Bolivian Law expressly requires that the contracting parties adjust their behavior to the good faith requirements in both the <u>pre-contractual stage and execution of a contract</u>. Both precepts apply in the present case: CIMSA and GCC were executing the 2005 Agreement but at the same time they were negotiating a new contract, which would have substituted this agreement." [emphasis added]

244. As Dr. Nishizawa, the Plaintiff's expert, rightfully states, the Defendants' expert ignores the Plaintiff's contractual right to acquire the securities in a single act, paying a price of US$ 75M, by focusing solely on the pre-contractual relationship existing between the Parties and not the contractual relationship arising from the 2005 Agreement[173].

245. <u>In short</u>, the Tribunal rules that it is not proven that the theory of loss of opportunity forms part of Bolivian Statutory Law, and even if it did form part of it, this doctrine is not applicable to the present case in which CIMSA has been deprived a concrete and perfected right: the right to acquire the Securities at a price of US$ 75M.

---

[171] Cabanellas II, paragraph 60, quoting R-575, p. 584.
[172] Final Partial Award, paragraph 510 [Tribunal's emphasis].
[173] Nishizawa paragraphs 131-133.

## XI **QUANTIFICATION OF THE FIRST CLAIM FOR DAMAGE**

246. The Arbitration Tribunal has already accepted that the difference between the actual or market value of the Securities and the agreed price constitutes recoverable damage (see Chap. VII *above*). It now remains to quantify the damage.

247. The Plaintiff argues that GCC transferred the Securities to CCS for US$ 75M, a lower price than the actual value; if CIMSA had acquired them at that price it would have generated a latent capital gain corresponding to the difference between the purchase price and the actual value[174]. Based on the calculations made by its expert, Dr. Flores, the Plaintiff claims as of July 2014, US$ 188.29M as compensation for this damage, which it characterizes as loss of earnings.

248. For their part, the Defendants categorically deny that CIMSA sustained the claimed damage[175]. In their opinion, CIMSA's request is not viable for the following reasons:

-   First, CIMSA had to demonstrate that it had a purchaser of and a solid purchase offer for the Securities at a price higher than US$ 75M, but it has not done so.

-   Second, the Defendants support their argument on the expert report of Dr. Pablo Spiller to show that the valuation that CIMSA and Dr. Flores assign to Soboce, in order to calculate the actual value of the Securities, is "highly questionable".

249. To resolve this difference, the Tribunal, in the first place, must address a particular question: the correct valuation date (1); below it will analyze the origin and nature of the claim (2) so as to later describe the valuations made by the parties (3), and ultimately it will decide the market value (4).

## 1. **VALUATION DATE**

### A. Position of the Parties

250. The Plaintiff argues that the appropriate valuation date, applying the principle of comprehensive compensation, and with the aim of reestablishing the creditor in the position closest to the one the creditor would have been in if the breach had not occurred, is the date of the final award[176]. The valuation of damage must take into consideration, therefore, information subsequent to the breach[177].

251. The Defendants, for their part, argue that the Tribunal should take the date of the breach as the valuation date. The Defendants allege that CIMSA's position is not supported in Bolivian Law: Bolivian law, the same as

---

[174] Claim, paragraph 90.
[175] Defense Plea, paragraphs 490-491.
[176] Claim, paragraphs 127-156. Reply paragraph; AT day 1, p. 48: 16-20.
[175] Defense Plea, paragraph 517.

Italian Law, takes the moment that the breach of contract occurred as the moment of reference for assessing the damage[178].

### Additional procedural argument

252. The Defendants present an additional argument of a procedural nature.

253. CIMSA submitted, along with its statement of claim dated July 11, 2012, the initial expert report of Dr. Flores, which assesses the damage as of the date of GCC's breach in August of 2011. Later, in the Second Stage of the arbitration, CIMSA presented a new report from the same expert that uses dates subsequent to the date of the breach, i.e., August 2012 and September 2013. Finally, along with its statement of conclusions, CIMSA submitted the last report by Dr. Flores that measures the damage as of July of 2014.

254. The Defendants argue that this change of legal posture is contrary to the obligation of procedural good faith[179], and that it damaged its right to defense, for had it known *ex ante* that CIMSA intended to postpone the moment of determining the damage to the issuing date of the final award, it would have been able to adopt different strategies[180]. They request, therefore, that it be dismissed.

255. In its defense, the Plaintiff requests that the Tribunal allow this modification for the following reasons:

- Art. 17 of CIAC Rules allows modifications and supplementations to the legal arguments of the parties[181];

- Case law maintains that, when the "essence" of the argument is not altered, the modifications are valid and must be accepted by the arbitration tribunal[182];

- In this case the change only affects the valuation date of the damage, not the theories of quantification of damage and methodology; later it complies with the two above rules.

## B. Decision

256. For valuation purposes, the Plaintiff argues that the final award date should be taken as a reference, while the Defendants hold that the

---

[178] Defense Plea, paragraph 597 *et seq*; Rejoinder, paragraphs 746-756: Ferrari I, paragraphs 20-24; Second legal expert report of Franco Ferrari of June 3, 2014 [**"Ferrari II"**], paragraphs 8-24 (Doc. R-762).
[179] Defense Plea, paragraph 546 *et seq*.
[180] Claim, paragraph 554.
[181] Art. 17 of the CIAC Rules: "In the course of the proceedings any party may amend or supplement its claim or defense plea, unless the tribunal considers that permitting this change is inappropriate due to the delay that it would give rise to, the damage it could cause the other party, or to any other circumstance. However, a claim may not be amended in such a way that the amended claim falls outside the purview of application of the arbitration clause or arbitration agreement."
[182] Reply, paragraph 494, note 750.

damage should be assessed at the time that the breach occurred. The Defendants' expert, Dr. Ferrari, also opted for this second position[183].

257. The Tribunal agrees with the Defendants. In the body of evidence provided there is no Bolivian doctrine or decisions that convincingly support the Plaintiff's position.

258. The party damaged by a contractual breach has the right to comprehensive compensation, to receive a compensation that puts this party in the same situation (or the most similar situation possible) to the one it would have been in if the breach had not occurred. It takes into account the date of the breach when the divergence between the situation the affected party would be in if the breach had not occurred ("*but for*" scenario) and the situation this party actually is in ("*as is*"). The purpose of the compensation is to convert the *as is* scenario into the *but for* situation, and, therefore, the rectifying effects of the compensation must begin to be felt from the date of the breach.

259. Several commentators support this position. Among them is Mark Kantor, who argues that:

> "*For breach of contract claims, the great weight of authority worldwide holds that the date of the injury is the proper valuation date.*"[184]

260. In conclusion: the breach of the right of preferential acquisition agreed in the 2005 Agreement will generate an obligation for compensation for the damage caused, the value of which shall be assessed starting from the date of the breach, that is, August 18, 2011.

*** *

261. As the Tribunal supported the Defendants' argument, it is not necessary to analyze the additional argument of a procedural nature invoked to reject the Plaintiff's position.

## 2. LEGAL NATURE OF THE CLAIM

262. In accordance with Bolivian Civil Law, the party affected by a breach of contract shall receive compensation "for the loss suffered" and "for the earnings of which said party was deprived" (Art. 344 C.C.).

263. In the present case, the breach consists in the denial of the right of preferential acquisition, which has resulted in the debtor, GCC, refusing to permit the acquisition of the agreed object – the Soboce shares – to the creditor, CIMSA. Bolivian Civil Law requires that the compensation include both "the loss suffered" and "the earnings of which the creditor has been deprived" (Art. 344 C.C.). Therefore, the Tribunal must determine how to calculate the compensation

---

[183] Ferrari I, section 4; Ferrari II, paragraphs 8-24.
[184] Kantor, M., *Valuation for Arbitration*, Kluwer Law International, 2008, pp. 60-61 (Doc. C-670), quoted in Rejoinder, paragraph 697.

for consequential damage and loss of earnings in cases where the debtor breaches its obligation to allow the creditor to acquire the object of the contract.

264. In these cases the damage is equal to the equity loss that the acquirer suffers as a result of not having been able to include the agreed object in its equity; and this loss can be determined in two ways:

- Concretely, in the event that the affected party acquires the asset from a third party, and is forced to pay a higher than agreed price for it ("substitution purchase"); the damage will be equal to the difference of prices; or

- Abstractly, when the substitution purchase does not take place, and in this case the damage will equal the difference between the agreed price and the actual market value.

265. Additionally, if the injured party was able to demonstrate that it would have been able to resell the asset at higher price than the market price, said party would still have the possibility of claiming the surplus as loss of earnings[185].

266. In the present case, the Plaintiff seeks compensation for the difference between the negotiated price for the acquisition of the Securities (US$ 75M) and their actual market value. It is requesting, therefore, compensation for the consequential damage caused by the breach, calculated abstractly. The claim is admissible.

267. The Plaintiff classifies its claim as loss of earnings[186]. Perhaps it would have been more correct to include it in the category of "loss suffered" and not in the category of "earnings of which it was deprived", because in reality what the Plaintiff is presenting is an application for damage with an abstract calculation, not the earnings that it could have earned if it had resold the asset. The argument at any rate is insignificant, because in the law, the use of an incorrect *nomen juris* is irrelevant if the true nature of the action leaves no room for doubt. And in the present case, there is no doubt that the Plaintiff is exercising an action so as to be compensated for the damage caused, calculated as the difference between the negotiated price and the actual market value.

268. The important issue is to determine if, as the Plaintiff asserts, the negotiated price was, in fact, less than the actual market value of the Securities. To resolve this doubt, the Tribunal will explain, first of all, the opinion of the experts.

## 3. **EXPERTS' VALUATION**

269. Below the tribunal will briefly describe the reasoning of the Plaintiff's expert, Dr. Daniel Flores, and the main criticisms of the Defendants' expert, Dr. Pablo Spiller.

---

[185] It concerns a general principle of law, expressed e.g., in Arts. 74, 75, and 76 of the Vienna Convention on the International Sale of Goods; this Convention does not apply to the sale of shares (Art. 2 d.) but reflects commonly accepted general principles of Law.
[186] Claim, paragraphs 162.

## A. Report by Dr. Daniel Flores

### a. Calculations

270. To determine the actual value of the Securities, Dr. Flores uses the valuation method by multiples. For this, he identifies seven cement companies and calculates the EV/EBITDA[187] of each one: the average of these multiples is 8.3[188]. After determining the EV/EBITDA multiple, he establishes Soboce's stand-alone value, multiplying Soboce's EBITDA in the 12 previous months[189] by this factor. Subsequently, to arrive at the Soboce's stand-alone equity value, he subtracts Soboce's net value from the company value[190].

271. The following table reflects the calculations made on five valuation dates: August of 2011 (which is the relevant one), August 2012, September 2013, March 2014, and July 2014[191]:

| Soboce Valuation (Without Fancesa Holding) | | | | | |
|---|---|---|---|---|---|
| | August 2011 | August 2012 | September 2013 | March 2014 | July 2014 |
| 1. EBITDA (US$ millions) | 43.25 | 63.95 | 65.89 | 65.83 | 59.56 |
| 2. EV/EBITDA Multiple | 8.3 | 8.3 | 8.3 | 8.3 | 8.3 |
| 3. Company Value (US$ millions) *(line 1 x line 2)* | 358.98 | 530.79 | 546.89 | 546.36 | 494.36 |
| 4. Net Debt (US$ millions) | 85.14 | 50.69 | 19.39 | 25.69 | 27.41 |
| 5. Equity Value (US$ millions) *(line 3 – line 4)* | 273.84 | 480.10 | 527.50 | 520.67 | 466.95 |
| | | | | | |

[187] These cement companies were: Holcim, Lafarge, Bio Bio, Cemex, Cimpor, GCC, and Moctezuma.

[188] With the aim of determining the EV/EBITDA multiple, Dr. Flores presented the multiples of various cement companies gathered from diverse sources, to wit:
- EV/EBITDA multiples calculated by Bloomberg for seven cement companies with operations in Latin America (Holcim, Lafarge, Bio Bio, Cemex, Cimpor, GCC, and Moctezuma), whose median for the third quarter was 8.3. Flores I, paragraphs 25-26.
- EV/EBITDA multiples of 7.1 used by Celfin Capital for the valuation of Fancesa carried out in February 2011 at the joint request of Soboce and GCC, Flores I, paragraphs 27-28.
- EV/EBITDA multiple of 8.14 established in the 2005 Agreement. Doc. C-67, Flores I, paragraphs 29-30.

[189] Presentation to Soboce Board of Directors, S.A., on September 26, 2011, p. 29 (Doc. C-190). (EBITDA calculated as the sum of the monthly EBITDAs from August 2010 to July 2011).

[190] Flores I, paragraphs 45-46.

[191] Updating of the Third Report of Dr. Daniel Flores (Doc. C-937), figure 25, p. 2. Dr. Flores calculated these damages using the following as valuation dates:
- August 2011, when the transfer of the shares to CCS occurred;
- August 2012, that is, one year after the date of the breach of contract by GCC;
- September 2013, that is, the month during which the Tribunal issued the Partial Award; and
- March 2014; and
- July 2014.

272. Soboce's equity value in August of 2011, the relevant date according to the Tribunal, is US$ 273.84M.

273. Below, the expert witness adds the value of the 33.34% that Soboce had in Fancesa until September 2010[192] to Soboce's equity value. According to the valuation made by Celfin Capital in February 2011, that value was US$ 93M[193]. This is the amount that Soboce, according to the expert, expects to obtain as compensation for the expropriation.

274. The expert uses these data to calculate Soboce's total value (*i.e.,* including the Fancesa holding) adding Soboce's equity value (US$ 273.84M) and the value of Soboce's holding in Fancesa (US$ 93M)[194].

275. Finally, to determine the damage suffered by CIMSA, he calculates the difference between the actual value of the shares (the 47.02% of Soboce's total value that amounts to US$ 172.49M) and the cost of the shares (US$ 75M)[195].

276. The following table summarizes the aforementioned calculations, with the August 2011 calculation being the relevant one[196]:

| Damage Suffered by CIMSA as a result of Not Being Able to Exercise the Right of First Refusal on 47.02% of the Soboce Shares (US$ millions) | | | | | |
|---|---|---|---|---|---|
| | August 2011 | August 2012 | September 2013 | March 2014 | July 2014 |
| 1. Soboce's Value | 273.84 | 480.10 | 527.50 | 520.67 | 466.95 |
| 2. Value of Fancesa Holding | 93.00 | 93.00 | 93.00 | 93.00 | 93.00 |
| 3. Total Value *[line 1 + line 2]* | 366.84 | 573.10 | 620.50 | 613.67 | 559.95 |
| 4. Value of the 47.02% of Soboce shares *[line 3 x 47.02%]* | 172.49 | 269.47 | 291.76 | 288.55 | 263.29 |
| 5. Cost of the 47.02% of Soboce shares | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 |
| 6. Damage Suffered by CIMSA *[line 4 – line 5]* | 97.49 | 194.47 | 216.76 | 213.55 | 188.29 |

277. Dr. Flores concludes, then, that the actual value of 100% of Soboce in August of 2011 is US$ 366.84M and the 47.02% of GCC is US$ 172.49M.

---

[192] In his report, Dr. Flores states that Soboce had equity in other companies in addition to Fancesa. However, due its lesser importance to Soboce's business on the whole, it has been excluded from the subject of the reports in order to simplify the calculations. Flores I, note 35.
[193] Flores I, paragraph 47.
[194] Flores I, paragraph 48.
[195] Flores I, paragraphs 10, 48, 70-72.
[196] Third expert report of Dr. Daniel Flores (Econ One Research Inc.) of April 29, 2014 (Doc. C-763), figure 26, p. 3.

278. Given that CIMSA had the right to acquire these securities for US$ 75M, it suffered a loss of US$ 97.49M, (this according to data as of 2011; if the data were taken as of July 2014, the loss would be US$ 188.29M[197]).

## b. Criticism

279. The Defendants submitted an expert report prepared by Dr. Pablo Spiller, which disagrees with the calculation of the damage made by Dr. Flores for the following reasons:

- First, if his valuation of Soboce is correct, the price of US$ 75M, at which GCC was willing to sell, would have been very attractive and would have attracted other investors that would have offered GCC a better price and would have reduced the breach between the "purchase price" and the "actual value" of the Securities. But that was not what happened: only two bidders appeared, CIMSA and CSS; consequently, and in contrast to the opinion of Dr. Flores, the immediate earnings, in the event that there were any, could not have been very significant[198].

- Second, the multiple used by Dr. Flores does not apply to Soboce, as it results in a blatant overvaluing of the *stand-alone* company (*i.e.*, excluding its holding in Fancesa); the companies Dr. Flores considers to determine the multiple are not comparable to Soboce:

  - because the size of their operations is substantially larger[199], and

  - because they involve significantly less risk, to the extent that they are not subject to the inherent risks in Bolivia in general and Soboce in particular[200];

  - in addition, Dr. Flores' valuations differ substantially from the valuations made by Soboce management, the implicit EBITDA multiples of which are between 5.47 and 6.41[201].

- Third, the valuation of GCC's holding in Fancesa is highly speculative; Dr. Flores ignores the fact that the collection of Fancesa's compensation continues to be contentious: the purchaser of the GCC holding would not purchase an indirect stake in Fancesa, but simply the right to make a claim against a Bolivian public body[202];

---

[197] Plaintiff Findings, paragraph 79.
[198] Spiller II, paragraphs 7 (a), 74-75; Third expert report of Dr. Pablo T. Spiller (Compass Lexecon, LLC) of June 4, 2014 (Doc. R-763)["**Spiller III**"], paragraph 26 (a).
[199] Spiller II, paragraph 114.
[200] Spiller II, paragraphs 104-113.
[201] Spiller II, paragraphs 7(c): 100; 120-122.
[202] Spiller II, paragraphs 82-83.

- _Fourth_, the price of US$ 75M reflects the fair market value of GCC's holding in Soboce as of August 2011. Thus, CIMSA did not suffer any damage due to loss of earnings as a result of not having been able to acquire this stake[203]:

   "[that] on the valuation date there is a transaction between two independent parties, with knowledge of the facts, and in such a situation that neither of the two had an imperious need to execute the transaction on that date, suggests that the resulting value of that transaction (US$ 75M) can be considered as the fair market value on that date."

## B. Alternative calculation

280. The Defendants' expert, Dr. Spiller, insists that the value of the Securities was not substantially higher than US$ 75M, as follows from two verifications:

- the price of US$ 75M was consistent with the valuations made by Soboce management [the **"Management"**] in March of 2010 (a.) and

- the price of US$ 75M was the understanding that the Parties had with respect to the fair value of Soboce and Fancesa in 2010 (b.) and 2011 (c.).

## a. Management Valuations

281. To support his first premise, the expert used the FCD valuation model employed by Management in March 2010, when GCC stated for the first time its intention to shed the Securities. The results of the model were expressed in a presentation[204], which situates the value of the Securities between US$ 109.3[205] and 114.5M[206].

282. Given that the presentation was based on the hypothesis of the construction and start-up of a cement plant owned by the Bolivian government in 2014[207], GCC requested that Management appraise the company under three alternative scenarios:

- Without Government plants[208].

- With two Government plants[209].

- With Soboce investment advance[210].

---

[203] Spiller II, paragraphs 7.d). 137.

[204] Soboce Management Presentation (Doc. R-458).

[205] Spiller II, paragraph 77. To arrive at these amounts, Spiller assumes: a uniform discount rate of 15.64% and growth into perpetuity of 3%.

[206] Spiller II, paragraph 77. To arrive at these amounts, Spiller assumes: a discount rate range of (14.5 to 16% and growth range into perpetuity of 2.5% to 3.5%).

[207] Soboce Valuation Model with one government plant (Doc. R-554).

[208] Soboce Valuation Model without government plant (Doc. R-555).

[209] Soboce Valuation Model with two government plants (Doc. R-556).

[210] Soboce Valuation Model – investment advance (Doc. R-557).

283. Dr. Spiller insists that the following conclusions regarding the value of Soboce and the Securities follows from these alternative scenarios[211]:

- Management considered a uniform discount rate of 15.64% for all the assets and scenarios, based on the WACC calculation, and growth of 3% for calculation of the terminal value;

- The value of 100% of consolidated Soboce[212] was in the range of US$ 207M and US$ 253M as of March 2010;

- The value of the 47.02% holding was between US$ 97.4M and US$ 119M;

- The value of the holding of the 47.02% in *stand-alone* Soboce was between US$ 71M and US$ 89M, and the value of Fancesa was between US$ 24.29M and US$ 29.18M;

- The EBITDA multiple implicit in the *stand-alone* Soboce valuation was between 5.47 and 6.41 in 2010.

284. According to Dr. Spiller, these results indicate that the price of US$ 75M was a market price for the Securities.

**b. Soboce Valuation in the 2010 Agreement**

285. As Dr. Spiller explained, the valuation that the Parties made for the 2010 Agreement suggests that[213]:

- The value of 100% of consolidated Soboce was US$ 224.7M, and, consequently, a pro-rata value of US$ 105.6M for the 47.02% stake that GCC held;

- The value of GCC's indirect holding in Fancesa was US$ 32.2M;

- The value of the holding of the 47.02% of *stand-alone* Soboce was US$ 73.5M.

286. According to Spiller, this valuation was based on an EV/EBITDA multiple of 5.42, reflecting Clause 7.2(b) of the 2010 Agreement[214].

287. For the Defendants' expert, the amounts reflected in the 2010 Agreement reaffirm that US$ 75M was a fair price for the Securities.

---

[211] Spiller II, 81-83.
[212] 100% stand-alone Soboce and 33% in Fancesa/Issa.
[213] Spiller II, 86.
[214] Spiller II, 84.

**c. 2011 Valuations**

288. In relation to the purchase offers that CIMSA made to CCS in 2011, Dr. Spiller explains that CIMSA initially presented two purchase alternatives[215]:

-   Fixed price of US$ 70M in two Soboce *stand-alone* payments;

-   Variable price in two payments, for a total of between US$ 60M and US$ 110M, according to the compensation that would be obtained through the Fancesa expropriation.

289. According to Dr. Spiller, the minimum price offered by CIMSA in the second option – US$ 60M – implied that Fancesa did not receive any compensation[216]. Thus, the price offered by CIMSA for GCC's shares in *stand-alone* Soboce was between US$ 60M and US$ 70M[217].

*** 

290. Based on the 2010 and 2011 valuations, the expert concludes that the CCS offer to GCC for 47.2% of Soboce for a price of US$ 75M is similar[218]:

-   to the price proposed by CIMSA in 2011 (between 60 and 70M), and

-   to the *stand-alone* value of the 47.02% of Soboce resulting from the 2010 Agreement (US$ 73.5M).

291. In addition, the price offered by CCS would entail an EBITDA multiple of 5.66 in line with the 5.42 multiple used in the 2010 Agreement[219], and within the range of 5.47-6.41 implicit in the valuations made by Management. Also, the price offered by CCS would reflect the fact that the value assigned to Fancesa was zero[220].

292. Dr. Spiller concluded that the similarity between the valuations of March 2010 and 2011 indicate that the Parties' understanding regarding Soboce's *stand-alone* value in August of 2011 was similar to and consistent with an EBITDA multiple not greater than 5.66, and that the value assigned to Fancesa was low or zero[221].

---

[215] Spiller II, paragraph 87.
[216] Spiller II, paragraph 88.
[217] Spiller II, paragraph 88.
[218] Spiller II, paragraph 89.
[219] Spiller II, paragraph 90. According to Spiller, the multiple would also be in the range of 5.47 and 6.41 implicit in the FCD valuations made by Soboce in 2010.
[220] Spiller II, paragraph 90.
[221] Spiller II, paragraph 92.

**C. Damage sensitivity**

293. Dr. Spiller notes that the EV/EBITDA multiple implicit in the price of US$ 75M is 5.66 and insisted that there is no basis for applying any other multiple[222], and less so the 8.3 used by the Plaintiff's expert.

294. To illustrate his position, the expert carried out a sensitivity analysis based exclusively on the values used in the Soboce Management valuations, which were discussed *above*[223]. According to the expert, the analysis of the EBITDA multiples implicit in the valuations of March 2010 fall within a range between 5.47 and 6.41[224].

295. The following table summarizes the sensitivity analysis of the damage under the use of the multiples implicit in the four different valuations made by Soboce in 2010[225]:

| Damage to CIMSA due to Loss of Earnings | Sale to CSS | [illegible] | Alternative Scenarios | | | [illegible] |
|---|---|---|---|---|---|---|
| *(in US$ millions)* | Transaction Multiple | 1 Gov. Plant | Without Gov. | 2 Gov. Plants | 1 Gov. + Invest. | FFD Models |
| EBITDA (12 months) | 43.25 | 43.25 | 43.25 | 43.25 | 43.25 | 43.25 |
| **EV/EBITDA Multiple** | **5.66x** | **6.07x** | **6.41x** | **6.00x** | **5.47x** | **6.04x** |
| | | | | | | |
| Company Value (Stand-alone) | 244.65 | 262.54 | 277.34 | 250.54 | 236.58 | 261.04 |
| | | | | | | |
| - Debt | 89.72 | 89.72 | 89.72 | 89.72 | 89.72 | 89.72 |
| - Cash | 4.58 | 4.58 | 4.58 | 4.58 | 4.58 | 4.58 |
| | | | | | | |
| Capital Value (Stand-alone) | 159.50 | 177.39 | 192.20 | 174.39 | 151.44 | 175.89 |
| | | | | | | |
| GCC Holding in Soboce | 47.02% | 47.02% | 47.02% | 47.02% | 47.02% | 47.02% |
| | | | | | | |
| Value of 47.02% of Shares in Soboce | 75.00 | 83.41 | 90.37 | 82.00 | 71.21 | 82.70 |
| Cost of 47.02% of Shares in Soboce | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 |
| | | | | | | |
| Damage Suffered by CIMSA | 0.00 | 8.41 | 15.37 | 7.00 | -3.79 | 7.70 |
| | | | | | | |

*Source: Source: Compass Lexecon based on Soboce Valuation Model – 1 Government Plant (R-544). Soboce Valuation Model- Without Government Plant (R-555), Soboce Valuation Model – 2 Government Plants (R-556), and Soboce Valuation Model – Soboce Investment Advance (R-557).*
*Note: The value of the company may differ from the multiplication of their factors as a result of rounding off.*

296. As can be seen, the damage is somewhere between US$ 3.79M (negative) and US$ 15.37M. Dr. Spiller opted for the Soboce base valuation case that generates an EBITDA multiple of 6.07[226], as it concerns the foreseeable scenario – according to Spiller – beyond 2010 and 2011. Using this multiple, the value of GCC's holding in *stand-alone* Soboce as of August 2011 would be US$ 83.41M and the damage suffered by CIMSA would be US$ 8.41M.

***

297. The following overview table reflects the different amounts resulting from the experts' calculations:

---

[222] Spiller II, paragraph 133.
[223] See paragraph 281 *et seq.*
[224] Spiller II, paragraph 134 and table VI.
[225] Spiller II, table VI.
[226] Spiller II, paragraph 136.

| Date | Valuation | Fancesa | Value of the holdings of 47.02% | EV/EBITDA multiple |
|---|---|---|---|---|
| March 2010 | Soboce management FCD | Included | US$ 97.44M – US$ 119.07M[227] | 5.47-6.41 |
| 2010 Agreement (May 2010) | Contractual | Included | US$ 105.6M | 5.42 |
| First CIMSA offer (June 2011) | Offer | Depends | Option 1: US$ 70M (separate from payment of Fancesa shares) Option 2: 50% = US$ 40M 50% = between US$ 20-70M (depends payment Fancesa) | Not calculated |
| Dr. Flores (August 2011) | Multiples + value of Fancesa | Calculated Value | US$ 172.49M | 8.3 |

## 4. __DECISION__

298.     The Tribunal's mission is to determine the market value of the Securities in August of 2011. This value is defined by two elements: the Soboce *stand-alone* value (A.), to which it will be necessary to add the value of Fancesa (B.). Next, the tribunal will determine each one of the elements.

## A.      Soboce stand-alone value

299.     In order to determine the value of the Securities in August 2011, the Tribunal must first establish the Soboce's *stand-alone* value. The Plaintiff's expert, Dr. Flores, valued Soboce *stand-alone* value in August 2011 at US$ 273.85M. The Defendants' expert, Dr. Spiller, considers this appraisal excessive because the multiple applied is not appropriate.

300.     The formula used by the Plaintiff's expert, and which the tribunal considers appropriate to determine Soboce's value, is as follows:

> Soboce *stand-alone* value = EBITDA (12 months) x EV/EBITDA multiple

301.     The Parties have not questioned that Soboce's EBITDA in the 12 months prior to August 2011 was US$ 43.25M, which is the amount calculated by Soboce's own Management in September 2011. The Tribunal considers this number correct[228].

302.     However, there is a significant discrepancy between the Parties' experts regarding the EV/EBITDA multiple. Dr. Flores, the Plaintiff's expert, uses a multiple of 8.3, obtained after calculating the EV/EBITDA average of seven cement companies. On the other hand, Dr. Spiller considers that that

---

[227] Spiller II, paragraph 81 c).
[228] Submitted to Soboce's Management on September 26, 2011, p. 29 (EBITDA calculation being the sum of all monthly EBITDA since August 2010 until July 2011) (Doc. C-190).

multiple is not applicable to Soboce and that it leads to a significant overvaluation of the company.

303. The Tribunal considers that the valuation of *stand-alone* Soboce made by Dr. Flores is excessive. The parameters used by Dr. Flores to value Soboce do not reflect the valuation an independent seller and an independent buyer, acting in good faith and with a reasonable knowledge of the circumstances, would be willing to pay for the Securities. Notably, the multiple used by Dr. Flores (8.3) is too high, since it is much larger

- than the implicit multiples used in the valuations submitted by Soboce's Management[229]: Dr. Spiller made the calculations and concluded that they would be between 5.47 and 6.41; and

- than the multiple agreed by the Parties in clause 7.2 (b) of the 2010 Agreement (5.42), which was designed to sell Soboce's shares between GCC and CIMSA[230].

304. The tribunal is convinced that the 6.41 multiple – the case of the valuation carried out by Management in March 2010 that did not envisage the creation of a plant by the Government – represents the value most adjusted to Soboce's reality, and the one that should be used. The Tribunal bases its opinion on the following arguments:

- First, Soboce's own Management has carried out this valuation with complete knowledge of the company and *in tempore insuspecto*;

- Second, it derives from an FDC methodology valuation that is usually considered the most appropriate for the valuation of companies;

- Third, although the multiple was established in March 2010, there is no reason to assume that it was significantly modified between then and August 2011;

- Fourth, it is the multiple implicit in the valuation that takes into account the scenario closest to the existing situation in August 2011, when, indeed, the Government had not built an additional plant;

- Finally, the 5.42 multiple agreed in the 2010 Agreement is designed to be applied to 2.5% of Soboce's shares, and its extension to the Minority Stake without any type of adjustment is not financially reasonable.

305. Therefore, Soboce's value- using the numbers the Tribunal considers more appropriate- was as of August 2011:

---

[229] Vid. Spiller II, paragraph 120.
[230] Clause 4.1 in 2010 Agreement (Doc. C-91).

> Soboce *stand-alone* value = US$ 43,250,000 x 6.41 = US$ 277,232,500

306.    In order to obtain the equity value of stand-alone Soboce, one still has to deduct the net debt from the business value. The Parties have not discussed that Soboce's net debt in August 2011 was US$ 85.14M[231]. Therefore, Soboce's equity value was:

> Soboce *stand-alone* value – Net Debt = Soboce stand-alone Equity Value
>
> US$ 277,232,500 – US$ 85,140,000 = US$ 192,092,500

## B.    Fancesa

307.    The Tribunal considers that the equity value of *stand-alone* Soboce should include an amount to reflect the 33.33% stake this company had in Fancesa, another Bolivian cement manufacturer. This stake in Fancesa was expropriated in September 2010, almost a year before the reference date for damage calculations, and it does not appear in the case file that Soboce has received any compensation for this.

308.    How would a hypothetical buyer value, in August 2011, Soboce's right to obtain compensation for the Fancesa securities that were expropriated the year before? This is a difficult question to answer, since there was a lot of uncertainty regarding the fair value that the Bolivian Authorities were ready to recognize and the time of actual payment –an uncertainty that continues today.

309.    The parties' experts have not addressed this question but have simply assigned the Fancesa stake a value based on Soboce's own value. Dr. Flores proposes a valuation of US$ 93M, an equivalent of US$ 43.73M for 47.02% that the Securities represent in Soboce. The amount seems completely disproportionate: a hypothetical buyer would have considered with great skepticism the possibility that Soboce, after being expropriated by Decree formulated by the executive power, would be able to obtain a compensation of US$ 93M from the Bolivian Authorities.

310.    How, then, to calculate the reasonable value of the Fancesa stake held by Soboce? The Plaintiff took a step, made *in tempore non suspecto*, that provides a very precise indication of what the foreseeable value of Fancesa's block of shares was.

311.    In June 2011, the Plaintiff voluntarily submitted an offer to acquire the Securities from GCC. CIMSA offered two alternatives:

-        a fixed price of US$ 70M (separate from the payment for Fancesa's shares) or

---

[231] Calculated by Dr. Flores as the difference between US$ 89.72M ("Bank and financial debts") and US$ 4.58M ("Availabilities"), (Flores I. n. 34). See also Spiller II, p. 79; uses the same data in Table IX.

- a variable price (depending on what Soboce would end up receiving from Fancesa).

312. In the second option, CIMSA would initially pay US$ 40M for 50% of GCC's shares, which presupposes a base price of US$ 80M for 100% of the Securities. The other 50% would be paid depending on the compensation received for Fancesa's expropriation, as shown in the following table[232]:

| Fancesa's compensation value (in M of US$) | Payment to GCC for the other 50% of the Securities (in M of US$) |
|---|---|
| 0-30 | 20 |
| >30-40 | 30 |
| **>40-50** | **40** |
| >50-60 | 50 |
| >60-70 | 60 |
| >70 | 70 |

313. From this proposal it can be deduced that in the basic case (where the second 50% of the Securities would have the same value as the first 50%, that is, US$ 40M), CIMSA expected that the compensation for Fancesa's expropriation would be between US$ 40M and US$ 50M. In the Tribunal's opinion, this range represents a reasonable valuation of the compensation that the Bolivian Authorities would be ready to pay for the expropriated Fancesa shares.

314. The precise value within the range still remains to be determined. The offer was drafted in June 2011. It is not shown on the records that since then, the Bolivian Authorities have taken any steps to compensate Soboce. In view of this inactivity, which does not bode well for a speedy resolution of the dispute, the Tribunal has opted for the lower value within the range, that is, US$ 40M.

315. Therefore, the Tribunal considers that the value that a hypothetical buyer would assign in August 2011 to Soboce's right to receive compensation for Fancesa's securities would be US$ 40M.

\* \* \*

316. The Tribunal has calculated that Soboce's equity value in August 2011 was US$ 192,092,500 and that the compensation expected for Fancesa's expropriation was approximately US$ 40,000,000. Thus, the tribunal estimates that Soboce's total value in August 2011 was US$ 192,092,500 plus US$ 40,000,000, that is, US$ 232,092,500.

317. After calculating Soboce's value, including the Fancesa stake, the value of the Securities is the result of a simple multiplication:

> US$ 232,092,500 x 0.4702 = US$ 109,129,893.50

---

[232] Email from Juan Carlos Requena (Soboce) to Gonzalo Belaúnde (Soboce) sent on June 20, 2011 (Doc. C-338) [Tribunal's emphasis].

318.     Consequently, the Tribunal estimates that the value of the Securities in August 2011 – including Fancesa – totaled US$ 109,129,893.50, and that the damage suffered by the Plaintiff consists in the difference between the real value of the Securities in August 2011 (US$ 109,129,893.50) and the price at which they would have had the right to buy them (US$ 75,000,000), that is, US$ 34,129,893.50.

## C.     Defendant's Counter-Arguments

319.     The Defendants have put forth an apparently strong counter-argument: if CCS was only willing to pay US$ 75M for the Securities, knowing that a preferential purchase option in favor of CIMSA existed, such conduct would be the "casting out nines" proof that the market value of the Securities did not exceed that amount.

320.     The argument, brilliantly argued by Dr. Spiller during the hearing[233], appears to be very convincing. The existence of a preferential purchase option is equivalent, for a third party that wants to acquire the shares, to an auction in which you can only make one bid. The economic reasoning would lead said party to make a market price offer, or even higher, in order to discourage the beneficiary of this option from exercising it.

321.     However, in the present case, there is a factor that undermines the argument. The amount offered by GCC in reality was not only US$ 75M. Rather, to this price one has to add the additional risk derived from this arbitration, which has been transferred to CCS.

322.     Indeed, the transfer of Securities was implemented in two contracts between CCS and the Defendants: the *Share Purchase Agreement* ["**SPA**"][234] and the SSPA[235]. While the SPA regulates the purchase of Securities for US$ 75M, the SSPA protects GCC if CIMSA were to initiate claims for the transfer of the Securities[236]. In essence, in the SSPA, CCS assumes the economic risk that could arise from a possible claim against GCC on the part of CIMSA-including the costs and risk of this arbitration[237].

323.     The transfer value of the Securities was not solely a fixed price of US$ 75M. The economic quantification of the legal risk assumed by CCS in the SSPA must also be added.

324.     How to calculate that risk's value? The parties have not submitted any quantification, probably because of the difficulties in attaching a monetary value to risk of a legal nature. But, aside from the calculation difficulties, what is certain is that the risk assumed by CCS was significant. *Res ipsa loquitur*: CCS accepted shouldering the costs and the sentence resulting from the claims submitted by CIMSA, including this award.

---

[233] AT day 3, p. 879:22-882:8.
[234] SPA (Doc. C-198).
[235] SSPA (Doc. C-199).
[236] SSPA, Clause 2.04 by reference to addendum 2.01 (Doc. C-199).
[237] SSPA, Clause 3.05 (Doc. C-199).

325.    There is no doubt that an economic value must be attached to the legal risk borne by CCS. The question is: How much?

326.    At first, it would seem reasonable to assume that the economic value of the assumed legal risk should be significant. CCS knew about the 2005 Agreement that allowed CIMSA to initiate arbitration and sue GCC for breach of contract. Any businessperson is aware that an arbitration of this kind may involve costs and sentences totaling millions of US dollars.

327.    However, there is no formula to quantify the legal risk with any sort of precision. Nevertheless, to attach an approximate value between US$ 20M and US$ 40M to the legal risk is not unreasonable and is endorsed by the Tribunal's experience.

328.    Accepting these amounts, the real total compensation offered by CCS in exchange for the Securities (including the explicit price and the assumption of risks) would be in the range of US$ 95M and US$ 115M.

329.    The valuation made by the tribunal (US$ 109,129,893.50) lies within this range.

* * *

330.    Conclusion: The Tribunal considers that the damage suffered by the Plaintiff consists in the difference between the real value of the Securities as of August 2011 (US$ 109,129,893.50) and the price at which the Plaintiff would have had the right to purchase them, that is: US$ 34,129,893.50.

## XII    COSTS

331.    This decision encompasses the costs generated both in the First and Second Stages of the proceedings.

332.    The Tribunal requested that the Parties provide a breakdown of the amounts they are requesting as costs. The following sections reproduce the parties' demands. Neither party has questioned the items of the opposing claim or the veracity of the numbers.

### 1.    PLAINTIFF'S POSITION

333.    The Plaintiff claims the following amounts[238]:

-    Cost of the proceedings related to the CIAC: US$ 451,282.99;

-    Legal fees and expenses: US$ 1,837,380.27[239];

-    Experts' fees: US$ 302,232.34[240];

-    Cost of the hearings: US$ 136,780.63[241].

334.    The sum of the abovementioned amounts is equivalent to a total of US$ 2,727,676.23.

335.    The Plaintiff also requests that the Tribunal sentence the Defendants to pay all these amounts[242] including interest calculated at 6% per year until the date of the actual payment[243]. The argument put forward in its claim for costs is that GCC is the party in breach as well as the losing party in this arbitration. And, in addition, from the Plaintiff's point of view, the Defendants deserve to bear the costs on account of their obstructive behavior throughout the proceedings[244].

### 2.    DEFENDANTS' POSITION

336.    The Defendants claim the following amounts[245]:

-    Cost of the proceedings related to the CIAC: US$ 364,676.50;

-    Legal fees and expenses: US$ 2,750,422.88[246];

---

[238] Plaintiff's expenses, p. 2.
[239] Curtis, Mallet-Prevost, Colt & Mosle LLP: US$ 1,484,858.30; Mendieta Romero & Asociados: US$ 352,521.97; the US$ 75,000 for the Von Borries Blanco law firm were not included (see section IX above).
[240] Economics expert Dr. Daniel Flores of Econ One Research, Inc.: US$ 166,447.34; Legal expert Dr. Santiago Nishizawa: US$ 135,785.
[241] First Stage Hearing: US$ 59,003.54; Second Stage Hearing: US$ 77,777.09.
[242] Plaintiff's expenses, paragraph 3.
[243] Claim, paragraphs 193-4: Plaintiff's Findings, paragraph 82 (6).
[244] Claim, paragraph 186: Rejoinder, paragraphs 605, 618-626.
[245] Defendants' Expenses, pp. 1-3.
[246] Astigarraga Davis: US$ 2,025,259.61 in fees and US$ 170,243.10 in expenses; Guevara & Gutiérrez: US$ 493,470.38 in fees and US$ 61,449.79 in expenses.

- Experts' fees: US$ 1,569,406.05[247];

- Cost of the hearings: US$ 78,680.68[248].

337. The total sum of the amounts claimed by the Defendants is US$ 4,763,186.11.

338. The Defendants argue that CIMSA has no right to recover its legal costs because it has lost many of its claims. The Defendants request that each Party be sentenced to pay for its own expenses[249], or at least, that the costs be apportioned in accordance with the losses and gains of each of the parties[250]. In addition, they consider that this has been a complex case where there have been honest differences of opinion between the Parties[251]. Therefore, they request that the Tribunal reject CIMSA's allegations regarding the Defendants' bad faith during the proceedings[252].

## 3. **TRIBUNAL'S DECISION**

339. Art. 58 of Bolivia's Arbitration Law states that the institution administering the arbitration shall regulate the cost and fees of the arbitration[253].

340. Art. 35 of the CIAC Rules states that[254]:

> "The arbitration tribunal will determine the arbitration costs in the award. The term "costs" includes only the following:
>
> a) The fees of the arbitration tribunal, which will be indicated separately for each arbitrator and which will be determined by the tribunal in accordance with Article 36;
>
> b) Travel expenses and other expenses of the arbitrators;
>
> c) The costs of experts counseling or any other assistance required by the arbitration tribunal;
>
> d) Travel expenses and other expenses incurred by witnesses, to the extent that these expenses are approved by the arbitration tribunal;

---

[247] Economics expert Dr. Pablo Spiller of Compass Lexecon: US$ 1,155,691.90; Financial expert Mr. Orlando Chiossone of Broadspan Capital: US$ 216,073.65; Legal expert Mr. Guillermo Cabanellas: US$ 67,788; Legal expert Mr. Carlos Ferreira: US$ 81,445; and Legal expert Dr. Franco Ferrari: US$ 48,407.50.
[248] Stenographer's expenses: US$ 32,841.09; Hotel expenses for the Second Stage (for experts, consultants, external counsel, etc.): US$ 22,081.18; conference rooms for the First Stage: US$ 5,496.47; logistic support and freight charges for the First Stage hearing: US$ 4,614.28; and hotel expenses shared with CIMSA attributable to GCC for the two stages: US$ 13,647.66.
[249] Defense Plea, paragraphs 643, 672.
[250] Rejoinder, paragraphs 827, 837, 839.
[251] Defense Plea, paragraph 676.
[252] Defense Plea, paragraph 686 (c) and (d); Rejoinder, paragraphs 844-847.
[253] Art. 58 of the LAB (Bolivia's Law of Arbitration).
[254] Art. 35 of CIAC Rules.

e) The normal expenses incurred by the winning party for its defense, provided that these have been claimed during the arbitration proceedings and up to the amount that the tribunal deems reasonable;

f) The administrative fees and other costs for services provided by CIAC, which will be determined by the CIAC's Arbitrators Nomination Committee in accordance with the fees valid at the outset of the arbitration. At the beginning of the lawsuit, the Committee may determine a provisional payment of these fees and before the award is made, the definitive payment for the tribunal to take into consideration when issuing the award."

341.     Also, Art. 37 states[255]:

"1. In theory, the arbitration costs shall be borne by the unsuccessful party. However, the arbitration tribunal may apportion each of these cost elements between the parties if it decides apportionment is reasonable, keeping in mind the circumstances of the case."

342.     On the other hand, the 2005 Agreement establishes in Clause 22 the right to a compensation by the *in bonis* party, including costs and expenses (including reasonable legal fees)[256]:

"22.1 Each Party will compensate the other Party (a "Compensated Person") and will hold it harmless from any losses, costs, claims, damages, liabilities, penalties, injuries, or expenses (including reasonable legal fees) of any type or nature, committed, imposed, or awarded against this Party, that occurs, is related to, or results from the breach of this Agreement or any transaction that is related to and is [sic] envisaged in this Agreement: with the exception of those losses, costs, claims, actions, damages, liabilities, fines, penalties, injuries, or expenses that are a direct consequence of gross negligence or willful misconduct of the Compensated Persons.

22.2 This Clause shall survive the termination of this Agreement with respect to any claim brought against a Compensated Person regarding any compensable damage mentioned above."

343.     The same clause in the 2005 Agreement – from which the Arbitration Tribunal's jurisdiction derives – provides for, in its section six, the regulation of costs:

"29.6 Cost of the Arbitration and Legal Representation: The losing party shall cover the reasonable arbitration costs in relation to any arbitration carried out pursuant to this Clause, including arbitration costs (that is, commissions and administrative expenses, fees and expenses of the arbitrators), and the legal representation fees and expenses regarding the arbitration process."

344.     The Tribunal adheres to the growing trend in international arbitration – referred to in Clause 29.6 of the 2005 Agreement – which establishes that the distribution of

---

[255] Art. 37 of CIAC Rules.
[256] Clause 22.1 of the 2005 Agreement (Doc. C-1).

the costs must reflect to some extent the principle that the unsuccessful party has to significantly contribute to the arbitration fees, costs, and expenses of the successful party.

345. However, in Article 35, the CIAC Rules grants the Tribunal a certain amount of discretion when settling the matter of distribution[257] of costs, and in Art. 37, it specifically allows for an apportionment in cases that the arbitration tribunal considers appropriate.

346. The Plaintiff believes that it is the successful party in the dispute. Consequently, it requests that the Tribunal order the opposing party to cover all the expenses generated in this arbitration, or alternatively, that it be sentenced for inappropriate procedural behavior. The Defendants deny that their conduct during the proceedings was in bad faith and request that each party cover its own costs or, alternatively, that the costs be apportioned in accordance with the losses and gains of each party.

347. The Tribunal has already concluded that the Defendants violated the 2005 Agreement and that as a consequence of said breach the Plaintiff suffered damages[258] that according to Bolivian law are recoverable. Finally, the Tribunal considers that, as a consequence of the breach of the agreement, the Defendants must pay the Plaintiff a compensation of US$ 34,129,893.50.

348. The Plaintiff, therefore, has been successful in the majority of the claims. Thus, the Defendants will have to bear the Plaintiff's costs (if not the totality, then in a specific proportion).

349. In order to distribute the arbitration costs, the Tribunal will distinguish between two large categories of claimed costs:

- The provisions of funds disbursed to the CIAC, including arbitrators' fees and expenses, referred to as costs of the proceedings ["**Costs of the Proceedings**"] (A.):

- The costs generated by the defense counsel of each party [the "**Costs of the Defense**"] (B.).

## A.    Costs of the Proceedings

350. The Costs of the Proceedings are broken down in CIAC administrative fees as well as the fees and expenses of the members of the Arbitration Tribunal.

351. According to the data submitted by the CIAC Secretariat, the administrative fees total US$ 105,000, while the fees and expenses of the arbitrators total US$ 968,686.68, divided as follows:

---

[257]Art. 35 of CIAC Rules: "…(d) Travel expenses… *in as much as the expenses are approved by the arbitration tribunal*; (e) The normal expenses incurred by the successful party for its defense… *only up to the amount the tribunal deems reasonable.*"

[258] Final Partial Award, paragraphs 528-9, see paragraphs 15 and 16 above.

-     US$ 308,046 as fees for each arbitrator; administrative assistant costs are included in the President's fees.

-     US$ 44,548.68 in expenses incurred by the arbitrators and the administrative assistant.

The above amounts are those determined by CIAC. However, the provision of funds made by the parties on the date of the signing of the award is insufficient to cover the total.

352.    The Tribunal verifies that the Plaintiff is the winning party, if not completely, then with respect to most of the proceedings: the tribunal has confirmed its jurisdiction regarding half of the Plaintiff's claims[259], has determined its jurisdictional objection to dismiss the counterclaim submitted by the Defendants, has ruled on one of the three concepts of damages claimed by the Plaintiff, and has awarded a compensation.

353.    For this reason, the Tribunal considers that the Defendants must assume a substantial part of the Costs of the Proceedings incurred by the Plaintiff. The Costs of the Proceedings claimed by the Plaintiff total US$ 451,282.99 and have been paid in full[260]. Thus, the Tribunal decides that the Defendants must reimburse the Plaintiff <u>US$ 450,000</u>.

## B.    Defense Expenses

354.    The Expenses of the Defense claimed by the Plaintiff are broken down into legal fees and expenses, experts' fees, and the costs of both hearings; they total, respectively, US$ 1,837,380.27[261], US$ 302,232.34[262], and US$ 136,780.63[263]. These amounts would have been accrued in the previous two stages of the proceedings.

355.    The Defendants have not questioned the reasonableness, items, or amounts claimed.

356.    The Tribunal must only determine, depending on the degree of maturity by the Plaintiff (a.) and the Defendants' behavior during the proceedings (b.), the proportion of these expenses to be borne by the Defendants:

## a.    Degree of maturity:

357.    The arbitration has been divided in two large stages: jurisdiction and liability, on the one hand, and damages, on the other. To determine the distribution of the costs, The tribunal

---

[259] Final Partial Award, paragraphs 589-594.
[260] Plaintiff's expenses, p. 2; Excel in relation to Plaintiff's Expenses (Doc. C-941).
[261] Curtis, Mallet-Prevost, Colt & Mosle LLP: US$ 1,484,858.30; Mendieta Romero & Asociados: US$ 352,521.97; the US$ 75,000 of Von Borries Blanco have not been included (see section IX above).
[262] Economics expert Dr. Daniel Flores of Econ One Research, Inc.: US$ 166,447.34; Legal expert Dr. Santiago Nishizawa: US$ 135,785.
[263] First Stage hearing: US$ 59,003.54; Second Stage hearing: US$ 77,777.09.

will assume that the Plaintiff's Defense Expenses have been divided in these two stages in equal parts.

358.     In the jurisdiction and liability stage, the Tribunal awarded the Plaintiff one of the two claims: it admitted its alternative claim; also, it has accepted its objection regarding lack of jurisdiction to decide on the counterclaim. The Tribunal thus rules that the Defendants shall contribute 67% of the Expenses of the Defense in the liability stage due to their success in two of the three categories of main issues to be decided: US$ 615.522.39 for legal fees and expenses, US$ 101,247.83 for experts' fees, and US$ 45,821.51 for costs of hearings.

359.     In the damages stage, of the three categories of damages claimed by the Plaintiff, the Tribunal has recognized the relevance of one of them, the main one[264], but, in spite of accepting the claimed item –itself of merit when assigning a value –, the Tribunal has substantially lowered the Plaintiff's quantification. Valuing the maturity as a whole, the Tribunal awards the Plaintiff 50% of the defense expenses incurred during the damage stage: US$ 459,345.07 for legal fees and expenses, US$ 75,558 for experts' fees, and US$ 34,195.16 for the cost of the hearings.

**b.      The Defendants' behavior during the proceedings:**

360.     The Plaintiff has called the Tribunal's attention to the apparent obstructive behavior of the Defendants throughout the proceedings, which the Defendants have denied. The Arbitration Tribunal partially agrees with the Plaintiff. Without going into whether or not there was procedural recklessness on the part of the Defendants, it is true that several of the procedural incidents submitted throughout the arbitration were rejected, of which the one in section II.5 is a significant example. The Arbitration Tribunal decides for this reason to attribute to the Defendants an additional 10% of the Plaintiff's overall defense expenses: US$ 183,738.03 for legal fees and expenses, US$ 30,223.23 for experts' fees and, US$ 13,678.06 for the cost of the hearings.

361.     In total, the Defendants owe the Plaintiff a total of <u>US$ 1,559,329.37</u> for Expenses of the Defense.

362.     To sum up, the Defendants must assume <u>US$ 2,009,329.37</u>[265] for the costs of this arbitration. In addition, the Plaintiff has asked that interest be accrued on this sum from the date of the Award. The Tribunal addresses this question in the following section.

---

[264] With a specific weight of 84% against the claimed total.
[265] US$ 450,000 + US$ 1,559,329.37.

## XIII    INTEREST

363.    The Plaintiff only requests post-award[266] interest under Art. 347 of the C.C. Since the Parties did not negotiate conventional interest for pecuniary obligations in the 2005 agreement, the Plaintiff requests that a legal interest of 6% be applied as of the day of the Award until the date of actual payment on the principal amount of the damages suffered by CIMSA [sic] , in addition to costs and other legal fees[267].

364.    The Defendants simply request that the Tribunal rejects the Defendants' [sic: Plaintiff's] claims and requests. However, regarding accrual of interests, they accept that the compensatory amount for the damages includes payment of interest[268], and they do not explicitly question the type of interest or the opposing accrual date proposed[269].

365.    Article 347 of the CC includes a brief regulation regarding accrual of interest in pecuniary obligations:

> "In the obligations concerning a sum of money, compensation for a delay in compliance only consists in the payment of legal interest as of the day of the arrears. This rule applies even if no interest was previously owed and the creditor does not justify having suffered damages. If before the arrears interest was owed in an amount above the legal amount, the penalty interest will be owed in the same measure, so long as it is within the permitted limits."[270]

366.    Taking this precept as a starting point, and supplementing it with other relevant precepts of Bolivian law, the Tribunal will now determine all the elements included in the calculation of interest:

-    The *dies a quo* and the *dies ad quem*: will be granted in accordance with the Plaintiff's request. Given that the Plaintiff only requests interest from the day of the Award, the issue is thus settled. The Tribunal could never grant interest from a prior date, or it would incur in *extra-petita*. Accordingly, the interest will be accrued from the date of issue of this Award. The *dies ad quem* will be the date of actual payment of the total debt by the Defendants.

-    Interest rate: the interest rate requested is, indeed, the 6% per year, as laid down in Art. 414 of the C.C.[271] The Tribunal grants the Plaintiff's claim. The applicable interest rate will thus be 6% per year, a rate the Tribunal considers reasonable.

[266] Claim, paragraph 192.
[267] Claim, paragraphs 193-4: Plaintiff Findings, paragraph 82 (6).
[268] Defendants Findings, paragraph 71.
[269] Rejoinder, paragraph 686 (c): R-60, paragraph 860 (c): Defendants Findings, paragraph 75.
[270] Art. 347 of the C.C. (Doc. C-365).
[271] Art. 414 del C.C.: "The legal interest is 6% per year. It applies in the absence of a conventional one from the day of the arrears." (Doc. C-365)

- <u>Principal</u>: The Plaintiff requests that the legal interest rate be applied on the amount of the damages the Defendants are sentenced to pay, in addition to costs and other legal fees. The Tribunal grants the claim, since it is standard practice that post-award interest is calculated on the principal equivalent to the pecuniary sentence.

\*\*\*

367. <u>In short</u>: The tribunal decides that, from the date of the Award until the date of payment, the principal amount –including compensation for damages and costs –will accrue a 6% per year interest rate.

# XIV   SUMMARY

368.   In its findings brief, the Plaintiff requested that the Tribunal:

"2)   order the Defendants to compensate CIMSA for the costs of all the legal proceedings (other than these proceedings) derived from GCC's breach of contract for an amount to be determined at the time of the award of the second stage of the proceedings;

3)   order the Defendants to compensate CIMSA for the loss of earnings for an amount no less than US$ 188.29 million;

4)   order the Defendants to compensate CIMSA for the actual loss for an amount no less than US$ 35.97 million;

5)   sentence the Defendants to pay all the costs and other legal fees derived from these arbitration proceedings; and

6)   state that all the amounts granted to CIMSA accrue a 6% per year interest rate from the date of the arbitration award of the second stage of the proceedings."[272]

369.   In its expenses brief the Plaintiff limited its first *petitum*[273]:

"Note that regarding the proceedings related to this arbitration, CIMSA only claims an amount of US$ 75,000 to be paid to the Von Borries Blanco Law Firm. This amount only includes the proceedings initiated in violation of the 2005 Shareholders' Agreement to annul the Partial Award. CIMSA withdraws the claim of the costs of the other proceedings derived from the Defendants' non-compliance in 2011 (distinct from these arbitration proceedings)"

370.   The Defendants requested in their findings brief that the requests proposed in the Defense Plea and Rejoinder be granted[274]:

"a.   Consider this Statement Brief to have been presented;

b.   Declare the inadmissibility of the damage claims made by CIMSA;

c.   Deny all the claims and requests made by CIMSA;

d.   After the issuing of the Second Stage award, summons the parties to determine which is the winning party and for quantification of the costs and legal expenses derived from the arbitration process consisting in the arguments raised here by GCC;

e.   Grant any remedy GCC may be entitled to."

---

[272] Plaintiff Findings, paragraph 82.
[273] Plaintiff Expenses, paragraph 5.
[274] Defense Plea, paragraph 686; Rejoinder, paragraph 860.

371. The Tribunal has dismissed the first of the Plaintiff's requests – already limited in its expenses brief – and has stated that no compensation applies regarding damages derived from legal expenses.

372. Regarding the second claim, the Tribunal, after assessing it, has stated that the Defendants must pay CIMSA an amount of US$ 34,129,893.50 for the difference between the real value of the Securities and their selling price to CCS.

373. The Tribunal has dismissed the third claim because the damages associated with a hypothetical loss of value of the control premium cannot be compensated.

374. Also, the Tribunal has partially assessed – for an amount of US$ 2,009,329.37 – the Plaintiff's claim regarding the payment of this arbitration's costs and has stated that all the amounts granted to CIMSA accrue an interest rate of 6% per year from the issuing date of this Award until its actual payment.

375. The Defendants' requests have been accepted inasmuch as two of the Plaintiff's requests have been rejected.

376. Finally, it is necessary to recall that the sentence to pay all the amounts settled by the Tribunal affects not only GCC but also, jointly and severally, Grupo Chihuahua, guarantor of the obligations assumed under the 2005 Agreement[275], which, having not been complied with, have resulted in the sentence for damages of this Award.

---

[275] Clause 23 of the 2005 Agreement (Doc. C-1).

## XIV    **DECISION**

377.    For the reasons set out above, the tribunal unanimously adopts the following decisions:

    1.    It jointly and severally orders GCC LATINOAMÉRICA, S.A. DE C.V. and GRUPO DE CEMENTOS DE CHIHUAHUA, S.A.B. to pay US$ 34,129,893.50 to COMPAÑÍA DE INVERSIONES MERCANTILES S.A. for the damages caused by the breach of the 2005 Agreement.

    2.    It jointly and severally orders GCC LATINOAMÉRICA, S.A. DE C.V. and GRUPO DE CEMENTOS DE CHICHUAHUA, S.A.B. DE C.V. to pay US$ 450,000 and US$ 1,559,329.37 for Proceedings Costs and Defense Counsel Expenses, respectively.

    3.    It jointly and severally orders GCC LATINOAMÉRICA, S.A. DE C.V. and GRUPO DE CEMENTOS DE CHICHUAHUA, S.A.B. DE C.V. to pay interest on the amounts ordered to be paid pursuant to this Award, accrued from the date of the Award until the payment date, calculated based on a 6% per year interest rate.

    4.    It dismisses any other claims brought by the Parties.


Date of the award: April 10, 2015.

Place of arbitration: La Paz, Bolivia.


This award is issued sevenfold, one for each of the parties, three for the Tribunal, and another for the CIAC, each consisting of 91 pages.


The Tribunal certifies that, for the purposes of Article 1 of the New York Convention of 1958 regarding the Recognition and Enforcement of Foreign Arbitral Awards and by virtue of Article 4 of the Inter-American Convention on International Commercial Arbitration (Panama Convention), this Final Award on Damages, which represents the definitive decision on damages, was issued in the place of arbitration, La Paz, Bolivia.

[signature]
Juan Fernández Armesto

[signature]                          [signature]
Fernando Salazar-Paredes            Eduardo Zuleta

CITY OF __Charleston_____ )
                                      )    ss.: 250 29 6658
COUNTY OF _____Charleston_____ )

I, Kevin Krell, am a translator who contracts with TransPerfect, a translation services company that operates under both ISO 9001:2008 and EN 15038:2006 certification. I have been speaking Spanish for 15 years and am a native of the United States. I am a recipient of post-graduate training in translation.

The following documents are to the best of my knowledge and belief a true and accurate translation from Spanish into English:

"CIMSA vs. GCC-CIAC Case No. 50 180 T 00867 11 – Final Award on Damages"

Kevin Krell

_Kevin Krell_
[Name]

Sworn to before me this

__24th_ day of September 2015

Notary Public

PAMELA S. MURPHY
NOTARY PUBLIC
FOR SOUTH CAROLINA
My commission expires: April 17, 2024

# INTER-AMERICAN COMMERCIAL ARBITRATION COMMISSION

Case No. 50 180 T 00867 11

COMPAÑÍA DE INVERSIONES MERCANTILES S.A.
*Claimant*

against

GCC LATINOAMÉRICA, S.A. DE C.V.

and

GRUPO CEMENTOS DE CHIHUAHUA, S.A.B. DE C.V.
*Respondents*

====

# DECISION ON THE INTERPRETATION AND CORRECTION OF THE FINAL ARBITRAL AWARD ON DAMAGES

====

## ARBITRAL TRIBUNAL

Juan Fernández-Armesto - President
Fernando Salazar-Paredes - Arbitrator
Eduardo Zuleta - Arbitrator

## ADMINISTRATIVE SECRETARIES
Krystle M. Baptista

CIMSA v. GCC- CIAC Case No. 50 180 T 00867 11
Decision on the interpretation and correction
of the Arbitral Award on Damages

**ARBITRAL AWARD**

THE UNDERSIGNED ARBITRATORS, designated in conformance with the arbitration agreement entered into by the Parties on **September 22, 2005**, having been sworn into office and having considered the evidence and allegations of the Parties, issue herein the **Decision on the Interpretation and Correction of the Final Arbitral Award on Damages issued on April 10, 2015** in this arbitration.

CIMSA v. GCC- CIAC Case No. 50 180 T 00867 11
Decision on the interpretation and correction
of the Arbitral Award on Damages

**INDEX**

**Whereas** ...........................................................................................................**4**

**I.**     **Request for interpretation and/or the Issue of an Additional Arbitral Award**..................**5**

     **1.**     **Introduction**...............................................................................**5**

     **2.**     **Requirements for the interpretation of the Arbitral Award**............................**5**

     **2.1.**     **Claimant's Position**......................................................................**5**

     **2.2.**     **Respondents' Position**..................................................................**6**

     **2.3**     **Applicable Regulations**..................................................................**7**

     **3.**     **Tribunal's Decision**.....................................................................**11**

**II.**     **Requests for correction**........................................................................**13**

**III.**     **Decision**......................................................................................**17**

**Attachment I**...................................................................................**19**

CIMSA v. GCC- CIAC Case No. 50 180 T 00867 11
Decision on the interpretation and correction
of the Arbitral Award on Damages

# WHEREAS

1.  On September 13, 2013, the Arbitral Tribunal issued a Final Partial Arbitral Award on Liability [the "**Final Partial Arbitral Award**"], which ended the First Phase of the Proceedings. In supplement to its decision and, upon the petition of the Respondents, the Arbitral Tribunal issued a Decision on the interpretation and correction of the Final Partial Arbitral Award on November 18, 2013.

2.  On April 10, 2015, the Arbitral Tribunal issued the Final Arbitral Award on Damages in the aforementioned proceedings [hereinafter the "**Arbitral Award**" or the "**Arbitral Award on Damages**"], which ended the Second - and last - Phase of the proceedings[1].

3.  The Arbitral Award contains a list on pages 5 through 8 of defined terms that are incorporated herein by reference.

4.  On April 17, 2015, within the period granted for this purpose in art. 59 of the LAB (Ley de Arbitraje de Brasil [Brazilian Arbitration Law]), the Respondents requested a supplement to or a clarification and amendment of the Arbitral Award[2] and announced that they would exercise their right to require the Arbitral Tribunal to "interpret and/or correct the arbitral award, and/or issue an additional arbitral award" within the period established by art. 32 through art. 34 of the CIAC (Comisión Interamericana de Arbitraje Comercial [Inter-American Commercial Arbitration Commission]) Rules.

5.  This notice occurred on May 15, 2015, within the period stipulated in art. 32 through art. 34 of the CIAC Rules, when the Respondents requested the interpretation and correction of the Arbitral Award[3] [hereinafter and in conjunction with the prior request on April 17, 2015, the "**Request for Interpretation and/or the Issue of an Additional Arbitral Award**"]. On that same day, within the period established for this purpose in art. 33(1) of the CIAC Rules, the Claimant requested the correction of the Arbitral Award[4].

6.  On May 18, 2015, the Arbitral Tribunal issued communication A 70, which granted the Parties a period until May 29, 2015 to answer the requests of their counterparties.

7.  In use of the period granted, on May 29, 2015 the Claimant submitted its answer to the Request for Interpretation[5] and the Respondents submitted their answers to the Claimant's request for correction[6].

8.  According to art. 32(2) of the CIAC Rules, the Tribunal has 45 days from receipt of the interpretation requirement to issue its interpretation in writing, and therefore this resolution is issued within this period.

9.  The Arbitral Tribunal issues the following Decision on the Interpretation and Correction of the Arbitral Award on Damages:

---

[1] The Parties were notified of the Arbitral Award on Damages on April 15, 2015.
[2] R 94.
[3] R 95.
[4] C 89.
[5] C 90.
[6] R 96.

CIMSA v. GCC- CIAC Case No. 50 180 T 00867 11
Decision on the interpretation and correction
of the Arbitral Award on Damages

## I.  REQUEST FOR INTERPRETATION AND/OR THE ISSUE OF AN ADDITIONAL ARBITRAL AWARD

### 1.  INTRODUCTION

10.  The Respondents have submitted a "request for interpretation and correction of the Final Arbitral Award on Damages and/or the issue of an Additional Arbitral Award," based on the provisions of art. 32, 33 and 34 of the CIAC Rules, which specifies that the Tribunal clarify whether the issue of the Arbitral Award on Damages took communication R 93 (submitted by Mr. Alejandro Salinas on April 09, 2015) into consideration.

11.  Communication R 93 alleged dilatory conduct on the part of the Claimant in the Final Partial Arbitral Award annulment proceeding and requested that the Arbitral Tribunal refrain from issuing the Arbitral Award until the definitive resolution of that proceeding.

12.  The Claimant has opposed said request and, in addition, has submitted a series of preliminary considerations:

- The Respondents' Request for Interpretation and/or the Issue of an Additional Arbitral Award is a mere tactic to delay the proceeding and to better prepare the previously notified Arbitral Award nullification request.

- The Respondents' request is submitted as an appeal and does not seek the clarification of ambiguities, but rather it seeks to re-litigate issues that were discussed and decided in the Arbitral Award.

13.  The Tribunal already established, in its "Decision on the interpretation and correction of the Final Arbitral Award on Liability," the requirements for the interpretation of the arbitral awards issued in this proceeding. The Tribunal will recall, firstly, the type of issues that may be clarified via interpretation of the Arbitral Award (section 2 *infra*) and, taking these into account, the Tribunal will subsequently analyze the request submitted (section 3 *infra*).

### 2.  REQUIREMENTS FOR THE INTERPRETATION OF THE ARBITRAL AWARD

### 2.1.  CLAIMANT'S POSITION

14.  The Claimant considers the Respondents' request to be an attempt to modify the substantive decision of the Arbitral Award - which is contrary to art. 29(2) of the CIAC Rules[7] that declares that arbitral awards are not appealable. The same conclusion is obtained from art. 60 of the LAB[8], in addition to the doctrine and jurisprudence that arise in connection with the interpretation of arbitral awards under the former UNCITRAL Rules (1976).

---

[7] C 90, para. 4.
[8] C 90, para. 5.

CIMSA v. GCC- CIAC Case No. 50 180 T 00867 11
Decision on the interpretation and correction
of the Arbitral Award on Damages

15.     The CIAC Rules are based on the UNCITRAL Rules (1976) and their formula is almost identical. The regulation for interpretation requests is no exception since it is written in a form very similar to art. 32 of the CIAC Rules and art. 35 of the UNCITRAL Rules (1976)[9]. The same occurs with requests to issue an additional arbitral award: regulated in art. 34 of the CIAC Rules and art. 37 of the UNCITRAL Rules (1976)[10]. Thus, there is a very lengthy doctrinal development of the concept of the interpretation of arbitral awards, based on the UNCITRAL Rules (1976), which is also applicable to the same concept included in the CIAC Rules[11].

16.     The Claimant explains that, in conformance with the doctrinal and jurisprudential development, it is not possible to reopen a matter that is res judicata on the grounds of interpretation or via the issue of an additional arbitral award.[12] Interpretation therefore consists of a mere clarification of obscurities, but it does not imply that the Tribunal must explain the reasons for the Arbitral Award in more detail.

17.     In particular, the Claimant considers the Request for Interpretation and/or Issue of an Additional Arbitral Award inappropriate, which specifies that the Tribunal clarify whether it took communication R 93 into consideration, for three reasons[13]:

-       Upon submission of communication R 93, the Arbitral Tribunal had already declared the instruction phase of the proceeding closed in conformance with art. 26 of the CIAC Rules;

-       The Arbitral Award on Damages effectively decides the request contained in communication R 93;

-       Even if CIMSA had delayed a court proceeding other than this arbitration – *quod non* – the Tribunal would lack the jurisdiction to pronounce judgment on the same.

## 2.2.    RESPONDENTS' POSITION

18.     The Respondents request the interpretation of the Arbitral Award because they observe that it is "unclear and ambiguous" whether the Tribunal took communication R 93 into consideration when it issued the Arbitral Award[14].

19.     The Respondents explain that communication R 93 was submitted by Mr. Alejandro Salinas a day before the issue of the Arbitral Award and on that date the Tribunal was still in operation[15], in conformance with the provisions of art. 61 of the LAB[16].

---

[9] C 90, para. 6.
[10] C 90, para. 6.
[11] C 90, paras. 6-7.
[12] C 90, para. 7.
[13] C 90, para. 15.
[14] R 95, p. 1, para. 3.
[15] R 94, p. 1; R 95, p. 1-2.
[16] Art. 61 of the LAB: "(End of operations) The Arbitral Tribunal will end its operations upon the termination of the arbitration proceedings, which include those actions relative to the amendment, supplement, clarification and declaration of enforceability of the arbitral award, without prejudice to the provisions of article 65."

CIMSA v. GCC- CIAC Case No. 50 180 T 00867 11
Decision on the interpretation and correction
of the Arbitral Award on Damages

20.     The Respondents consider said communication to be especially relevant, given that in the Arbitral Award the Tribunal ordered the Respondents to pay costs[17].

## 2.3.    APPLICABLE REGULATIONS

<u>Arbitration law</u>

21.     The general principle recognized in the applicable arbitration law, the LAB, is that the arbitral award is firm and has the "value of a judgment with the force of res judicata, and compliance therewith will be compulsory and obligatory as of notification of the parties of the resolution thus declared."[18]

22.     However, there are very occasional exceptions in which the Arbitral Tribunal can modify the text of the arbitral award. The LAB does not expressly regulate the interpretation of arbitral awards, but art. 59(II) establishes the exceptional possibility that the arbitral tribunal can clarify, at the request of one of the parties, any point of "doubtful intelligence and interpretation." Specifically, article 59(II) permits:

> "ARTICLE 59o.- (Amendment, supplement and clarification)
>
> I. Within the three (3) days following notification of the arbitral award, the parties may request that the Arbitral Tribunal amend any computational, clerical, typographical or other similar error, provided it does not substantially alter the decision. Mere material error may be corrected ex officio, even in the enforcement of the arbitral award.
>
> II. In the same manner and in a similar period, the parties may request that the Arbitral Tribunal pronounce judgment on an omitted point or on doubtful intelligence or interpretation, in order to supplement or clarify the arbitral award. The amendment, supplement or clarification requested will be settled by the Arbitral Tribunal within ten (10) days following the request. If necessary, this period will be extended for a maximum term of ten (10) days, with the agreement of the parties.
>
> III. The amendment, supplement and clarification of the arbitral award will be subject to the regulations established in articles 53 and 56 of this law."

23.     The LAB therefore permits, *inter alia*, the clarification of the text of the arbitral award upon compliance with the following requirements:

---

[17] R 94, p. 1-2; R 95, p. 2
[18] Art. 60(II) of the LAB.

CIMSA v. GCC- CIAC Case No. 50 180 T 00867 11
Decision on the interpretation and correction
of the Arbitral Award on Damages

(i)     The existence in the arbitral award of doubtful intelligence and interpretation;

(ii)    A request for clarification by one of the parties during the three days following notification of the arbitral award;

(iii)   A decision by the Tribunal during the 10 days following the request, with a possible extension of 10 days, with the agreement of the parties.

24.     Requirement (i) is necessary to overcome the general principle of firmness of the arbitral award. However, requirements (ii) and (iii) are merely formal and, therefore, are of a dispositive nature. In use of said dispositive nature, the parties agreed to the extension of periods (ii) and (iii), upon subjecting the dispute to the CIAC Rules and complying with the extended periods that this permits.

CIAC Rules

25.     The Respondents' interpretation request is based on art. 32 of the CIAC Rules[19]:

> "Interpretation of the arbitral award
>
> Article 32
>
> 1. Within thirty days following receipt of the arbitral award, any of the parties may require the arbitral tribunal to interpret the arbitration award. As of the request, the Tribunal must notify the other party or parties within the process.
>
> 2. The interpretation will be given in writing within forty-five days after receipt of the requirement.
>
> The interpretation will form part of the arbitral award and the provisions of paragraphs 2 through 7 of article 29 will be applicable."

26.     Meanwhile, the request, in conjunction with or alternatively to the issue of an additional arbitral award, is regulated in art. 34 of the CIAC Rules[20]:

> "1. Within thirty days following receipt of the arbitral award, any of the parties may require the arbitral tribunal, which must notify the other party, to issue an additional arbitral award with respect to the claims formed in the arbitral proceeding but omitted from the arbitral award.
>
> 2. If the tribunal deems the requirement for an additional arbitral award to be justified and considers that the omission may be rectified without the necessity for further hearings or evidence, it will complete its arbitral award within sixty days following receipt of the request.

---

[19] R 94, p. 3; R 95, p. 1.
[20] R 95, p.1.

CIMSA v. GCC- CIAC Case No. 50 180 T 00867 11
Decision on the interpretation and correction
of the Arbitral Award on Damages

> 3. When it issues an additional arbitral award, the provisions of paragraphs 2
> through 7 of article 29 will be applicable."

27. The sole indications offered by the CIAC Rules regarding the requirements for interpretation and/or the issue of an additional arbitral award include:

- The period for requests: "thirty days following receipt of the arbitral award;" in this case the Respondents complied with the request, since the 30 days expired on May 15, 2015, and on that day they submitted their requests;

- The obligation to notify the other party of the request for interpretation: this requirement was also complied with, given that the Respondents copied the Claimant in its notification and, in addition, the Arbitral Tribunal granted the Claimant a period of 11 days to answer the requests[21];

- The period for issuing the decision: "forty-five days after receipt of the requirement;" the period for issuing the interpretation decision expires on June 29, 2015; and "sixty days following receipt of the request;" the period for issuing the additional arbitral award expires on July 14, and consequently the decision of the Arbitral Tribunal is issued within this period;

- The decision must be in "written" form: this last requirement is also hereby complied with.

28. Therefore, the formal requirements for the submission of the requests for interpretation and/or the issue of an additional arbitral award (extended by the agreement of the parties with respect to the provisions of the LAB) have been complied with in this case.

29. Art. 34 of the CIAC Rules adds, as a requirement for the issue of an additional arbitral award, that there must be claims formed in the arbitral proceedings that have been omitted from the arbitral award.

30. On the other hand, art. 32 of the CIAC Rules says nothing regarding the substantive requirements. But an additional requirement is derived from its wording: that ambiguity must exist in the text of the arbitral award that requires interpretation. This is also the requirement set forth by the LAB, and is required by the international doctrine for the interpretation of an arbitral award.

31. Jurisprudence and the doctrine have analyzed the concept of "interpretation of the arbitral award" used in art. 32 of the CIAC Rules. As explained in the Final Partial Arbitral Award[22], there is little specific development in relation to the CIAC Rules. It is also incontrovertible that its text is based on the UNCITRAL Rules (1976). Specifically, the regulation for interpretation requests is almost identical in both sets of rules[23].

---

[21] A 70.
[22] See para. 536 of the Final Partial Arbitral Award.
[23] See art. 32 of the CIAC Rules (para. supra) and art. 35 of the UNCITRAL Rules (1976):
"INTERPRETATION OF THE ARBITRAL AWARD Article 35
   1. Within thirty days following receipt of the arbitral award, any of the parties may require the arbitral tribunal, by notifying the other party, to interpret the arbitration award.

CIMSA v. GCC- CIAC Case No. 50 180 T 00867 11
Decision on the interpretation and correction
of the Arbitral Award on Damages

Therefore, doctrinal and jurisprudential development of the concept of the interpretation of arbitral awards, based on the UNCITRAL Rules (1976), is also applicable to the same concept included in the CIAC Rules.

32.     Interpretation of the arbitral award can only be for the purpose of clarifying and resolving ambiguities. This point is undisputed by the doctrine. For example, Caron, Caplan y Pellonpää indicate in their commentary on the UNCITRAL Rules (1976)[24]:

> "Unfortunately, in some cases, the terms of an award may be written unclearly, obscuring the arbitral tribunal's decision on the claims presented by the parties. Article 35 of the UNCITRAL Rules [(1976)] establishes a procedure whereby a disputing party may request the arbitral tribunal to provide an interpretation of a previously rendered award. Interpretation, as distinguished from other post-award proceedings, provides "clarification of the award" by resolving any ambiguity and vagueness in its terms."[25]

33.     In other words, arbitral tribunals are not obligated to issue an interpretation of their arbitral awards if there is no real need to clarify the meaning of a vague term or another ambiguity in the wording. Furthermore: if the wording is unambiguous, the principle of the firmness of what is already clear precludes the possibility that the tribunal will issue an interpretation on an existing arbitral award. Its decision being informed by various arguments, the tribunal may not use the interpretation process to broaden its argument. In addition, the parties are prohibited from trying to use interpretation requests to appeal decisions of the tribunal with which they disagree[26].

---

2. The interpretation will be given in writing within forty-five days after receipt of the requirement. The interpretation will form part of the arbitral award and the provisions of paragraphs 2 through 7 of article 32 will be applicable."

[24] "The UNCITRAL Arbitration Rules – A Commentary", D. D. Caron, L. M. Caplan, M. Pellonpää, (Oxford University Press, 2006), p. 881.

[25] The underlining is ours. Free translation of the original:

"Unfortunately, in some cases, the terms of an award may be written unclearly, obscuring the arbitral tribunal's decision on the claims presented by the parties. Article 35 of the UNCITRAL Rules establishes a procedure whereby a disputing party may request the arbitral tribunal to provide an interpretation of a previously rendered award. Interpretation, as distinguished from other post-award proceedings, provides "clarification of the award" by resolving any ambiguity and vagueness in its terms." Page's footnotes excluded from the original and its translation.

[26] See "The UNCITRAL Arbitration Rules – A Commentary", D. D. Caron, L. M. Caplan, M. Pellonpää, (Oxford University Press, 2006), p. 881. Original text: The interpretation process does not provide grounds for review "when a party seeks to reargue the case or disagrees with the conclusions reached by the Tribunal." Free translation: The interpretation process does not provide grounds for review "when a party seeks to reargue the case or disagrees with the conclusions reached by the Tribunal." (Page's footnotes excluded from the original and its translation).

CIMSA v. GCC- CIAC Case No. 50 180 T 00867 11
Decision on the interpretation and correction
of the Arbitral Award on Damages

Conclusion

34.     Therefore, regarding the general scope of the interpretation of arbitral awards, the Tribunal agrees with the Claimant.

35.     It is not appropriate to request the interpretation of an arbitral award when in reality attempting to reopen issues decided with the force of res judicata, nor is it appropriate to require greater reasoning for substantive issues. The arbitral award is definitive and complete. In addition, the Respondents also may not attempt have an additional arbitral award issued under the pretext of clarifying issues addressed in the Arbitral Award.

36.     In summary, the issue of an additional arbitral award is reserved for claims formed by the parties in the arbitral proceedings that have been omitted from the arbitral award. Conversely, interpretation of the Arbitral Award must be limited to clarifying obscure issues (if any) that, within the scope of the Second Phase decision, are unclear in the Arbitral Award.

## 3.     **TRIBUNAL'S DECISION**

37.     The Respondents have requested that the Tribunal interpret the Arbitral Award and/or issue an additional arbitral award that clarifies whether communication R 93 was taken into consideration in its decision to impose an additional 10% of the Claimant's overall defense expenses. The Claimant does not consider there to be any obscurity on this point, which has been addressed in the Arbitral Award, and therefore considers it inappropriate to interpret the Arbitral Award or issue an additional arbitral award.

38.     The Tribunal agrees with the Claimant.

39.     Communication R 93 reiterated the petition that is implicit in communication R 86 and explicit in communication R 88 - in which the Respondent requested compliance with the Court Order of December 3, 2014, and consequently, suspension of the arbitral proceeding and abstention by the Tribunal from issuing the Arbitral Award on Damages - based on the Claimant's alleged dilatory conduct in the nullification proceeding for the Final Partial Arbitral Award. The petitions for suspension of the arbitral proceeding and abstention from issuing the Arbitral Award were subject to a complete and detailed legal analysis by the Arbitral Tribunal, which dedicated section II.5 of the Arbitral Award to dismiss them. Therefore, the petition for the issue of an additional arbitral award is not upheld.

40.     The Respondents consider communication R 93 to be especially relevant in light of paras. 360 through 362 of the Arbitral Award, in which the Tribunal imposes on the Respondents an additional 10% of the Claimant's overall defense expenses, for the reasons sufficiently expressed in the Arbitral Award, and orders them to pay US$2,009,329.37 for arbitration costs[27]:

> "360. The Claimant has brought to the Tribunal's attention the Respondents' supposed obstructive behavior throughout the proceeding, which they have denied.

---

[27] Arbitral Award on Damages, paras. 360-362.

CIMSA v. GCC- CIAC Case No. 50 180 T 00867 11
Decision on the interpretation and correction
of the Arbitral Award on Damages

The Arbitral Tribunal partially agrees with the Claimant. Without beginning to qualify whether procedural recklessness has been committed by the Respondents, it is true that some of the procedural matters they have submitted throughout the arbitration have been rejected, a significant sample of which is addressed in section II.5. Therefore, the Arbitral Tribunal decides to attribute to the Respondents an additional 10% of the Claimant's overall defense expenses: US$183,738.03 for attorney fees and expenses, US$30,223.23 for expert fees and US$13,678.06 for hearing expenses.

361. In total, the Respondents owe the Claimant, for Defense Expenses, a total of: US$1,559,329.37.

362. In summary, the Respondents must assume US$2,009,329.37 for the cost of this arbitration. In addition, the Claimant has requested that interest accrue on this amount from the date of the Arbitral Award, which is an issue the Tribunal addresses in the following section." [page's footnotes excluded]

41.    The Tribunal reiterates the provisions of the Arbitral Award:

"96. Upon an analysis of the claims, the Tribunal has taken into account the Parties' numerous and extensive documents and all the factual and legal allegations on each of their claims, although in this Arbitral Award the Tribunal will only expressly refer to the arguments it considers crucial for its decision."

42.    In summary, we are faced with an assumption that does not require interpretation. Interpretation of the Arbitral Award cannot be a means to request a review of the substantive decisions, nor a means to achieve a more detailed reasoning by the Tribunal or to achieve the citation of each and every communication submitted by the Parties.

43.    Therefore, the Arbitral Tribunal:

-      rejects the request for interpretation of the Arbitral Award on this point, since there is no ambiguity that requires interpretation in conformance with art. 32 of the CIAC Rules;

-      rejects the request for the issue of an additional arbitral award, since none of the claims submitted in the proceeding have been omitted from the Arbitral Award.

CIMSA v. GCC- CIAC Case No. 50 180 T 00867 11
Decision on the interpretation and correction
of the Arbitral Award on Damages

## II.    REQUESTS FOR CORRECTION

44.    The Parties request the amendment of certain errors[28].

45.    Art. 60(II) of the LAB establishes that arbitral awards have the authority of res judicata and compliance therewith will be compulsory and obligatory as of notification of the parties. However, there are some exceptional circumstances in which amendment, supplement or clarification is permitted, as provided for in art. 59 of the LAB[29]. Specifically, art. 59(I) of the LAB permits correction:

> Within three (3) days following notification of the arbitral award, the parties may request that the <u>Arbitral Tribunal amend any computational, clerical, typographical or other similar error, provided it does not substantially alter the decision</u>. Mere material error may be corrected ex officio, even in enforcement of the arbitral award." (The underlining is ours)

46.    The three-day period was extended by agreement of the parties, upon subjecting the dispute to the CIAC Rules, which establish the following:

> "Correction of the arbitral award
>
> Article 33
>
> 1. Within thirty days following receipt of the arbitral award, any of the parties may require the arbitral tribunal, which must notify the other party, to correct any computational, clerical, typographical or other similar error in the arbitral award. Within thirty days following communication of the arbitral award, the arbitral tribunal may make said corrections on its own initiative.
>
> 2. Said corrections will be made in writing and the provisions of paragraphs 2 through 7 of article 29 will be applicable."

47.    Both the LAB and the CIAC Rules, therefore, permit the correction of computational, clerical, typographical or other similar errors by the Tribunal at the request of one of the parties, and only imposes these formal requirements:

-    That the request be made within 30 days following notification of the arbitral award; which was complied with in this case since the request was submitted on May 15, 2015, 30 days after the notification; and

-    That the correction be made in writing; a requirement also hereby complied with.

---

[28] R 94, R 95, C 89.
[29] See para. 22 supra for the complete text of the article.

CIMSA v. GCC- CIAC Case No. 50 180 T 00867 11
Decision on the interpretation and correction
of the Arbitral Award on Damages

Request for correction of typographical errors

48.     Both Parties have submitted lists of typographical errors and state that they have no
        objection whatsoever to the corrections otherwise requested, except in the cases
        addressed below. Although none of the errors detected by the Parties impede the
        comprehension and/or correct reading of the Arbitral Award, nor do they give rise to
        misunderstandings, the Arbitral Tribunal appreciates the detailed review carried out by
        the Parties and attaches an erratum hereto as **Attachment I**.

Discrepancies

49.     However, there are two discrepancies between the Parties' petitions.

50.     First, the Claimant requests the correction of the text of the third indent of para. 64 of the
        Arbitral Award, which establishes that:

        "in addition, the 1.63% was owned by other partners (Samuel, María Luisa,
        María Lourdes and Silvia Doria Medina)."

51.     The Claimant requests that the following text be changed[30]

        "in addition, 1.63% was owned by multiple partners (including among them
        Samuel, María Luisa, María Lourdes and Silvia Doria Medina)."

52.     The Respondents agree that the text needs to be modified, but do not agree with the text
        proposed by CIMSA[31]. The Respondents consider there to be no evidence on file that
        effectively permits Samuel, María Luisa, María Lourdes and Silvia Doria Medina to be
        identified as owners of 1.63% of Soboce's capital. Therefore, they suggest that the text be
        modified in the following terms[32]:

        "in addition, 1.63% was owned by other partners."

53.     The Tribunal notes that this phrase already appears in the third indent of para. 14 of the
        Final Partial Arbitral Award, without the Parties noting any inaccuracy whatsoever. The
        Tribunal agrees that this is a simplification of reality inherent to all arbitral awards - to
        reproduce facts in an abbreviated form - and it agrees to modify the text in the terms
        proposed by the Respondents.

54.     Second, the Claimant requests the following modifications[33]:

---

[30] C 89, p. 3, last line.
[31] R 96, p. 1.
[32] R 96, p. 2.
[33] C 89, p. 7, second line, p. 10, last line.

CIMSA v. GCC- CIAC Case No. 50 180 T 00867 11
Decision on the interpretation and correction
of the Arbitral Award on Damages

| Reference | Wording in the Arbitral Award | Proposed by CIMSA |
|---|---|---|
| Para. 223, first line. | "the Tribunal considers the legal expenses claimed by the Claimant to be unrecoverable" | "the Tribunal considers the legal expenses paid to the attorneys who defend the Claimant in the Final Partial Arbitral Award nullification proceeding to be unrecoverable" |
| Para. 371, second line. | "has declared that there is no basis for the compensation of damages derived from legal expenses." | "has declared that there is no bases for the compensation of damages derived from legal expenses for court and arbitration proceedings other than this proceeding. |

55. The Respondents do not consider it procedurally appropriate to make the additions that CIMSA requests, since it would not be a matter of computational, typographical, clerical or other similar errors that require correction[34]. The Respondents believe that if CIMSA considered there to be ambiguity in the phrase it should have requested clarification via an interpretation request. Given that it did not submit said request, the petition should be dismissed.

56. The Tribunal agrees with the Respondents and considers the addition of text to be unnecessary in paras. 223 and 371, given that there are no doubts and that these refer to legal expenses that CIMSA claimed for court proceedings other than this arbitration.

<u>Request for the correction of computational error</u>

57. Finally, there is a petition from the Respondents that requires the attention of the Arbitral Tribunal, since it affects the calculation of the value of the Shares. The Respondents request that the calculation performed in para. 317 of the Arbitral Award use as a factor the exact percentage of GCC's share in Soboce, which was 0.47018, and not the figure rounded to four decimal places used by the Arbitral Tribunal: 0.4702. This would imply a US$4,641.85 reduction in the value of the Shares (from US$109,129,893.50 to US$109,125,251.65) and the damage suffered by the Claimant would be set at US$34,125,251.65.

58. The Claimant has not expressed a position regarding the Respondents' petition.

59. The Arbitral Tribunal dismisses the Respondents' petition. The Arbitral Tribunal's calculations use the figure rounded to four decimal places as stated in all expert documents and reports submitted by the Respondents[35].

---

[34] R 96, p. 2.
[35] Answer, paras. 20, 384, 388, 540; Copy, para. 326, 419, 428; Dr. Spiller's First Report, paras. 13b), 21, 24, 28, 30, 39, No. 15, 16 (Doc. R 31); Spiller II, paras. 2, 4, 6, 16, 18, 24, 38, 49, 71, 81, 84, 89, 129, 155, 158, No. 2, 118, 124, table II; Spiller III, paras. 4, 9, 25, 78, table I, No. 88.

CIMSA v. GCC- CIAC Case No. 50 180 T 00867 11
Decision on the interpretation and correction
of the Arbitral Award on Damages

60.   <u>In summary</u>, the Arbitral Tribunal partially agrees to the Parties' requests for correction, as reflected in Attachment I hereto, and it dismisses Respondents' request for correction that affects the calculation performed in para. 317 of the Arbitral Award.

CIMSA v. GCC- CIAC Case No. 50 180 T 00867 11
Decision on the interpretation and correction
of the Arbitral Award on Damages

### III.     DECISION

For the aforementioned reasons, the Arbitral Tribunal unanimously adopts the following Decision on the interpretation and correction of the Final Partial Arbitral Award on Damages:

1. It dismisses the Request for Interpretation and/or Issue of an Additional Arbitral Award in its entirety.

2. It partially sustains the Parties' requests for correction, and corrects the Final Partial Arbitral Award on Damages as reflected in Attachment I hereto.

3. It dismisses the Respondents' request for correction that affects the calculation performed in para. 317 of the Arbitral Award.

Decision Date: June 24, 2015
Place of arbitration: La Paz, Bolivia

The Tribunal certifies that, for the purposes of article 1 of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards and in virtue of Article 4 of the Inter-American Commercial Arbitration Commission (Convention of Panama), this Decision on the Interpretation and Correction of the Final Arbitral Award on Damages, which definitively decides on damages, was issued in the place of arbitration, La Paz, Bolivia.

CIMSA v. GCC- CIAC Case No. 50 180 T 00867 11
Decision on the interpretation and correction
of the Arbitral Award on Damages

[signature]

Juan Fernández Armesto

[signature]                                    [signature]
Fernando Salazar-Paredes                Eduardo Zuleta

CIMSA v. GCC- CIAC Case No. 50 180 T 00867 11
Decision on the interpretation and correction
of the Arbitral Award on Damages

## ATTACHMENT I

| Reference | Wording in the Arbitral Award | Corrected Wording |
|---|---|---|
| Heading | "Final on Arbitral Award on Damages" | "Final Arbitral Award on Damages" |
| Page 5, definition of "Order," first line. | "Court order of December 4, 2014" | "Court order of December 3, 2014" |
| Page 5, definition of "C.C.," second and third line. | "May 6, 200"[sic] " | "May 5, 2000" |
| Page 7, definition of the CCS Offer, second line. | "Mián Reyes" | "Milán Reyes" |
| Page 8, definition of Response" first line. | "Response document document" | "Response document" |
| Page 9, last line. | "115 Mexico" | "11580 Mexico" |
| Para. 23, second line. | "respondent document" | "claim document" |
| Para. 29, third line. | "Respondent's Conclusions" | "Respondents' Conclusions" |
| Para. 30, third line. | "Respondent's Costs" | "Respondents' Costs" |
| Para. 32, third line. | "Court order of December 4, 2014" | "Court order of December 3, 2014" |
| Para. 36, second line. | "arguments of presented" | "arguments presented" |
| Page 21, No. 21, third line. | "of the arbitration21. Thus" | "of the arbitration. Thus" |
| Page 21, No. 21, seventh line. | "to seem to be" | "seems to be" |
| Page 24, No. 31, third line. | "by the Respondents" | "by the Respondents" |
| Para. 64, third indent. | "in addition, 1.63% was owned by other partners (Samuel, María Luisa, María Lourdes and Silvia Doria Medina)" | "in addition, 1.63% was owned by other partners." |
| Para. 76, first line. | "investors that had committed" | "investors that had committed" |

CIMSA v. GCC- CIAC Case No. 50 180 T 00867 11
Decision on the interpretation and correction
of the Arbitral Award on Damages

| Para. 81, third indent, first line. | "to carry out" | "to carry out" |
|---|---|---|
| Para. 84, first line. | "The Tribunal considered CIMSA's conduct to be" | "The Tribunal considered GCC's conduct to be" |
| Page 28, No. 53 last line. | "August 19, 2001" | "August 19, 2011" |
| Page 30, No. 55, first line. | "the Respondent cites" | "the Claimant cites" |
| Para. 88, second indent. | "Fancesa; and." | "Fancesa; and" |
| Para. 91, literal quote. | "1. Orders the Respondents to compensate CIMSA for the cost of... 2. Orders the Respondents to compensate CIMSA for the profits... 3. Orders the Respondents to compensate CIMSA for the damages... 4. Orders the Respondents to pay... 5. Expresses that all the amounts granted to CIMSA..." | "[…] 2. Orders the Respondents to compensate CIMSA for the cost of... 3. Orders the Respondents to compensate CIMSA for the profits... 4. Orders the Respondents to compensate CIMSA for the damages... 5. Orders the Respondents to pay... 6. Expresses that all the amounts granted to CIMSA..." |
| Para. 101, first line. | "344 and following C.C." | "344 and following of the C.C." |
| Para. 102, first line. | "344 C.C." | "344 of the C.C." |
| Para. 103, first line. | "345 and 346 C.C." | "345 and 346 of the C.C." |
| Para. 105, first line. | "Agreement of 2005" | "Agreement 2005" |
| Para. 105, literal quote, first line. | "one Peron" | "one Person" |
| Para. 112, first line. | "345 C.C." | "345 of the C.C." |
| Para. 173, first line. | "345 C.C." | "345 of the C.C." |
| Para. 176, first indent, second line. | "would be obligated" | "would be obligated" |
| Para. 176, first indent, fourth line. | "Agreement. Namely" | "Agreement 2005. Namely" |

| Para. 179, second line. | "damages caused to CIMSA" | "damages caused to CIMSA" |
|---|---|---|
| Para. 188, third line. | "of the minority shareholders" | "of the minority shareholders" |
| Para. 190, first indent, first line. | "if it had acquired the Shares to CCS" | "if it had acquired the Shares to GCC" |
| Para. 221, first and second line. | "the moment at which the Respondent refused CIMSA" | "the moment at which the Respondents refused CIMSA" |
| Para. 224, third line. | "breach of the Respondent" | "breach of the Respondents" |
| Para. 233, first line. | "The parties agree" | "The Parties agree" |
| Para. 262, last line. | "344 C.C." | "344 of the C.C." |
| Para. 263, penultimate and last line. | "344 C.C." | "344 of the C.C." |
| Page 68, No. 196 | "Dr. Daniel Flores' third expert report (Econ One Research Inc.) of April 29, 2014 (Doc. C-763)" | "Update of Dr. Daniel Flores' Third Report (Doc. C-937)" |
| Para. 286, last line. | "reflected clause" | "reflected in the clause" |
| Para. 288, first line. | "Purchase offers made by CIMSA to CCS" | "Purchase offers made by CIMSA to GCC" |
| Para. 321, second line. | "value offered by GCC" | "value offered by CCS" |
| Para. 323, last line. | "in the SPPA" | "in the SSPA (Seguridad, Salud y Protección Ambiental [Safety, Health and Environmental Protection])" |
| Para. 326, fourth line. | "A all" | "All" |
| Para. 329, first line. | "they are" | "it is" |
| Para. 331, first line. | "both in First" | "both in the First" |
| Para. 332, first line. | "requested that the parties" | "requested that the Parties" |
| Para. 332, third line. | "petitions of the parties" | "petitions of the Parties" |
| Page 82, first line. | "performed by the party" | "performed by the party" |

CIMSA v. GCC- CIAC Case No. 50 180 T 00867 11
Decision on the interpretation and correction
of the Arbitral Award on Damages

| Para. 342, first line. | "Agreement of 2005" | "Agreement 2005" |
|---|---|---|
| Para. 343, first line. | "That same clause" | "Clause 29" |
| Para. 344, last line. | "Agreement of 2005" | "Agreement 2005" |
| Para. 351, second line of the last paragraph. | "performed by the parties" | "performed by the Parties" |
| Para. 363, second line. | "Agreement of 2005" | "Agreement 2005" |
| Para. 366, first indent, first line. | "will be granted" | "are granted" |
| Para. 369, literal quote, first line. | "the related proceedings" | "the related proceedings" |

CITY OF <u>Pineville</u>     )
                           )    ss.:
COUNTY OF <u>McDonald</u>   )

I, Jennifer R. Mosby, am a translator who contracts with TransPerfect, a translation services company that operates under both ISO 9001:2008 and EN 15038:2006 certification. I have been speaking Spanish for 12 years and am a native of the U.S. I am a recipient of a Master's Degree in Global Affairs/Translation Studies from Denver University.

The following document is to the best of my knowledge and belief a true and accurate translation from Spanish into English:

"CIMSA v. GCC- CIAC Case No. 50 180 T 00867 11 – Decision on the interpretation and correction of the Arbitral Award on Damages"

_Jennifer R. Mosby_
Jennifer R. Mosby

Sworn to before me this

22nd day of September, 2015

_Cassie Sammons_
Notary Public

CASSIE SAMMONS
Notary Public-Notary Seal
State of Missouri, Mc Donald County
Commission # 15141645
My Commission Expires Feb 9, 2019