**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:15-CV-02120

COMPAÑÍA DE INVERSIONES MERCANTILES S.A.,

Petitioner,
v.

GRUPO CEMENTOS DE CHIHUAHUA, S.A.B. de C.V., and GCC LATINOAMÉRICA, S.A.
de C.V.,

Respondents.

_____

**MEMORANDUM OPINION AND ORDER**
_____

Kane, J.

Petitioner Compañía de Inversiones Mercantiles S.A. ("CIMSA") brought this action in

2015 pursuant to 9 U.S.C. § 207 to confirm a foreign arbitral award issued against Respondents

Grupo Cementos de Chihuahua, S.A.B. de C.V. ("GCC") and GCC Latinoamérica, S.A. de C.V.

("GCC Latinoamérica") in Bolivia. The resolution of this case has been prolonged by ongoing

litigation in Bolivia and obstacles to effectuating service. In October 2018, I authorized

alternative service and Respondents were promptly served. (*See* ECF Nos. 79 and 81). On

December 12, 2018, I rejected Respondents' challenges to jurisdiction and ordered the parties to

present oral argument on the merits of CIMSA's Petition. (*See* ECF No. 82). Having considered

the parties' oral arguments, presented on February 13, 2019, and the voluminous filings and

arguments contained therein, I now grant CIMSA's Petition to Confirm a Foreign Arbitral

Award (ECF No. 1) and the subsequent Motion to Confirm Foreign Arbitral Award (ECF No.

50).

## I. BACKGROUND

### A. The Parties' Contractual Relationship and Arbitration Proceedings in Bolivia

Contractual Agreements and Negotiations

GCC, a Mexican corporation with its principal place of business in Chihuahua, Mexico, "is a leading supplier of cement, aggregates, concrete and construction-related services in Mexico and the United States." (Hertzberg Decl. ¶ 2, ECF No. 1-10; GCC's 2Q2015 Earnings Report, ECF No. 1-11). In the early-2000s, GCC began "exploring the possibility of expanding" its business into the southern hemisphere. (Hertzberg Decl. ¶ 2; Amaya Decl. ¶ 5, ECF No. 62). In 2004, GCC representatives traveled to La Paz, Bolivia to meet with representatives from Sociedad Boliviana de Cemento, S.A. ("SOBOCE"), Bolivia's largest cement company. (Doria Medina Decl. ¶ 2, ECF No. 1-9; Amaya Decl. ¶ 6). Later that same year, GCC representatives mentioned to SOBOCE representatives that GCC "was interested in growth opportunities in South America." (Amaya Decl. ¶ 7). SOBOCE representatives informed the GCC representatives that CIMSA, a Bolivian corporation with its principal place of business in Bolivia, "was searching for a new partner to invest in SOBOCE." (*Id.*). At the time, CIMSA owned a controlling interest in SOBOCE. (Hertzberg Decl. ¶ 3).

In 2005, representatives from GCC and CIMSA met in Miami, Florida to discuss GCC's "potential interest in acquiring shares in SOBOCE." (Doria Medina Decl. ¶ 5). The parties engaged in extensive negotiations over the next six months, and on September 22, 2005, GCC Latinoamérica, GCC's wholly-owned subsidiary, acquired a 47 percent interest in SOBOCE. (Hertzberg Decl. ¶ 3). The same day, GCC, GCC Latinoamérica, SOBOCE, and CIMSA executed a shareholder's agreement (the "2005 Agreement") governed by Bolivian law. (Amaya

Decl. ¶ 20). GCC guaranteed GCC Latinoamérica's obligations under the 2005 Agreement. (Hertzberg Decl. ¶ 3).

The 2005 Agreement provided, among other things, that each party had a right of first refusal with respect to the other's shares in SOBOCE. (Doria Medina Decl. ¶ 10). Under the agreement, either party could "transfer its shares to a third party after a period of five years." (*Id.*). However, the party wishing to transfer its shares could only do so after providing notice and "afford[ing] the other party an opportunity to purchase the shares on the same or better terms within 30 days." (*Id.*). The 2005 Agreement also provided that any dispute between the parties would be "submitted to conciliation and subsequent international arbitration for final resolution, subject to the rules of the Inter-American Commercial Arbitration Commission (IACAC)," known as the Comisión Inter-Americana de Arbitraje Comercial ("CIAC") in Spanish, "and as modified by means of mutual agreement between the Parties to the Arbitration." (2005 Agreement, cl. 29.1, ECF Nos. 62-1 & 62-2). Under the Agreement, the arbitration was to be administered by the national chapter of the CIAC in Bolivia. (*Id.*)

In 2009, Respondents informed CIMSA of their desire to sell their SOBOCE shares. (Amaya Decl. ¶ 24). Pursuant to CIMSA's right of first refusal under the 2005 Agreement, the parties met in Miami six different times in 2010 to negotiate an agreement that would allow CIMSA to purchase Respondents' shares in SOBOCE. The parties "came to an agreement regarding fundamental terms of sale" and signed an agreement in La Paz, Bolivia the following month. (*Id.*). However, the Government of Bolivia "expropriated a substantial division of SOBOCE's business" shortly before the transaction was scheduled to close. (Doria Medina Decl. ¶ 15). As a result, CIMSA was unable to pay for Respondents' shares under the terms of the new agreement, and the parties failed to close the deal. (*Id.*; Amaya Decl. ¶ 29).

In 2011, the parties met in Houston, Texas to negotiate another agreement under which CIMSA would purchase Respondents' SOBOCE shares pursuant to its right of first refusal under the 2005 Agreement. (Doria Medina Decl. ¶ 16; Amaya Decl. ¶¶ 31-32). During the meeting, CIMSA proposed "two alternative payment structures." (Doria Medina Decl. ¶ 18). Negotiations continued via telephone and email for several weeks, but the parties ultimately agreed on one of the payment terms CIMSA proposed. (*Id.* ¶¶ 19-22). In August 2011, Respondents "instructed CIMSA to hire New York counsel to draft a final agreement." (*Id.* at ¶ 22). Respondents also retained their own counsel from a New York-based law firm, and the parties agreed that New York law would govern the new agreement. (*Id.*). Nevertheless, Respondents proceeded to sell their SOBOCE shares to a third party on August 18, 2011, despite previous indications that the payment term CIMSA suggested at the 2011 meeting was satisfactory. (Doria Medina Decl. ¶ 26; Amaya Decl. ¶¶ 39-41).

<u>Arbitration Proceedings</u>

In response, CIMSA submitted a notice of arbitration to the CIAC against Respondents in Bolivia, and the parties appointed their chosen arbitrators (the "Arbitral Tribunal" or "Tribunal"). (Doria Medina Decl. ¶¶ 27-28). The parties agreed to bifurcate the proceedings into two phases: a phase to determine liability ("Merits Phase"), and a phase to determine damages ("Damages Phase"). (Von Borries Decl. ¶ 15).

On September 13, 2013, the Arbitral Tribunal issued a "Partial Final Award on Liability" (the "Merits Award") in favor of CIMSA. (Merits Award, ECF No. 46-2; Von Borries Decl. ¶¶ 16-18). The Merits Award concluded that Respondents violated "the requirements of good faith as stipulated by Bolivian law and the obligations emanating from subclause 6.3 of the 2005

Agreement," and ruled to move on to the second stage where it would "quantify the damages to be paid to CIMSA by the Respondents." (Merits Award ¶ 595, p. 158).

On April 10, 2015, the Arbitral Tribunal issued a Final Award on Damages (the "Damages Award"). (Damages Award, ECF No. 1-8). The Tribunal quantified CIMSA's damages at approximately $34.1 million, plus fees and costs, totaling $36,139,223, plus annual interest at a rate of 6%. (*Id.* ¶ 377, p. 90). The Respondents submitted a request for interpretation and correction of the Damages Award asking the Tribunal to amend its damages calculation. The Tribunal rejected the request and confirmed its damages calculation in its June 2015 Decision on the Interpretation and Correction of the Final Arbitral Award on Damages. (Decision on Interpretation of the Damages Award, ECF No. 1-8, pp. 94-116).

Respondents initiated court proceedings in Bolivia seeking to annul both the Merits Award and the Damages Award, as detailed below.

**B. Post-Arbitration Legal Proceedings in Bolivia**

The various legal proceedings in Bolivia are detailed in the parties' filings (*See* ECF Nos. 50, 61, 64, 65, 69, 71, 73, 76, 77, & 78), so here I outline only those events most pertinent to my analysis and decision.

Bolivian Proceedings Regarding the Merits Award

In November 2013, two months after the Arbitral Tribunal issued the Merits Award, and shortly after the Tribunal commenced the Damages Phase of the arbitration, Respondents filed a request for annulment of the Merits Award, which, pursuant to the law at the time, was first submitted to the Arbitral Tribunal for initial review. (Von Borries Decl. ¶ 32, ECF No. 46). In February 2014, the Tribunal found that the request satisfied the technical requirements and could

proceed to the Bolivian courts to decide the merits of the request. (*Id.* ¶ 33).[1]  The request for

annulment was assigned to the Eighth Judge for the Civil and Commercial Court of the Judicial

District of La Paz, Dr. Rosario Sánchez Sánchez. On August 31, 2015, the Eighth Judge denied

Respondents' request for annulment of the Merits Award. ("Eighth Judge Decision," No.

362/2015, ECF No. 65-4).

Bolivian law does not permit parties to appeal a trial court decision in an action to set

aside an arbitral award. Under Bolivian Law No. 1770 (the "Old Arbitration Law"), a request for

annulment is the exclusive remedy for a party seeking relief from an arbitral award, and there is

no appeal from the trial court's decision on a request to annual an arbitral award. (Von Borries

Decl. ¶¶ 32, 43; Asbun Report ¶ 15, ECF No. 49-1).[2]  However, if a judge violates a party's

constitutional rights during the proceedings or in the decision, the party may bring an *amparo*

action pursuant to Article 128 of the Bolivian Constitution and Law No. 254 of the Bolivian

Code of Constitutional Procedure. (Asbun Report ¶17, ECF No. 49-1; Von Borries Decl. ¶ 43).

An *amparo* is not an appeal of the substantive merits of the underlying claim, but is a distinct

---

[1] Although the Tribunal gave Respondents two weeks to seek suspension of the Damages Phase pending the court's decision on the request for annulment of the Merits Award, they never requested suspension of the arbitration proceedings in Bolivia. (*Id.* ¶¶ 33-34). Instead, months later in December 2014, they obtained an *ex parte* anti-arbitration injunction from a court in Chihuahua, Mexico, ordering suspension of the Damages Phase of the arbitration proceedings. (*Id.* ¶ 34). The Arbitral Tribunal considered the parties' arguments on the Mexican court's anti-arbitration injunction, but concluded that the Mexican court did not have jurisdiction to interfere with the arbitration in Bolivia. (*Id.* ¶¶ 35-37).

[2] The Old Arbitration Law was replaced with Law No. 708 (the "New Arbitration Law") on June 25, 2015, but the Old Arbitration Law continued to apply to all proceedings commenced prior to its enactment, including Respondents' challenge to the Merits Award. (Von Borries Decl. ¶ 32, n. 2, p. 12). The New Arbitration Law applies to the annulment proceedings on the Damages Award, which Respondents initiated in July 2015. Like the Old Arbitration Law, the New Arbitration Law provides that the only way to challenge an arbitral award is to request that the Bolivian trial court annul the award, and the court's resolution of this request is not appealable. (Asbun Report ¶ 15; *see also* Andrés Moreno Gutierrez & Daniel Arredondo Zelada, Bolivia, GLOBAL ARBITRATION REV., Sept. 4, 2017, *available at* https://globalarbitrationreview.com/chapter/1147054/bolivia).

action to address official conduct that violates a party's constitutional rights. (*See* Asbun Report ¶ 19).

Respondents filed an *amparo* against the Eighth Judge, alleging that she violated its rights by, *inter alia*, failing to sufficiently explain her decision. *Amparos* are initially heard by departmental courts, called "Guarantee Courts" when acting on *amparos*, and the resolution of the Guarantee Court is subject to review by the Plurinational Constitutional Tribunal ("PCT"), the highest constitutional court in Bolivia. Although a Guarantee Court's resolution on an *amparo* is subject to mandatory review by the PCT, it is also subject to immediate compliance. Under this simultaneous process of remand and review, after a Guarantee Court grants an *amparo*, the case is sent to the PCT for review <u>and also</u> sent back to the trial court for compliance with the Guarantee Court's resolution. (Asbun Report ¶¶ 22-23; Von Borries Decl. ¶¶ 47-48).

On October 28, 2015, a Guarantee Court granted Respondents' *amparo* and revoked the Eighth Judge Decision. (Guarantee Court Resolution No. 77/2015, ECF No. 65-6). The Guarantee Court remanded the case "so that the Eighth [ ] Judge may issue a new decision with proper statement of grounds according to the principle of consistency." (*Id.* at 17). Rather than send the case back to the Eighth Civil and Commercial Court right away, the Guarantee Court waited more than two months and sent the case back on Friday, January 8, 2016, when the Eighth Judge was away on a planned two-week long vacation (from January 4, 2016 through and including Monday, January 18, 2016). (Von Borries Decl. ¶ 49).

The Ninth Judge of the Civil and Commercial Court, Fabiano Cristiam Chui Torrez, was assigned to monitor the Eighth Judge's docket while she was away. On Monday, January 11, 2016, the next business day after the Guarantee Court remitted the case to the Eighth Civil and

Commercial Court, Respondents moved the Ninth Judge, who was covering, for a decision on its request for annulment. (*Id.* ¶¶ 49-50). The next day, CIMSA filed a petition to disqualify the Ninth Judge. On January 15, 2016, the Ninth Judge dismissed CIMSA's petition for disqualification, and his decision to reject the motion to disqualify was transferred to the Second Civil Chamber of the Departmental Court of Justice of La Paz for review. (Asbun Report ¶ 41).

On January 18, 2016, while the disqualification matter was still pending before the Second Civil Chamber, the Ninth Judge granted Respondents' request for annulment of the Merits Award.[3] ("Ninth Judge Decision," No. 13/2016, ECF No. 65-12). The Ninth Judge issued his decision just one week after receiving the case file, which he acknowledged was sent for ruling on January 12, 2016 (*see id.* at 4), and one day before the Eighth Judge was due to resume duties.

CIMSA filed an *amparo* against the Ninth Judge on February 6, 2016, alleging, *inter alia*, that the Ninth Judge Decision violated CIMSA's due process rights. (Von Borries Decl. ¶59). On February 22, 2016, a Guarantee Court granted CIMSA's *amparo*, overturned the Ninth Judge Decision, and remanded the case to the Eighth Judge. (*Id.* ¶¶ 60-61). Consistent with the standard procedure, the Guarantee Court's resolution granting CIMSA's *amparo* was simultaneously sent to the PCT for mandatory review. (*Id.*)

While the CIMSA *amparo* against the Ninth Judge was pending PCT review, the PCT issued a decision on Respondents' *amparo* against the Eighth Judge. On March 16, 2016, the PCT issued a final decision, No. 0337/2016, that revoked Guarantee Court Resolution No. 77/2015 and rejected the Respondents' *amparo* against the Eighth Judge. ("PCT Revocation

---

[3] The Second Civil Chamber ultimately rejected CIMSA's motion to recuse on February 23, 2016, more than a month after the Ninth Judge had already issued his decision on Respondents' request for annulment. (*See* Second Civil Chamber Resolution No. R-58116, ECF No. 65-10).

Order," ECF No. 65-14). Specifically, the PCT decided "TO REVOKE [Guarantee Court Resolution No. 77/2015 dated] October 28, and, accordingly, TO DENY the protection sought" by Respondents in their *amparo*.[4] (*Id.* p. 18). CIMSA maintains that this decision, from the highest constitutional court in Bolivia, reinstated the Eighth Judge Decision and made it legally valid and binding.

CIMSA withdrew its *amparo* against the Ninth Judge Decision after learning of the PCT Revocation Order. (Von Borries Decl. ¶ 65). According to CIMSA, it withdrew its *amparo* in September 2016 because it understood the PCT Revocation Order to nullify the Ninth Judge's jurisdiction and eliminate any need for constitutional relief. (*Id.*)

On November 21, 2016, after CIMSA withdrew its *amparo*, the parties were notified of PCT Procedural Order No. 581/2016, dated May 23, 2016. ("PCT Procedural Order," ECF No. 65-16). The PCT Procedural Order revoked Guarantee Court Resolution No. 04/2016, which had granted CIMSA's *amparo* against the Ninth Judge. The PCT concluded that it could not "review the work of interpretation . . . of other courts . . . except when it is explained why the interpretive work is arbitrary, and the causal connection is established." (*Id.* p. 10). Because CIMSA had not claimed a violation of the principle of legality or established its causal connection with the right to due process, the PCT ruled that it could not review the merits of the Ninth Judge Decision and that the Guarantee Court "did not carry out an adequate verification of the background information" when it addressed the merits and granted the *amparo*. (*Id.* pp. 10-11). The PCT emphasized that it did not examine the merits of the case and that CIMSA was entitled to refile its *amparo* action against the Ninth Judge. (*Id.*; *see also* Von Borries Decl. ¶ 67). CIMSA asserts

---

[4] As the PCT acknowledged, Respondents' *amparo* action sought an order setting aside the Eighth Judge Decision and ordering the judge a quo to issue a new decision. (*See* PCT Revocation Order No. 0337/2016 ¶ I.1.3, p. 3).

that it did not refile its *amparo* because, having already tried to withdraw its original *amparo* in light of the PCT Revocation Order, it had no reason to seek relief from the Ninth Judge Decision, which it deemed to be invalid. (Von Borries Decl. ¶ 67).

On November 24, 2016, Respondents filed an *ex parte* request to the PCT seeking clarification of the PCT Procedural Order. PCT Clarification Order No. 004/2017, dated January 27, 2017, stated that because the PCT Procedural Order did not reach the merits of the CIMSA *amparo*, and therefore did not address the validity or invalidity of the Ninth Judge Decision, the Ninth Judge Decision "remains in effect," or "subsists,"[5] in relation to the Procedural Order. ("PCT Clarification Order," ECF No. 65-20). Notably, although Respondents had asked the PCT to expressly state that the Ninth Judge Decision was not modified by the effects of the PCT Revocation Order, the PCT Clarification Order included no such declaration. It did not speak to the substantive validity of the Ninth Judge Decision in light of the PCT's revocation of the Guarantee Court resolution from which the Ninth Judge Decision originated.

In August 2016, Respondents requested clarification and amendment of the PCT Revocation Order from the president of the PCT, Juan Oswaldo Valencia Alvarado. The president of the PCT then issued a "decree" effectively stating that although the Guarantee Court's resolution is no longer valid (because the PCT Revocation Order revoked it), the legal acts arising out of it—that is, the Ninth Judge Decision—remain effective. ("President's Decree," ECF No. 65-18; *see also* Asbun Report ¶ 76). The validity of the President's Decree is discussed below, but the circumstances surrounding the decree and the PCT Clarification Order

---

[5] The parties dispute the appropriate translation and meaning of this statement. Respondents contend that it unambiguously upholds the Ninth Judge Decision and declares that it remains in effect. CIMSA, however, argues that "remains in effect" should be more accurately understood to mean "subsists." "In other words," CIMSA argues, "because the PCT Procedural Order did not evaluate the validity of the Ninth Judge Decision, the PCT Procedural Order could not revoke the Ninth Judge Decision." (Pet'r Reply at 49, ECF No. 73).

should be mentioned here. The PCT president authored both the President's Decree and the Clarification Order (acting in his role as a judge). And while the decree is dated November 25, 2016, and the Clarification Order dated January 27, 2017, the documents were not placed in the case file until December 29, 2017—the last day of Juan Oswaldo Valencia Alvarado's term as PCT president. (*See* Asbun Report ¶¶ 74, 76, 83, 84, 91, & 92; Von Borries Decl. ¶¶ 72, 73, 76, & 78).

<u>Bolivian Proceedings Regarding the Damages Award</u>

In July 2015, two months after the Arbitral Tribunal issued the Damages Award, Respondents filed a request to annul it. The request for annulment was assigned to the Twelfth Judge of the Civil and Commercial Court, Karina Erika Valdez Cuba. In a decision dated October 9, 2015, the Twelfth Judge granted Respondents' request and annulled the Damages Award. (Twelfth Judge Decision No. 154/2015, ECF No. 65-36). The Twelfth Judge accepted two out of five proposed grounds for annulment, concluding that the Arbitral Tribunal had breached Respondents' right to a defense and right to due process by (1) relying on an exhibit that had been accepted into evidence during the Merits Phase, but that was not presented or recognized to be evidence under consideration during the Damages Phase; and (2) relying on its own "experience" in valuing CIMSA's damages. (*See id.* pp. 15-20; Rivera Decl. ¶ 54; Von Borries Decl. ¶ 90). The Twelfth Judge ordered the arbitration panel to issue a new award consistent with her ruling. (Twelfth Judge Decision No. 154/2015 p. 23).

CIMSA then sought an *amparo* from the PCT, "arguing that the Twelfth Judge had violated its due process rights by improperly acting as a court of appeal and reopening the evidentiary phase of the arbitration." (Von Borries Decl. ¶ 92). A Guarantee Court rejected CIMSA's *amparo*, but upon final review the PCT revoked the Guarantee Court's decision and

vacated the Twelfth Judge's annulment order. (PCT Judgment 1481/2016-S3, issued Dec. 16, 2016, ECF No. 65-38). The PCT ordered the Twelfth Judge to issue a new decision on the request to annul the Damages Award consistent with its order. (*Id.*).

On April 19, 2017, while the damages annulment proceedings were pending before the Twelfth Judge, Respondents commenced a collateral action challenging the applicable arbitration law. (Von Borries Reply Decl. ¶ 42, ECF No. 71). The Twelfth Judge suspended her consideration of Respondents' request to annul the Damages Award while the PCT considered the unconstitutionality action. (*Id.*). In March 2018, the PCT rejected Respondents' constitutional challenge to the arbitration law and sent the case file back to the Twelfth Judge to issue a new decision on the request for annulment of the Damages Award. (*See id.* ¶¶ 43-44; Rivera Reply Decl. ¶ 45, ECF No. 76).

On July 27, 2018, while the Twelfth Judge was considering the request to annul the Damages Award on remand, Respondents filed a petition asserting that the Twelfth Judge lacked jurisdiction to rule on the Damages Award because it was effectively nullified by the alleged annulment of the Merits Award. (Oral Argument Tr. at 32:8-18; 35:9-16, ECF No. 92). The Twelfth Judge must rule on Respondents' July 2018 petition before deciding the request for annulment of the Damages Award. (*Id.* at 32:25-33:5).

The Twelfth Judge may decide that she is not qualified to rule on whether the Merits Award was actually annulled, in which case it is unclear whether she would then issue a decision on the Damages Award notwithstanding Respondents' July 2018 petition. (*See id.* at 83:18-21). If she rejects Respondents' July 2018 petition and decides that she does have jurisdiction to consider the Damages Award (because it was not nullified by the alleged annulment of the Merits Award), she will have approximately 30 days to issue a decision on the request for

annulment of the Damages Award, consistent with the PCT Damages Order that remanded the case. (*See id.* at 37:3-8). Regardless of how the Twelfth Judge rules on Respondents' July 2018 petition or the request for annulment of the Damages Award, the losing party will likely seek an *amparo*. (*See id.* at 83:21-84:3).

## II. LEGAL STANDARD

CIMSA brings this action to confirm a foreign arbitral award pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"), codified at 9 U.S.C. § 201 *et seq*. When a party to a foreign arbitration moves to confirm an award under the New York Convention, the district court must "confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the . . . Convention." 9 U.S.C. § 207. The seven exclusive grounds upon which courts may refuse to confirm an award are specified in Article V of the New York Convention.[6] "Courts construe these defenses narrowly, to encourage the recognition and

---

[6] Article V of the New York Convention in full provides:

1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

(a) The parties to the agreement ... were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

(b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

(c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

enforcement of commercial arbitration agreements in international contracts." *CEEG (Shanghai) Solar Science & Technology Co., Ltd v. LUMOS LLC*, 829 F.3d 1201, 1206 (10th Cir. 2016) (internal quotations omitted). The party opposing enforcement of the arbitral award has the burden of proving that one of the defenses applies. *Id.* "[This] burden is a heavy one, as the showing required to avoid summary confirmance is high." *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 90 (2d Cir. 2005) (internal quotations omitted).

As relevant here, Article V(1)(e) provides that a court may refuse to enforce an arbitral award if "[t]he award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." New York Convention art. V(1)(e). While deference must generally be afforded to the decision of a competent authority in the primary jurisdiction, there is a narrow exception to this rule when "the foreign judgment setting aside the award is 'repugnant to fundamental notions of what is decent and just in the State where enforcement is sought' . . . or violated 'basic notions of justice.'" *Thai-Lao Lignite Co., Ltd. v. Gov't of the Lao People's Democratic Republic*, 997 F.Supp.2d 214, 223 (S.D.N.Y. 2014), aff'd 864 F.3d 172 (2nd Cir. 2017) (quoting *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 938 (D.C. Cir. 2007)).

---

(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.
2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:
(a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or
(b) The recognition or enforcement of the award would be contrary to the public policy of that country.
New York Convention art. V(1)-(2).

## III. ANALYSIS

CIMSA contends that Respondents cannot establish a defense to confirmation with respect to the Merits Award because it was not effectively annulled in Bolivia. (*See* Pet'r Reply at 41-59, ECF No. 73). They further argue that even if the Ninth Judge Decision could be understood to annul the Merits Award, it was so "tainted with judicial misconduct [that it] should not be recognized." (Pet'r Reply at 50). Meanwhile, Respondents assert that the Merits Award has been lawfully set aside by a competent authority in Bolivia, and they argue that the judicial corruption alleged by CIMSA does not "warrant ignoring the decisions of the courts of the primary jurisdiction." (Resp. at 41, ECF No. 61).

With respect to the Damages Award, CIMSA contends that Respondents have no defense to confirmation because the Damages Award has not been set aside in Bolivia and is binding under the New York Convention. (Pet'r Reply at 36-38). Respondents do not dispute that the Damages Award has not yet been aside, but they argue that the Damages Award is not binding under Bolivian law. Respondents argue that if I will not dismiss CIMSA's Petition, I should exercise my discretion under Article VI of the New York Convention to stay the case pending resolution of their request to annul the Damages Award in Bolivia. (Resp. at 59-60).

**A. Whether the Merits Award Has Been Set Aside**

The Impact of the PCT Revocation Order on the Ninth Judge Decision

The status of the Merits Award depends on the legal validity and current effect of the Ninth Judge Decision, which the parties debate. CIMSA has presented a strong case that the PCT Revocation Order (which upheld the Eighth Judge Decision and rejected Respondents' *amparo*) rendered the Ninth Judge Decision null and void. The origin of the Ninth Judge Decision—the Guarantee Court's remand order—was ultimately revoked by the PCT. As Dr. Jorge Asbun, an

15

expert on Bolivian constitutional law, explains, "the default rule, as mandated by the Constitution and the Constitutional Procedural Code, is that when a Guarantee Court resolution is revoked, both the resolution itself as well as any acts based upon it are rendered without effect."[7] (Asbun Reply ¶ 29, ECF No. 69-2). Indeed, it would be illogical for actions arising out of a Guarantee Court's resolution to remain binding if the PCT ultimately overturns the resolution. (*See* Asbun Report ¶¶ 47-51, ECF No. 49-1). This would render the PCT's review meaningless. (*Id.* ¶ 50). Accordingly, the Ninth Judge Decision "would only operate to override the Eighth Judge Decision if the PCT had affirmed the Guarantee Court's" remand order. (*Id.* ¶ 54). Because the PCT Revocation Order revoked the legal basis for the Ninth Judge Decision, the Ninth Judge Decision cannot be reasonably understood to supersede the Eighth Judge Decision. (*See id.*)

The expert report of Mr. Andaluz, submitted by Respondents, does not convincingly refute this. Mr. Andaluz states that the PCT Revocation Order could not revoke the Ninth Judge Decision because Respondents' *amparo* was against the Eighth Judge, not the Ninth Judge. (Andaluz Report ¶ 75.2, p. 64, ECF No. 64-2). This argument completely ignores the context in which the Ninth Judge Decision arose.[8] Far more compelling is Dr. Asbun's conclusion that because the "Ninth Judge Decision arose in the proceedings on [Respondents'] *amparo* . . . the final decision in those proceedings, [the PCT Revocation Order,] bears directly on its validity." (Asbun Reply p. 2).

---

[7] Dr. Asbun cites to PCT precedent supporting this rule. For example, the PCT has recognized that "the obvious consequence of the revocation of the decision granting the *amparo*, is that things return to their previous state, or as they were before the *amparo* decision from the Guarantee Judge or *amparo* was complied with." (Asbun Reply ¶ 19, ECF No. 69-2) (citing SCP 98/2004-R, issued Jan. 21, 2004).

[8] While I do not take issue with Mr. Andaluz's qualifications or his general credibility as an expert on arbitration, his reports include opinions on Bolivian law that are often vague, noncommittal, and unpersuasive.

Respondents have likewise failed to establish their alternative argument—that the PCT Revocation Order could only render the Ninth Judge Decision invalid if it expressly stated that it did so. (*See* Resp. at 43). Dr. Asbun asserts that, contrary to Respondents' contention, Bolivian law recognizes the basic principle that the PCT's revocation of a Guarantee Court resolution also revokes any decisions emanating from it. (Asbun Reply ¶ 18). Because this is the default rule, established in Articles 129.IV and 202.6 of the Political Constitution of the State and Articles 38 *et seq.* of the Constitutional Procedural Code, the PCT need not make an express pronouncement of the effect of its revocation order unless it intends to make an exception and deviate from the default rule. (*Id.*). Mr. Andaluz does not dispute that this is a default basic principle in Bolivian law. He merely states that "[i]f the [PCT Revocation Order] would have revoked the [Ninth Judge Decision], it would have said so, because the [Revocation Order] is dated March 16, 2016, two months after the [Ninth Judge Decision] was issued (January 18, 2016)." (Andaluz Report ¶ 75.1). This is unconvincing.

The Effect of the PCT Procedural Order

Respondents point to the PCT Procedural Order as evidence of the validity of the Ninth Judge Decision. They claim that the only way for CIMSA to nullify the Ninth Judge Decision was to have it revoked through an *amparo*. (*See* Resp't Reply at 46, ECF No. 78). According to Respondents, the PCT Procedural Order, which dismissed CIMSA's *amparo* against the Ninth Judge, "affirmed the [Ninth Judge Decision's] continued vitality." (*Id.*). But, as CIMSA is quick to point out, Respondents' characterization of the PCT Procedural Order and focus on the outcome of CIMSA's *amparo* "is misplaced." (Pet'r Reply at 47). CIMSA argues that the outcome of its *amparo* against the Ninth Judge no longer mattered once the PCT Revocation

Order rendered the Ninth Judge Decision a nullity, hence why CIMSA withdrew its *amparo* after learning of the PCT Revocation Order. (*Id.*).

In asserting that the PCT Procedural Order gave substantive validity to the Ninth Judge Decision, Respondents ask the Court to view the Ninth Judge Decision in a vacuum and ignore the significance of the PCT Revocation Order. Dr. Asbun explains that "the judges of the PCT are only authorized to decide the specific questions presented within the particular constitutional action before them." (Asbun Reply ¶ 26). Therefore, the PCT Procedural Order only decided the procedural validity of the Ninth Judge Decision for purposes of the proceedings relating to CIMSA's *amparo*, and it could not have decided the substantive validity of the Ninth Judge Decision in relation to the PCT Revocation Order. (*Id.*).

<u>The Effect of the PCT Clarification Order</u>

Respondents rely on the statement in the PCT Clarification Order that the Ninth Judge Decision "subsists." (*See* Resp't Reply at 47). However, as CIMSA emphasizes, the PCT Clarification Order did not provide the substantive declaration Respondents sought: a declaration that the Ninth Judge Decision was valid and in effect notwithstanding the PCT Revocation Order. (*See* Pet'r Reply at 43; PCT Clarification Order No. 004/2017). Dr. Asbun explains that the term "subsistence," when understood in the context of that particular proceeding, must relate to the impact of the PCT Procedural Order on the Ninth Judge Decision, not the validity of the Ninth Judge Decision writ large. (*See* Asbun Reply ¶¶ 30-31). I find compelling Dr. Asbun's statement that "clarificatory decisions, such as the PCT Clarification Order, may only refer to the particular decision they purport to clarify and cannot address decisions issued in different proceedings." (*Id.* ¶ 35). Thus, the PCT Clarification Order served a limited purpose and could

not have given substantive validity to the Ninth Judge Decision after it had been rendered a nullity by the PCT Revocation Order.

<u>The Effect of the President's Decree</u>

Without providing any basis for accepting the purported legality of the President's Decree, Respondents argue that it "confirms [the Ninth Judge Decision's] continued validity." (Resp. at 44). The circumstances surrounding the President's Decree, described in the Background section above, are unusual to say the least. However, I need not dissect these troubling circumstances or give the President's Decree more attention than it warrants. The expert reports make clear that the President of the PCT has no legal authority to unilaterally issue such a decree. Bolivian law authorizes the PCT to issue only three types of decisions ("decrees" are not among them), which must be issued by the full PCT or a duly constituted chamber of the PCT. (Asbun Report ¶¶ 78-80). The PCT President issued the decree on his own, not collectively as part of a PCT chamber, and the document includes no official PCT docket number or recognized decision type. (*Id.* ¶¶ 81-82). Notably, Mr. Andaluz dances around the legality of the President's Decree, never directly attesting to its validity. (Andaluz Report ¶ 75.7). Instead, he hedges that *if* the President's Decree lacks validity, CIMSA should have challenged it. (*See id.*). I agree with CIMSA that the President's Decree has no legal value and no bearing on the alleged validity of the Ninth Judge Decision.

Therefore, I find that the Merits Award has not been set aside by a competent authority in Bolivia. The Eighth Judge Decision denied Respondents' request to annul the Merits Award, and that decision was ultimately confirmed by the PCT. Neither the Ninth Judge Decision nor the procedural and technical PCT orders undermine that result. Because Respondents have not demonstrated that the Merits Award has been set aside by a competent authority in Bolivia, I

need not address CIMSA's alternative argument that I should not recognize the Ninth Judge Decision even if it did effectively annul the Merits Award.[9]

## B. Whether the Damages Award is Binding

A court may refuse to enforce an arbitral award under the New York Convention if the award "has not yet become binding on the parties." New York Convention art. V(1)(e). As I concluded above, Respondents had no further recourse with respect to the Arbitral Tribunal's liability finding once the Eighth Judge Decision rejected their request to annul the Merits Award.[10] Thus, the Merits Award is binding and has the effect of res judicata.[11] The binding nature of the Damages Award, however, is more difficult to determine.

Respondents contend that as long as their request to annul the Damages Award is pending in Bolivian court, the award is not final and binding under Bolivian law. (Resp. at 60). First, they argue that in Bolivia, a "writ of execution is required to prove the validity of the arbitration award." (Oral Argument Tr. at 33:11-13). Yet reputable sources indicate that the New Arbitration Law, which applies to the challenge against the Damages Award, only requires a writ of execution to prove enforceability in the case of *foreign* arbitral awards. *See* Gutierrez &

---

[9] I note that even if the effect of the PCT Revocation Order on the Ninth Judge Decision were in doubt, I would question the legitimacy of the Ninth Judge Decision given the evidence of potential misconduct. For instance, I cannot fathom how he could have reviewed the 30,000 page record, analyzed the parties' arguments, and written a thoughtful and well-reasoned decision in one week. (*See* Von Borries Decl. ¶ 54). Had his decision somehow survived the PCT Revocation Order, it would, for many reasons, remain suspect.

[10] Under both the Old Arbitration Law and the New Arbitration Law, the only way to challenge an arbitral award in Bolivia is to request that the court annul the award, and the court's resolution of this request is not appealable. *See supra* note 2.

[11] Article 60 of the Old Arbitration Law, which applies to the Merits Award, states: "The award shall have the effect of a judicial judgment with the normative authority of res judicata and its binding effect shall be obligatory and inexcusable from the time that notices served on the parties accompanied by a resolution that would so state its binding and res judicata effect." THE FORDHAM PAPERS 2011, CONTEMPORARY ISSUES IN INTERNATIONAL ARBITRATION AND MEDIATION 149 (Arthur W. Rovine, ed., Martinus Nijhoff Publishers 2012).

Zelada, *supra* note 2 (explaining that Article 122 of the New Arbitration Law lists the grounds for refusing to recognize and enforce a foreign arbitral award, including the absence of enforceability due to the lack of a writ of execution). Supporting this conclusion is the fact that the lack of a writ of execution is *not* one of the exclusive grounds for annulling an arbitration award made in Bolivia pursuant to Article 112 of the New Arbitration Law. (*See* PCT Judgment 1481/2016-S3 § III.3, p. 16, ECF No.65-38).

Respondents' next argument is that under Bolivian arbitration law, an arbitral award is only enforceable once a Bolivian court has ruled on (and denied) a request for annulment. (*See* Resp't Reply at 62). However, the expert report of Mr. Andaluz on which Respondents rely only states that *under the Old Arbitration Law*, an award must be expressly declared enforceable by a court following the resolution of a request for annulment made against it. (Andaluz Report ¶ 78).[12] Because Respondents have not provided the full text in Spanish or in English of either the Old or the New Arbitration Law, I am left in the dark as to whether Mr. Andaluz's characterization of these provisions is accurate and whether they also appear in the New Arbitration Law. But even assuming they do, these provisions would only dictate what a party must do to enforce an award in Bolivia—they do not speak to the finality or binding nature of an award in any context beyond enforcing an award domestically. And here, although the parties agreed that Bolivian law would apply to the *arbitration proceedings*, CIMSA is not seeking recognition or enforcement of the award in Bolivia. CIMSA moves to enforce the award in the

---

[12] Paragraph 78 of the Andaluz Report states, "As it is known, for an award to be final, the motion for annulment against it (1) must have been accepted or declared inadmissible (Article 60.I of Law 1770); and, (2) it must have been declared enforceable by an express resolution in that sense (Article 60.II)."

U.S. pursuant to the New York Convention, and under the New York Convention, the existence of ongoing judicial proceedings in Bolivia is not a defense to enforcement.[13]

The New York Convention does not define "binding on the parties," but it would be contrary to the Convention's intent to conclude that "binding" means the award must be enforceable in the country where the arbitration took place. One of the main goals of the New York Convention "was to facilitate the enforcement of arbitration awards by enabling parties to enforce them in third countries without first having to obtain either confirmation of such awards or leave to enforce them from a court in the country of the arbitral situs." *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 500 F.3d 571, 576 n. 4 (7th Cir. 2007) (quoting *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 366-67 (5th Cir. 2003)). To that end, the New York Convention purposefully "eradicate[ed] the requirement that a court in the rendering state recognize an award before it could be taken and enforced abroad." *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 22 (2nd Cir. 1997).

Furthermore, U.S. courts have held that "[a]n arbitration award becomes binding when 'no further recourse may be had to another arbitral tribunal (that is, an appeals tribunal).'" *Ministry of Def. & Support v. Cubic Def. Sys.*, 665 F. 3d 1091, 1100 (9th Cir. 2011) (quoting *Fertilizer Corp. of India v. IDI Mgmt., Inc.*, 517 F. Supp. 948, 958 (S.D. Ohio 1981)). In *Cubic*

---

[13] The New York Convention distinguishes between a challenge that successfully set aside the award and a challenge that is merely pending. *Compare* New York Convention Article V(1)(e) (providing that a court may refuse to enforce an arbitral award if "[t]he award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made"), *with* New York Convention Article VI (providing that if an application to set aside the award has been made to a competent authority in the country in which the award was made, the court "may, if it considers it proper, adjourn the decision on the enforcement of the award" pending the resolution of the foreign proceedings).

*Defense Systems*, the Ninth Circuit concluded that the award had become binding because all arbitration appeals had been exhausted, even though the defendant argued that "the award had not yet been confirmed." 665 F. 3d 1091, 1101 n. 6.[14] The Second Circuit has similarly concluded that "the confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court," and thus an "award need not actually be confirmed by a court to be valid." *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984) (internal citation omitted).

Respondents cite a 1989 case from the Southern District of New York for the proposition that "a determination that the award is final and binding [is made] according to the law of the country where the award was rendered." *Dworkin-Cossell Interair Courier Servs., Inc. v. Avraham*, 728 F. Supp. 156, 161 (S.D.N.Y. 1989). (Resp't Reply at 62). But *Dworkin* dealt with ambiguity in the arbitration award itself, which compelled the court to remand the award to the arbitration panel for clarification. 728 F. Supp. at 161-62. *Dworkin* cites *Fertilizer Corporation*, in which the court considered Indian law as part of the "final and binding" inquiry because the Indian Arbitration Act provided that all arbitration awards shall be final and binding unless the parties' arbitration agreement expressed a different intention. *Fertilizer Corp.*, 517 F. Supp. at 956. The *Fertilizer Corporation* court therefore took into account Indian law, the parties' agreement, and the rules the parties agreed to govern the arbitration, before ultimately holding that the arbitral award *was* final and binding for purposes of the New York Convention notwithstanding the fact that an Indian court was reviewing the award. *Id.* at 956-57.[15] Moreover,

---

[14] *See also Boeing Co. v. KB Yuzhnoye*, 2013 WL 12131183, at *6 (C.D. Cal. Dec. 18, 2013) (concluding that because all arbitral appeals had been exhausted, and the award was being reviewed by a court, not an arbitrator, the award had become binding and Article V(1)(e) did not apply).

[15] In supporting its holding, the *Fertilizer Corporation* court noted a particularly instructive comment from the General Counsel of the American Arbitration Association: "The fact that

another district court examining *Fertilizer Corporation* found that "[n]othing in *Fertilizer Corporation* indicates the law of the arbitral situs is generally biding on the issue of whether the award is 'binding' under the New York Convention." *Aperture Software GmbH v. Avocent Huntsville Corp.*, 2015 WL 12838967, at *2–3 (N.D. Ala. Jan. 5, 2015) (unpublished).

The D.C. Circuit recently recognized that "[w]hen the 'binding' status of an award is in doubt under Article V(1)(e) of the New York Convention, the court may look to the law of the rendering jurisdiction . . . particularly when the [parties'] agreement incorporates local arbitral law . . . ." *Diag Human S.E. v. Czech Republic - Ministry of Health*, 907 F.3d 606, 611 (D.C. Cir. 2018). But there, the parties expressly agreed to a review process authorized under Czech arbitration law "in which a second *arbitral panel* can revisit the original award with the power to uphold, nullify, or modify it." *Id.* at 608 (emphasis added). Thus, in that case, the powers of the *review arbitration panel* and the effects of its actions "hinge[d] on Czech law." *Id.* at 611. Here, the parties' agreement and the applicable IACAC Rules provided that the decisions of the Arbitral Tribunal would be final and binding.

The parties' 2005 Agreement states: "Any awards or orders issued by the Arbitral Tribunal shall be final and binding on the Parties to the Arbitration, who hereby expressly waive all motions to vacate, defenses and appeals against said award. The arbitral award may be enforced in any court having competent jurisdiction over same or over the Parties to the Arbitration or their assets." (2005 Agreement, cl. 29.2). The IACAC Rules to which the parties submitted similarly provide: "The award shall be made in writing and shall be final and binding

---

recourse may be had to a court of law does not prevent the award from being 'binding.' This provision should make it more difficult for an obstructive loser to postpone or prevent enforcement by bringing, or threatening to bring, proceedings to have an award set aside or suspended." *Id.* at 958 (quoting G. Aksen, *American Arbitration Accession Arrives in the Age of Aquarius: United States Implements United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 3 Sw.U.L.Rev. 1, 11 (1971)).

on the parties and subject to no appeal. The parties undertake to carry out the award without delay." IACAC Rules art. 29.2.  Furthermore, the Arbitral Tribunal itself certified that the Merits Award "definitively rules on [l]iability" (Merits Award p. 159), and that the Damages Award "represents the definitive decision on damages." (Damages Award p. 90). Thus, the terms of the parties' 2005 Agreement and the IACAC Rules incorporated therein contradict Respondents' characterization of the award as non-binding. *See Int'l Trading & Indus. Inv. Co. v. DynCorp Aero. Tech.*, 763 F. Supp. 2d 12, 22 (D.D.C. 2011) (concluding that "the terms of the Agreement belie any suggestion that the Award issued by the arbitrator was non-binding").

Therefore, I find that even if a Bolivian court would not enforce the award at this juncture, it is binding under the New York Convention because the arbitration has concluded, a final award has been issued, and there are no further proceedings within the arbitral process.

## C. Whether a Stay is Appropriate

Respondents argue that if the Court does not dismiss CIMSA's petition, it should nevertheless exercise its discretion under Article VI of the New York Convention to stay the case pending a decision by the Twelfth Judge on Respondents' request to annul the Damages Award. "If an application for the setting aside or suspension of the award has been made to a competent authority [of the country in which, or under the law of which, that award was made]," the court in which enforcement is sought "may, if it considers it proper," stay enforcement proceedings under the New York Convention. New York Convention, art. VI.

There is an inherent tension between the goals of the New York Convention and granting a stay. "[A] district court should not automatically stay enforcement proceedings on the ground that parallel proceedings are pending in the originating country." *InterDigital Comms., Inc. v. Huawei Invest. & Holding Co.*, 166 F. Supp. 3d 463, 470 (S.D.N.Y. 2016) (quotation omitted).

On the other hand, "where there is a parallel annulment proceeding in the originating country and there is a possibility the award will be set aside, a district court may be acting improvidently by enforcing the award prior to the completion of the foreign proceedings." *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 317 (1998). In *Europcar*, the Second Circuit articulated six non-exclusive factors to consider in determining whether a stay is warranted. 156 F.3d at 317-18. These factors are:

> (1) the general objectives of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation;
>
> (2) the status of the foreign proceedings and the estimated time for those proceedings to be resolved;
>
> (3) whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review;
>
> (4) the characteristics of the foreign proceedings including (i) whether they were brought to enforce an award . . . or to set the award aside . . .; (ii) whether they were initiated before the underlying enforcement proceeding so as to raise concerns of international comity; (iii) whether they were initiated by the party now seeking to enforce the award in federal court; and (iv) whether they were initiated under circumstances indicating an intent to hinder or delay resolution of the dispute;
>
> (5) a balance of the possible hardships to each of the parties . . .; and
>
> (6) any other circumstances that could tend to shift the balance in favor of or against adjournment . . . .

*Europcar*, 156 F.3d at 317-18.

Although the Tenth Circuit has not had occasion to consider and apply the *Europcar* factors, a number of federal courts have embraced their use. *See, e.g., Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1172 n.7 (11th Cir. 2004); *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 71-72 (D.D.C. 2013). Therefore, I will address the Article VI considerations under the *Europcar* framework, beginning with the first and second factors, which, "[b]ecause the primary goal of the Convention is to facilitate the recognition and enforcement of arbitral awards, . . . should weigh more heavily in the district court's determination." *Europcar*, 156 F.3d at 318.

### 1. The General Objectives of Arbitration

While CIMSA contends that the general objectives of arbitration are best served by confirming the award rather than granting a stay, Respondents argue that a stay is warranted because "[b]oth parties are engaged in a battle in the Bolivian courts, as they should be, given that they agreed to seek arbitration in Bolivia . . . ." (Oral Argument Tr. at 42:4-6). However, the primary goal of arbitration is to avoid extensive and costly court battles. The parties have been litigating in Bolivia for more than five years, and those proceedings have been far from expeditious. If history is any indication, the legal proceedings in Bolivia will continue for an unpredictable amount of time. Respondents concede that they "can't provide an exact time line for when the [D]amages [A]ward proceedings are going to run their course." (*Id.* at 42:8-10). And regardless of how the Twelfth Judge rules on the request to annul the Damages Award, assuming she decides she has jurisdiction to decide it, the losing party will undoubtedly seek an *amparo*. (*See id.* at 83:21-84:1).

The rising expense is also troubling. The parties' legal fees and expenses for the arbitration proceedings alone totaled over $3 million. (*See* Damages Award ¶¶ 333, 336, p. 80).

CIMSA then incurred $75,000 in legal costs just for the initial litigation proceedings relating to Respondents' request to annul the Merits Award. (*See id.* ¶¶ 210-11, p. 56). This amount was calculated before the Eighth Judge Decision and the various proceedings that followed, including the Guarantee Court Resolution No. 77/2015, the Ninth Judge Decision, and the PCT Revocation Order, so there is no telling the amount of legal costs CIMSA ultimately incurred in relation to litigation on the Merits Award. Add to this CIMSA's legal costs in litigating Respondents' challenge to the Damages Award, Respondents' legal costs for all the court proceedings in Bolivia, and the parties' legal costs in the present action, and the overall litigation expenses could now be astronomical.

Given the amount of time that has passed since the arbitration concluded and the increasing costs of protracted litigation in more than one country, I find the overarching goals of arbitration weigh in favor of confirmation and against a stay.

### 2. The Status of the Foreign Proceedings

Respondents urge this Court to grant a stay in light of the "significant issues of Bolivian law still to be resolved by the Twelfth Judge." (Oral Argument Tr. at 41:11-12). However, as noted above, Respondents cannot confidently estimate when a final resolution will occur. The fact that this dispute has been "stayed for nearly three years in deference to the Bolivian annulment proceedings," (Resp. at 61), only points to the protracted nature of the dispute and the likelihood that one or both of the parties will pursue further legal challenges in Bolivia.

It is not clear whether the Twelfth Judge will find she has jurisdiction to issue a decision on the request to annul the Damages Award, and the implications of her declining jurisdiction are unknown. What is known is that, assuming the Twelfth Judge asserts jurisdiction, she will then have 30 days to rule on the request to annul the Damages Award. (Oral Argument Tr. at 37:3-8).

But even then, the losing party would undoubtedly pursue an *amparo*, and the litigation could go on and on with anyone's guess as to when there would be a truly final resolution of the matter in the Bolivian courts. (*Id.* at 83:18-84:4).

Because there is "no clear end" to the litigation proceedings in Bolivia, this second factor weighs in favor of confirmation and against a stay. *See Hardy Exploration & Prod. (India), Inc. v. Gov't of India, Ministry of Petroleum & Nat. Gas*, 314 F. Supp. 3d 95, 106 (D.D.C. 2018) ("[T]he fact that the underlying arbitral award was rendered five years ago and the fact that there is no clear end to the Indian set-aside proceedings in sight counsels against granting [ ] a stay."), *appeal filed*, D.C. Cir. No. 18-7093; *see also Gold Reserve, Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 135 (D.D.C. 2015) ("As no final resolution appears imminent, the Court finds this factor also weighs in favor of [the party seeking to enforce the award].").

### 3. Scrutiny of Award in Foreign Proceedings

This factor is intended to provide appropriate "deference to proceedings in the originating country that involve less deferential standards of review on the premise that, under these circumstances, a foreign court well-versed in its own law is better suited to determine the validity of the award." *Europcar*, 156 F.3d at 317. While neither party has addressed in detail the comparable level of scrutiny the award will receive in the remaining Bolivian proceedings, Respondents have presented nothing to indicate that the level of scrutiny the Damages Award will receive in the Bolivian proceedings tips the balance in favor of a stay.

In Bolivia, the court reviewing a request for annulment may set aside the arbitral award only on limited grounds under the New Arbitration Law.[16] These grounds, which do not appear

---

[16] These include: (1) the matter is not subject to arbitration; (2) the Arbitral Award Violates law and order; (3) one of the parties' right to a defense has been affected by the arbitration proceeding; (4) the Arbitral Tribunal grossly overstepped its authority in the Arbitral Award, in

to be much broader than those under Article V of the New York Convention, evince a conscious restriction on the available recourse against an arbitral award. As the PCT has explained, the New Arbitration Law "recogniz[es] the right to challenge the award[,] but in a strict sense[,] for the purpose of correcting defects or irregularities in arbitration decisions." (PCT Judgment 1481/2016-S3 § III.3, p.17).

The PCT has already vacated the Twelfth Judge's annulment decision and ordered the Twelfth Judge to issue a new decision consistent with the PCT's December 2016 judgment. (*See id.* p. 32).[17] While the parties debate the likely outcome of the Twelfth Judge's review of the annulment action on remand, it will be difficult for the judge to reach the same result without repeating the reversible errors identified by the PCT. The PCT found that the Twelfth Judge erroneously conflated and attempted to broaden the scope of application of two different grounds for annulment. (*Id.* § III.5.2, pp. 27-28). It further concluded that the Twelfth Judge impermissibly overstepped her authority by revisiting the evidence to reach a different interpretation than that reached by the arbitrators. (*Id.* § III.5.2, p. 25). This suggests that the review standard in Bolivia, even if more searching than that under the New York Convention, may not favor Respondents on remand. *See Chevron Corp.,* 949 F. Supp. 2d at 72 ("[T]he fact that the Dutch District Court has already denied the motion to set aside suggests that to the extent the standard is any more searching, it has not helped Ecuador in its attempt to resist confirmation.").

---

relation to a dispute that was not foreseen in the arbitration agreement; and (5) the Arbitral Tribunal was irregularly created. (*See* PCT Judgment 1481/2016-S3 § III.3, p. 16).

[17] On remand, the Twelfth Judge will revisit the bases on which she annulled the Damages Award: that the Arbitral Tribunal breached Respondents' right to a defense and due process by (1) considering evidence not presented during the Damages Phase to decide a portion of the damages, and (2) relying on its own experience in making its damages calculation. (Von Borries Decl. ¶ 90; Rivera Decl. ¶ 54).

When it is not clear whether the award will receive greater scrutiny in the foreign proceedings, "the possibility that the [foreign court] will set aside the award[ ] weighs mildly in favor of granting a stay." *In re Arbitration of Certain Controversies between Getma Int'l & Republic of Guinea*, 142 F. Supp. 3d 110, 116 (D.D.C. 2015) (internal quotations omitted); *see also Venco Imtiaz Constr. Co. v. Symbion Power LLC*, 2017 WL 2374349, at *7 (D.D.C. May 31, 2017) (concluding that this factor weighs only mildly in favor of a stay even when the standard of review in the foreign proceedings is slightly less deferential and gives the foreign "court more leeway to not enforce the award"). Thus, this factor can only marginally weigh in favor of Respondents and does not tip the scale towards a stay when the first two factors favor CIMSA.

### 4. The Characteristics of the Foreign Proceedings

The fourth factor includes four distinct considerations: (i) whether the proceedings were brought to enforce an award (which would tend to weigh in favor of a stay) or to set the award aside (which would tend to weigh in favor of enforcement); (ii) whether the proceedings were initiated before the underlying enforcement proceeding so as to raise concerns of comity; (iii) whether the proceedings were initiated by the party now seeking to enforce the award in federal court; and (iv) whether the proceedings were initiated under circumstances indicating an intent to hinder or delay resolution of the dispute. *Europcar*, 156 F.3d at 318.

Although the Bolivian proceedings were initiated before the proceedings in this Court, the remaining considerations counsel against a stay and in favor of enforcement. The first and third considerations clearly weigh in favor of enforcement given that the proceedings in Bolivia were brought by Respondents, not CIMSA, and sought to set aside rather than enforce the award.

In examining the fourth consideration, I take particular note of the fact that "a stay of confirmation should not be lightly granted lest it encourage abusive tactics by the party that lost in arbitration." *Id.* at 317. Even though CIMSA has itself filed *amparos* and objections that have added to the protracted proceedings in Bolivia, it did so to protect its interests once entangled in Bolivian legal proceedings it did not initiate or expect. Despite the parties' agreement to "waive all motions to vacate, defenses and appeals against said award," (2005 Agreement, cl. 29.2), the Respondents wasted no time in filing a series of challenges and subsequent appeals in Bolivian courts when the outcome of the arbitration was unfavorable to them. When Respondents had the opportunity to seek suspension of the Damages Phase in Bolivia, they instead sought an injunction in Mexico. And when they failed to set aside the Merits Award through the sole annulment process available in Bolivia, (*see* Asbun Report ¶ 15), they employed unconventional and suspect means to get more favorable decisions from select judges. While Bolivian arbitration law provided Respondents with a limited mechanism for challenging the award, Respondents' "contributions to the protractedness of the litigation . . . cannot be denied." *Hardy Exploration*, 314 F. Supp. 3d at 108.

### 5. The Balance of the Possible Hardships to Each of the Parties

The balance of hardships also counsels in favor of enforcement rather than a stay. At the outset of their business dealings, the parties mutually agreed that disputes would be resolved through arbitration and that the decision of the arbitral tribunal would be final and not subject to appeal. Despite this agreement, CIMSA has entertained years of tumultuous legal proceedings, when it was Respondents' breach of contract that caused CIMSA to seek relief through arbitration in the first place.

Respondents breached their contract with CIMSA more than seven years ago, and CIMSA prevailed on the merits of the dispute in arbitration more than five years ago. Nearly four years have passed since the Arbitral Tribunal handed down the Damages Award, yet CIMSA has been unable to collect a single cent of the monetary relief it was awarded. *Europcar* advised courts to "keep[ ] in mind that if enforcement is postponed under Article VI . . . the party seeking enforcement may receive 'suitable security.'" 156 F.3d at 318. While "suitable security" would provide CIMSA with necessary protection in the event of a stay, this protection does not offset the hardship CIMSA has and will suffer were this Court to continue to delay confirmation of the award. "[G]iven the length of time that [CIMSA] has waited to receive the award, and the amount of money at issue, [CIMSA] would be burdened should the Court delay confirmation of the award." *Hardy Exploration*, 314 F. Supp. 3d at 108.

### *6. Other Considerations*

Neither party presents any other circumstances that would shift the balance in favor of or against a stay.

Because the *Europcar* factors, on balance, weigh in favor of enforcement and against a stay, I conclude that a stay is unwarranted.

### **IV. CONCLUSION**

For the aforementioned reasons, I confirm the Final Award on Damages of the Arbitral Tribunal and lift the order suspending GCC America's obligation to file its Garnishee Report (ECF No. 18).

Accordingly, it is ORDERED that:

1. CIMSA's Motion to Lift the Abatement Order (ECF No. 42) is GRANTED;

2. CIMSA's Petition (ECF No. 1) and Motion to Confirm a Foreign Arbitral Award (ECF No. 50) are GRANTED;

3. The Clerk shall enter judgment in favor of Petitioner CIMSA in the amount of

$36,139,223, plus annual interest at a rate of 6% from April 10, 2015 to the date of entry of judgment;

    4. Post-judgment interest shall accrue at the applicable federal rate; and

    5. Petitioner CIMSA shall be awarded its costs incurred in this action.


    DATED this 25th day of March, 2019.


                         _____
                         JOHN L. KANE
                         SENIOR U.S. DISTRICT JUDGE