**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**August 17, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

COMPAÑÍA DE INVERSIONES
MERCANTILES, S.A.,

       Plaintiff - Appellee,

v.

GRUPO CEMENTOS DE CHIHUAHUA
S.A.B. DE C.V.; GCC
LATINOAMÉRICA, S.A. DE C.V.,

       Defendants - Appellants.

No. 19-1151

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:15-CV-02120-JLK)**
_____

David M. Cooper, Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York
(Juan P. Morillo and Daniel Pulecio-Boek, Quinn Emanuel Urquhart & Sullivan, LLP,
Washington, DC, with him on the briefs), appearing for the Appellants.

Eliot Lauer, Curtis, Mallet-Prevost, Colt & Mosle, LLP, New York, New York (Gabriel
Hertzberg and Sylvi Sareva, Curtis, Mallet-Prevost, Colt & Mosle, LLP, New York, New
York; and Michael A. Rollin, Fox Rothschild LLP, Denver, Colorado, with him on the
brief), appearing for the Appellee.
_____

Before **BRISCOE**, **EBEL**, and **LUCERO**, Circuit Judges.
_____

**BRISCOE**, Circuit Judge.
_____

This case involves a Bolivian company known as Compañia de Inversiones Mercantiles S.A. ("CIMSA") and Mexican companies known as Grupo Cementos de Chihuahua, S.A.B. de C.V. and GCC Latinoamerica, S.A. de C.V. (collectively "GCC").  Plaintiff - Appellant CIMSA brought a district court action in 2015 pursuant to the Federal Arbitration Act, 9 U.S.C. § 207, to confirm a foreign arbitral award issued in Bolivia against Defendant - Appellee GCC.  The action has been prolonged by ongoing litigation abroad and obstacles to effectuating service.  The underlying dispute arises out of an agreement under which CIMSA and GCC arranged to give each other a right of first refusal if either party decided to sell its shares in a Bolivian cement company known as Sociedad Boliviana de Cemento, S.A. ("SOBOCE").  GCC sold its SOBOCE shares to a third party after taking the position that CIMSA failed to properly exercise its right of first refusal.  In 2011, CIMSA initiated an arbitration proceeding in Bolivia.  The arbitration tribunal determined that GCC violated the contract and the parties' expectations.  The arbitration tribunal later awarded CIMSA tens of millions of dollars for GCC's breach.

GCC initiated Bolivian and Mexican court actions challenging the arbitration tribunal's decisions.  A Bolivian judge, holding a position similar to that of an American trial judge, rejected GCC's challenge to the arbitration tribunal's decision on the merits.  A Bolivian court, acting in a capacity similar to that of an American intermediate appellate court, reversed and remanded.  On remand, the matter was temporarily assigned to a different trial judge, who granted GCC's request for relief before the original trial judge could return from a planned vacation.  While these

2

remand proceedings were occurring, however, Bolivia's highest court reversed the Bolivian appellate court and affirmed the original trial judge. But as a result of the simultaneous remand proceedings, Bolivia's highest court also issued arguably contradictory orders suggesting the second trial judge's ruling on the merits remained in effect. GCC filed a separate Bolivian court action challenging the arbitration tribunal's damages award. That case made its way to Bolivia's highest court as well, which reversed an intermediate appellate court's nullification of the award and remanded for further proceedings. The parties continue to litigate the damages award in Bolivia.

Invoking the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), June 10, 1958, 21 U.S.T. 2517, CIMSA filed a confirmation action in the United States District Court for the District of Colorado. After encountering difficulties with conventional service of process in Mexico under the Hague Convention on Service Abroad of Judicial and Extrajudicial Documents (the "Hague Service Convention" or "Convention"), Nov. 15, 1965, 20 U.S.T. 361, CIMSA sought and received permission from the district court to serve GCC through its American counsel pursuant to Federal Rule of Civil Procedure ("Rule") 4(f)(3). The district court then rejected GCC's challenges to personal jurisdiction, holding (among other things) that (1) it was appropriate to aggregate GCC's contacts with the United States; (2) CIMSA's injury arose out of GCC's contacts; (3) exercising jurisdiction was consistent with fair play and substantial justice; and (4) alternative service was proper. The district court further

rejected GCC's defenses to CIMSA's claim under the New York Convention, concluding that (1) the arbitration tribunal's ruling on the merits had not been set aside by a competent Bolivian authority; and (2) the arbitration tribunal's ruling on damages was sufficiently "binding" to allow confirmation. These issues are now before us on appeal.

Although the jurisdictional questions are difficult, we consider this appeal pursuant to 28 U.S.C. § 1291 and affirm the district court. The district court appropriately aggregated GCC's contacts with the United States as a whole under Rule 4(k)(2). GCC forfeited arguments based on Rule 4(k)(2) and, regardless, we conclude that those arguments fall short on the merits. The district court properly determined that CIMSA's injury arose out of or related to GCC's nationwide contacts. Contacts concerning GCC's underlying breach of contract are pertinent, and those contacts satisfy the applicable version of the test for "proximate cause." The district court correctly decided that exercising personal jurisdiction over GCC comported with fair play and substantial justice because CIMSA established minimum contacts and GCC did not make a compelling case to the contrary. Last, the district court accurately concluded that substitute service on GCC's United States counsel did not run afoul of the Hague Service Convention or Rule 4(f)(3).

We also affirm the district court's confirmation of the arbitration tribunal's decisions. We agree with the district court that the best reading of the Bolivian proceedings is that the arbitration panel's merits award has not been set aside, because the Bolivian court orders supporting the second trial judge's decision

4

favoring GCC lost any legal effect after Bolivia's highest court affirmed the initial

trial judge's decision favoring CIMSA.  In addition, the arbitration tribunal's

damages award may be confirmed in the United States under the New York

Convention even if GCC's Bolivian judicial challenge remains pending.  By

necessity, we highlight in today's opinion some differences between the American

judicial system and the Bolivian judicial system (and, at times, the Mexican judicial

system).  We note these differences only to place this case in context, not as a

critique.

## I.     Background

CIMSA is a Bolivian company.  Appellant's Appendix ("App.") at 130.  GCC

is a set of Mexican companies.  *Id.*  The relationship between CIMSA and GCC

began no later than 2005, when the parties met in Miami to discuss a potential joint

venture relating to SOBOCE.  Appellee's Supplemental Appendix ("Supp. App.") at

6–7.  SOBOCE is Bolivia's largest cement company.  *Id.* at 6.  After the Miami

meeting, GCC made an offer to purchase a substantial interest in SOBOCE for

approximately $59 million.  *Id.* at 7.  That offer was accepted and consummated a

few months later, as GCC and CIMSA simultaneously entered into a shareholder

agreement (the "2005 Shareholder Agreement").  *Id.*  The 2005 Shareholder

Agreement was governed by Bolivian law.  App. at 561.  GCC paid for the acquired

SOBOCE shares (and later distributed SOBOCE dividends) through a San Francisco

bank account.  Supp. App. at 8.  GCC's General Counsel is located in Colorado.  *Id.*

at 60.

Several years after the execution of the 2005 Shareholder Agreement, a disagreement arose between CIMSA and GCC involving a right of first refusal. The 2005 Shareholder Agreement enabled each party to transfer its shares in SOBOCE to a third party after a period of five years, provided that the transferring party gave notice and afforded the other party an opportunity to purchase the shares on the same or better terms within 30 days. *Id.* at 8. In late 2009, after GCC signaled its intention to sell its SOBOCE shares at the end of the five-year holding period, CIMSA and GCC again met in Miami. *Id.* at 8–9. In early 2010, the parties met six more times in Miami, and the discussions included price, sales terms, valuation, and other features of a possible deal in which CIMSA would purchase GCC's SOBOCE shares. *Id.* at 9–10. The parties reached agreement on the fundamental terms of the sale during an April 2010 meeting in Miami, and signed an agreement (the "2010 Shareholder Agreement") in May 2010 in La Paz, Bolivia. *Id.* at 10. The transaction contemplated by the 2010 Shareholder Agreement did not close, however, because the Bolivian government expropriated a division of SOBOCE's business. *Id.*

In the wake of the expropriation, CIMSA and GCC began negotiating a new agreement. In mid-2011, the parties met in Houston, where CIMSA proposed two alternative payment structures. *Id.* at 10–11. In the weeks following the Houston meeting, the parties continued to discuss CIMSA's proposals via telephone and email. *Id.* at 11. In July 2011, GCC notified CIMSA that a Peruvian company had tendered a firm offer to buy GCC's SOBOCE shares. *Id.* CIMSA reiterated its willingness to purchase the shares, and requested a longer payment schedule than the

one proposed by the Peruvian company. *Id.* GCC indicated that, assuming the parties could reach an agreement on all relevant terms, GCC would accept one of the payment terms proposed by CIMSA at the Houston meeting. *Id.*

By early August 2011, CIMSA and GCC had nearly finalized the terms of the new SOBOCE transaction. *Id.* GCC instructed CIMSA to hire New York counsel to draft a final agreement. *Id.* CIMSA did so, and GCC hired its own New York counsel. *Id.* GCC sent CIMSA a draft purchase agreement (the "2011 Agreement") that was governed by New York law. *Id.* Right before the transaction was set to close, GCC demanded an increase in the number of SOBOCE shares CIMSA would place in trust, from 4% to 27%, allegedly to ensure CIMSA's compliance with a longer payment schedule. *Id.* at 11–12. In the months that followed, CIMSA attempted to exercise its right of first refusal under the terms proposed in Houston that had been negotiated by the parties. *Id.* at 12. GCC took the position that CIMSA's attempt was invalid, and during the second week of August 2011, sold its SOBOCE shares to the Peruvian company. *Id.*

The 2005 Shareholder Agreement contained an arbitration clause. The parties agreed that any "dispute, litigation, discrepancy, issue, or claim" that may arise "regarding the existence, application, validity, interpretation, compliance or breach, and termination" of the 2005 Shareholder Agreement "shall be submitted to mediation and then to international arbitration for a final resolution, pursuant to the rules and regulations of the Inter-American Commercial Arbitration Commission" (the "IACAC"). *Id.* at 2. The parties further agreed that the arbitration "shall be

administered by the national chapter of the [IACAC] in Bolivia[.]" *Id.* (brackets added).  CIMSA invoked this clause and submitted a notice of arbitration in November 2011.  App. at 169.  The arbitration was conducted by a three-person tribunal in La Paz and subject to Bolivian law.  *Id.* at 169–70.  The parties agreed to bifurcate the arbitration proceedings into a merits phase and a damages phase.  *Id.* at 170.

In September 2013, the arbitration tribunal issued a ruling on the merits, holding that GCC breached the right of first refusal in the 2005 Shareholder Agreement and acted inappropriately.  *Id.* at 170–71, 352–53.  Among other things, the arbitration tribunal found that GCC in 2011 created a legitimate expectation CIMSA's proposed payment schedule would be accepted, yet GCC later turned down the proposal without extending CIMSA an opportunity to submit a new offer.  *Id.* at 171, 353–54.

In November 2013, GCC sought leave from a Bolivian court to file a request to annul the arbitration tribunal's ruling on the merits.  *Id.* at 180, 675.  Once leave was granted and GCC made the filing, the annulment request was assigned to the Eighth Judge for the Civil and Commercial Court of the Judicial District of La Paz (the "Eighth Judge").  *Id.* at 181, 675.  In August 2015, the Eighth Judge denied GCC's annulment request (the "Eighth Judge Decision").  *Id.* at 181–82.  Unable to directly appeal the Eighth Judge Decision, GCC initiated an *amparo*.  *Id.* at 182–83, 383, 675–76.  An *amparo* is an extraordinary remedy that must be based on an alleged violation of rights protected by the Bolivian Constitution.  *Id.* at 182–83, 676.

8

GCC's *amparo* was assigned to what is known as a "Guarantee Court," which in October 2015 granted GCC's requested relief, annulled the Eighth Judge Decision, and remanded the matter to the Eighth Judge for a new decision. *Id.* at 183–84, 384, 676–77.

The remand of GCC's *amparo* did not immediately end up in front of the Eighth Judge. Because the Guarantee Court sent the case back during a period when the Eighth Judge was known to be on vacation, GCC's *amparo* was assigned to a substitute jurist, the Ninth Judge of the Civil and Commercial Court of the Judicial District of La Paz (the "Ninth Judge"). *Id.* at 185, 390. Given these unusual circumstances surrounding the remand—and the fact that the existing case record was 30,000 pages—CIMSA moved to disqualify the Ninth Judge. *Id.* at 185–86. Within seven days of receiving the voluminous case file, the Ninth Judge denied CIMSA's disqualification motion and granted a request by GCC to annul and vacate the Eighth Judge Decision (the "Ninth Judge Decision"). *Id.* at 186, 679. CIMSA then filed its own *amparo* against the Ninth Judge Decision, which a Guarantee Court granted in February 2016. *Id.* at 189–90, 681–82.

By law, each Guarantee Court decision in an *amparo* is sent for review to the highest court in Bolivia, the Plurinational Constitutional Tribunal (the "PCT"). *Id.* at 184–85, 676. Remand proceedings in the lower court continue while the PCT conducts its review. *Id.* at 676. In March 2016, the PCT rejected GCC's *amparo* against the Eighth Judge Decision, concluding that the Eighth Judge had not violated GCC's constitutional rights. *Id.* at 191, 387–88. Without providing notice to

CIMSA, GCC in July 2016 filed a request for clarification of the March 2016 PCT order reinstating the Eighth Judge Decision. *Id.* at 193–94. After that request was denied, GCC filed a memorandum asking the President of the PCT to address the issue. *Id.* at 194–95. The President obliged, stating in a decree dated November 2016 (but unknown to CIMSA until January 2018) that:

> [I]t is appropriate to reconsider the effects of [the Eighth Judge Decision], in such a way that the acts following the issuance of [the Guarantee Court resolution granting GCC's *amparo* against the Eighth Judge], subsist; that is, the continued adjudication of the request for annulment of the award by the judicial authorities, without retroactively invalidating procedural or adjudicative acts[.]

*Id.* at 195 (brackets added); *see also id.* at 790 (setting forth GCC's translation of this portion of the decree).

Armed with the PCT's March 2016 order, CIMSA withdrew its *amparo* against the Ninth Judge Decision in September 2016. *Id.* at 192. Despite the withdrawal, the PCT notified the parties in November 2016 of an order that had been backdated to May 2016. *Id.* at 192–93. Among other things, the May 2016 PCT order stated that CIMSA had not identified a constitutional right which had been violated by the Ninth Judge. *Id.* The May 2016 PCT order indicated that it did not constitute a ruling on the merits of CIMSA's *amparo* against the Ninth Judge Decision, and added that CIMSA was entitled to file another such *amparo*. *Id.*

Again without providing notice to CIMSA, GCC in November 2016 filed a request for clarification of the PCT's backdated May 2016 order. *Id.* at 196. The PCT then issued an order dated January 2017 (again unknown to CIMSA until

January 2018) stating that the Ninth Judge Decision annulling the Eighth Judge

Decision "subsists according to the terms established in [herein]." *Id.* (brackets in

original); *see also id.* at 795 (setting forth GCC's translation of this portion of the

order). The PCT President served as one of the two signatories on the January 2017

order after another PCT judge recused himself. *Id.* at 197. The January 2017 order

went into the public record on the same day as the November 2016 decree, which was

also the PCT President's last day in office. *Id.* at 197, 407–08.

All told, the Bolivian proceedings concerning the merits award may be

summarized as follows:

| 9/13 Arbitration Merits Award | | |
|---|---|---|
| GCC files annulment motion | | |
| 8/15 Eighth Judge Order Denying Annulment | | |
| GCC files *amparo* | | |
| 10/15 Guarantee Court Order Reversing Eighth Judge | → | Case is simultaneously remanded |
| CIMSA appeals to PCT | | 1/16 Ninth Judge Order Granting Annulment |
| 3/16 PCT Order Reversing Guarantee Court | | CIMSA files *amparo* |
| GCC files memo with President | | 2/16 Guarantee Court Order Reversing Ninth Judge |
| 11/16 PCT Presidential Decree On Ninth Judge Order | | CIMSA withdraws *amparo* |
| | | 11/16 PCT Order On Alleged Constitutional Violation |
| | | GCC files clarification motion with PCT |
| | | 1/17 PCT Order On Ninth Judge Order |

Meanwhile, proceedings relating to the damages phase of the arbitration were

taking place as well. In April 2015, the arbitration tribunal held that CIMSA was

entitled to more than $34 million in damages and more than $2 million in fees and

costs, resulting in an overall award in excess of $36 million. *Id.* at 174–75. GCC

filed a request to annul the damages award in July 2015.  *Id.* at 200.  The matter was assigned to the Twelfth Civil and Commercial Court of the Judicial District of La Paz (the "Twelfth Judge"), who granted GCC's request and annulled the damages award in October 2015.  *Id.* at 201–02, 689.

In April 2016, CIMSA filed an *amparo* against the Twelfth Judge's damages decision.  *Id.* at 202, 689–90.  A Guarantee Court denied CIMSA's *amparo*, but the PCT revoked the denial, found that the Twelfth Judge had violated CIMSA's constitutional rights, and remanded for further proceedings.  *Id.* at 202–03, 690–91. According to the parties, the Twelfth Judge has not yet issued a new damages decision on remand.  *Cf. id.* at 651 (stating that annulment proceedings on the damages award are "still in process").  Nor has the Twelfth Judge ruled on a motion submitted by GCC prior to October 2015 asserting, based on the purported invalidation of the arbitration tribunal's ruling on the merits, that the Twelfth Judge lacks jurisdiction over the damages annulment request.  *Id.* at 1178–79, 1181.  Under Bolivian law, an arbitration award is not enforceable while an action to annul the award is pending.  *Id.* at 691.

CIMSA initiated this case in September 2015 by filing a petition in federal district court to confirm the arbitration award under the New York Convention.  App. at 129–44.  Pursuant to the Hague Service Convention, CIMSA delivered a summons and other materials to the Mexican central authority to serve on GCC.  Supp. App. at 55–56.  In June 2017, the Mexican central authority notified CIMSA that service had not been effected because GCC's offices supposedly could not be located at the

12

headquarters address shown on GCC's website. *Id.* at 56–57. In May 2018, CIMSA sought permission from the district court to serve GCC through GCC's counsel in the United States. App. at 145–61. Citing Rule 4(f)(3), the district court authorized this alternative form of service. *Id.* at 1124–26.

Around the time it filed the alternative service motion, CIMSA also filed a motion to confirm the arbitration award. *Id.* at 420–69. GCC responded to the confirmation motion and filed a "cross-motion" to dismiss the petition. *Id.* at 481–552. In that combined pleading, GCC contended it was not subject to personal jurisdiction because (1) GCC had not purposefully directed activities at American residents; (2) CIMSA had not adequately alleged the lawsuit arose out of GCC's asserted contacts; and (3) the exercise of personal jurisdiction would not be reasonable. *Id.* at 510–20. GCC further contended that the award could not be confirmed because, *inter alia*, (1) Bolivian courts had nullified or set aside the arbitration tribunal's decision on the merits; and (2) the arbitration tribunal's decision on damages was in the process of judicial review and unenforceable under Bolivian law. *Id.* at 527–50. The district court "considered the jurisdictional challenges" and concluded it could "properly exercise personal jurisdiction over Respondents in this case." *Id.* at 1127, 1132–44. In a separate order, the district court determined that the arbitration tribunal's award was binding for purposes of the New York Convention, and granted CIMSA's petition and confirmation motion. *Id.* at 1237–70.

## II.    The district court did not err in exercising personal jurisdiction over GCC

It is generally acknowledged that there are "two types of personal jurisdiction: 'general' (sometimes called 'all-purpose') jurisdiction and 'specific' (sometimes called 'case-linked') jurisdiction." *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1779–80 (2017) (citation omitted).  General jurisdiction involves "continuous and systematic general business contacts" between a party and the forum, empowering the forum "to resolve any dispute involving that party, not just the dispute at issue." *Newsome v. Gallacher*, 722 F.3d 1257, 1264 (10th Cir. 2013) (citations and internal quotation marks omitted).  No theory of general jurisdiction has been advanced here.

We thus limit our attention to specific jurisdiction, and we consider the issue solely as the parties have framed it.  The parties agree that due process requires constitutionally sufficient "minimum contacts" between the defendant and the forum. *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  Using this framework, we generally ask "(1) whether the defendant purposefully directed its activities at residents of the forum state; (2) whether the plaintiff's injury arose from those purposefully directed activities; and (3) whether exercising jurisdiction would offend traditional notions of fair play and substantial justice." *Newsome*, 722 F.3d at 1264; *see also Monge v. RG Petro-Mach. (Grp.) Co.*, 701 F.3d 598, 614 (10th Cir. 2012) ("Whether a defendant has the requisite minimum contacts with the forum state

14

must be decided on the particular facts of each case.") (citation and internal quotation marks omitted).[1]

We review a district court's ruling on personal jurisdiction de novo. *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1065 (10th Cir. 2007). "The plaintiff has the burden of proving that the court has jurisdiction." *Id.* When personal jurisdiction is decided on the basis of a complaint and affidavits, both this court and the district court take as true "all well-pled (that is, plausible, non-conclusory, and non-speculative) facts alleged in plaintiffs' complaint." *Dudnikov*, 514 F.3d at 1070 (citations omitted). Any factual disputes in the parties' affidavits are also resolved "in plaintiffs' favor." *Id.*

---

[1] For a claim arising under federal law, we have previously held that "[w]here Congress has statutorily authorized nationwide service of process, such service establishes personal jurisdiction, provided that the federal court's exercise of jurisdiction comports with Fifth Amendment due process." *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1229 (10th Cir. 2006); *see also GCIU-Emp'r Ret. Fund v. Coleridge Fine Arts*, 700 F. App'x 865, 867–68 (10th Cir. 2017) (unpublished) (indicating for a federal claim that if the defendant is not subject to the authority of any state court of general jurisdiction, then jurisdiction may be exercised if it comports with Fifth Amendment due process). Because no party in the case at bar asserts that there is a meaningful distinction between the Fifth and Fourteenth Amendments, we have no occasion to consider that argument, or the potential application of cases like *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206 (10th Cir. 2000). In any event, *Peay* teaches that personal jurisdiction should be refused under the Fifth Amendment in a nationwide-service-of-process case where (1) litigation in the forum is "so gravely difficult and inconvenient" that the defendant "unfairly is at a severe disadvantage in comparison to his opponent;" and (2) this burden on the defendant is not outweighed by "the federal interest in litigating the dispute in the chosen forum[.]" *Id.* at 1212–13 (citations omitted). For the reasons discussed below, GCC has not satisfied these criteria.

## A.     GCC's objection to the use of nationwide contacts fails

In limited circumstances, Rule 4(k)(2) allows courts to examine a defendant's contacts with the United States as a whole, as opposed to contacts with a particular state.  The Rule provides that for "a claim that arises under federal law," serving a summons establishes personal jurisdiction if "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction," and "exercising jurisdiction is consistent with the United States Constitution and laws."  Fed. R. Civ. P. 4(k)(2)(A)–(B).  GCC argues that CIMSA cannot invoke Rule 4(k)(2) because the plaintiff has the burden to establish personal jurisdiction and there is no evidence (from CIMSA or otherwise) that GCC is not subject to the jurisdiction of any of the 50 states.

GCC forfeited these Rule 4(k)(2) arguments by failing to raise them in district court.  CIMSA alleged in its petition that GCC's "activities at several jurisdictions within the United States" were sufficient "for specific personal jurisdiction pursuant to Fed. R. Civ. P. 4(k)(2), the federal long arm statute, where, as here, Respondents are not subject to general jurisdiction in any state of the United States."  App. at 133. GCC responded to CIMSA's motion to confirm the arbitration award and simultaneously filed a "cross-motion" to dismiss CIMSA's petition.  *See supra* § I. GCC argued that CIMSA had not shouldered its burden to show "purposeful availment," an injury "arising out of" relevant contacts, and reasonableness for purposes of personal jurisdiction.  *Id.*  GCC did not assert, however, that its nationwide contacts could not or should not be aggregated.

16

Nor did GCC oppose aggregating nationwide contacts in subsequent district court briefs. CIMSA pointed this out in its reply brief in support of the motion to confirm the award:

> Rule 4(k)(2) permits federal courts to aggregate a foreign defendant's nationwide contacts in order to exercise jurisdiction where the defendant's contacts with any individual state are insufficient. In order to establish jurisdiction under Rule 4(k)(2), a plaintiff must show that (1) the claim arises under federal law; (2) the defendant is not subject to the jurisdiction of the courts of general jurisdiction of any state; and (3) the court's exercise of jurisdiction would be consistent with the Constitution and laws of the United States. Respondents do not dispute the first two requirements for jurisdiction under Rule 4(k)(2). Rather, Respondents argue that, under the third element, the Court's exercise of jurisdiction would not comport with due process.

App. at 926–27 (citations, internal quotation marks, and indentation omitted). And CIMSA's reply brief was not the last word. GCC filed what it styled as a reply in support of its cross-motion to dismiss. *Id.* at 1046–1123. Once more, GCC said its contacts did not satisfy the requirements of purposeful availment, relatedness, and reasonableness. *Id.* at 1074–93. But GCC never argued before the district court that those contacts could not, or should not, be aggregated under Rule 4(k)(2).

GCC's arguments on appeal challenging the application of Rule 4(k)(2) thus come too late. GCC's decision not to raise those arguments in the district court constitutes a forfeiture, rather than a waiver, and thus is reviewable for plain error. *See Platt v. Winnebago Indus., Inc.*, 960 F.3d 1264, 1273 (10th Cir. 2020) (explaining that a waiver requires intentional relinquishment or abandonment, whereas a forfeiture arises through mere neglect). Nevertheless, "[i]n order to avoid a waiver on appeal, a party is required to identify plain error as the standard of

17

review in their opening brief and to provide a defense of that standard's application."
*Id.*; *see also McKissick v. Yuen*, 618 F.3d 1177, 1189 (10th Cir. 2010) ("A party
cannot count on us to pick out, argue for, and apply a standard of review for it on our
own initiative, without the benefit of the adversarial process, and without any
opportunity for the adversely affected party to be heard on the question.").  This
principle applies here, as GCC did not discuss the plain error factors in its opening
appellate brief.  *See, e.g.*, *Benham v. Ozark Materials River Rock, LLC*, 885 F.3d
1267, 1276–77 (10th Cir. 2018) (converting a forfeiture to a waiver in the absence of
an argument for plain error).

It is true that "[t]his forfeiture rule does not apply when the district court
explicitly considers and resolves an issue of law on the merits.  In that circumstance,
the appellant may challenge that ruling on appeal on the ground addressed by the
district court even if he failed to raise the issue in the district court."  *Tesone v.
Empire Mkt'g Strategies*, 942 F.3d 979, 991–92 (10th Cir. 2019) (citation and
internal quotation marks omitted).  In a footnote, the district court in this case cited
authority for the proposition that GCC did not shoulder its burden to "name some
other state in which the suit could proceed" under Rule 4(k)(2).  App. at 1133 n.4.
But the district court made that observation only after confirming that GCC "d[id]
not dispute" CIMSA's contention that GCC was not subject to jurisdiction in any
state.  *Id.*  The district court therefore focused on the arguments GCC did make, i.e.,
"whether the Court's exercise of personal jurisdiction would comport with due
process."  *Id.*  GCC does not assert on appeal that the forfeiture rule is inapplicable

because the district court ruled on Rule 4(k)(2)'s "no state" requirement.  Even if GCC had made such an argument, the facts in this case are unique—the district court addressed the "no state" issue only in passing and in dicta.  *Cf. Tesone*, 942 F.3d at 992 (stating that a district court "passes upon" an issue "when it applies the relevant law to the relevant facts") (citation and internal quotation marks omitted).

Even assuming *arguendo* that the issue was properly preserved, we find GCC's Rule 4(k)(2) arguments unpersuasive.  The First Circuit was the first circuit court to address how burdens of proof should be allocated under Rule 4(k)(2).  That court held a plaintiff seeking to invoke 4(k)(2) must "make a prima facie case for the applicability of the rule," including a certification "based on the information that is readily available to the plaintiff and his counsel" that "the defendant is not subject to suit in the courts of general jurisdiction of any state."  *United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 41 (1st Cir. 1999).  The Fourth Circuit has cited *Swiss Am. Bank* with approval, albeit without extensive analysis.  *E.g.*, *Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory"*, 283 F.3d 208, 215 (4th Cir. 2002). Every other circuit court to consider the issue has placed the initial burden on the defendant to identify a state in which the lawsuit could proceed.  *E.g.*, *Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1413–15 (Fed. Cir. 2009); *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1218 n.22 (11th Cir. 2009); *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 461–62 (9th Cir. 2007); *Mwani v. Bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005); *Adams v. Unione Mediterranea Di Sicurta*,

364 F.3d 646, 650–51 (5th Cir. 2004); *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*,

256 F.3d 548, 551–52 (7th Cir. 2001).

    The rationale for the majority rule was articulated by the Seventh Circuit in

*ISI*. That court explained:

> Now one might read Rule 4(k)(2) to make matters worse by requiring 51
> constitutional decisions: The court must first determine that the United
> States has power and then ensure that none of the 50 states does so. . . .
> Constitutional analysis for each of the 50 states is eminently avoidable
> by allocating burdens sensibly. A defendant who wants to preclude use
> of Rule 4(k)(2) has only to name some other state in which the suit
> could proceed. Naming a more appropriate state would amount to a
> consent to personal jurisdiction there (personal jurisdiction, unlike
> federal subject-matter jurisdiction, is waivable). If, however, the
> defendant contends that he cannot be sued in the forum state and refuses
> to identify any other where suit is possible, then the federal court is
> entitled to use Rule 4(k)(2).

256 F.3d at 552. Other appellate courts have agreed with this reasoning, often

expressly choosing the Seventh Circuit's approach over the First Circuit's approach.

*See, e.g.*, *Touchcom*, 574 F.3d at 1414–15 (noting the First Circuit's decision in *Swiss*

*Am. Bank* but concluding "the approach articulated by the Seventh Circuit is more in

tune with the purposes behind the enactment of Rule 4(k)(2)"); *Holland*, 485 F.3d at

461–62 (acknowledging *Swiss Am. Bank* but deciding to "join the Fifth, Seventh, and

D.C. Circuits").

    Based on the arguments presented by the parties in this case, we join the

majority. Following the prevailing rule on aggregating contacts under Rule 4(k)(2) is

consistent with this court's unpublished decision in *GCIU*. There, we applied the

Rule after observing the defendants had conceded the plaintiff's claims arose under

20

federal law and "no state court has jurisdiction over them."  700 F. App'x at 867–68.

We cited *Holland* for the proposition that "a defendant who wants to preclude the use

of Rule 4(k)(2) has only to name some other state in which the suit could proceed."

*Id.* at 868; *see also GCIU-Emp'r Ret. Fund v. Coleridge Fine Arts*, 808 F. App'x 655,

661–66 (10th Cir. 2020) (unpublished) (holding, after remanding the case for

additional discovery, that personal jurisdiction was lacking).  Continuing in *GCIU*'s

footsteps, we adopt the approach endorsed by the Fifth, Seventh, Ninth, Eleventh,

District of Columbia, and Federal Circuits.

### B.    GCC's contacts were sufficient to confer jurisdiction

Aside from resisting the application of Rule 4(k)(2), GCC challenges personal

jurisdiction on other grounds.  First, GCC asserts that neither CIMSA's claim to

enforce the arbitration award nor CIMSA's underlying claim arises from GCC's

alleged contacts with the United States.  Second, GCC argues that the exercise of

personal jurisdiction would be inconsistent with traditional notions of fair play and

substantial justice.  We address each argument in turn.

### 1.    CIMSA's injury was "proximately caused" by, and thus arose out of, GCC's contacts

A plaintiff's injury must "arise out of or relate to" the defendant's forum

contacts.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985) (citation

omitted).  "The import of the 'arising out of' analysis is whether the plaintiff can

establish that the claimed injury resulted from the defendant's forum-related

activities."  *Newsome*, 722 F.3d at 1271.  This requirement has been subject to

different interpretations.  "Some courts have interpreted the phrase 'arise out of' as endorsing a theory of 'but-for' causation, while other courts have required proximate cause to support the exercise of personal jurisdiction."  *Dudnikov*, 514 F.3d at 1078 (citations omitted).  But-for causation means "any event in the causal chain leading to the plaintiff's injury is sufficiently related to the claim to support the exercise of specific jurisdiction."  *Id.*  "[C]onsiderably more restrictive" is proximate causation, which turns on "whether any of the defendant's contacts with the forum are relevant to the merits of the plaintiff's claim."  *Id.* (citation omitted).

This court on several occasions has declined to choose between but-for and proximate causation, finding that neither test was outcome determinative given the facts at hand.  *E.g.*, *Newsome*, 722 F.3d at 1270; *Dudnikov*, 514 F.3d at 1079.  Nonetheless, "[i]n contract actions, we have consistently applied the more-restrictive proximate-cause approach," *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1161 n.7 (10th Cir. 2010), and the parties here agree that proximate causation is required.  Consequently, in evaluating the "arising out of" requirement, we must "determine whether a nexus exists" between GCC's "forum-related contacts" and CIMSA's "cause of action."  *Monge*, 701 F.3d at 614 (citation omitted); *see also Bristol-Myers Squibb*, 137 S. Ct. at 1781 (stating that "there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State") (brackets in original, citation and

internal quotation marks omitted).[2]  The "arising out of" requirement is not satisfied when a plaintiff "would have suffered the same injury even if none of the [defendant's forum] contacts had taken place."  *Kuenzle v. HTM Sport-Und Freizeitgerate AG*, 102 F.3d 453, 456–57 (10th Cir. 1996) (brackets in original, citation and internal quotation marks omitted).

We have, however, rejected a "third approach" which veers away from "causation-based principles."  *Dudnikov*, 514 F.3d at 1078.  This third approach "asks whether there is a 'substantial connection' or 'discernible relationship' between the contacts and the suit."  *Id.* (citation omitted).  Put another way, the "substantial connection" test "merely requires the tie between the defendant's contacts and the plaintiff's claim [to be] close enough to make jurisdiction fair and reasonable."  *Emp'rs Mut.*, 618 F.3d at 1160–61 n.6 (brackets in original, citation and internal quotation marks omitted).  Among other things, we have held that "the 'substantial connection' test inappropriately blurs the distinction between specific and general personal jurisdiction."  *Dudnikov*, 514 F.3d at 1078; *see also Emp'rs Mut.*, 618 F.3d at 1161 (confirming that "we have rejected the substantial-connection approach outright").

Although the parties agree that a "proximate cause" test applies, they dispute which contacts are relevant to the analysis.  GCC contends that because the claim at

---

[2] The Supreme Court explained in *Bristol-Myers Squibb* that "since our decision concerns the due process limits on the exercise of specific jurisdiction by a State, we leave open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court."  137 S. Ct. at 1783–84.

this stage is merely to confirm a foreign arbitral award, the only contacts that matter are those relating to the arbitration.  To press this point, GCC argues that the jurisdictional landscape changed with the Supreme Court's decision in *Bristol-Myers Squibb*.  But that case merely applied the principle that there must be "a connection between the forum and the specific claims at issue," holding that personal jurisdiction over a corporate defendant was lacking with respect to nonresident products liability plaintiffs who suffered no harm in, and whose claims were based on conduct outside, the forum.  137 S. Ct. at 1780–83.  The Supreme Court made clear that it resolved the matter using "settled principles" of personal jurisdiction.  *Id.* at 1781, 1783.

Based on the facts and arguments presented here, we conclude that contacts relating to the underlying claim (i.e., the formation and alleged violation of the 2005 Shareholder Agreement) are pertinent.  Consistent with the Due Process Clause, a court may exercise specific personal jurisdiction only if "the litigation results from alleged *injuries*" that arise out of or relate to activities by the defendant which were purposefully directed at the forum.  *Burger King*, 471 U.S. at 472–73 (emphasis added, citations omitted); *accord Newsome*, 722 F.3d at 1269–71.  In a case like this one, this guidance makes more sense—and perhaps only makes sense—if applied with an eye toward the underlying dispute.  Although personal jurisdiction turns on due process principles, rather than the elements of a given claim, an action to confirm or enforce an arbitral award does not involve a conventional "injury."

"Under the New York Convention, a court must 'confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the

24

award specified in the said Convention.'" *CEEG (Shanghai) Solar Sci. & Tech. Co.*

*v. LUMOS LLC*, 829 F.3d 1201, 1206 (10th Cir. 2016) (quoting 9 U.S.C. § 207).  The

New York Convention thus enumerates "specific" and exclusive grounds "on which a

court with secondary jurisdiction may refuse enforcement." *Karaha Bodas Co., LLC*

*v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 287–88

(5th Cir. 2004).  Article V sets forth those seven grounds:

> 1. Recognition and enforcement of the award may be refused, at
> the request of the party against whom it is invoked, only if that party
> furnishes to the competent authority where the recognition and
> enforcement is sought, proof that:

>> (a) The parties to the agreement referred to in article II
>> were, under the law applicable to them, under some incapacity, or
>> the said agreement is not valid under the law to which the parties
>> have subjected it or, failing any indication thereon, under the law
>> of the country where the award was made; or

>> (b) The party against whom the award is invoked was not
>> given proper notice of the appointment of the arbitrator or of the
>> arbitration proceedings or was otherwise unable to present his
>> case; or

>> (c) The award deals with a difference not contemplated by
>> or not falling within the terms of the submission to arbitration, or
>> it contains decisions on matters beyond the scope of the
>> submission to arbitration, provided that, if the decisions on
>> matters submitted to arbitration can be separated from those not
>> so submitted, that part of the award which contains decisions on
>> matters submitted to arbitration may be recognized and enforced;
>> or

>> (d) The composition of the arbitral authority or the arbitral
>> procedure was not in accordance with the agreement of the
>> parties, or, failing such agreement, was not in accordance with
>> the law of the country where the arbitration took place; or

>> (e) The award has not yet become binding on the parties,

or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

(a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

(b) The recognition or enforcement of the award would be contrary to the public policy of that country.

New York Convention, 21 U.S.T. 2157, art. V(1)–(2).

A confirmation action under the New York Convention "is a summary proceeding in nature, which is not intended to involve complex factual determinations, other than a determination of the limited statutory conditions for confirmation or grounds for refusal to confirm." *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007); *accord Argentine Republic v. Nat'l Grid PLC*, 637 F.3d 365, 369 (D.C. Cir. 2011). This more limited focus means that "[t]he party opposing enforcement of an arbitral award has the burden to prove that one of the seven defenses under the New York Convention applies." *Zeiler*, 500 F.3d at 164; *see also CEEG*, 829 F.3d at 1206 ("As the party opposing enforcement of the arbitral award, LUMOS bears the burden of proving that one of the defenses applies."). These substantive and procedural features of an action to confirm an arbitration award support the conclusion that the proper jurisdictional inquiry is whether the beneficiary of an award can show he or she sustained an injury caused by the defendant's forum activities in connection with the claim that led to the arbitration,

26

as opposed to an injury caused by the defendant's forum activities in connection with the arbitration proceeding itself. We therefore agree with CIMSA's suggested approach to the due process analysis, which is not limited to GCC's conduct at the arbitration.

As it is a close question whether CIMSA's underlying claim arose out of GCC's nationwide contacts, it is important that we apply the operative legal standard with precision. The Supreme Court "has not yet explained the scope" of the "arising out of" requirement. *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 318 (3d Cir. 2007); *see also SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 344 (2d Cir. 2018) ("The Supreme Court has yet to address exactly how a defendant's activities must be tied to the forum for a court to properly exercise specific personal jurisdiction over a defendant."). In *Dudnikov*, we cited *O'Connor* when articulating the type of proximate causation required for purposes of personal jurisdiction. *Dudnikov*, 514 F.3d at 1078. *O'Connor* clarified that proximate causation in this context is not necessarily coterminous with proximate causation in the tort context:

> With each purposeful contact by an out-of-state resident, the forum state's laws will extend certain benefits and impose certain obligations. . . . The relatedness requirement's function is to maintain balance in this reciprocal exchange. In order to do so, it must keep the jurisdictional exposure that results from a contact tailored to that contact's accompanying substantive obligations. The causal connection can be somewhat looser than the tort concept of proximate causation, but it must nonetheless be intimate enough to keep the quid pro quo proportional and personal jurisdiction reasonably foreseeable.

496 F.3d at 323 (citations omitted). Other cases similarly suggest that tort-level proximate causation may not always be required. *See SPV Osus*, 882 F.3d at 344

(indicating that proximate cause is required when a defendant "had only limited contacts," but may not be required where the defendant's contacts "are more substantial") (citation omitted); *Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 716 (1st Cir. 1996) ("[W]e intend to emphasize the importance of proximate causation, but to allow a slight loosening of that standard when circumstances dictate. We think such flexibility is necessary in the jurisdictional inquiry; relatedness cannot merely be reduced to one tort concept for all circumstances.").

We agree that the test for proximate causation for purposes of personal jurisdiction may be, in appropriate circumstances, somewhat looser than the tort concept of proximate causation. CIMSA has satisfied that test in this case. GCC met with CIMSA in Miami in 2005 to discuss a potential purchase of shares of SOBOCE. *See supra* § I. After the Miami meeting, GCC and CIMSA consummated the 2005 Shareholder Agreement with a right of first refusal. *Id.* In 2009 and 2010, the parties met multiple times in Miami to discuss how CIMSA would exercise its right of first refusal once GCC indicated it intended to sell its SOBOCE shares. *Id.* The parties then signed the 2010 Shareholder Agreement in Bolivia, but the actions of the Bolivian government prevented the transaction from closing. *Id.* CIMSA proposed new terms in Houston in 2011, which GCC subsequently appeared to accept. *Id.* Using New York counsel and contemplating the application of New York law, the parties began drafting the 2011 Agreement. *Id.* At the eleventh hour, GCC took the position that there was no agreement and CIMSA could not exercise its right of first

28

refusal, a position that was later rejected by arbitrators in Bolivia who awarded CIMSA more than $36 million. *Id.*

GCC's American contacts bear at least some causal relationship with CIMSA's injury, even if CIMSA's loss was not proximately caused in a tort sense by GCC's activities in the United States. CIMSA's injury became manifest when GCC declined to honor the right of first refusal. Although GCC technically rejected CIMSA's offer after the parties met in Houston in 2011 (which came after the parties' meetings in Miami in 2005, 2009, and 2010), those prior meetings contributed to CIMSA's understanding that the parties had agreed on terms for CIMSA to exercise the right of first refusal and purchase GCC's SOBOCE shares. *Id.* Had GCC allegedly not led CIMSA to this belief, GCC's excuse for not honoring the right of first refusal in the 2005 Shareholder Agreement might have carried more weight, and at a minimum the timing and circumstances of the breach could have been different. These contacts in 2005, 2009, 2010, and 2011 are all "relevant to the merits of the plaintiff's claim," *Dudnikov*, 514 F.3d at 1078, thereby satisfying the "arising out of" requirement.

Our holding that CIMSA's harm arises out of GCC's American contacts should not be understood as unduly diluting the proximate causation standard or adopting a "substantial connection" test. As noted, under the but-for test, a plaintiff must show that "any event in the causal chain" leading to injury is "sufficiently related to the claim." *Dudnikov*, 514 F.3d at 1078 (citation omitted). Under the "substantial connection" test, the plaintiff's only obligation is to show some reasonable tie "between the defendant's contacts and the plaintiff's claim." *Emp'rs*

*Mut.*, 618 F.3d at 1160–61 n.6 (citation and internal quotation marks omitted). GCC's contacts not only constitute events in the causal chain leading to CIMSA's financial loss, but also form part of the narrative determining when and how GCC's breach occurred. And because GCC's contacts have causative features, relying on them should not and cannot be interpreted as reviving any "substantial connection" standard.

Likewise, finding some form of proximate causation is not inconsistent with our prior decisions. Previous contract cases that have addressed the "arising out of" element do not necessarily speak to the specific facts now before the court, but several of those earlier decisions deem that element satisfied. *See, e.g., TH Agric. & Nutrition, LLC v. ACE European Grp. Ltd.*, 488 F.3d 1282, 1291–92 (10th Cir. 2007) (finding the "arising out of" requirement satisfied where the defendants' contacts included a denial of insurance coverage under one or more contracts classifying the forum as "covered territory," with at least one allegedly covered claim filed in the forum); *Pro Axess, Inc. v. Orlux Distribution, Inc.*, 428 F.3d 1270, 1278–79 (10th Cir. 2005) (finding the requirement satisfied where the defendant knowingly solicited the plaintiff in the forum, developed and supposedly broke a business agreement with the plaintiff in the forum, and communicated with the plaintiff in the forum); *Benton v. Cameco Corp.*, 375 F.3d 1070, 1076–78 (10th Cir. 2004) (finding the requirement satisfied where the defendant knowingly entered into a contract with a forum resident calling for at least partial performance in the forum, sent employees to the forum to conduct due diligence, and sent correspondence to the forum); *OMI Holdings, Inc. v.*

30

*Royal Ins. Co. of Canada*, 149 F.3d 1086, 1095 (10th Cir. 1998) (finding the requirement satisfied where the defendant issued, but allegedly failed to honor, insurance policies requiring a defense from suit in the forum). We conclude that GCC's contacts in connection with the claim underlying the arbitration satisfy the test for "proximate cause" for purposes of personal jurisdiction.

### 2. Relying on GCC's contacts was consistent with fair play and substantial justice

The next issue is whether the district court's exercise of personal jurisdiction was reasonable. "Even when a defendant has purposefully established minimum contacts with a forum state, 'minimum requirements inherent in the concept of fair play and substantial justice may defeat the reasonableness of jurisdiction.'" *TH*, 488 F.3d at 1292 (quoting *Burger King*, 471 U.S. at 477–78). We consider "(1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies." *OMI*, 149 F.3d at 1095. A defendant must present a "compelling" case that factors like these render jurisdiction unreasonable. *Burger King*, 471 U.S. at 477. The reasonableness inquiry "evokes a sliding scale: the weaker the plaintiff's showing on [minimum contacts], the less a defendant need show in terms of unreasonableness to defeat jurisdiction." *TH*, 488 F.3d at 1292 (brackets in original, citation and internal quotation marks omitted). Still, instances where the exercise of

personal jurisdiction offends fair play and substantial justice are "rare." *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1102 (10th Cir. 2009); *accord Newsome*, 722 F.3d at 1271.

GCC's case for unreasonableness has some traction, but is less than compelling. Even taking into account a sliding scale, CIMSA's demonstration of minimum contacts is not so feeble as to provide a definitive advantage to GCC. CIMSA may only narrowly satisfy the "arising out of" requirement, but there is no bona fide challenge in GCC's opening appellate brief to CIMSA's showing of "purposeful availment." GCC asserts in its appellate reply brief that it did not surrender the debate over purposeful availment, but GCC's point heading in its opening brief only referred to the "arising out of" requirement, with any "purposeful availment" arguments buried at the end of that section (Aplt. Br. at 29–32). That is not enough to preserve the issue. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief."); *Adams-Arapahoe Joint Sch. Dist. No. 28-J v. Cont'l Ins. Co.*, 891 F.2d 772, 776 (10th Cir. 1989) ("An issue not included in either the docketing statement or the statement of issues in the party's initial brief is waived on appeal."). Furthermore, with only one possible exception, each of the five reasonableness factors at best only marginally supports GCC.

The first reasonableness factor recognizes that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal

jurisdiction over national borders." *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 114 (1987); *see also OMI*, 149 F.3d at 1096 (urging "great care and reserve" before exercising personal jurisdiction over a defendant from another country) (citation omitted). GCC's onus associated with litigating an arbitration confirmation action in the United States is real but not crushing. GCC previously traveled to the United States for meetings, has its General Counsel located here, and does hundreds of millions of dollars of business here. *See supra* § I; Supp. App. at 179–81. "[M]odern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engaged in economic activity." *Burger King*, 471 U.S. at 474 (citation omitted). The progression of this case has shown that GCC has the wherewithal to defend itself in an American forum.

As to the second reasonableness factor, "States have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors." *OMI*, 149 F.3d at 1096; *see also id.* (explaining that a state's interest "is also implicated where resolution of the dispute requires a general application of the forum state's law"). CIMSA is not a United States resident, so America's "interests in the dispute" are "considerably diminished." *Asahi*, 480 U.S. at 114. Similarly, the financial harm which prompted CIMSA's arbitration confirmation action involves a Bolivian plaintiff, a Mexican defendant (though with ties to the United States), and a contract governed by Bolivian law. *See supra* § I. Nevertheless, the Supreme Court has declared that the "emphatic federal policy in

favor of arbitral dispute resolution" applies "with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985); *see also Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1514 (10th Cir. 1995) (commenting that the "federal policy favoring arbitration for dispute resolution" is "particularly strong in the context of international transactions") (citations omitted).  Given the New York Convention and its implementation in the United States through the Federal Arbitration Act, America has at least some interest in providing a forum.

The third reasonableness factor "evaluates whether the plaintiff may receive convenient and effective relief in another forum." *TH*, 488 F.3d at 1294.  This factor "may weigh heavily in cases where a Plaintiff's chances of recovery will be greatly diminished by forcing him to litigate in another forum because of that forum's laws or because the burden may be so overwhelming as to practically foreclose pursuit of the lawsuit." *Benton*, 375 F.3d at 1079 (citation omitted).  GCC argues that Mexico can confirm any arbitration award, and it appears Mexico is indeed a signatory to the New York Convention.  *See* New York Arbitration Convention ("NYAC") website, http://www.newyorkconvention.org/countries (last visited July 17, 2020) (indicating that Mexico signed in 1971).  We also recognize that in the context of motions seeking dismissal based on the doctrine of forum non conveniens, courts frequently hold (or affirm, under an abuse of discretion standard) that Mexico is an available and adequate forum.  *E.g., In re Ford Motor Co.*, 591 F.3d 406, 412–13 (5th Cir. 2009); *Loya v. Starwood Hotels & Resorts Worldwide, Inc.*, 583 F.3d 656, 664 (9th

34

Cir. 2009).  The Fifth Circuit, for instance, has held not only that Mexico is adequate in certain circumstances, but also that there is "a nearly airtight presumption" that Mexico is available.  *Saqui v. Pride Cent. Am., LLC*, 595 F.3d 206, 211–13 (5th Cir. 2010).

Yet even if we assume for purposes of argument that Mexico generally is an available and adequate forum, the record shows CIMSA has encountered specific roadblocks in this case.  The district court found that GCC obtained "an *ex parte* order from a Mexican court expressly enjoin[ing] CIMSA from commencing any proceedings to confirm the award in Mexico."  App. at 1142 (brackets and emphasis in original, citation and internal quotation marks omitted).  The district court additionally detected an inability or unwillingness on the part of the Mexican central authority to timely serve GCC with process at the publicized address of GCC's corporate headquarters.  *Id.* at 1143 n.6.  Relief (including an appeal of the *ex parte* order) may be theoretically available in Mexico, but that does not negate the actual, practical difficulties CIMSA has faced.  We make no broad declarations about the competence or good faith of any foreign court, in Mexico or elsewhere.  *Cf. Saqui*, 595 F.3d at 212–13 (concluding that the record was insufficient to establish "corruption" and "long delays" in the Mexican court system).  Instead, we merely conclude that the third reasonableness factor does not favor GCC based on evidence particular to this dispute.[3]

---

[3] GCC hints that Bolivia, too, could confirm any arbitration award.  Because CIMSA has established minimum contacts, however, it is GCC's responsibility to

The fourth reasonableness factor "asks whether the forum state is the most efficient place to litigate the dispute." *TH*, 488 F.3d at 1296 (citation and internal quotation marks omitted). "Key to this inquiry are the location of witnesses, where the wrong underlying the lawsuit occurred, what forum's substantive law governs the case, and whether jurisdiction is necessary to prevent piecemeal litigation." *OMI*, 149 F.3d at 1097 (citations omitted). Neither GCC nor CIMSA contends that the location of witnesses points toward any specific forum. But the underlying controversy is governed by Bolivian law, and it is by no means clear that GCC's breach of the right of first refusal occurred in the United States. *See supra* § I. Moreover, a confirmation proceeding in Mexico would be somewhat more efficient than a confirmation proceeding in the United States. Judicial proceedings concerning the legal validity of the arbitral award are pending in Mexico, so a confirmation action in that country could consolidate at least parts of the litigation. All of this means that the fourth factor is the one most aligned with GCC's position.

The fifth reasonableness factor focuses on "the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction." *Asahi*, 480 U.S. at 115 (emphasis omitted). "Important to this inquiry is the extent to

---

make a compelling case for "unreasonableness." *Burger King*, 471 U.S. at 477. Although it appears that Bolivia signed the New York Convention, *see* NYAC website, http://www.newyorkconvention.org/countries (last visited July 17, 2020) (indicating that Bolivia signed in 1995), GCC has not established that a Bolivian confirmation proceeding would be convenient and effective. In fact, the evidence provided by CIMSA describing Bolivian court developments in this matter suggests the opposite. Hence, on this record, we lack a sufficient basis to construe the third factor in GCC's favor.

which jurisdiction in the forum state interferes with the foreign nation's sovereignty." *OMI*, 149 F.3d at 1098. "Relevant considerations include whether one of the parties is a citizen of a foreign nation, whether the foreign nation's law governs the dispute, and whether the foreign nation's citizen chose to conduct business with a forum resident." *TH*, 488 F.3d at 1297 (citation and internal quotation marks omitted). Here, no party is a citizen of the United States, Bolivian law governs the underlying dispute, and American confirmation might initiate enforcement of an arbitration award that is later invalidated by Bolivian courts. *See supra* § I. These facts point in GCC's direction. Yet the possibility of foreign confirmation of an award that is unenforceable in the home country was contemplated by all signatories to the New York Convention, including Bolivia, thereby reducing the threat of sovereign intrusion. *See infra* § III. And although CIMSA chose to work with a pair of Mexican entities, GCC does a substantial amount of business in the United States (even if that business is largely unconnected to the dispute giving rise to the arbitration), and the parties conducted multiple meetings in America. *See supra* § I. It follows that while GCC's showing on the fifth reasonableness factor is more than colorable, there are countervailing considerations as well.

In sum, GCC's "unreasonableness" arguments are far from frivolous, but they are not so compelling as to overcome CIMSA's demonstration of minimum contacts. *See Emp'rs Mut.*, 618 F.3d at 1164 ("Although certain traditional notions of fair play and substantial justice favored [the defendant], it failed to establish a 'compelling case' that personal jurisdiction would be unreasonable.") (brackets added); *see also*

*Newsome*, 722 F.3d at 1274 ("A handful of considerations favor defendants.  But they have not carried their overall burden of convincing us that [forum] jurisdiction would offend fair play and substantial justice.") (brackets added).  We conclude that the district court's exercise of personal jurisdiction over GCC was consistent with due process.

### C.   CIMSA properly served GCC with process

GCC's final jurisdictional objections relate to service of process.  "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."  *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987).  Service of process notifies a defendant of the commencement of an action against him and "marks the court's assertion of jurisdiction over the lawsuit."  *Okla. Radio Assocs. v. FDIC*, 969 F.2d 940, 943 (10th Cir. 1992).  Stated differently, "service of summons is the procedure by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served."  *Omni*, 484 U.S. at 104 (citation and brackets omitted); *see also BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1556 (2017) ("[A]bsent consent, a basis for service of a summons on the defendant is prerequisite to the exercise of personal jurisdiction.") (brackets added).

Evaluating GCC's challenges requires us to examine the Hague Service Convention.  The purpose of that agreement is to "simplify, standardize, and generally improve the process of serving documents abroad."  *Water Splash, Inc. v. Menon*, 137 S. Ct. 1504, 1507 (2017).  The "primary invention" of the Convention

38

"is that it requires each state to establish a central authority to receive requests for service of other documents from other countries." *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 698–99 (1988) (citing Article 2). "When a central authority receives an appropriate request, it must serve the documents or arrange for their service, and then provide a certificate of service." *Water Splash*, 137 S. Ct. at 1508 (citing Articles 5–6). "A state also may consent to methods of service within its boundaries other than a request to its central authority." *Schlunk*, 486 U.S. at 699 (citing Articles 8–11 and 19). For example, Article 10 says that "[p]rovided the State of destination does not object," the Convention "shall not interfere" with "the freedom to send judicial documents, by postal channels, directly to persons abroad," or with the freedom of certain individuals "to effect service of judicial documents directly" through "judicial officers, officials or other competent persons in the State of destination." 20 U.S.T. 361, art. 10(a)–(c). "[C]ompliance with the Convention is mandatory in all cases to which it applies[.]" *Schlunk*, 486 U.S. at 705 (brackets added).

Both Mexico and the United States are signatories to the Hague Service Convention. *See* Hague Conference on Private International Law ("HCCH") website, https://www.hcch.net/en/instruments/conventions/status-table/?cid=17 (last visited July 17, 2020) (indicating that the treaty entered into force for Mexico in 2000 and the United States in 1969). Mexico has lodged certain objections to alternative forms of service. Continuing with the Article 10 example, Mexico declared in 1999 that "[i]n relation to Article 10, the United Mexican States are opposed to the direct

service of documents through diplomatic or consular agents to persons in Mexican

territory" according to the procedures described in sub-paragraphs (a), (b), and (c),

"unless the Judicial Authority exceptionally grants the simplification different from

the national regulations and provided that such a procedure does not contravene

public law or violate individual guarantees."  HCCH website,

https://www.hcch.net/en/instruments/conventions/status-

table/notifications/?csid=412&disp=resdn (last visited July 17, 2020).[4]  In 2011,

Mexico stated that "[i]n accordance with Article 21, second paragraph, subparagraph

a), Mexico declares that it is opposed to the use in its territory of the methods of

transmission provided for in Article 10."  *Id.*

Evaluating GCC's challenges also requires us to examine Rule 4.  Rule 4(h)

states in part that absent a waiver or federal law to the contrary, a "foreign

corporation" must be served "at a place not within any judicial district of the United

States, in any manner prescribed by Rule 4(f) for serving an individual, except

personal delivery under (f)(2)(C)(i)."  Fed. R. Civ. P. 4(h)(2).  Rule 4(f), in turn,

states as follows:

---

[4] In carrying treaties into effect, the "public acts and proclamations of
[foreign] governments, and those of their publicly recognized agents," are "historical
and notorious facts, of which the court can take regular judicial notice."  *Gross v.
German Found. Indus. Initiative*, 549 F.3d 605, 612 (3d Cir. 2008) (brackets in
original, quoting *United States v. Reynes*, 50 U.S. (9 How.) 127, 147–48 (1850)).
Because the statements of Mexico's position appearing on the Hague Service
Convention website are "not subject to reasonable factual dispute" and "capable of
determination using sources whose accuracy cannot reasonably be questioned," *New
Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 n.22 (10th
Cir. 2009), they are subject to judicial notice.

(f) SERVING AN INDIVIDUAL IN A FOREIGN COUNTRY. Unless federal law provides otherwise, an individual—other than a minor, an incompetent person, or a person whose waiver has been filed—may be served at a place not within any judicial district of the United States:

(1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;

(2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:

(A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;

(B) as the foreign authority directs in response to a letter rogatory or letter of request; or

(C) unless prohibited by the foreign country's law, by:

(i) delivering a copy of the summons and of the complaint to the individual personally; or

(ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or

(3) by other means not prohibited by international agreement, as the court orders.

Fed. R. Civ. P. 4(f)(1)–(3).

GCC contends that in light of Mexico's objections, the Hague Service Convention does not authorize service methods beyond the use of that country's central authority. But the relevant inquiry under Rule 4(f)(3) is not whether the agreement affirmatively endorses service outside the central authority. *Cf.* Fed. R. Civ. P. 4(f)(1) (contemplating "any internationally agreed means" of service under

the Hague Service Convention).  It is whether the alternative service method in

question is "prohibited" by the agreement.  Fed. R. Civ. P. 4(f)(3).  The district court

approved service on GCC's American counsel because the Mexican central authority

did not or would not serve GCC, despite a well-known headquarters address.  *See*

*supra* § I; App. at 1143 n.6.  Several tribunals have held—Article 10 objections

notwithstanding—that the Convention does not contain a specific prohibition on this

form of service.  *See, e.g., SEC v. de Nicolas Gutierrez*, No. 17cv2086-JAH (JLB),

2020 WL 1307143, at *3 (S.D. Cal. Mar. 19, 2020) (holding that service on

American counsel is permissible "even taking into account Mexico's objection to

certain articles of the Hague Convention," including Article 10); *FTC v. Repair All*

*PC, LLC*, No. 1:17 CV 869, 2017 WL 2362946, at *3–4 (N.D. Ohio May 31, 2017)

(remarking that "[t]here are numerous cases where courts have permitted service

through U.S. counsel despite the foreign signatory's objection to Article 10 of the

Hague Convention," and upholding such service even though "India has objected to

Article 10"); *Carrico v. Samsung Elecs. Co., Ltd.*, No. 15-cv-02087-DMR, 2016 WL

2654392, at *4 (N.D. Cal. May 10, 2016) (holding that "[n]othing in the Hague

Convention bars Plaintiffs' requested service on Park through her attorney," despite

the Republic of Korea's objections to various articles); *In re Cathode Ray Tube*

*(CRT) Antitrust Litig.*, 27 F. Supp. 3d 1002, 1010 (N.D. Cal. 2014) (holding, despite

China's objection to Article 10, that the Convention "does not prohibit" service on

United States counsel, "a common method of service under Rule 4(f)(3)"); *RSM*

*Prod. Corp. v. Fridman*, No. 06 Civ. 11512(DLC), 2007 WL 2295907, at *4

(S.D.N.Y. Aug. 10, 2007) (determining that the Convention was inapplicable, but even so, "the Russian Federation's objections to Articles 8 and 10 do not prohibit" service through an American attorney).  In short, "numerous courts have authorized alternative service under Rule 4(f)(3)," including "[s]ervice upon a foreign defendant's United States-based counsel," in cases involving countries that "have objected to the alternative forms of service permitted under Article 10 of the Hague Convention."  *Richmond Techs., Inc. v. Aumtech Bus. Sols.*, No. 11-CV-02460-LHK, 2011 WL 2607158, at *11–13 (N.D. Cal. July 1, 2011).[5]  We therefore decline to embrace GCC's complaint based on the Convention.

GCC additionally asserts that service on United States counsel is foreclosed by the text of Rule 4(f), which envisions service "at a place not within any judicial district of the United States[.]"  Here too, however, courts have held that the "proper construction" of Rule 4(f)(3) vis-à-vis a foreign defendant includes service via "delivery to the defendant's attorney."  *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1016 (9th Cir. 2002); *see also Marks Law Offices, LLC v. Mireskandari*, 704 F. App'x 171, 177 (3d Cir. 2017) (unpublished) (citing *Rio Props.* for the same point); *Freedom Watch, Inc. v. Org. of the Petroleum Exporting Countries (OPEC)*,

---

[5] The parties have not briefed whether an objection to Article 10 of the Hague Service Convention prohibits service by email.  We express no view on that issue. Nor have the parties briefed whether service on GCC's American counsel was "reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). We likewise save that topic for another day.

766 F.3d 74, 83 (D.C. Cir. 2014) ("A number of courts thus have sanctioned service on United States counsel as an alternative means of service under Rule 4(f)(3) without requiring any specific authorization by the defendant for the recipient to accept service on its behalf."); *Nuance Commc'ns, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1239–40 (Fed. Cir. 2010) (indicating that service may be made under Rule 4(f)(3) "on Defendants' domestic subsidiaries or domestic counsel").  Among the theories supporting this view is that "court orders generally crafted under Rule 4(f)(3) require transmission of service papers to a foreign defendant via a domestic conduit like a law firm or agent—ultimately, the foreign individual is served and thereby provided notice outside a United States judicial district, in accordance with Rule 4's plain language."  *Cathode Ray Tube*, 27 F. Supp. 3d at 1010; *see also Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Aerohotelco, C.A.*, 168 F. Supp. 3d 1, 14 (D.D.C. 2016) ("This Court disagrees with the defendants' cramped interpretation of Rule 4(f) and instead holds that permitting service of a foreign individual or corporation through retained United States counsel does not run afoul of the rule's application to individuals and corporations located in foreign countries, where service will be completed.").  We thus decline to adopt GCC's complaint based on Rule 4(f)(3) as well.

### III.   The district court did not err in confirming the arbitration tribunal's decisions

As described *supra* in § II.B.1, a district court must confirm a foreign arbitration award under the New York Convention unless the party opposing

confirmation makes a specified showing.  The New York Convention states in Article

V that "[r]ecognition and enforcement of the award may be refused, at the request of

the party against whom it is invoked, only if that party furnishes to the competent

authority where the recognition and enforcement is sought, proof" of an enumerated

defense.  21 U.S.T. 2157, art. V(1).  Courts construe Article V defenses "narrowly,"

to "encourage recognition and enforcement of commercial arbitration agreements in

international contracts."  *OJSC Ukrnafta v. Carpatsky Petroleum Corp.*, 957 F.3d

487, 497 (5th Cir. 2020) (citations and internal quotation marks omitted); *see also*

*Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v.*

*Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1096 (9th Cir. 2011) ("These defenses are

construed narrowly, and the party opposing recognition or enforcement bears the

burden of establishing that a defense applies.").  One such defense is that "[t]he

award has not yet become binding on the parties, or has been set aside or suspended

by a competent authority of the country in which, or under the law of which, that

award was made."  New York Convention, 21 U.S.T. 2157, art. V(1)(e).

Relying on this portion of Article V, GCC argues that the district court should

not have confirmed CIMSA's arbitration award for two reasons.  First, GCC contends

that the award on the merits has been set aside or suspended by a competent Bolivian

authority.  Second, GCC maintains that the damages award is not binding because

GCC is in the process of challenging it in a Bolivian court.  "We review a district

court's legal interpretations of the New York Convention as well as its contract

interpretation *de novo*; findings of fact are reviewed for clear error."  *VRG Linhas*

*Aeras S.A. v. MatlinPatterson Global Opportunities Partners II L.P.*, 717 F.3d 322, 325 (2d Cir. 2013).  If an interpretation of Bolivian law is required, "the court's determination of an issue of foreign law is to be treated as a ruling on a question of 'law,' not 'fact,' so that appellate review will not be narrowly confined to the 'clearly erroneous' standard of Rule 52(a)."  Advisory committee's note to 1966 adoption of Fed. R. Civ. P. 44.1; *see also Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1873 (2018) (reasoning that under Rule 44.1 "a federal court should carefully consider a foreign state's views about the meaning of its own laws," but "the appropriate weight in each case will depend upon the circumstances").

Whether the arbitration tribunal's award on the merits has been set aside or suspended is a knotty issue.  Not surprisingly, the parties cite almost no American case law to support their positions.  That is because the validity of the merits award turns on whether various procedural maneuvers in, and substantive rulings of, Bolivian courts were proper.  And Bolivian judicial proceedings on the merits award did not follow an entirely familiar pattern.  In some ways, the proceedings resembled an American interlocutory appeal in which trial court litigation is not stayed.  In other ways, they did not.

Although our review of foreign law is de novo, the district court's opinion is instructive.  That court concluded the merits award had not been set aside for several reasons.  First, the district court reasoned that once the PCT in March 2016 reversed the Guarantee Court's decision on GCC's *amparo* against the Eighth Judge, none of the orders that arose out of the simultaneous remand (and which appeared to sustain

the Ninth Judge Decision) had any legal effect.  App. at 1251–54; *see also id.* at 1252

(stating that because the March 2016 PCT order "revoked the legal basis for the

Ninth Judge Decision, the Ninth Judge Decision cannot be reasonably understood to

supersede the Eighth Judge Decision"); *id.* at 1254 (rejecting, with respect to the

November 2016 PCT order, GCC's request to "view the Ninth Judge Decision in a

vacuum and ignore the significance of" the March 2016 PCT order).  Second, the

district court determined that the January 2017 PCT order, despite referring to the

"subsistence" of the Ninth Judge Decision, served a limited procedural purpose "and

could not have given substantive validity to the Ninth Judge Decision after it had

been rendered a nullity" by the March 2016 PCT order.  *Id.* at 1254–55; *see also id.*

at 1254 (noting that GCC sought, but did not receive, a statement in the January 2017

PCT order that "the Ninth Judge Decision was valid and in effect" notwithstanding

the March 2016 PCT order).  Third, the district court observed that "[t]he expert

reports make clear" the President of the PCT had "no legal authority to unilaterally

issue" his November 2016 decree.  *Id.* at 1255; *see also id.* (referencing the "three

types of decisions" the PCT is authorized to make under Bolivian law).

        After independently reviewing the record, we agree with the district court's

analysis.  We recognize that the district court's ruling and our ruling insinuate that

the November 2016 PCT order, the November 2016 PCT Presidential decree, and the

January 2017 PCT order were improvidently issued and/or do not mean that the Ninth

Judge Decision remains in effect, even though that is what each order or decree

arguably states or implies.  No party, however, fits together all of the pieces of the

puzzle.  In other words, no party provides an explanation which renders consistent

and logical all of the twists, turns, and orders in the Bolivian proceedings, at least by

standards recognizable to American jurists and litigants.  So while CIMSA's

interpretation may not be seamless, we are convinced there *is* no perfect explanation

of what has happened in Bolivia, and CIMSA's construction is more defensible than

the alternative.

A more detailed examination of the evidence and authorities proffered by

CIMSA bears this out.  Those materials indicate that GCC sought to annul the merits

award.  App. at 180–81, 381–82.  The Eighth Judge denied the request.  *Id.* at 181–

82, 382–83.  GCC had no right to appeal that decision.  *Id.* at 182–83, 383.  GCC's

only option was to pursue the "extraordinary remedy" of an *amparo*, which is what

GCC did, asserting that the Eighth Judge failed to sufficiently explain her reasoning.

*Id.* at 182–83, 383–84.  A Guarantee Court agreed with GCC, temporarily revoked

the Eighth Judge Decision, and remanded the case to the Eighth Judge to issue a new

ruling.  *Id.* at 183–84, 384–86.  However, the validity of the Guarantee Court's

actions was contingent upon further review by the PCT.  *Id.* at 184–85, 384–86.  In a

March 2016 order, the PCT reversed the Guarantee Court, holding that the Eighth

Judge had acted properly.  *Id.* at 191–92, 387–88, 873–74.

In the interim, the Ninth Judge entered the picture.  Instead of promptly

remanding the matter to the Eighth Judge for a new decision, the Guarantee Court

held on to the case for nearly two months, sending it back when the Eighth Judge was

on vacation.  *Id.* at 185, 390.  That resulted in the matter being routed to a substitute

judge—the Ninth Judge—who faced a disqualification request from CIMSA and had only approximately a week to review the voluminous record; the Ninth Judge granted GCC's annulment request the day before the Eighth Judge returned from vacation, despite the fact that substitute judges typically do not issue substantive final judgments. *Id.* at 185–86, 390–92, 899–902.  CIMSA filed an *amparo* against the Ninth Judge, which a Guarantee Court granted in February 2016. *Id.* at 189–90, 396–97.  That led to the case being remanded to the Eighth Judge, with the validity of the actions of the Guarantee Court again being contingent on PCT review. *Id.* at 190.

As indicated, though, roughly a month later, the PCT in GCC's original *amparo* concluded there was no basis to challenge the Eighth Judge's actions in the first place. *Id.* at 191–92, 387–88, 873–74.  That effectively reinstated the merits award as a final and binding judgment. *Id.* at 192, 388–90.  Once CIMSA found out about this PCT order, CIMSA reasonably concluded that the reinstatement of the Eighth Judge Decision and the merits award rendered superfluous a separate attack on the Ninth Judge's rulings. *Id.* at 191–92, 871.  In the words of one of CIMSA's experts, the Ninth Judge Decision had "no legal effect" and was "rendered void" by the March 2016 PCT order, which "revoked the only legal authority for a new decision on GCC's request for annulment." *Id.* at 393; *accord id.* at 393–96, 399–400, 869–70, 876–79.  CIMSA consequently withdrew its *amparo* against the Ninth Judge. *Id.* at 192, 397–98.  Even with the withdrawal, a PCT ruled on CIMSA's *amparo* anyway, issuing an order that was backdated almost six months. *Id.* at 192–93, 398–99.

This prompted GCC to file (without notice to CIMSA) requests for "clarification." *Id.* at 193, 401, 406–07. GCC's clarification requests produced a decree from the President of the PCT regarding GCC's *amparo* and a January 2017 PCT order regarding CIMSA's *amparo* (both of which were issued without notice to CIMSA). *Id.* at 193–94, 402. The presidential decree used language that is difficult to understand, and in any event, the President lacked authority under Bolivian law to issue the order. *Id.* at 195–96, 402–06, 873, 879–80. The President was also one of the signatories of the January 2017 PCT order, which (like the November 2016 PCT order) did not and could not overturn the March 2016 PCT order finalizing the merits award and rejecting GCC's challenge to the Eighth Judge. *Id.* at 196–97, 407–10, 870–71, 880–86. Accordingly, we conclude that the merits award has not been set aside or suspended for purposes of the New York Convention.

We also reject GCC's argument that the arbitration tribunal's damages award is not binding because annulment proceedings are pending in Bolivian courts. A court action in the country where the arbitration took place does not create a defense to confirmation. American judges hold—virtually unanimously—that under the New York Convention "[a]n arbitration award becomes binding when no further recourse may be had to *another arbitral tribunal* (that is, an appeals tribunal)." *Ministry*, 665 F.3d at 1100–01 (emphasis added, citation and internal quotation marks omitted). American judges further hold that "[u]nder the [New York] Convention, a court maintains the discretion to enforce an arbitral award even when nullification proceedings are occurring in the country where the award was rendered." *Karaha*

*Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335

F.3d 357, 367 (5th Cir. 2003) (brackets added).[6]

The rationale for this rule is straightforward.  "When the [New York]

Convention was drafted, one of its main purposes was to facilitate the enforcement of

arbitration awards by enabling parties to enforce them in third countries without first

having to obtain either confirmation of such awards or leave to enforce them from a

court in the country of the arbitral situs."  *Id.* at 366–67 (brackets added).  "By

allowing concurrent enforcement and annulment actions, as well as simultaneous

enforcement actions in third countries, the [New York] Convention necessarily

envisions multiple proceedings that address the same substantive challenges to an

arbitral award."  *Id.* at 367 (brackets added); *see also Ingaseosas Int'l Co. v.

Aconcagua Investing Ltd.*, 479 F. App'x 955, 961 (11th Cir. 2012) (unpublished) ("It

is true that the [New York] Convention envisions multiple proceedings that address

---

[6] For additional examples of cases holding that the exhaustion of arbitration
proceedings makes an award "binding," see *Aperture Software GmbH v. Avocent
Huntsville Corp.*, No. 5:14-cv-00211-JHE, 2015 WL 12838967, at *2 (N.D. Ala. Jan.
5, 2015); *Boeing Co. v. KB Yuzhnoye*, No. CV 13-730 ABC (AJWx), 2013 WL
12131183, at *6 (C.D. Cal. Dec. 18, 2013); *Jorf Lasfar Energy Co., S.C.A. v. AMCI
Export Corp.*, No. Civ. A. 05-0423, 2006 WL 1228930, at *4 (W.D. Pa. May 5,
2006); *Ukrvneshprom State Foreign Econ. Enter. v. Tradeway, Inc.*, No. 95 Civ.
10278 (RPP), 1996 WL 107285, at *4 (S.D.N.Y. Mar. 12, 1996); and *Fertilizer Corp.
of India v. IDI Mgmt., Inc.*, 517 F. Supp. 948, 957–58 (S.D. Ohio 1981).  For more
examples of cases holding that enforcement may proceed despite pending judicial
proceedings in the country where the arbitration occurred, see *Fakhri v. Marriot Int'l
Hotels, Inc.*, 201 F. Supp. 3d 696, 711 n.11 (D. Md. 2016); *OJSC Ukrnafta v.
Carpatsky Petroleum Corp.*, No. Civ. A. H-09-891, 2011 WL 13131147, at *3 (S.D.
Tex. Oct. 12, 2011); *Jorf Lasfar*, 2006 WL 1228930, at *4; and *Alto Mar Girassol v.
Lumbermens Mut. Cas. Co.*, No. 04 C 7731, 2005 WL 947126, at *4 (N.D. Ill. Apr.
12, 2005).

the same substantive challenges to an arbitral award.") (citation and internal

quotation marks omitted, brackets added).

New York Convention provisions anticipate the possibility of a party seeking

confirmation in one country even though nullification proceedings are underway in

another.  The New York Convention states:

> If an application for the setting aside or suspension of the award has
> been made to a competent authority referred to in article V(1)(e), the
> authority before which the award is sought to be relied upon may, if it
> considers it proper, adjourn the decision on the enforcement of the
> award and may also, on the application of the party claiming
> enforcement of the award, order the other party to give suitable security.

21 U.S.T. 2157, art. VI.  American judges recognize that "a district court faced with a

decision whether to adjourn arbitral enforcement proceedings to await the outcome of

foreign proceedings must take into account the inherent tension between competing

concerns."  *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 317 (2d

Cir. 1998).  Factors relevant to the adjournment analysis include, without limitation,

(1) the general objective of the arbitration; (2) the status of the foreign proceedings

and the estimated time for those proceedings to be resolved; (3) the level of scrutiny

and the standard of review in the foreign proceedings; (4) other characteristics of the

foreign proceedings; and (5) the balance of possible hardships to each of the parties.

*Id.* at 317–18.

GCC elides the distinction between an arbitration and a subsequent judicial

challenge by attempting to portray the issue as whether the law of the country where

the arbitration took place determines whether an award is binding.  The pivotal

inquiry under any forum's law is whether the arbitration proceedings have

sufficiently run their course, not whether post-arbitration judicial proceedings are

available.  Courts typically look to the parties' arbitration agreement, the rules

governing the arbitration, and other forum laws to decide whether an award is

binding.  *See, e.g., Aperture*, 2015 WL 12838967, at *3 (relying on the parties'

contract and arbitration rules); *Fertilizer Corp.*, 517 F. Supp. at 956–58 (relying on

the parties' contract, arbitration rules, and the law of the forum).  That is logical,

because the parties are free to agree on the terms and conditions of their arbitration,

as permitted by law.  Looking to the rules of the forum in this context is quite

different from looking to the law of the forum with respect to judicial nullification

options.

      *Diag Human S.E. v. Czech Republic—Ministry of Health*, 907 F.3d 606 (D.C.

Cir. 2018), illustrates the point.  In that case, the D.C. Circuit affirmed a district

court's ruling that an arbitration award was not binding under the New York

Convention.  *Id.* at 607–12.  The D.C. Circuit recognized that the parties, as

permitted by "Czech arbitration law," agreed to "a review process in which a second

arbitration panel can revisit the original award with the power to uphold, nullify, or

modify it."  *Id.* at 608.  Citing cases like *Ministry*, 665 F.3d at 1100–01, and

*Fertilizer Corp.*, 517 F. Supp. at 958, the D.C. Circuit found not only that "the parties

had recourse to another arbitration panel, which was sufficient to prevent the award

from becoming binding at that time," but also that the second panel had "invalidated"

the award.  *Diag*, 907 F.3d at 609.  The D.C. Circuit observed that "[w]hen the

binding status of an award is in doubt under Article V(1)(e) of the New York Convention, the court may look to the law of the rendering jurisdiction, though litigation of that issue is rare.  This is true particularly when the agreement incorporates local arbitral law, as this agreement did here."  *Id.* at 611 (citing, among other cases, *Aperture*, 2015 WL 12838967, at *2–3).

In the case before us, the parties' agreement demonstrates that the arbitration award became binding upon issuance for purposes of the New York Convention.  The 2005 Shareholder Agreement's "Waiver of Remedies" clause stated that "[a]ny awards or order issued by the Arbitration Court shall be final and of mandatory compliance for the Parties to the Arbitration who expressly waive all actions for annulment, objection, or appeal against the award."  Supp. App. at 2.  The 2005 Shareholder Agreement also specified the use of IACAC arbitration rules, *id.*, which rules provided that "[t]he award shall be made in writing and shall be final and binding on the parties and subject to no appeal."  *See* 22 C.F.R. pt. 194, app. A, art. 29.2 (setting forth the IACAC rules as amended April 1, 2002).  Bolivian law may very well permit a judicial challenge to the damages award.  That does not detract from the "binding" nature of the arbitration under the New York Convention.

## IV.   Conclusion

For the foregoing reasons, we AFFIRM the district court's orders exercising personal jurisdiction over GCC and confirming the arbitration award under the New York Convention.