**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:15-CV-02120

COMPAÑÍA DE INVERSIONES MERCANTILES S.A.,

     Judgment Creditor,

v.

GRUPO CEMENTOS DE CHIHUAHUA, S.A.B. de C.V.,
and GCC LATINOAMÉRICA, S.A. de C.V.,

     Judgment Debtors.

---

**CIMSA'S BRIEF IN OPPOSITION TO GCC'S**
**RULE 60(b) MOTION TO VACATE JUDGMENT**

---

FOX ROTHSCHILD LLP
Marsha M. Piccone
1225 17th Street
Suite 2200
Denver, CO 80202
New York, NY 10178
Tel:  (303) 292-1200
Fax:  (303) 292-1300

CURTIS, MALLET-PREVOST,
  COLT & MOSLE LLP
Eliot Lauer
Gabriel Hertzberg
Sylvi Sareva
101 Park Avenue
New York, NY 10178
Tel.:  (212) 696-6192
Fax:  (212) 697-1559

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

GLOSSARY OF DEFINED TERMS ................................................................................ vii

PRELIMINARY STATEMENT ......................................................................................... 1

PROCEDURAL HISTORY ................................................................................................ 5

FACTUAL BACKGROUND .............................................................................................. 6

      1.  The Proceedings Regarding the Damages Award ...................................... 6

      2.  GCC's Improper Attempts to Overturn the 2016 PCT Judgment................... 9

      3.  The Twelfth Judge Purports to Reinstate Her Prior Annulment Decision................. 11

STANDARD OF REVIEW ............................................................................................... 12

ARGUMENT ..................................................................................................................... 14

I.    Rule 60(b)(5)'s "Based on an Earlier Judgment" Provision Does Not Apply To This Case ......................................................................................................................... 14

II.   The New 2020 Decisions Are Not Entitled to Recognition By This Court ......................... 19

    A.  The 2020 Procedural Order and Twelfth Judge Auto Are Not Entitled  to Comity Because They Violate Basic Principles of *Res Judicata*................................ 21

    B.  This Court Should Not Extend Comity to the Invented Assertion that CIMSA Acted with "Fraud and Deceit" ......................................................................... 24

    C.  The 2020 Procedural Order and Twelfth Judge Auto Represent a Flagrant Departure From Elementary Principles of Bolivian Law .............................. 26

    D.  CIMSA Had No Opportunity to Defend the Accusation of "Fraud" in the 2020 Procedural Order ....................................................................................... 29

    E.  The 2020 Decisions Were Rendered By a Judiciary Suffering From Systemic Corruption and a Pointed Political Bias Against CIMSA ................................ 31

III.  GCC Is Not Entitled To Equitable Relief  Because GCC Has Not Conducted Itself Equitably ......................................................................................................................... 35

CONCLUSION .................................................................................................................. 38

## <u>TABLE OF AUTHORITIES</u>

<span style="font-variant: small-caps">Cases</span>

*Ag Pro, Inc. v. Sakraida*,
 512 F.2d 141 (5th Cir. 1975) , *rev'd on other grounds*, 425 U.S. 273 (1976) ........................ 14

*Anderson Living Tr. v. ConocoPhillips Co.*, LLC,
 952 F. Supp. 2d 979 (D.N.M. 2013)........................................................................................ 37

*Axar Master Fund, Ltd. v. Bedford*,
 806 F. App'x 35 (2d Cir. 2020)............................................................................................... 14

*Baker v. GMC*,
 522 U.S. 222 (1998) ................................................................................................................ 22

*Bank Melli Iran v. Pahlavi*,
 58 F.3d 1406, 1407 (9th Cir. 1995) ........................................................................................ 31

*Bell v. Dillard Dep't Stores*,
 85 F.3d 1451 (10th Cir. 1996) ................................................................................................ 30

*BG Grp. plc v. Republic of Arg.*,
 572 U.S. 25 (2014) .................................................................................................................. 18

*Biodiversity Conservation Alliance v. Jiron*,
 762 F.3d 1036 (10th Cir. 2014)............................................................................................... 36

*Bridgeway Corp. v. Citibank*,
 45 F. Supp. 2d 276, 280 (S.D.N.Y. 1999) .............................................................................. 31

*Briseno v. ConAgra Foods, Inc.*,
 844 F.3d 1121 (9th Cir. 2017) ................................................................................................ 15

*Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*,
 498 U.S. 533 (1991) ................................................................................................................ 15

*Byblos Bank Europe, S.A. v. Sekerbank Turk Anonym Syrketi*,
 885 N.E.2d 191 (N.Y. 2008) ................................................................................................... 23

*Carmen v. Fox Film Corporation*,
 269 F. 928  (2d Cir. 1920), cert. denied, 255 U.S. 569 (1921)................................................ 37

*Cent. Bank, N.A. v. First Interstate Bank, N.A.*,
 511 U.S. 164 (1994) ................................................................................................................ 16

*Cessna Fin. Corp. v. Bielenberg Masonry*,
 715 F.2d 1442 (10th Cir. 1983) .............................................................................................. 13

*Chromalloy Aeroservices v. Arab Republic*,
 939 F. Supp. 907 (D.D.C. 1996).............................................................................................. 21

*Comm'r v. Sunnen*,
 333 U.S. 591 (1948) ................................................................................................................ 22

*Compañía de Inversiones Mercantiles, S.A. v.*
   *Grupo Cementos de Chihuahua, S.A.B. de C.V.*,
   970 F.3d 1269 (10th Cir. 2020) .................................................................... 6

*Corporación Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v.*
   *Pemex-Exploración Y Producción*,
   832 F.3d 92 (2d Cir. 2016) ...................................................................... 21

*Derr v. Swarek*,
   766 F.3d 430 (5th Cir. 2014) .................................................................... 22

*Di Vito v. Fidelity and Deposit Co. of Md.*,
   361 F.2d 936 (7th Cir. 1966) .................................................................... 13

*Eastman Kodak Co. v. Kavlin*,
   978 F. Supp. 1078 (S.D. Fla. 1997) ........................................................ 31

*Elias v. Am. Dental Partners of Cal., Inc.*,
   No. EDCV 11-1565-JST (Ex), 2011 U.S. Dist. LEXIS 157926
   (C.D. Cal. Nov. 28, 2011)........................................................................ 16

*Federated Dep't Stores v. Moitie*,
   452 U.S. 394 (1981) ................................................................................ 22

*Films by Jove, Inc. v. Berov*,
   250 F. Supp. 2d 156 (E.D.N.Y. 2003) .................................................... 27

*Finstuen v. Crutcher*,
   496 F.3d 1139 (10th Cir. 2007) .............................................................. 15

*Fox v. Bank Mandiri*,
   357 B.R. 231 (Bankr. S.D.N.Y. 2006)..................................................... 34

*Hart Steel Co. v. R.R.  Supply Co.*,
   244 U.S. 294 (1917) ................................................................................ 22

*Hilton v. Guyot*,
   159 U.S. 113 (1895) ................................................................ 19, 20, 31, 35

*In re Delfino*,
   351 B.R. 786 (Bankr. S.D. Fla. 2006) .................................................... 36

*Jolen, Inc. v. Kundan Rice Mills, Ltd.*,
   No. 19-cv-1296 (PKC), 2019 U.S. Dist. LEXIS 61774 (S.D.N.Y. Apr. 9, 2019).................... 18

*Jones v. Bock*,
   549 U.S. 199 (2007) ................................................................................ 16

*Jordan v. Paccar, Inc.*,
   No. 95-3478, 1996 U.S. App. LEXIS 25358 (6th Cir. Sept. 17, 1996).................... 15

*Kansas v. Colorado*,
   514 U.S. 673  (1995) ............................................................................... 36

*MacArthur v. San Juan Cty.*,
   497 F.3d 1057 (10th Cir. 2007) .............................................................. 19

*Macias v. N.M. Dep't of Labor*,
　300 F.R.D. 529 (D.N.M. 2014) ........................................................... 13

*Maersk, Inc. v. Neewra, Inc.*,
　No. 05 Civ. 4356 (CM), 2010 U.S. Dist. LEXIS 69862 (S.D.N.Y. July 9, 2010) ................. 35

*Manzanares v. City of Albuquerque*,
　628 F.3d 1237 (10th Cir. 2010) ........................................................... 14

*Maxwell v. Roe*,
　628 F.3d 486 (9th Cir. 2010) ........................................................... 26

*Metlyn Realty Corp. v. Esmark, Inc.*,
　763 F.2d 826 (7th Cir. 1985) ........................................................... 13

*Motorola Credit Corp. v. Uzan*,
　561 F.3d 123 (2d Cir. 2009) ........................................................ 1, 13, 35

*Mulugeta v. Ademachew*,
　407 F. Supp. 3d 569 (E.D. Va. 2019) ................................................. 33, 35

*Navani v. Shahani*,
　496 F.3d 1121, 1131 (10th Cir. 2007) ................................................... 31

*Pelican Prod. Corp. v. Mariano*,
　893 F.2d 1143 (10th Cir. 1990) ........................................................... 13

*Rawson v. Sw. Cardiology Assocs., P.A.*,
　No. CIV 99-379 MV/RLP, 1999 U.S. Dist. LEXIS 24514 (D.N.M. June 23, 1999).............. 13

*Scherk v. Alberto-Culver Co.*,
　417 U.S. 506 (1974) ........................................................... 19

*Servants of the Paraclete v. Does*,
　204 F.3d 1005 (10th Cir. 2000) ........................................................... 36

*Sigma Chi Fraternity v. Regents of Univ. of Colo.*,
　258 F. Supp. 515 (D. Colo. 1966) ........................................................... 30

*Soc'y of Lloyd's v. Reinhart*,
　402 F.3d 982 (10th Cir. 2005) ........................................................... 20

*St. Louis Baptist Temple v. FDIC*,
　605 F.2d 1169 (10th Cir. 1979) ........................................................... 22

*Stokors S.A. v. Morrison*,
　147 F.3d 759 (8th Cir. 1998) ........................................................... 15

*Termorio S.A. E.S.P. v. Electranta S.P.*,
　487 F.3d 928 (D.C. Cir. 2007) ........................................................... 21

*Thai-Lao Lignite Co., Ltd. v. Gov't of the Lao People's Democratic Republic*,
　864 F.3d 172 (2d Cir. 2017) .................................................... 16, 17, 18

*Tolliver v. Northrop Corp.*,
　786 F.2d 316 (7th Cir. 1986) ........................................................... 19

*Townsend v. Burke*,
   334 U.S. 736 (1948) ........................................................................................ 26

*United States v. Shavanaux*,
   647 F.3d 993 (10th Cir. 2011) ........................................................................ 20

*Vreeland v. Zupan*,
   No. 14-cv-02175-PAB, 2019 U.S. Dist. LEXIS 110533 (D. Colo. July 2, 2019).................. 14

*Wells Fargo Bank, N.A. v. Kendrick*,
   Nos. 6:12-bk-16342-ABB, 6:13-ap-00017-ABB, 2013 Bankr. LEXIS 2635 (Bankr.
   M.D. Fla. June 28, 2013), *vacated on other grounds by* No. 6:13-cv-1577-Orl-28,
   2014 U.S. Dist. LEXIS 15047 (M.D. Fla. Feb. 3, 2014) ........................................... 15

*Wilson v. Marchington*,
   127 F.3d 805 (9th Cir. 1997) .......................................................................... 33

*Winfield Assocs., Inc. v. W.L. Stonecipher*,
   429 F.2d 1087 (10th Cir. 1970) ....................................................................... 12

*World Granite & Marble Corp. v. Wil-Freds Constr.*,
   No. 96 C 6441, 1996 U.S. Dist. LEXIS 19737 (N.D. Ill. Nov. 18, 1996)....................... 24, 26

*Zurich N. Am. v. Matrix Serv., Inc.*,
   426 F.3d 1281 (10th Cir. 2005) ....................................................................... 14

S<small>TATUTES</small> & R<small>ULE</small>

42 U.S.C. § 1997e(a)...................................................................................... 16

Article III of the New York Convention............................................................. 17, 18, 19

Article IV of the New York Convention............................................................. 18

Article V of the New York Convention.............................................................. 18

Article V(1)(e) of the New York Convention....................................................... 5

Article VI of the New York Convention............................................................. 5, 6

Convention on the Recognition and Enforcement of Foreign Arbitral Awards
   of June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997 ........................................ passim

F<small>ED</small>. R. C<small>IV</small>. P. 54(a) ........................................................................... 16

Fed. R. Civ. P. 60(b)(5).................................................................................. passim

Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ................................................... 2

S<small>ECONDARY</small> S<small>OURCES</small>

1 B<small>LACK</small>, J<small>UDGMENTS</small> § 271 (2d ed. 1904)....................................................... 22

11 Charles Alan Wright, Arthur R. Miller & M. Kane, F<small>EDERAL</small> P<small>RACTICE</small> &
   P<small>ROCEDURE</small> § 2857, at 326-27 (2d ed. 2012) ................................................ 13

12 M<small>OORE'S</small> F<small>EDERAL</small> P<small>RACTICE</small> - C<small>IVIL</small> § 60.22 (2020)....................................... 13, 35

2 A.C. F<small>REEMAN</small>, A T<small>REATISE OF THE</small> L<small>AW OF</small> J<small>UDGMENTS</small> § 627 (5th ed. 1925) .............. 21

46 Am Jur. 2d Judgments § 1 ................................................................................... 15

Black's Law Dictionary (8th ed. 2004) .................................................................... 15

Black's Law Dictionary 918 (9th ed. 2009) ............................................................. 15

GARY B. BORN, INTERNATIONAL COMMERCIAL ARBITRATION
    (3d. ed. Kluwer Law International 2020) ........................................................... 18

Restatement (Fourth) of Foreign Relations ............................................................. 20

RESTATEMENT (FOURTH) OF FOREIGN RELATIONS § 484 cmt. i (2018) ...................... 31

RESTATEMENT (FOURTH) OF FOREIGN RELATIONS § 484(a) (2018) ........................... 29

RESTATEMENT (FOURTH) OF FOREIGN RELATIONS § 484(g) (2018) ........................... 31

RESTATEMENT (FOURTH) OF FOREIGN RELATIONS §§ 484(h), (c) (2018) ................... 26

Restatement (Fourth) of Foreign Relations, Section 483 ......................................... 20

Restatement (Fourth) of Foreign Relations, Section 484 ......................................... 20

RESTATEMENT (SECOND) OF JUDGMENTS § 17 (1982) .............................................. 22

RESTATEMENT (THIRD) FOREIGN RELATIONS § 482 cmt. b.) ...................................... 34

UNCITRAL Secretariat Guide on the Convention on the Recognition and Enforcement of
    Foreign Arbitral Awards (New York, 1958) (2016 ed.) ..................................... 18

## <u>GLOSSARY OF DEFINED TERMS</u>

**CIAC:** Comisión Interamericana de Arbitraje Comercial, or the Inter-American Commercial Arbitration Commission, the arbitral institution that oversaw the parties' dispute

**Merits Award:** The Final Partial Award on Liability, dated September 13, 2013

**Damages Award:** The Final Award on Damages, dated April 10, 2015

**Procedural Order No. 12:** The Arbitral Tribunal's order dated September 7, 2015, which allowed GCC's request for annulment of the Damages Award to proceed to the Bolivian courts
**Twelfth Judge:** Judge Dr. Erika Valdez Cuba, the Twelfth Judge of the Civil and Commercial Court of the Judicial District of La Paz, the trial judge that presided over GCC's original request for annulment

**Twelfth Judge Decision:** The Twelfth Judge's Decision No. 154/2015, dated October 9, 2015, in which the Twelfth Judge granted GCC's request for annulment of the Damages Award

**Arbitral Amparo:** CIMSA's *amparo* against the Arbitral Tribunal, in which it alleged that the Arbitral Tribunal had violated CIMSA's constitutional rights in issuing Procedural Order No. 12

**Substantive Amparo**: CIMSA's *amparo* against the Twelfth Judge Decision, in which it challenged the constitutionality of the Twelfth Judge's annulment of the Damages Award

**First PCT Order:** The First PCT Chamber's Decision No. 1127/2016-S1, dated November 7, 2016, dismissing the Arbitral Amparo on procedural grounds

**2016 PCT Judgment:** The Third PCT Chamber's Decision No. 1481/2016, dated December 16, 2016, granting the Substantive Amparo, revoking the Twelfth Judge Decision, and ordering the Twelfth Judge to issue a new decision

**2020 Procedural Order:** The Fourth PCT Chamber's Order ACP 0017/2020-O, dated February 18, 2020, purporting to nullify the 2016 PCT Judgment

**Twelfth Judge Auto:** The order issued by the Twelfth Judge on November 5, 2020, purporting to reinstate the Twelfth Judge Decision and sending the case file back to the Arbitral Tribunal to issue a new award on

Judgment Creditor Compañía de Inversiones Mercantiles S.A. ("CIMSA") respectfully submits this memorandum of law in opposition to the motion pursuant to Fed. R. Civ. P. 60(b)(5) to vacate this Court's March 26, 2019 Final Judgment (the "Motion to Vacate" or "Motion"), filed by Judgment Debtors Grupo Cementos de Chihuahua, S.A.B. de C.V. ("Grupo") and GCC Latinoamérica, S.A. de C.V. ("GCC Latinoamérica," and together "GCC") [ECF No. 158].

## PRELIMINARY STATEMENT

Nearly two years ago, this Court confirmed a well-reasoned foreign arbitral award rendered in Bolivia by world-renowned arbitrators in favor of CIMSA, and entered judgment against GCC in the amount of $44,734,314 plus post-judgment interest and costs [ECF No. 94] (the "Judgment"). The Tenth Circuit affirmed the Judgment. GCC, a publicly-traded Mexican corporation that earns nearly a billion dollars per year by selling cement to U.S. customers from facilities located in Colorado, has done nothing in that period to bond or satisfy the Judgment.

Now GCC asks the Court to exercise its discretion to apply the equitable remedy of vacating the Judgment pursuant to Rule 60(b)(5). GCC contends that this extraordinary remedy is appropriate because, after this Court entered the Judgment and the Tenth Circuit affirmed it, a trial court in Bolivia has purportedly set aside the arbitral tribunal's damages determination (the "Damages Award"). But U.S. courts rarely, if ever, grant equitable relief under Rule 60(b) to a defendant that has unjustifiably refused to pay a judgment. *See, e.g.*, *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 128 (2d Cir. 2009) (noting the sheer "chutzpah" required of a judgment debtor to seek post-judgment relief from the same court whose judgment it refused to pay).

GCC's unclean hands aside, nothing in the plain text of Rule 60(b)(5) would permit vacatur in these circumstances. That provision permits a district court to vacate its

judgment where "it is based on an earlier <u>judgment</u> that has been reversed or vacated."  FED. R. CIV. P. 60(b)(5) (emphasis added).  This Court's judgment was not based on any "earlier judgment," *id*., but on an <u>arbitral award</u>.  A judgment is a judicial act by a court; an arbitral award is not a judgment.  The Supreme Court (which promulgates the Federal Rules) and Congress (which passes them into law) know the difference, and they did not include arbitral awards in Rule 60(b)(5).  That plain language reading of the rule is sound for an additional reason: neither the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. ("<u>FAA</u>"), nor the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997 (the "<u>New York Convention</u>") contemplates that an arbitral award can be "un-confirmed" once converted into a judgment.

In addition, the recent Bolivian decisions that GCC relies upon as having set aside the Damages Award are not entitled to recognition in this Court.  In 2016, a three-judge panel of the Plurinational Constitutional Tribunal ("<u>PCT</u>"), the highest court in Bolivia, issued a final judgment (the "<u>2016 PCT Judgement</u>") definitively and conclusively rejecting an earlier trial court decision setting aside the Damages Award, and directed the trial court judge (the "<u>Twelfth Judge</u>") to issue a new decision in accordance with that judgment.  The Twelfth Judge never complied with that mandate.  Now, more than four years later, GCC asks this Court to recognize a procedural order issued by a two-judge panel of the PCT late last year (the "<u>2020 Procedural Order</u>") purporting to nullify the long-standing 2016 PCT Judgment on the ground that CIMSA, in some undefined manner, engaged in "deceit or procedural fraud" in the underlying proceedings.  [ECF No. 158 at 2].  GCC seeks recognition of a new decision by the Twelfth Judge, which purports, based on the 2020 Procedural Order, to reinstate her long-reversed decision.

This house of cards is built on the flimsy charge that CIMSA somehow engaged in fraud in the underlying Bolivian litigation that produced the 2016 PCT Judgment.  One would expect that upon such a serious contention—and one that carries the severe remedy of overturning a *res judicata* judgment from the nation's highest court—the two judges that issued the 2020 Procedural Order would have identified the precise conduct determined to be fraudulent or deceitful; *e.g.*, that CIMSA perhaps misstated some material fact to the court.  And yet, nothing of that kind is identified.

That is because the charge is a complete fabrication.  The two PCT judges incant the words "fraud" and "deceit" as cover for a results-oriented decision that makes no sense under Bolivian law.  (*See* Expert Report of Jorge Asbun dated Jan. 22, 2021 at ¶ 6) ("Asbun").  The Twelfth Judge, who for four years had made no effort to comply with the PCT's mandate directing her to issue a new decision consistent with the 2016 PCT Judgment, seemed to leap within days at an opportunity to reinstate her 2015 decision, even though nothing in the 2020 Procedural Order actually compelled or authorized her to do so.  (Asbun ¶¶ 26-27; *see also* Declaration of Christian Von Borries dated Jan. 21, 2021 at ¶ 40) ("Von Borries").  The whole affair stinks.  It is the product of a broken and corrupt judiciary that is under the vice grip of a newly re-elected political party that is uniquely hostile to CIMSA because of the political activities of its founder and principal, a leader of the pro-democracy opposition movement.  (*See* Expert Report of Eduardo Gamarra dated Jan. 22, 2021 at ¶ 10) ("Gamarra").

Sadly, this is not the first (or even the second) time that GCC comes to this Court seeking relief based on highly suspect circumstances in the Bolivian judiciary.  In 2018, in opposing CIMSA's motion to confirm the award, GCC relied upon the decision of another Bolivian trial court judge, the "Ninth Judge," who purported to set aside the arbitral tribunal's

liability determination (the "<u>Merits Award</u>"), which remains intact.  This Court ruled that the Ninth Judge's decision was not operative under Bolivian law, but noted that, even if it were, the Court "would question the legitimacy of the Ninth Judge Decision given the evidence of potential misconduct" which rendered the decision "suspect." [ECF No. 93 n.9].  GCC also relied on a "decree" issued by the PCT president on his last day in office but backdated by nearly a year (*id.* at 11), which purported to confirm the Ninth Judge decision.  This Court held that "circumstances surrounding the President's Decree…are unusual to say the least" and were so "troubling" that the Court disregarded it entirely.  *Id.* at 19.

      The circumstances surrounding the 2020 Procedural Order are equally troubling. Just as the presidential decree was backdated, the 2020 Procedural Order was notified to the parties on October 31, 2020 but backdated to February 28, 2020.  GCC offers no explanation. The fact is, the presidential elections in Bolivia were held on October 18, 2020, consolidating control of the judiciary by the political party long hostile to CIMSA.  (Gamarra ¶¶ 10, 25).  No major leap is required to discern that the 2020 Procedural Order was the product of bias and corruption and that the backdating of that order was intended to obscure the fact that it was a post-election invention.

      The reasoning of the 2020 Procedural Order—or the absence thereof—further confirms that conclusion.  As explained by Dr. Asbun, the 2020 Procedural Order could not, as a matter of Bolivian law, invalidate the hierarchically higher 2016 PCT Judgment—a ruling that not only conclusively and definitively rejected GCC's efforts to set aside the Damages Award with *res judicata* effect, but also was issued in constitutionally distinct proceedings.  Thus, GCC asks this Court for the extraordinary relief of vacating its own judgment and "un-confirming" the

arbitral award based on a pair of highly suspect and incoherent foreign decisions that, even if assumed to be non-corrupt, would violate basic principles of *res judicata* if recognized.

As this Court correctly observed in denying GCC's motion to stay execution of the Judgment pending this Motion, "[b]oth the Court and the public have a strong interest in the finality of proceedings and the enforcement of judgments." [ECF No. 167 at 3]. Nothing in GCC's meritless Motion overcomes that strong public interest. The Motion should be denied.

## **PROCEDURAL HISTORY**

In September 2013, following an arbitration administered by the Inter-American Commercial Arbitration Commission (the *Comisión Interamericana de Arbitraje Comercial* or "CIAC") a duly constituted panel of three arbitrators (the "Arbitral Tribunal") issued the Merits Award, in which it concluded that GCC was liable for breaching the parties' joint venture agreement. In April 2015, the Arbitral Tribunal issued the Damages Award in favor of CIMSA for $36,139,222.90, plus post-award interest.

In September 2015, CIMSA commenced this action to confirm the Damages Award pursuant to the New York Convention. During the confirmation proceedings, GCC sought to establish a defense to confirmation under Article V(1)(e) of the New York Convention, including that the Damages Award was unenforceable because the underlying Merits Award had been annulled in Bolivia. In the alternative, GCC argued that, pursuant to Article VI of the New York Convention, the Court should stay the action pending resolution of proceedings to annul the Damages Award in Bolivia.

In March 2019, this Court issued an Opinion and Order confirming the Damages Award, notwithstanding the fact that proceedings to annul the Damages Award were still ongoing in Bolivia. [ECF No. 93]. This Court refused to stay confirmation, noting "the amount

of time that ha[d] passed since the arbitration concluded" and observing that "the litigation could go on and on with anyone's guess as to when there would be a truly final resolution of the matter in the Bolivian courts." *Id.* at 28.  The Court further observed that GCC had "wasted no time in filing a series of challenges and subsequent appeals in Bolivian courts when the outcome of the arbitration was unfavorable to them," and "employed unconventional and suspect means to get more favorable decisions from select judges." *Id.* at 32.  The Court then entered the Judgment [ECF No. 94].

GCC appealed to the Tenth Circuit [ECF No. 106].  On appeal, GCC abandoned its request for a stay under Article VI of the New York Convention.  In August 2020, the Tenth Circuit affirmed the Judgment in its entirety.  *See Compañía de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua, S.A.B. de C.V.*, 970 F.3d 1269, 1300 (10th Cir. 2020).  The appellate mandate issued on October 8, 2020 following GCC's failed motion for a stay pending a writ of certiorari.

The following month, on November 20, 2020, GCC filed its Motion to Vacate. GCC argues that the Damages Award has been annulled in Bolivia and "thus there is no longer any arbitral award to enforce and no basis for a judgment to enforce such an award."  (Motion to Vacate at 1).

## **FACTUAL BACKGROUND**

1. ### **The Proceedings Regarding the Damages Award**

In July 2015, GCC sought leave from the Arbitral Tribunal to request annulment of the Damages Award.  The Arbitral Tribunal granted GCC's application ("Procedural Order No. 12"), concluding that GCC had met the *prima facie* requirements for the request to proceed to the Bolivian courts.  In October 2015, the Twelfth Judge (the equivalent of a trial court judge

in Bolivia) issued Decision No. 154/2015 ("the <u>Twelfth Judge Decision</u>") annulling the Damages Award.  (Von Borries ¶ 4).

The Twelfth Judge did not take issue with the amount of damages awarded to CIMSA, but accepted two out of GCC's five proposed grounds for annulment.  Specifically, she concluded that the Arbitral Tribunal had violated GCC's rights by (i) failing to advise the parties that it would consider during the damages phase of the arbitration an e-mail that had been accepted into evidence during the earlier merits phase; and (ii) relying on its "experience" in determining CIMSA's damages.  The Twelfth Judge found that these "breaches" rose to the level of a "denial of due process" and "violation of public order."  (*See* ECF No. 46 at ¶¶ 87, 90; *see also* ECF No. 1-8 at 78 n.232, ¶ 327).  The Twelfth Judge sent the Damages Award back to the Arbitral Tribunal to address the purported "infirmities" in its reasoning.  (Von Borries ¶ 5).

Bolivian law does not permit parties to appeal a trial court decision in an action to set aside an arbitral award, but does recognize a proceeding called an *amparo*, which is not an appeal but an action to redress official conduct that violates a party's basic constitutional rights. (Von Borries ¶ 16).  In October 2015, CIMSA filed an *amparo* against the Arbitral Tribunal (the "<u>Arbitral Amparo</u>") on the ground that the Arbitral Tribunal failed to enforce the parties' express contractual waiver of their right to seek post-arbitral judicial remedies.  (Von Borries ¶ 6).  The Arbitral Amparo was assigned to the Third Civil Chamber of the Departmental Court of Justice of La Paz  (the "<u>Third Civil Chamber</u>").[1]  In January 2016, the Third Civil Chamber issued Resolution No. 01/2016, dismissing the Arbitral Amparo on procedural grounds without reaching the merits.  (Von Borries ¶ 7).

---

[1] The Civil, Criminal, and Administrative Chambers of the Departmental Courts of Justice in each capital serve as the courts of first instance in amparo actions.  When acting in their capacity as *amparo* courts, the chambers are referred to as "Guarantee Courts."  (Von Borries n.2).

Consistent with Bolivian law, Resolution No. 01/2016 was automatically sent to Bolivia's highest court, the PCT, for review.  While it was pending in the PCT, in April 2016, CIMSA filed its second *amparo* in connection with the Damages Award.  This time, CIMSA sought recourse directly against the Twelfth Judge Decision, challenging the substantive basis for the annulment of the Damages Award (the "Substantive Amparo").  (Von Borries ¶ 9).  The Substantive Amparo was assigned to the Second Social Administrative Chamber (the "Second Administrative Chamber").  Although the Second Administrative Chamber initially found that the Substantive Amparo was procedurally inadmissible because the Arbitral Amparo was pending, the PCT ultimately revoked that decision.  The case was then returned to the Second Administrative Chamber to consider the Substantive Amparo on its merits.  In October 2016, the Second Administrative Chamber issued Resolution No. 033/2016, in which it denied CIMSA's Substantive Amparo on the grounds that a decision on the Substantive Amparo could potentially result in conflicting decisions by the PCT, since the original Arbitral Amparo was still pending before the PCT.  Under Bolivian law, that decision was subject to automatic review by the PCT.  (Von Borries ¶ 8).

Then, in November 2016, the First Chamber of the PCT[2] issued a decision in the Arbitral Amparo.  In Decision No. 1127/2016-S1 (the "First PCT Order"), the PCT confirmed the Third Civil Chamber's dismissal of the Arbitral Amparo.  (Von Borries ¶ 8).

Approximately one month later, the PCT ruled on the Substantive Amparo.  In Decision No. 1481/2016, dated December 16, 2016 (the 2016 PCT Judgment), the Third Chamber of the PCT (the "Third PCT Chamber") revoked Resolution No. 033/2016 and vacated the Twelfth Judge Decision, thereby reinstating the Damages Award.  (Von Borries ¶ 13).  The

_____

[2] The PCT is divided into four chambers of three judges in each chamber.

Third PCT Chamber specifically found that there was no risk of inconsistency between the Arbitral Amparo and the Substantive Amparo because the two *amparos* were filed against two different entities, and alleged different constitutional violations.  The PCT rejected the two grounds upon which the Twelfth Judge set aside the Damages Award and ordered the Twelfth Judge to issue a new decision regarding GCC's request for annulment.  (Von Borries ¶ 14).  Under Bolivian law, final decisions or judgments of the PCT, known as *sentencias,* are not subject to modification or further recourse.  They are conclusive as to the specific constitutional allegations at issue in a particular *amparo* proceeding, but—under the "silo" rule—have no legal effect upon parties outside of the silo of that proceeding.  (Asbun ¶ 35).

GCC filed a request for clarification of the 2016 PCT Judgment, again raising the alleged incompatibility between the Arbitral and Substantive Amparos.  In January 2017, the Third PCT Chamber, presiding in the Substantive Amparo proceedings, issued a procedural order, called an *auto,* in which it clarified that there was no risk of conflicting decisions by the PCT in the separate *amparo* proceedings.  (Von Borries ¶ 15).  With that *auto*, the Substantive Amparo concluded and, as a matter of Bolivian law, the 2016 PCT Judgment became "a final decision with binding *res judicata* effect."  (Asbun ¶ 33).  "It [was] not subject to any further appeals or collateral challenges, and by law [could not] be modified by any subsequent decision."  (Asbun ¶ 33).  Accordingly, the Twelfth Judge was constitutionally bound to comply with the PCT's directive to issue a new decision on GCC's request for annulment consistent with the 2016 PCT Judgment.

## 2.  GCC's Improper Attempts to Overturn the 2016 PCT Judgment

Immediately after the case was remanded to the Twelfth Judge, GCC initiated a series of actions before the Twelfth Judge to enable her to resist compliance with the 2016 PCT

Judgment.  (Von Borries ¶¶ 17-20).  For nearly <u>three years</u>, GCC advanced a series of frivolous motions, including a challenge to the constitutionality of the Bolivian arbitral law (which it had already challenged unsuccessfully on two prior occasions) and a motion to have the Twelfth Judge conclude that the litigation over the Damages Award was "moot" as a result of the alleged annulment of the Merits Award by the Ninth Judge.  (Von Borries ¶ 19).  The Twelfth Judge was all too ready to allow GCC to create delay—she even sought to defer the question of the legal status of the Merits Award to CIAC rather than resolve that issue for herself.  (Von Borries ¶ 20).

It was not until 2019—almost immediately after this Court issued its Judgment— that GCC launched the attack on the 2016 PCT Judgment that resulted in the 2020 Procedural Order.  Specifically, GCC filed a new application known as a complaint for non-compliance, or *queja,*[3] with the Third Civil Chamber in the context of the Arbitral Amparo.  GCC repeated its argument that the Substantive Amparo was invalid because it was issued in "breach" of the Arbitral Amparo.  (Von Borries ¶ 28).  In August 2019, the Third Civil Chamber rejected GCC's application, concluding that CIMSA was well within its rights to file the Substantive Amparo, as the PCT had concluded almost three years earlier.  (Von Borries ¶ 30).

GCC then took its *queja* to the PCT, arguing yet again, that CIMSA should not have been permitted to file the Substantive Amparo while the Arbitral Amparo was *sub judice* in the PCT.  (Von Borries ¶ 31).  This time, GCC procured a different result:  on October 31, 2020, CIMSA was notified that, in an *auto* purportedly written eight months earlier, two judges from the Fourth Chamber of the PCT (the "<u>Fourth PCT Chamber</u>") had issued the 2020 Procedural Order.  It states that all "actions undertaken after the issuance of the Resolution [No.] 01/2016

---

[3] A *queja por incumplimiento* is a special mechanism used to compel compliance by officials with existing *amparo* decisions.  (Von Borries ¶ 28).

[*i.e.*, the Third Civil Chamber's decision dismissing the Arbitral Amparo on procedural grounds] …are annulled and not subject to validation." (Von Borries ¶ 32). The Fourth PCT Chamber found that "the object and purpose of both [the Arbitral Amparo and the Substantive Amparo] turned out to be the same," notwithstanding the Third PCT Chamber's 2016 determination that there was "no identity of subject, object and cause between" the two *amparos*. (Von Borries ¶ 34). The Fourth PCT Chamber therefore concluded that "it was not possible to file the [Substantive Amparo] when the [Arbitral Amparo] had not concluded yet," even though the that precise question had already been fully and fairly litigated before the Third PCT Chamber, which reached a contrary conclusion in the 2016 PCT Judgment. (Asbun ¶ 33).

In a transparent attempt to sidestep the *res judicata* issue, the Fourth PCT Chamber asserted that CIMSA had acted with "fraud and deceit" by filing the Substantive Amparo prior to the conclusion of the proceedings on the Arbitral Amparo, and that the 2016 PCT Judgment was the result of such "fraudulent" actions. (Von Borries ¶ 35). The Fourth PCT Chamber provides no support for its finding of fraud, noting only that CIMSA filed the Substantive Amparo while the Arbitral Amparo was pending. But, as noted above, the impact of the Arbitral Amparo on the validity of the Substantive Amparo was litigated at every juncture during the proceedings on the Substantive Amparo, and no court suggested that there was something "fraudulent" about filing the Substantive Amparo. (Von Borries ¶ 37; Asbun ¶ 25).

3.     **The Twelfth Judge Purports to Reinstate Her Prior Annulment Decision**

On November 5, 2020, the Twelfth Judge, purportedly in "compliance" with the PCT's 2020 Procedural Order, and in response to an *ex parte* motion by GCC, issued a new *auto* (the "Twelfth Judge Auto") in which she reinstated her 2015 decision setting aside the Damages

Award.  Her decision states that she was sending the case file back to the Arbitral Tribunal to issue a new damages award.  (Von Borries ¶ 40).

On November 10, 2020, CIMSA sought reconsideration and/or an appeal from the Twelfth Judge Auto.  CIMSA argued that, *inter alia,* the Twelfth Judge was constitutionally obligated to comply with the 2016 PCT Judgment and had no authority to act on the basis of any "orders" arising out of the separate and constitutionally distinct Arbitral Amparo proceedings, to which she was not a party.  CIMSA also argued that the 2020 Procedural Order could not invalidate the 2016 PCT Judgment as a matter of Bolivian law.  (Von Borries ¶ 42).

The Twelfth Judge rejected CIMSA's motion in a one-page decision dated November 13, 2020.  She stated that she was merely "complying" with the PCT's 2020 Procedural Order, without addressing any of CIMSA's arguments.  In her view, the 2020 Procedural Order reinstated her original decision regarding GCC's request for annulment.  She denied CIMSA leave to appeal on the ground that Bolivian arbitration law does not permit parties to appeal from decisions on requests for annulment.  (Von Borries ¶ 44).

On November 23, 2020, CIMSA filed an application known as a *compulsa* to challenge the Twelfth Judge's denial of its right to appeal.[4]  By decision dated December 18, 2020, an appeals court rejected CIMSA's *compulsa*, relying exclusively on the Bolivian arbitration law principle that a decision on a request for annulment is not subject to appeal.  (Von Borries ¶ 46).

## STANDARD OF REVIEW

Relief under Rule 60(b) is equitable in nature.  *See Winfield Assocs., Inc. v. W.L. Stonecipher*, 429 F.2d 1087, 1090 (10th Cir. 1970); *Di Vito v. Fidelity and Deposit Co. of Md.*,

---

[4] A *compulsa* is challenge against an undue dismissal of an appeal.  (Von Borries n.10).

361 F.2d 936, 939 (7th Cir. 1966) ("Rule 60(b) is equitable in character and to be administered upon equitable principles"). Thus, a court "may always consider whether the moving party has acted equitably," and "[r]elief from a judgment may be inappropriate . . . if circumstances are such that setting it aside would cause prejudice to a party." 12 MOORE'S FEDERAL PRACTICE - CIVIL § 60.22 (2020); *see also Motorola Credit*, 561 F.3d at 128 (holding that the "clean hands doctrine" precludes Rule 60(b) relief for a judgment debtor that has refused to comply with the judgment).

Rule 60(b) does not require any action by the court, nor does it guarantee any relief to the moving party. Rather, the decision of whether to grant relief is committed to the sound discretion of the court. *See Pelican Prod. Corp. v. Mariano*, 893 F.2d 1143, 1145-46 (10th Cir. 1990) ("A district court has substantial discretion in connection with a Rule 60(b) motion."); *Rawson v. Sw. Cardiology Assocs., P.A.*, No. CIV 99-379 MV/RLP, 1999 U.S. Dist. LEXIS 24514, at *4 (D.N.M. June 23, 1999) ("District courts have wide latitude in denying motions under Rule 60(b).").

In exercising that discretion, courts seek "to strike a 'delicate balance' between respecting the finality of judgments" and "recognizing the court's principal interest of executing justice." *Macias v. N.M. Dep't of Labor*, 300 F.R.D. 529, 542 (D.N.M. 2014) (quoting *Cessna Fin. Corp. v. Bielenberg Masonry*, 715 F.2d 1442, 1444 (10th Cir. 1983)). Because the finality of judgments is "of great importance," and "final judgments should not be disturbed lightly," MOORE'S § 60.22, courts "have administered Rule 60(b) with a scrupulous regard for the aims of finality." *Macias*, 300 F.R.D. at 542 (quoting 11 Charles Alan Wright, Arthur R. Miller & M. Kane, FEDERAL PRACTICE & PROCEDURE § 2857, at 326-27 (2d ed. 2012)); *see also Metlyn Realty Corp. v. Esmark, Inc*., 763 F.2d 826, 830 (7th Cir. 1985) ("Judgments in civil cases fix the

rights of parties and entitle them to go about their lives. They may be reopened only for

extraordinary reasons.").

**ARGUMENT**

I. **Rule 60(b)(5)'s "Based on an Earlier Judgment"**
   **Provision Does Not Apply To This Case**

Precisely because "[r]elief under Rule 60(b) is 'extraordinary and may only be

granted in exceptional circumstances,'" *Manzanares v. City of Albuquerque*, 628 F.3d 1237,

1241 (10th Cir. 2010) (quoting *Zurich N. Am. v. Matrix Serv., Inc.*, 426 F.3d 1281, 1289 (10th

Cir. 2005), courts narrowly construe and strictly apply the requirements of each Rule 60(b)

subsection. *See, e.g.*, *Axar Master Fund, Ltd. v. Bedford*, 806 F. App'x 35, 39 (2d Cir. 2020)

(noting that Rule 60(b) holds parties to "stringent standards"); *Ag Pro, Inc. v. Sakraida*, 512 F.2d

141, 143 (5th Cir. 1975) (concluding that "the requirements of [Rule 60(b)] must be strictly

met"), *rev'd on other grounds*, 425 U.S. 273 (1976); *Vreeland v. Zupan*, No. 14-cv-02175-PAB,

2019 U.S. Dist. LEXIS 110533, at *7 (D. Colo. July 2, 2019) ("[I]f the finality of judgments is to

be preserved a strict interpretation of Rule 60(b) is required."). The Court must thus construe the

language of Rule 60(b)(5) strictly in order to determine whether it is applicable in this case.

GCC relies exclusively upon the second prong of Rule 60(b)(5), which permits

relief from a final judgment where it "is based on an earlier judgment that has been reversed or

vacated." FED. R. CIV. P. 60(b)(5). GCC argues that because the Bolivian courts have allegedly

"set aside the Damages Award in a Final Order, this Court should vacate its judgment to enforce

that now-nullified award." (Motion to Vacate at 8). In other words, according to GCC, the

Damages Award is the "earlier judgment" upon which this Court's decision was based for

purposes of Rule 60(b)(5). (*See* Motion to Vacate at 9 ("The Damages Award was the

'necessary element' of this Court's confirmation decision, and so Rule 60(b)(5) vacatur is warranted.")).[5]

By its plain language, however, Rule 60(b)(5) extends only to vacatur or reversal of "earlier *judgments*," not arbitral awards.  Like statutes, the Federal Rules are to be interpreted according to "their plain meaning."  *See Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 540 (1991); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1125 (9th Cir. 2017) ("[W]e employ the 'traditional tools of statutory construction' to interpret the Federal Rules of Civil Procedure.") (collecting cases)); *Jordan v. Paccar, Inc.*, No. 95-3478, 1996 U.S. App. LEXIS 25358, at *16 (6th Cir. Sept. 17, 1996) (applying strict plain-meaning interpretation of Rule 60(b)(3)).

"A judgment is a judicial act of the court."  46 Am Jur. 2d Judgments § 1.  Strictly construed, the term "judgment" does not encompass a decision of *private* arbitrators.  *See Finstuen v. Crutcher*, 496 F.3d 1139, 1152 n.12 (10th Cir. 2007) (identifying "the common definition" of "judgment" as a "*court's* final determination of the rights and obligations of the parties in a case" (quoting Black's Law Dictionary (8th ed. 2004) (emphasis added)); *Wells Fargo Bank, N.A. v. Kendrick*, Nos. 6:12-bk-16342-ABB, 6:13-ap-00017-ABB, 2013 Bankr. LEXIS 2635, at *5 (Bankr. M.D. Fla. June 28, 2013) (concluding that an arbitration award is not a "judgment" as that legal term is ordinarily understood (citing Black's Law Dictionary 918 (9th ed. 2009)), *vacated on other grounds by* No. 6:13-cv-1577-Orl-28, 2014 U.S. Dist. LEXIS 15047 (M.D. Fla. Feb. 3, 2014); *Elias v. Am. Dental Partners of Cal., Inc.*, No. EDCV 11-1565-JST

---

[5] GCC does not advance an argument that Rule 60(b)(5)'s third prong—that applying the judgment "prospectively is no longer equitable"—is applicable.  Nor could it, as the third prong is limited to equitable judgments like consent decrees and injunctions, and not applicable to money judgments.  *Stokors S.A. v. Morrison*, 147 F.3d 759, 762-63 (8th Cir. 1998).

(Ex), 2011 U.S. Dist. LEXIS 157926, at *13 (C.D. Cal. Nov. 28, 2011) ("This reading is also

consistent with the mechanics of arbitration, in which an arbitrator's award, without judicial

confirmation, does not result in a judgment.").  GCC's attempt to expand the phrase "earlier

*judgment*" to cover arbitral awards should thus be rejected as being flatly inconsistent with the

unambiguous language of Rule 60(b)(5).

    Another canon of interpretation—that the omission of language from a rule or

statute is presumed to be intentional—further supports the conclusion that Rule 60(b)(5) does not

apply to the vacatur of arbitral awards.  *See, e.g., Cent. Bank, N.A. v. First Interstate Bank, N.A.*,

511 U.S. 164, 176-77 (1994) ("If . . . Congress intended to impose aiding and abetting liability,

we presume it would have used the words 'aid' and 'abet' in the statutory text. But it did not");

*Jones v. Bock*, 549 U.S. 199, 222 (2007) ("Congress knew how to differentiate between the

entire action and particular claims when it wanted to, and suggests that its use of 'action' rather

than 'claim' in 42 U.S.C. § 1997e(a) should be given effect.").  The only definition of

"judgment" provided under the Federal Rules contemplates the sorts of judicial acts "from which

an appeal lies," and says nothing of non-judicial decisions such as arbitral awards from which

there is no "appeal" under U.S. law.  *See* FED. R. CIV. P. 54(a).  There is no question that the

distinction between an arbitral award and a judgment is material, and that both the drafters of the

Federal Rules and Congress know the difference, yet did not include awards in the text of Rule

60(b)(5).  Had Congress intended to include the vacatur of an underlying arbitral award as a

basis for relief under Rule 60(b)(5), it could have said so.

    In support of its proposition that Rule 60(b)(5) extends to arbitral awards, GCC

relies exclusively on the Second Circuit's decision in *Thai-Lao Lignite Co., Ltd. v. Gov't of the

Lao People's Democratic Republic,* 864 F.3d 172 (2d Cir. 2017).  But the *Thai-Lao* court did not

have occasion to construe the term "judgment" for purposes of Rule 60(b)(5) because neither party raised the issue; the court thus accepted that it included an arbitral award.  The court's analysis in *Thai-Lao* was limited to whether Rule 60(b) as a <u>general</u> matter is compatible with the New York Convention, in particular Article III of the Convention, which provides that contracting states must "recognize arbitral awards as binding and enforce them <u>in accordance with the rules of procedure</u> of the territory where the award is relied upon, under the conditions laid down in the following articles."  N.Y. Convention art. III (emphasis supplied).  The court held that "Article III suggests that a court should apply its procedural rules for vacating judgments to its judgments enforcing arbitral awards," and that "[n]othing in the language suggests that post-judgment procedures were not encompassed by Article III's phrase."  *Id.*  The *Thai-Lao* court found that Rule 60(b)(5) was "procedural" because the advisory committee's note to the 1946 amendment of Rule 60 "describe[ed] Rule 60(b) as one 'procedure' by which a judgment may be vacated."  *Thai-Lao*, 864 F.3d at 185.

Insofar as *Thai Lao* held that Rule 60(b)(5) is a "rule of procedure" under Article III, that holding is neither binding nor persuasive.  Each of the cases the *Thai-Lao* court relied upon for its Article III analysis involved the application of other subsections of Rule 60(b) to <u>domestic</u> arbitral awards to which the New York Convention does not apply, and none of the cases applied Rule 60(b)(5) on the basis of the annulment of an award.  Indeed, *Thai-Lao* is the <u>only</u> case to ever apply Rule 60(b)(5) to vacate a judgment confirming an arbitral award based on the "earlier judgment" provision.

Moreover, "courts have considered that the 'rules of procedure' that may be applied under article III should be interpreted narrowly, and should be determined independently of the categories observed under national laws."  UNCITRAL Secretariat Guide on the

Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York, 1958) (2016 ed.) (the "UNCITRAL Guide").[6]  Article III of the New York Convention "is concerned only with purely procedural aspects of the recognition proceedings themselves (*e.g.*, filing fees, time periods, legal representation and judicial venue)," and "cannot be relied upon as a basis for applying national law to substantive issues concerning recognition of an award, which are instead addressed solely in Articles IV and V of the Convention."  GARY B. BORN, INTERNATIONAL COMMERCIAL ARBITRATION (3d. ed. Kluwer Law International 2020) (emphasis added).[7]

In other words, "Article III must be read together with Article V," which contemplates that confirmation in the first instance may be refused if the award has been set aside by a competent authority.  *Id.*  Similarly, Article VI expressly envisions that a domestic court may stay confirmation of an award in anticipation that it might be vacated in pending annulment proceedings.  The New York Convention does not contemplate that, once a court has confirmed an award notwithstanding pending set-aside proceedings, the court could go back in time and "un-confirm" the award under Article V.  Had the drafters intended to allow parties to re-visit the enforceability of the award upon the conclusion of such proceedings, they could have included such a provision.  Neither *Thai Lao* nor GCC provides  any examples of other contracting states allowing such relief.  Applying Rule 60(b)(5) in this manner would thus be

---

[6] U.S. courts have cited the UNCITRAL Guide with approval, noting that while it is "not an official interpretation of the treaty, [it] is intended by UNCITRAL to assist courts of signatory countries in arriving at a uniform interpretation of the New York Convention." *Jolen, Inc. v. Kundan Rice Mills, Ltd.*, No. 19-cv-1296 (PKC), 2019 U.S. Dist. LEXIS 61774, at *8 (S.D.N.Y. Apr. 9, 2019).

[7] The Supreme Court has relied on the Born treatise as "international authority" when analyzing the New York Convention.  *BG Grp. plc v. Republic of Arg.*, 572 U.S. 25, 43 (2014).

inconsistent with the New York Convention's goal of "unify[ing] the standards by which …arbitral awards are enforced in the signatory countries." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974). Thus, regardless of whether Article III might permit the application of other subsections of Rule 60(b) in another context where such application is indeed "purely procedural," the specific application GCC urges here is not at all procedural, and thus inconsistent with the text and purpose of the New York Convention.

## II.     The New 2020 Decisions Are Not Entitled to Recognition By This Court

Even if an arbitral award could be "un-confirmed" pursuant to Rule 60(b)(5), neither the 2020 Procedural Order nor the Twelfth Judge Auto is entitled to recognition by this Court. Just as relief under Rule 60(b) is discretionary, there is no obligation on the part of the court to extend comity to a foreign judgment. *MacArthur v. San Juan Cty.*, 497 F.3d 1057, 1067 (10th Cir. 2007) (citations omitted) ("Comity is not an inexorable command, and a request for recognition of a foreign judgment may be rebuffed on any number of grounds."); *see also Tolliver v. Northrop Corp.*, 786 F.2d 316, 318-19 (7th Cir. 1986) (explaining that "a decision under Rule 60(b) is discretion piled on discretion," and the Court's analysis is therefore "doubly discretionary").

The Supreme Court's decision in *Hilton v. Guyot*, 159 U.S. 113 (1895), sets forth the guiding principles of comity. In *Hilton*, the Supreme Court held that foreign judgments are entitled to comity where:

> there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other

special reason why the comity of this nation should not allow it full effect.

*Hilton*, 59 U.S. at 202.  The Restatement (Fourth) of Foreign Relations sets forth the types of circumstances that may justify non-recognition under the *Hilton* standard.[8]  Specifically, under Section 483, "[a] court in the United States will not recognize a judgment of a court of a foreign state if," *inter alia*, "the judgment was rendered under a judicial system that does not provide impartial tribunals or procedures compatible with fundamental principles of fairness." *Id.* Section 484 in turn provides that a court in the United States need not recognize a judgment of a court of a foreign state if, *inter alia*:

> (a) the party resisting recognition did not receive adequate notice of the proceeding in the foreign court in sufficient time to enable it to defend;
>
> (b) the judgment was obtained by fraud that deprived the party resisting recognition of an adequate opportunity to present its case;
>
> (c) the judgment or the claim on which the judgment is based is repugnant to the public policy of the State in which recognition is sought or of the United States;
>
> (d) the judgment conflicts with another final and conclusive judgment; . . .
>
> (g) the judgment was rendered in circumstances that raise substantial doubt about the integrity of the rendering court with respect to the judgment; [or]
>
> (h) the specific proceeding in the foreign court leading to the judgment was not compatible with fundamental principles of fairness[.]"

RESTATEMENT (FOURTH) OF FOREIGN RELATIONS § 484 (2018).

---

[8] Courts in the Tenth Circuit apply the Restatement factors when determining whether to recognize a foreign judgment. *See, e.g.*, *United States v. Shavanaux*, 647 F.3d 993, 999 (10th Cir. 2011); *Navani v. Shahani*, 496 F.3d 1121, 1131 (10th Cir. 2007); *Soc'y of Lloyd's v. Reinhart*, 402 F.3d 982, 1001 (10th Cir. 2005).

The same comity standards apply where the foreign judgment at issue is a judgment annulling a foreign arbitral award.  Courts in that context have generally considered whether such judgment is "unenforceable as to public policy," *i.e.*, whether the "judgment of that [foreign] court violated basic notions of justice to which we subscribe."  *Termorio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 939 (D.C. Cir. 2007); *see also Corporación Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploración Y Producción*, 832 F.3d 92, 106 (2d Cir. 2016); *Chromalloy Aeroservices v. Arab Republic*, 939 F. Supp. 907, 913 (D.D.C. 1996).  As set forth below, the nature of the 2020 Procedural Order and the Twelfth Judge Auto, as well as the circumstances surrounding their issuance, implicate several of the traditional grounds for non-recognition, and as such, their recognition would violate basic notions of U.S. justice.

        A.      The 2020 Procedural Order and Twelfth Judge Auto Are Not Entitled to Comity Because They Violate Basic Principles of *Res Judicata*

Recognition of the 2020 decisions would violate the doctrine of *res judicata*, a "principle of universal jurisprudence forming part of the legal systems of all civilized nations," because they contravene the precise issues finally determined in the 2016 PCT Judgment.  2 A.C. FREEMAN, A TREATISE OF THE LAW OF JUDGMENTS § 627 (5th ed. 1925).[9]

As Dr. Asbun explains, "it is a fundamental tenet of Bolivian law that PCT *sentencias* [or judgments] are final, binding, and subject to no further recourse."  (Asbun ¶ 59).  "In other words, it is impossible for any subsequent decision—including by the PCT itself—to modify the ruling in a *sentencia* on the specific issues in a given *amparo*."  (Asbun ¶ 35).

---

[9] GCC's Motion to Vacate is dependent upon this Court's recognition of each of those decisions, which, according to GCC, together operate to "reinstate" the Twelfth Judge Decision setting aside the Damages Award.  (*See* Motion to Vacate at 5).  Thus, if this Court declines to extend comity to the 2020 Procedural Order, the Twelfth Judge Auto cannot stand.

This Bolivian rule precluding review of final PCT *sentencias* is rooted in basic principles of *res judicata* (Asbun ¶ 33), which are also firmly entrenched in basic notions of U.S. justice.  *See Federated Dep't Stores v. Moitie*, 452 U.S. 394, 398 (1981); *see also Baker v. GMC*, 522 U.S. 222, 233 n.5 (1998) ("[A] valid final adjudication of a claim precludes a second action on that claim or any part of it.").  As the Supreme Court has observed:

> [P]ublic policy dictates that...those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties.... [T]he doctrine of res judicata is not a mere matter of practice or procedure inherited from a more technical time than ours.  <u>It is a rule of fundamental and substantial justice, of public policy and of private peace, which should be cordially regarded and enforced by the courts.</u>

*Moitie*, 452 U.S. at 401 (quoting *Hart Steel Co. v. R.R.  Supply Co.*, 244 U.S. 294, 299 (1917)) (emphasis added).  The doctrine is based in part on clear "public policy favoring the establishment of certainty in legal relations."  *St. Louis Baptist Temple v. FDIC*, 605 F.2d 1169, 1175 (10th Cir. 1979) (quoting *Comm'r v. Sunnen*, 333 U.S. 591, 597 (1948)).  Thus, a final judgment "puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground[.]."  *Sunnen*, 333 U.S. at 597; *see also* RESTATEMENT (SECOND) OF JUDGMENTS § 17 (1982) ("No principle of law is more firmly settled than that the judgment of a court of competent jurisdiction, so long as it stands in full force and is unreversed, cannot be impeached in any collateral proceeding on account of mere errors or irregularities[.]") (quoting 1 BLACK, JUDGMENTS § 271 (2d ed. 1904)).

Indeed, U.S. courts have routinely declined to recognize foreign judgments where recognition would result in a violation of principles of *res judicata.  See, e.g., Derr v. Swarek*, 766 F.3d 430, 443-44 (5th Cir. 2014) (refusing to recognize a German judgment because the German court failed to recognize the *res judicata* effect of a prior judgment on the merits);

*Byblos Bank Europe, S.A. v. Sekerbank Turk Anonym Syrketi*, 885 N.E.2d 191, 193-94 (N.Y. 2008) (denying recognition of foreign judgment where foreign court decision "disregarded--and conflicted with--a previously rendered . . . judgment").

Here, the 2020 Procedural Order is not entitled to comity because the Fourth PCT Chamber blatantly ignored the *res judicata* effect of the 2016 PCT Judgment.  As Dr. Asbun's report makes clear, the 2016 PCT Judgment conclusively ended the proceedings on CIMSA's Substantive Amparo, unambiguously vacating the Twelfth Judge Decision and explicitly directing the Twelfth Judge to issue a new decision "consistent with its opinion."  (*See* Asbun ¶ 6).  The Twelfth Judge was thus bound by the 2016 PCT Judgment to act in accordance with that judgment.

The 2016 PCT Judgment <u>also</u> considered and categorically rejected GCC's argument that the Substantive Amparo was "inadmissible because the Arbitral Amparo was being simultaneously decided by the [PCT]."  (Von Borries ¶ 14).  It concluded, in no uncertain terms, that the Substantive Amparo was admissible because there was "no identity of subject, object and cause between" the two *amparos*.  It reiterated this conclusion in a subsequent order, issued upon GCC's request for clarification, stating that there was no "potential for contradiction between" the PCT's *sentencias* in each *amparo*.  (Von Borries ¶ 15).  The Third PCT Chamber's conclusion regarding the admissibility and validity of the Substantive Amparo was thus binding and irreversible under basic principles of *res judicata*, as generally understood and as incorporated into Bolivian law.  (Von Borries ¶ 27).

The Fourth PCT Chamber nevertheless reached the exact opposite conclusion in the 2020 Procedural Order.  Specifically, the Fourth PCT Chamber found that "it was not possible to file the [Substantive Amparo] when the [Arbitral Amparo] had not concluded," and

that the PCT's *sentencias* in the two *amparo* proceedings "could have been contradictory to each other."  (Von Borries ¶¶ 35, 38).  According to the Fourth PCT Chamber, the "the object and purpose of both [*amparos*] turned out to be the same," notwithstanding the Third PCT Chamber's express conclusion to the contrary.

The Twelfth Judge also "offered no basis for her conclusion that a final, binding *sentencia* was somehow annulled by" the 2020 Procedural Order.  As Dr. Asbun observes, "the 2020 [Procedural Order] did not and could not have that effect on [the 2016 PCT Judgment], which retains binding, *res judicata* effect."  (Asbun ¶ 74).  By re-opening the question of the admissibility of the Substantive Amparo and retroactively determining that CIMSA was not entitled to pursue another *amparo* during the pendency of the Arbitral Amparo proceedings, the Fourth PCT Chamber and the Twelfth Judge flatly ignored the Third PCT Chamber's final, binding conclusion that the Substantive Amparo <u>was</u> valid and admissible.  Accordingly, the Twelfth Judge Auto, and the 2020 Procedural Order upon which it is based, should not be recognized because they violate basic *res judicata* principles.

> B.    This Court Should Not Extend Comity to the Invented
>         <u>Assertion that CIMSA Acted with "Fraud and Deceit"</u>

The Fourth PCT Chamber's attempt to invalidate the 2016 PCT Judgment was premised on an inexplicable and unsubstantiated finding that CIMSA somehow acted with "fraud and deceit" in filing the Substantive Amparo.  Needless to say, it would violate basic U.S. legal principles to recognize a foreign decision premised on a fictitious factual basis.  *See e.g.*, *World Granite & Marble Corp. v. Wil-Freds Constr.*, No. 96 C 6441, 1996 U.S. Dist. LEXIS 19737, at *11-13 (N.D. Ill. Nov. 18, 1996) ("It would unquestionably be repugnant to the public policy of…the United States of America to recognize and enforce foreign judgments…which are

procured through fraudulent representations [and] which are premised on incorrect

information.").

       The  Fourth PCT Chamber's 2020 Procedural Order does not attribute any

specific "fraudulent" or "deceitful" acts to CIMSA, but appears to rely exclusively on the fact

that CIMSA filed the Substantive Amparo in the first instance.  (Asbun ¶ 47).  But as Dr. Asbun

states:

> There is no question that the mere <u>filing</u> of a Substantive Amparo
> does not in itself constitute fraud.  Of course, Guarantee Courts
> [which review amparos in the first instance] may, and often do,
> consider the effect of an existing *amparo* in evaluating the
> admissibility of a subsequent *amparo*, and can deny the
> Substantive Amparo on the grounds that it is duplicative of the
> Arbitral Amparo. But there is nothing inherently fraudulent about
> simply filing a Substantive Amparo during the pendency of
> existing *amparo* proceedings.

(Asbun ¶ 47).  By way of comparison, a U.S. court might conclude that a litigant's claim is

barred by issue or claim preclusion, but it is self-evident that the mere act of pursuing the latter

claim is not in and of itself "fraudulent" on the courts.  Indeed, the Fourth PCT Chamber <u>itself</u>

"cited cases …in which the courts evaluated the admissibility of the Substantive Amparo by

comparing the subject matters, parties, and purposes of the two *amparos*."  (Asbun at ¶ 16 n.6).

       Moreover, CIMSA expressly disclosed the existence of the Arbitral Amparo to

the Second Administrative Chamber, which reviewed the Substantive Amparo, and CIMSA even

explained the distinction between the two *amparos*, stating:

> We must advise that CIMSA filed a Constitutional Amparo Action
> against the Arbitral Tribunal, requesting the annulment of
> Procedural Order No. 12, dated September 7, 2015, and any and all
> acts and decisions based upon the challenged Procedural Order,
> which includes [the Twelfth Judge Decision]….We must clarify
> that that *amparo* action was not against [the Twelfth Judge
> Decision]….This clarification is necessary in order to avoid any

> misrepresentations, pretext, or confusion that might encumber the
> purpose of this action.

(Asbun ¶ 50).  The record is replete with evidence that <u>every single Bolivian court</u> to consider

the Substantive Amparo was not only aware of the Arbitral Amparo, but in fact directly

evaluated whether the pendency of the Arbitral Amparo precluded the Substantive Amparo.

(Asbun ¶ 52).  Even the Guarantee Court that rejected the Substantive Amparo as inadmissible

on the basis of the pending Arbitral Amparo never suggested that there was anything

"fraud[ulent]" or "deceit[ful]" about the Substantive Amparo.  (Asbun ¶ 52).

      The Fourth PCT Chamber's reliance on a blatantly false and indefensible premise

is incompatible "with fundamental principles of fairness" and contrary to U.S. public policy.  *See*

RESTATEMENT (FOURTH) OF FOREIGN RELATIONS §§ 484(h), (c) (2018); *see also Townsend v.*

*Burke*, 334 U.S. 736, 741 (1948) (a judgment based on "materially untrue" assumptions or

misinformation "is inconsistent with due process of law," and "cannot stand"); *Maxwell v. Roe*,

628 F.3d 486, 506 (9th Cir. 2010) ("A conviction based in part on false evidence, even false

evidence presented in good faith, hardly comports with fundamental fairness."); *World Granite*

*& Marble Corp.*, 1996 U.S. Dist. LEXIS 19737, at *13.

    C.    The 2020 Procedural Order and Twelfth Judge Auto Represent a
        <u>Flagrant Departure From Elementary Principles of Bolivian Law</u>

      In addition to violating basic principles of *res judicata* and relying on a made up

yet unexplained "fraud," the 2020 Procedural Order and Twelfth Judge Auto are so illogical and

unsubstantiated that they lack any viable credibility as legitimate juridical acts.  As Dr. Asbun

explains, both decisions depart dramatically from basic principles of Bolivian law.  (Asbun

¶ 43).  This Court should refuse to recognize foreign decisions that represent a flagrant disregard

of basic legal principles.  *See, e.g.*, *Films by Jove, Inc. v. Berov*, 250 F. Supp. 2d 156, 216

(E.D.N.Y. 2003) (refusing to recognize foreign judgment where the court's analysis was "plainly erroneous, and unjustifiably depart[ed] from the universal understanding" regarding foreign statute).

First, as CIMSA explained in its motion to confirm, *amparo* proceedings exist in distinct "silos." The PCT's authority to act on an *amparo* is "circumscribed by the parties, authorities, and acts at issue, and the PCT cannot decide or affect anything outside the scope of the specific *amparo* proceeding." (Asbun ¶ 32). This Court and the Tenth Circuit have already accepted this fundamental principle of Bolivian law. *See* ECF No. 93 at 18; *CIMSA*, 970 F.3d at 1298 (observing that decisions regarding one *amparo* "did not and could not overturn" a decision from a prior *amparo*).

Here, the 2020 Procedural Order "arose in the proceedings on the [Arbitral Amparo], and therefore cannot purport to impact any decision that arose outside those proceedings." (Asbun ¶ 63). The only question before the PCT in the Arbitral Amparo was the constitutional validity of the Arbitral Tribunal's Procedural Order No. 12. The Fourth PCT Chamber had no authority to reach outside of its silo to modify or disturb a decision that arose in the separate Substantive Amparo, including the 2016 PCT Judgment.

Second, the 2020 Procedural Order is a more precisely known as an "intra-procedural" decision, which, under Bolivian law, cannot substantively impact a litigant's rights. (Asbun ¶ 36). Unlike a *sentencia*, which finally decides the substance of an *amparo* and ends the proceedings and the substantive controversy between the parties, "intra-procedural" decisions or *autos* are "are only issued throughout the pendency of the proceedings, and…cannot operate to decide the merits of a dispute, but rather 'shall only be used for the administration of the proceedings and to order purely executory actions.'" (Asbun ¶ 36). Since an *auto* "cannot under

- 27 -

any circumstances substantively modify a *sentencia*…or change the outcome of the proceedings," (Asbun ¶ 36), the 2020 Procedural Order could not validly operate to invalidate the 2016 PCT Judgment, a *sentencia*.

Third, the Fourth PCT Chamber could not invalidate the 2016 PCT Judgment in response to a *queja*. A *queja* is a "very limited" procedural mechanism "pursuant to which a party to the proceedings can seek to enforce immediate compliance with an *amparo* decision," through measures such as fines, the use of public force, and administrative sanctions. (Asbun ¶ 38). "In addressing a *queja*, the PCT can only order compliance by the authority against whom the *amparo* was brought, and cannot purport to compel action by any other entity." (Asbun ¶ 38). Thus, "the relationship between two *amparos* and the propriety of subsequent *amparo* is beyond the scope of a *queja* proceeding, which is strictly a means of ensuring <u>compliance</u> with an existing *amparo* decision." (Asbun ¶ 66). The Fourth PCT Chamber therefore had no authority to assess the validity of the Substantive Amparo, let alone invalidate the 2016 PCT Judgment in response to GCC's *queja*.[10]

Fourth, the Twelfth Judge had no authority to issue the Twelfth Judge Auto. She purported to do so on the basis of the 2020 Procedural Order, but she "had no authority to act purportedly in 'compliance' with the 2020 [Procedural Order]" because she was not the public officer named in the proceedings on the Arbitral Amparo" and "decisions on *amparos* only have effect as to the specific parties and alleged constitutional violations at issue." (Asbun ¶ 75). By contrast, the Twelfth Judge <u>was</u> bound by the 2016 PCT Judgment, which explicitly states that

---

[10] Moreover, neither Resolution No. 01/2016 nor the First PCT Sentencia imposed any obligations on anyone, but merely "declined to consider CIMSA's Arbitral Amparo, without remanding or directing any sort of action." (Asbun ¶ 65). Accordingly, there was nothing anyone needed to do in order to "comply" with the Guarantee Court's resolution. (Asbun ¶ 65).

the Twelfth Judge Decision "is invalidated," and that the Twelfth Judge must therefore "issue a new decision in accordance with the parameters set forth in this constitutional *sentencia*." (Asbun ¶ 76). "The Twelfth Judge flatly ignored this clear and explicit directive." (Asbun ¶ 76). The Twelfth Judge made no effort to "explain how the 2020 [Procedural Order] could, consistent with Bolivian law, purport to invalidate [the 2016 PCT Judgment]," given the fundamental principle that *sentencias* are not subject to reversal or any other modification. (Asbun ¶ 71). Thus, "the Twelfth Judge remains bound by [the 2016 PCT Judgment], and is not and has never been bound by the [2020 Procedural Order]." (Asbun ¶ 76).

        D.     CIMSA Had No Opportunity to Defend the Accusation of "Fraud" in the 2020 Procedural Order

        The Fourth PCT Chamber's contention that CIMSA acted with "fraud and deceit" in its prosecution of the Substantive Amparo was, as far as CIMSA is aware, a *sua sponte* assertion; GCC, in its submissions to the Guarantee Court, never accused CIMSA of acting dishonestly, arguing only that it was procedurally improper to advance the Substantive Amparo while the Arbitral Amparo was pending. (Von Borries ¶ 31). Thus, CIMSA never had an opportunity to defend itself against that spurious claim, which it first heard in October 2020 when it was notified of the PCT Procedural Order. (Von Borries ¶ 32). The Fourth PCT Chamber's conclusion that CIMSA had acted with "fraud and deceit" was its sole justification for vacating the 2016 PCT Judgment.

        Notice and an opportunity to be heard are basic due process rights, *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965), and a foreign judgment is not entitled to recognition where a party "did not receive adequate notice of the proceeding in the foreign court in sufficient time to enable it to defend." *See* Restatement (Fourth) Of Foreign Relations § 484(a) (2018). Indeed, as Dr. Asbun explains:

> [I]n accusing CIMSA of "fraud" in deciding the *queja*, the Fourth PCT Chamber violated the constitutional rights of CIMSA, including the presumption of innocence, effective judicial protection, due process, and right to defense. In effect, the Fourth PCT Chamber noted the existence of fraud and affected the legal sphere of CIMSA, without even giving CIMSA the right to defend itself against such an accusation.

(Asbun ¶ 49). To issue a decision that without prior notice attributes fraudulent conduct to CIMSA, and on that basis substantially impact CIMSA's rights with respect to the arbitral award issued in its favor, violates fundamental principles of due process. *See Sigma Chi Fraternity v. Regents of Univ. of Colo.*, 258 F. Supp. 515, 528 (D. Colo. 1966) (due process requires "adequate notice of opposing claims" and a "reasonable opportunity to prepare and meet them in an orderly hearing adapted to the nature of the case").

To make matters worse, the Twelfth Judge Auto was issued in response to an *ex parte* motion in which GCC apparently requested that the Twelfth Judge "comply" with 2020 Procedural Order. CIMSA did not receive notice of GCC's motion, let alone have an opportunity to respond. (Von Borries ¶ 26). The Twelfth Judge did not request a response from CIMSA, but rather promptly issued the Twelfth Judge Auto accepting GCC's arguments within <u>two days</u> of GCC's motion, asserting that she was merely "complying" with the 2020 Procedural Order. And although CIMSA sought reconsideration and leave to appeal the Twelfth Judge Auto, she denied CIMSA's request on the ground that the Twelfth Judge Auto represented a reinstatement of her 2015 decision concerning GCC's request for annulment, and Bolivian law does not permit appeals from decisions on requests for annulment. Thus, CIMSA was denied an opportunity to present any substantive appeal from the effects of the 2020 Procedural Order. *See, e.g.*, *Bell v. Dillard Dep't Stores*, 85 F.3d 1451, 1456 (10th Cir. 1996) (citing authorities for

the proposition that the lack of opportunity to appeal weighs against finding that a party had a

full and fair opportunity to litigate an issue).

     E.     The 2020 Decisions Were Rendered By a Judiciary Suffering From
<u>Systemic Corruption and a Pointed Political Bias Against CIMSA</u>

     The Court should refuse to extend comity to the 2020 Procedural Order and the

Twelfth Judge Auto because each was "rendered in circumstances that raise substantial doubt

about the integrity of the rendering courts." RESTATEMENT (FOURTH) OF FOREIGN RELATIONS

§ 484(g) (2018).  In evaluating whether to extend comity to a foreign judgment, courts must

consider whether the decision was issued "under a system of jurisprudence likely to secure an

impartial administration of justice." *Navani v. Shahani*, 496 F.3d 1121, 1131 (10th Cir. 2007)

(quoting *Hilton v. Guyot*, 159 U.S. 113, 205-06 (1895)); *see also Eastman Kodak Co. v. Kavlin*,

978 F. Supp. 1078, 1086 (S.D. Fla. 1997) (evidence of corruption in the Bolivian courts came

against "backdrop" of allegations of misconduct in specific Bolivian proceedings); *Bridgeway*

*Corp. v. Citibank*, 45 F. Supp. 2d 276, 280, 287-288 (S.D.N.Y. 1999) (rejecting Liberian

judgment, citing U.S. Department of State Country Report that described the Liberian court

system as functioning "erratically" and noting that judicial officers were subject to political and

social influence); *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1407, 1411 (9th Cir. 1995) (refusing

to recognize Iranian judgments because "at the time that the judgments were obtained [the

defendant] could not have obtained due process of law in the courts of Iran," and citing, *inter*

*alia*, "consular information sheets which gave travel warning from 1981 to 1992 and noted that

anti-American sentiment could make it dangerous to live in Iran").

     At times, "[e]ven though a foreign legal system may not suffer from systemic

deficiencies, there may be substantial doubt about the integrity of a court with respect to the

particular proceeding." RESTATEMENT (FOURTH) OF FOREIGN RELATIONS § 484 cmt. i (2018).

Here, there is ample record evidence that the Bolivian judicial system—irrefutably weak as a whole—is particularly subject to bias against CIMSA because of the political activities of its principal.  (Gamarra ¶ 10).

A brief review of the fundamental shortcomings of the Bolivian judicial system provides important context for the proceedings that lead to these two decisions.  One of the greatest challenges to the rule of law in Bolivia is the judiciary's "subordination to the executive branch and to the ruling *Movimiento al Socialismo* ("MAS") party."  (Gamarra ¶ 10).  Upon assuming power in 2006, former president Evo Morales and the MAS party "undermined systematically the checks and balances that are cornerstones of liberal democracy."  [ECF 48-1 ¶ 9].  Attempted constitutional reforms in 2009 only "exacerbated the lack of independence of the judiciary," and "contributed to centralization of power in the executive branch [and] repeated violations of the 2009 Constitution."  (Gamarra ¶ 11).  By gaining control of Bolivia's Pluri-national Legislative Assembly, "Morales and the MAS were essentially able to establish a monopoly over the administration of justice in Bolivia."  (Gamarra ¶ 13).

Although Morales resigned in October 2019, his resignation "did not change the composition of the judiciary" because "the composition of the system stemmed from the judicial elections in 2017 that elected the current members of the Judiciary."  (Gamarra ¶ 19).  In fact, "most analyses of the July 2017 judicial elections conclude that the results led to the most MAS dominated judiciary ever."  (Gamarra ¶ 19).  Thus, "the lack of independence and the pro MAS political biases of the Morales era prevailed in 2019-2020," the very period that GCC pursued and obtained the 2020 Procedural Order and the Twelfth Judge Auto.  (Gamarra ¶ 19).

CIMSA is particularly likely to suffer from the effects of the Bolivian judiciary's lack of independence because its principal, Samuel Doria Medina, is one of Bolivia's most vocal

opponents against MAS.  Today, "Mr. Doria Medina continues to raise the ire of the MAS and

the government.  He is also the target of Morales, who despite no longer holding the presidential

sash, he is clearly the most powerful politician in Bolivia.[11]  Indeed, Doria Medina's role during

Bolivia's 12-month transition period following Morales's resignation "made him an even more

prominent threat;" as the vice-presidential running mate for interim president Jeanine Añez,

Doria Medina "often vowed to do whatever he could to prevent the return of the MAS and

Morales to power."  (Gamarra ¶ 32).  Since 2019, both the MAS and Morales have been

"steadily going after members of the interim government and its collaborators."  (Gamarra ¶ 32).

       In fact, the U.S. State Department's Annual Report on Democracy and Human

Rights specifically notes how the Morales administration used the courts to weaken Doria

Medina in particular.  The administration used the "judicial system for political purposes, taking

legal action against several opposition members and critics of the government [including]…the

leader of the National Unity opposition party, Samuel Doria Medina."  (Gamarra ¶ 16).  *See*

*Mulugeta v. Ademachew*, 407 F. Supp. 3d 569, 585 (E.D. Va. 2019) (declining to conclude that

Ethiopian justice system suffered from such systematic corruption as to "depriv[e] all of its

judgments from eligibility for recognition," but refusing to recognize Ethiopian judgment in part

because "the Ethiopian judiciary is swayable if a case has political implications," and the

defendant's "wealth, close ties to the upper echelons of the government, and status as a well-

known construction and real estate mogul [gave] the case a political dimension"); *Wilson v.*

*Marchington*, 127 F.3d 805, 811 (9th Cir. 1997) (noting that a legal system may not be entitled

---

[11] Professor Gamarra notes that "Morales's influence is perhaps most evident in the way in which his supporters were able to weigh on [newly appointed] Minister of Justice Ivan Lima to forego judicial reform aimed at addressing judicial independence," which is an eyebrow-raising development, to say the least, given that it is widely known that Lima acted on behalf of GCC in the Bolivian proceedings related to this case.  (Gamarra ¶ 31; *see also* Von Borries n.5).

to recognition where "the judiciary was dominated by the political branches of government or by an opposing litigant") (quoting RESTATEMENT (THIRD) FOREIGN RELATIONS § 482 cmt. b.); *Fox v. Bank Mandiri*, 357 B.R. 231, 243 (Bankr. S.D.N.Y. 2006) (refusing to recognize Indonesian judgment where defendant "fail[ed] to explain how or why the Indonesia Supreme Court reviewed its own decision, reversing it only at the eleventh hour, and on a basis that had been apparent, if it mattered, from the time of the earliest proceedings in the Indonesia district court," and "fail[ed] to address how decisions on the merits could be reached in [a subsequent] action that were seemingly, if not plainly, contrary to those reached in the First Indonesia Supreme Court decision").

Here, the circumstances surrounding the 2020 Procedural Order and the Twelfth Judge Auto cannot be explained as anything but the product of bias and corruption by a judiciary controlled by a political party intent on punishing Doria Medina and weakening CIMSA. *E.g.*,:

- The Fourth PCT Chamber's surreptitious backdating of the 2020 Procedural Order to conceal that it was written after the October election (*supra* p. 4);

- The false justification in the 2020 Procedural Order that CIMSA acted fraudulently, where no fraud of any kind is identified or described (*supra* Section II.B);

- The blatant disregard for *res judicata* principles—both in terms of the finality of the 2016 PCT Judgment on the determination of the status of the Damages Award but also on the question of whether the Substantive Amparo could be adjudicated while the Arbitral Amparo was pending (*supra* Section II.A);

- The violation of the first principle "silo rule" by the Fourth PCT Chamber in the Arbitral Amparo by purporting to nullify the Third PCT Chamber's long-standing 2016 PCT Judgment arising in the Substantive Amparo (*supra* Section II.C);

- The Twelfth Judge's decision to reinstate her 2015 decision in response to the 2020 Procedural Order where she was not bound or authorized to act in

compliance with it, and the absence of any explanation for her reasoning (*supra* Section II.C);[12]

- The sudden alacrity with which the Twelfth Judge issued her *auto* as compared to her conduct over the prior years in allowing GCC to delay her compliance with the 2016 PCT Judgment time and time again (*supra* pp. 9-11).[13]

On this record, GCC cannot establish with any degree of reliability that the Fourth PCT Chamber and Twelfth Judge acted with sufficient integrity to warrant recognition of their decisions by this Court.

## III.    GCC Is Not Entitled To Equitable Relief Because GCC Has Not Conducted Itself Equitably

The Motion to Vacate should also be denied because GCC does not, contrary to its assertions (Motion at 11-13), come to the Court with "clean hands." *Motorola Credit*, 561 F.3d at 128.  As noted above, a court "may always consider whether the moving party has acted equitably" and "[r]elief from a judgment may be inappropriate . . . if circumstances are such that setting it aside would cause prejudice to a party." MOORE'S § 60.22; Motion to Vacate at 11.

---

[12] *See, e.g.*, *Burrell v. Armijo*, 456 F.3d 1159, 1173 (10th Cir. 2006) (refusing to extend comity to tribal decision where tribal judge, without reviewing prior hearing testimony, conducting further hearings, or ruling on other pending motions, dismissed the plaintiff's claims in a "one-page order [that] contained no reference to any testimony from the evidentiary hearing, or for that matter any explanation of the tribal court's reasoning."); *Maersk, Inc. v. Neewra, Inc.*, No. 05 Civ. 4356 (CM), 2010 U.S. Dist. LEXIS 69862, at \*43 (S.D.N.Y. July 9, 2010) (declining to recognize Kuwaiti judgment where the Kuwaiti Court's rejection of the plaintiff's claims was "purely conclusory; it spans all of a single paragraph, and does not allow this Court to conclude that the claim was adjudicated in a manner consistent with the principles espoused in *Hilton*.").

[13] As Von Borries describes, a mere two hours after CIMSA was notified of the Twelfth Judge Auto, the Twelfth Judge sent the case file back to the Arbitral Tribunal, which, under Bolivian law, represents the conclusion of the proceedings.  (Von Borries ¶ 43).  But Bolivian judges do not typically unilaterally deliver case files abroad, rather, the usual practice is for a judge to request that the parties provide the requisite payment to do so.  (Von Borries ¶ 43).  The Twelfth Judge did not make any such request here, which suggests that she sought to prevent CIMSA from challenging her decision before it became "final."  *See Mulugeta*, 407 F. Supp. 3d at 585.

First, GCC argues that it has "acted equitably in this litigation" because its jurisdictional challenges in the U.S. were "close questions," (Motion at 12), but GCC does not contend with its gamesmanship in Bolivia.  It is undisputed that GCC only launched the *queja* proceedings that produced the 2020 decisions in May 2019, after this Court issued its Judgment. (Motion at 6).  Had GCC acted diligently—*i.e.*, equitably—in pursuing the *queja* immediately after the 2016 PCT Judgment, the parties could well have litigated that issue to resolution in Bolivia long before engaging this Court on the merits of confirmation.  *Cf. In re Delfino*, 351 B.R. 786, 790 (Bankr. S.D. Fla. 2006) (rejecting equitable relief to a litigant that kept "the trump card of a motion to reopen the case…tucked away in [its] back pocket for later use in the event the [other] litigation failed").  GCC offers no explanation for why it failed to commence that litigation earlier, since the underlying fact of the allegedly duplicative *amparos* was known to GCC years earlier when the PCT issued the 2016 PCT Judgment.  It is well-established that a court will not entertain a motion based on new facts or new law when the facts or the law could just as well have been presented to the court prior to the court issuing the judgment or order from which the litigant later seeks relief.  *See Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000) (noting that a Rule 60(b) motion cannot be used to advance new arguments which could have been presented at the time of the original ruling).  It is also well-settled that equitable relief is unavailable to a party that fails to act on its rights in a timely manner.  *See Biodiversity Conservation Alliance v. Jiron*, 762 F.3d 1036, 1090-91 (10th Cir. 2014) (observing the maxim, "equity aids the vigilant and not those who slumber on their rights") (quoting *Kansas v. Colorado*, 514 U.S. 673, 687 (1995)).

Second, GCC never addresses its original sin in this litigation:  its willful breach of the parties' mutual agreement never to pursue judicial remedies against the award.  All the

decisions that GCC has relied upon in this Court—both pre- and post-judgment—are the product of its breach of that contractual undertaking.  Equitable remedies are unavailable to reward a party's breach of contract.  *See e.g. Anderson Living Tr. v. ConocoPhillips Co.*, LLC, 952 F. Supp. 2d 979, 984 (D.N.M. 2013) ("Plaintiffs may not recover in equity for conduct that allegedly breaches the parties' leases."); *see also Carmen v. Fox Film Corporation*, 269 F. 928, 932 (2d Cir. 1920), cert. denied, 255 U.S. 569 (1921) ("equity will refuse its aid in any manner to one seeking  its active interposition if he has been guilty either of illegal or inequitable conduct respecting the subject-matter of the litigation.").

Third, GCC misstates the equities when it argues that "[i]t would be contrary to the fundamental principles underlying the New York Convention and international comity to enforce an arbitral award while the arbitration panel is reconsidering the proper amount of that award."  (Motion at 13).  In fact, no "arbitration panel" is currently "reconsidering the proper amount of" the Damages Award, and to the contrary, CIAC has unequivocally rejected GCC's numerous attempts to reconstitute the Arbitral Tribunal.  (Von Borries ¶¶ 23-24).

What truly would be inequitable under "fundamental principles underlying the New York Convention" (Motion at 13) is to jettison a 100-page well-reasoned and well-documented damages determination by a tribunal of world-class arbitrators on the basis of the 2015 Twelfth Judge Decision which purported to set aside the Damages Award on two pretextual infirmities that the PCT explicitly concluded were not infirmities at all.  Perhaps even more inequitable is the notion that this Court should vacate its Judgment and un-confirm the Damages Award on the basis of the 2020 decisions which purportedly are based on a conclusion of "fraud and deceit" by CIMSA that was never even alleged by GCC, never notified to CIMSA, and never explained by the two judges that came up with that rationale without even trying to explain it.

On this record, there would be nothing equitable about depriving CIMSA of the benefits of a hard-fought arbitration that it won fair and square, and nothing equitable about undoing years of litigation in this Court and the Tenth Circuit. GCC's relentless efforts to undermine the Damages Award and this Court's Judgment should not be validated.

## **CONCLUSION**

The Motion should be denied.


Dated:  January 22, 2021

FOX ROTHSCHILD
Marsha M. Piccone
1225 17th Street
Suite 2200
Denver, CO  80202
Tel.:  (303) 292-1200
Fax:  (303) 292-1300

CURTIS, MALLET-PREVOST,
  COLT & MOSLE LLP

By:   *Gabriel Hertzberg*
      Eliot Lauer
      Gabriel Hertzberg
      Sylvi Sareva
      101 Park Avenue
      New York, NY 10178
      Tel:  (212) 696-6192
      Fax:  (212) 697-1559

*Attorneys for Compañía de Inversiones Mercantiles S.A.*

39304281

- 38 -