## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-cv-02120-JLK

COMPAÑÍA DE INVERSIONES MERCANTILES S.A.,

     Petitioner,

v.

GRUPO CEMENTOS DE CHIHUAHUA, S.A.B. de C.V., and
GCC LATINOAMÉRICA, S.A. de C.V.,

     Respondents.

_____

### ORDER DENYING MOTION TO VACATE JUDGMENT (ECF NO. 158)
_____

Kane, J.

     This Court issued Final Judgment in favor of Petitioner Compañía de Inversiones

Mercantiles S.A. ("CIMSA"), a Bolivian corporation, on March 26, 2019, confirming a 2015

foreign arbitral award of $36,139,222.90. (ECF No. 94). Presently before me is a Motion to

Vacate that Judgment (ECF No. 158) filed by Respondents Grupo Cementos de Chihuahua,

S.A.B. de C.V. ("GCC S.A.B.") and GCC Latinoamérica, S.A. de C.V. ("GCC Latinoamérica,"

and collectively "GCC"), both Mexican corporations. The parties' related arguments have been

extensively briefed, including a sur-reply and affidavits from five experts. GCC contends that I

must vacate my previous ruling pursuant to Federal Rule of Civil Procedure 60(b)(5) because the

arbitral award has been annulled through a series of 2020 Bolivian court orders. For the reasons

that follow, I conclude that application of the recent orders would offend basic standards of

justice and therefore deny the Motion to Vacate.

1

## I. RELEVANT BACKGROUND

The Tenth Circuit has set forth the background and procedural history of this case in detail, so I do not repeat it here other than to recount events relevant to my present analysis. *See Compañía de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua, S.A.B. de C.V.*, 970 F.3d 1269, 1275-80 (10th Cir. 2020) (hereinafter *Grupo Cementos*). In 2005, the parties executed a shareholder's agreement under which they each obtained a right of first refusal of shares in a mutually held Bolivian cement company (the "2005 Agreement"). *Id.* at 1276-77. In late 2009, GCC communicated its intention to sell its shares in the cement company. *Id.* at 1277. From that time until August 2011, the parties conducted ongoing negotiations regarding CIMSA's purchase of GCC's shares, in accordance with CIMSA's right of first refusal. *Id.* GCC, operating on the undisclosed conclusion that CIMSA's attempts to exercise its right were invalid, ended the negotiations abruptly when it sold the shares to a Peruvian company instead. *Id.*

The 2005 Agreement, governed by Bolivian law, provided that disputes would be "submitted to conciliation and subsequent international arbitration for final resolution, subject to the rules of the Inter-American Commercial Arbitration Commission." 2005 Agreement, cl. 29.1, ECF No. 62-2; Amaya Decl. ¶ 20, ECF No. 62. CIMSA initiated arbitration in 2011 by submitting a notice of arbitration to the Inter-American Commercial Arbitration Commission (the "IACAC"). Doria-Medina Decl. ¶ 27, ECF No. 1-9. The parties each appointed an arbitrator, and the chosen arbitrators jointly appointed a third as president of the Tribunal (together the "Arbitral Tribunal" or "Tribunal"). *Id.* ¶ 28. The parties agreed to bifurcate the proceedings into a merits phase to determine liability and a later damages phase. The Arbitral Tribunal issued an award on liability (the "Merits Award") in favor of CIMSA on September 13, 2013, finding GCC liable because it violated the 2005 Agreement and breached the good faith requirements

established by Bolivian law. *See* 9/13/2013 Final Award on Liability ¶¶ 592, 595, ECF No. 46-2.

The Tribunal issued a final award on damages (the "Damages Award") in April 2015. 4/10/2015

Final Award on Damages at 90, ECF No. 1-8.

The 2005 Agreement included an express waiver of "all motions to vacate, defenses and

appeals against [any arbitral] award." *Id.* at 29.2. And yet, Bolivian law permits its courts to

entertain requests for annulment of arbitral awards after prima facie review by the arbitral

tribunal, and the tribunal is given little discretion in determining whether a party has shown a

prima facie case for annulment—the party seeking annulment need only plead one of several

enumerated grounds to proceed. Von Borries Resp. Decl. ¶ 3, ECF No. 180 (explaining Article

113 of the Bolivian Arbitration and Conciliation Law). Ignoring the 2005 Agreement's express

waiver and citing the relevant Bolivian law, GCC has sought to annul both the Tribunal's Merits

and Damages Awards in Bolivia through a series of overlapping court proceedings. When

decisions were issued in favor of GCC, CIMSA has filed its own challenges. Throughout these

proceedings in the Bolivian courts, the parties have initiated a number of "*amparos*."

"An *amparo* is an extraordinary remedy that must be based on an alleged violation of

rights protected by the Bolivian Constitution." *Grupo Cementos*, 970 F.3d at 1278. *Amparos* are

brought pursuant to Article 128 of the Bolivian Constitution and Law No. 254 of the Bolivian

Code of Constitutional Procedure. Asbun Decl. ¶ 17, ECF No. 49-1. An *amparo* is not an appeal

on the merits of the underlying claim, but rather an action to address a violation of constitutional

rights. *Id.* ¶ 19. *Amparos* are initially heard by departmental courts, called "Guarantee Courts"

when acting on *amparos*. *Id.* ¶ 20. A Guarantee Court's resolution is subject to mandatory

review by the Plurinational Constitutional Tribunal ("PCT"), Bolivia's highest constitutional court.[1] Von Borries Decl. ¶ 48, ECF No. 46.

As described below, the PCT has issued a congeries of rulings and clarification orders in relation to the two arbitral awards, many before the Final Judgment entered in this case and a few since. Each party claims that a different final ruling now controls enforcement of the awards under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958 (the "New York Convention" or "Convention"), 21 U.S.T. 2517, T.I.A.S. No. 6997, as implemented by the Federal Arbitration Act, 9 U.S.C. § 201 *et seq.*

***Pre-Confirmation Bolivian Proceedings***

After the Arbitral Tribunal issued the Damages Award in April 2015, GCC sought leave from the Tribunal to request annulment of the award pursuant to Article 113 of the Bolivian Arbitration and Conciliation Law.[2] Von Borries Resp. Decl. ¶ 3. With its Procedural Order No. 12, the Tribunal concluded GCC had met the prima facie requirements for the request, thereby permitting a challenge of the Damages Award to proceed through the Bolivian justice system. *Id.* On October 9, 2015, the Twelfth Judge of the Civil and Commercial Court (the "Twelfth Judge")—the equivalent of a trial court judge—granted GCC's request to annul the Damages Award. Twelfth Judge Dec. No. 154/2015, ECF No. 65-36.

CIMSA challenged the Twelfth Judge's decision through two *amparos*. The first (the "Arbitral Amparo") argued that the Tribunal's failure to consider the parties' waiver of the right to seek post-arbitral judicial remedies in Article 29.2 of the 2005 Agreement invalidated

---

[1] The PCT is composed of four equal but distinct chambers. Asbun Decl. ¶ 21 n.4.
[2] The Tribunal had previously granted GCC's request for leave to pursue annulment of the Merits Award as well. Von Borries Decl. ¶¶ 32-33.

Procedural Order No. 12, and any decisions arising from that order, such as the Twelfth Judge's damages annulment order. Von Borries Resp. Decl. ¶ 6. The Guarantee Court for the Arbitral Amparo was the Third Civil Chamber of the Departmental Court of Justice of La Paz (the "Third Civil Chamber"), which dismissed the *amparo* action on procedural grounds in January 2016. *Id.* ¶¶ 6-7. Specifically, the Third Civil Chamber held that the damages annulment order was outside the scope of the Arbitral Amparo because the Twelfth Judge was not listed as a party. *Id.* ¶ 8. Upon automatic review, the First Chamber of the PCT issued SCP No. 1127 on November 7, 2016, confirming the Third Civil Chamber's resolution. *Id.*

In response to the Third Civil Chamber's January 11, 2016 resolution, CIMSA filed its second *amparo* (the "Substantive Amparo") on April 8, 2016, shortly before the statute of limitations ran. *Id.* ¶ 9. That *amparo* directly challenged the Twelfth Judge's annulment of the Damages Award. *Id.* CIMSA argued "the Twelfth Judge had violated its due process rights by improperly acting as a court of appeal and reopening the evidentiary phase of the arbitration." Von Borries Decl. ¶ 92. A different Guarantee Court rejected the claim on procedural grounds after determining that CIMSA could not properly file the Substantive Amparo while the Arbitral Amparo was pending. Von Borries Resp. Decl. ¶ 10. The PCT Admission Committee revoked the Guarantee Court's order and returned the *amparo* to the Guarantee Court for reconsideration on May 5, 2016. *Id.* ¶ 11. The Guarantee Court then considered the merits of the *amparo's* constitutional claim and denied it, finding that the Substantive Amparo was precluded by the Arbitral Amparo because the two *amparos* could result in contradictory decisions. *Id.* ¶ 12. On review, the Third Chamber of the PCT flatly disagreed, and in an order dated December 16, 2016 ("SCP No. 1481"), it found no impermissible overlap between the two *amparos*. PCT Judgment 1481/2016-S3, Dec. 16, 2016 § III.5.1, ECF No. 65-38. It went on to consider the merits of the

Substantive Amparo and determined that the Twelfth Judge had committed numerous legal errors in violation of CIMSA's constitutional rights, concluding that the Twelfth Judge erroneously conflated and attempted to broaden the scope of application of two different grounds for annulment, and that the Twelfth Judge impermissibly overstepped her authority by revisiting the evidence to reach a different interpretation than that reached by the arbitrators. *Id.* § III.5.2; *see also* Von Borries Resp. Decl. ¶¶ 13-14. Consequently, the Third Chamber of the PCT vacated the Twelfth Judge's decision to annul the Damages Award and directed her to issue a new decision consistent with its order. *Id.* ¶ 14. The Third Chamber issued this order without knowledge of the November 2016 PCT Decision, which had been issued by the First Chamber, Gutierrez-Gantier Reply Decl. ¶ 50, ECF No. 191-2; however, the order acknowledged the existence of the overlapping *amparo* proceedings and made it clear that the two proceedings were independent, PCT Judgment 1481/2016-S3, Dec. 16, 2016 § III.5.1.

Later in December 2016, GCC asked the Third Chamber to clarify its ruling, questioning whether the most recent order, SCP No. 1481, had invalidated the earlier one, SCP No. 1127. Von Borries Resp. Decl. ¶ 15. In line with its previous ruling, the Third Chamber of the PCT responded that there was no potential for contradiction, as SCP No. 1127 was a procedural decision while SCP No. 1481 was substantive, and further, that the two *amparo* proceedings involved distinct parties, subject matters, and causes of action. *Id.* The case was remanded to the Twelfth Judge to issue a new decision, but SCP No. 1481 effectively left no legal basis for her to annul the award a second time. *Id.* ¶ 13.

Months passed, and the Twelfth Judge did not comply with the PCT's mandate. *See* PCT Judgment 1481/2016-S3 at 32. CIMSA petitioned the Twelfth Judge to issue a new decision on April 17, 2017, and she promptly agreed to do so. Von Borries Resp. Decl. ¶ 16. Her authority

was quickly suspended, however, when GCC commenced a collateral action before the PCT challenging the constitutionality of Bolivia's arbitration law and its restriction on the right to appeal an arbitral award.[3] *Id.* ¶ 17; Gutierrez-Gantier Reply Decl. ¶ 26. The PCT rejected GCC's challenge on March 14, 2018, finding it "manifestly meritless" and again directed the Twelfth Judge to issue a new decision on the request for annulment of the Damages Award. Von Borries Reply to Mot. to Confirm Decl. ¶ 43, ECF No. 71.

The PCT only returned the file to the Twelfth Judge in July 2018. Von Borries Resp. Decl. ¶ 18. In quick succession, GCC initiated two new collateral proceedings to delay the Twelfth Judge's compliance with SCP No. 1481. First, GCC alleged it had not been properly served with the PCT's decision regarding the constitutionality of the arbitration law. *Id.* On August 30, 2018, the PCT responded that GCC had been properly notified of its decision, and any claim of improper service was false. *Id.* Second, GCC submitted arguments to the Twelfth Judge asserting she lacked jurisdiction to issue a new decision because the Damages Award was effectively nullified through separate proceedings in front of other trial court judges related to the Merits Award. Von Borries Resp. Decl. ¶ 19; *see Grupo Cementos*, 970 F.3d at 1275-80, 1295-98 (describing the "twists, turns, and orders" in those proceedings and rejecting the contention that the Merits Award had been set aside). The Twelfth Judge could not issue the anticipated decision on the Damages Award until she ruled on this petition from GCC. Oral Argument Tr. at 32:25-33:5, ECF No. 92. In September 2018, the Twelfth Judge made the inscrutable determination that the Arbitral Tribunal was in a better position to determine the status of the

---

[3] GCC had already filed two similar actions in 2016, resulting in other favorable delays within the Arbitral Amparo proceedings. Von Borries Decl. ¶¶ 82, 86.

Merits Award under Bolivian law, and therefore stated her intention to request clarification from the IACAC. Gutierrez-Gantier Reply Decl. ¶ 27; Von Borries Resp. Decl. ¶ 20.

***U.S. Proceedings***

Five months after the Arbitral Tribunal issued the Damages Award, CIMSA petitioned this Court to confirm the foreign arbitral award. (ECF No. 1). The case was stalled for approximately two years while CIMSA was unable to serve GCC in accordance with the Hague Convention, despite attempted service to the corporate headquarters' address, as it appeared on GCC's website. *See* Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters (the "Hague Convention"), Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638. When CIMSA filed a Motion to Authorize Alternative Service (ECF No. 43), GCC opposed the motion, despite CIMSA's success in serving the summons and complaint to the headquarters address via DHL and its regular communication with CIMSA through counsel. Mot. to Authorize Alternative Service at 4, 12. I granted the motion. (ECF No. 79).

On March 26, 2019, judgment was entered, based on my findings that the Merits Award had not been set aside and that the Damages Award was binding under the New York Convention. Mem. Op. & Order at 19, 25, ECF No. 93. On April 25, 2019, the day after filing its notice of appeal to the Tenth Circuit, GCC moved to stay execution of the judgment pending appeal without posting a bond. (ECF No. 108). I declined to issue an unsecured stay, noting "Respondents have challenged the arbitration award at every turn despite the parties' agreement to waive appeals against the award." Order Denying Mot. to Stay at 5-6, ECF No. 117. The Tenth Circuit likewise denied GCC an unsecured stay. *See* Order, No. 19-1151 (10th Cir., Aug. 6, 2019). And in late 2019, I rejected GCC's efforts to limit CIMSA's post-judgment discovery.

(ECF No. 146). On August 17, 2020, the Tenth Circuit affirmed in full my Order confirming the Tribunal's awards. *Grupo Cementos*, 970 F.3d at 1300.

On November 20, 2020, GCC filed a Motion to Vacate Judgment (ECF No. 158), claiming that recent Bolivian court orders had vacated the Damages Award. GCC followed the Motion to Vacate with a Motion to Stay Post-Judgment Discovery (ECF No. 162), which I denied, highlighting GCC's "attempts to circumvent the Rule 62 bond requirement," Order Denying Mot. to Stay Discovery at 2, ECF No. 167. GCC has since petitioned the Supreme Court of the United States for a writ of certiorari and requested that the Tenth Circuit stay issuance of its mandate pending the Supreme Court's ruling. The Tenth Circuit again declined to grant a stay. Order, No. 19-1151 (10th Cir., Oct. 8, 2020). After I ordered the release of a relatively miniscule amount of funds from the Court Registry, GCC moved for reconsideration and again requested a stay. (ECF No. 202). That motion was denied on the same grounds as the Motion to Stay Post-Judgment Discovery. (ECF No. 210). Two years later, it remains a fact that "Respondents have challenged the arbitration award at every turn despite the parties' agreement to waive appeals against the award." Order Denying Mot. to Stay at 5-6.

### *Post-Confirmation Bolivian Proceedings*

While CIMSA's Petition to Confirm was still before me, the Twelfth Judge made no movements. Despite a September 3, 2018 ruling in which she stated her intention to request assistance from the IACAC, the case sat idle for a year. Von Borries Resp. Decl. ¶¶ 20, 22. In September 2019, the Twelfth Judge sent a letter posing questions of Bolivian law to the IACAC, but it did not respond. *Id.* ¶ 22. In July 2020, however, the IACAC did respond to a letter from GCC, writing the following:

> It is not [IACAC's] authority to rule on the merits of the arbitrations it administers, and thus it would be wrong for [IACAC] to determine if, based on the parties' arguments, the award had been annulled . . . since this is a determination that pertains to the merits of the dispute, and is beyond the authority of an institution that administers proceedings.
>
> On the contrary, this Arbitration commenced in 2011 and the first partial award on the merits was issued on September 13, [2013] and a second award on damages was issued on April 10, 2015. Therefore, this case is concluded and if one or each of the parties want to have issues relating to it to be decided, they must commence a new arbitration.

*Id.* ¶ 23. The next week, GCC asked the Twelfth Judge to issue a certification that the proceedings to challenge the Damages Award were still pending and, if so, that the award was not binding under Bolivian law. *Id.* ¶ 25. On September 10, 2020, the Twelfth Judge issued a decision in which she confirmed that the proceedings were still pending, but she declined to certify that the Damages Award was not binding. *Id.* She maintained that she was bound by SCP No. 1481. *Id.*

On May 9, 2019, approximately six weeks after I issued my ruling confirming the arbitral awards, GCC took a new tack, initiating a challenge in the context of the long-concluded Arbitral Amparo and arguing, again, that the Substantive Amparo proceedings were invalid in their entirety, leaving the November 2016 PCT Decision as the only final PCT decision with any force. *Id.* ¶ 26. First, it filed an *ex parte* request with the Third Civil Chamber, but the court refused the request, finding that it lacked jurisdiction over the Substantive Amparo and that it was limited by SCP No. 1481 as *res judicata*. *Id.* ¶¶ 26-27. GCC next challenged that refusal through the mechanism of a *queja por incumplimiento* ("*queja*"), a complaint for non-compliance with an existing *amparo*. *Id.* ¶ 28. In the *queja*, GCC argued that CIMSA had impermissibly filed the second *amparo* in "breach" of the previously filed Arbitral Amparo. *Id.* The Third Civil Chamber rejected the *queja* on August 2, 2019, on the same basis as the *ex parte*

request. *Id.* ¶ 30. On August 14, 2019, GCC challenged the Guarantee Court's rejection of its *queja* with the PCT. *Id.* ¶ 31.

At the time of GCC's challenge, Bolivia was experiencing political unrest. Gamarra Resp. Decl. ¶¶ 11, 17-18, ECF No. 181-1. Former President Evo Morales resigned from office in October 2019, amid allegations of fraud in the general elections. Langer Reply Decl. ¶ 19, ECF No. 190-4. Special elections were held the following October. *Id.* CIMSA's principal, Mr. Samuel Doria-Medina, served as Interim President Jeanine Añez's vice-presidential running mate until September 2020, when polls showed defeat was imminent. *Id.* ¶ 20. On October 18, 2020, successful elections resulted in a new president. *Id.* ¶¶ 21-22. Two weeks later, the Fourth Chamber of the PCT issued a procedural order (the "2020 Procedural Order"), stating that the Substantive Amparo should not have been filed while the Arbitral Amparo proceedings were pending because they had "the same purpose." PCT Auto Constitucional ACP No. 0017/2020, Oct. 29, 2020 at 10-12 (hereinafter "2020 Procedural Order"), ECF No. 158-3; *see also* Von Borries Resp. Decl. ¶¶ 32-33. The Fourth Chamber further found that SCP No. 1481 was the "product of a deceit or procedural fraud"[4] because the first *amparo* carried an "implicit mandate" which precluded the filing of a second *amparo* before the first *amparo* proceedings concluded. 2020 Procedural Order at 19. The order was issued on October 29, 2020 but dated February 18, 2020. *Id.* at 2, 20-21. The consequence of the 2020 Procedural Order was to invalidate all orders issued after the January 2016 decision of the Third Civil Chamber finding the Arbitral Amparo procedurally unsound. Von Borries Resp. Decl. ¶¶ 32-33.

---

[4] Rather than indicating dishonest conduct, this wording, translated from Spanish, represents a legal conclusion by the PCT regarding any successive amparo under similar circumstances. *See* Reply at 25 n.9, ECF No. 190. Thus, "product of deceit" and "procedural fraud" are terms of art that do not express condemnation of CIMSA's behavior and would not warrant sanctions. *Id.*

On November 3, 2020, GCC filed another *ex parte* motion with the Twelfth Judge, asking her to comply with the 2020 Procedural Order, making the questionable claim that the Order required her to reinstate her October 2015 decision to annul the Damages Award. Von Borries Resp. Decl. ¶ 39; *see also* Asbun Resp. Decl. ¶¶ 69-74, ECF No. 179-2. Two days later, on November 5, 2020, the Twelfth Judge issued a terse order reinstating her October 2015 decision annulling the Damages Award. Von Borries Resp. Decl. ¶ 40. CIMSA promptly sought reconsideration of the Twelfth Judge's order on procedural and substantive grounds. Von Borries Resp. Decl. ¶ 41. The Twelfth Judge dismissed the motion for reconsideration in another brief order, stating she was complying with the 2020 Procedural Order. *Id.* ¶ 44. A petition for redress to a higher court was likewise met with a one-page dismissal. Asbun Resp. Decl. ¶ 80. GCC has filed the present Motion to Vacate on the basis of the PCT's 2020 Procedural Order and the Twelfth Judge's November 5, 2020 order, arguing "there is no longer any arbitral award to enforce and no basis for a judgment to enforce such an award." Mot. to Vacate at 1.

## III. LEGAL STANDARDS

### The New York Convention

There is a pro-enforcement bias to the New York Convention. *See Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974). One core objective of the Convention was to "free the international arbitral process from domination by the law of the place of arbitration," thereby encouraging enforcement of arbitral awards. Jan Paulsson, *Enforcing Arbitral Awards Notwithstanding Local Standards Annulments*, 6 ASIA PAC. L. REV. 1, 8 (1998). "Under the Convention, the country in which . . . an award was made is said to have *primary* jurisdiction over the arbitration award. All other signatory States are *secondary* jurisdictions, in which parties

can only contest whether that State should enforce the arbitral award." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 364 (5th Cir. 2003) (quoting New York Convention art. V(1)(e)) (internal quotation marks and brackets omitted).

Article V of the Convention delineates seven defenses to recognition and enforcement of an arbitral award. New York Convention art. V. Most relevant here, a court may refuse to enforce an award that "has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." *Id.* art. V(1)(e).[5] The Convention does not specify the grounds on which courts in the primary jurisdiction may set aside an award, indicating instead that "an action to set aside an international arbitral award . . . is controlled by the domestic law of the rendering state." *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 21 (2d Cir. 1997). A defense to enforcement must be construed narrowly, and the party opposing confirmation of the award bears the burden of proof. *See Goldgroup Resources v. Dynaresource De Mexico*, --- F.3d ---, 2021 WL 1432953, at *8 (10th Cir. April 16, 2021) (citing *Grupo Cementos*, 970 F.3d at 1295-96).

The Convention's implicit concerns for comity must be considered and deference must generally be afforded to the decision of a competent authority in the primary jurisdiction. *See Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*, 864 F.3d 172, 186 (2d Cir. 2017) ("The annulment of an arbitral award in the primary jurisdiction should be given significant weight."). Nevertheless, "[i]n certain narrow circumstances, a Convention award may be entitled to confirmation, recognition, or enforcement, despite having previously

---

[5] "The most significant aspect of [Article V(1)] is its structure, which is to establish an affirmative obligation to recognize foreign . . . awards, subject to specified exceptions—but not to establish an affirmative obligation to deny recognition. Critically, the Article V(1) exceptions are just that: exceptions to an affirmative obligation, and not affirmative obligations in their own right." 3 G. Born, *International Commercial Arbitration* § 26.03[B][6], pg. 3428 (2nd ed. 2014).

been set aside [by a competent authority]." Restatement (Third) U.S. Law of Int'l Comm. Arb. §

4.14(d) (Am. L. Inst., Proposed Final Draft 2019). Courts have applied a narrow public policy

exception when a foreign judgment or the foreign proceedings are "repugnant to fundamental

notions of what is decent and just," drawing that standard, in part, from the Restatement

(Second) of Conflict of Laws § 117 (1971). *See e.g.*, *Thai-Lao*, 864 F.3d at 184, 189 (affirming

district court absent showing that vacatur would "offend basic notions of justice"); *Corporacion*

*Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploracion Y Produccion*,

832 F.3d 92, 111 (2d Cir. 2016) (affirming enforcement of award when nullification "offend[ed]

basic standards of justice"); *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 938 (D.C.

Cir. 2007) (declining to apply narrow public policy exception absent showing that foreign

proceedings were repugnant to public policy).

 Federal Rule of Civil Procedure 60(b) applies to motions to vacate judgments confirming

arbitral awards that have been annulled by courts in the primary jurisdiction because, under the

New York Convention, contracting states are to enforce arbitral awards "in accordance with the

rules of procedure of the territory where the award is relied upon," New York Convention art.

III. Rule 60(b)(5) is one such rule of procedure. *See Thai-Lao*, 864 F.3d at 185.

### *Federal Rule of Civil Procedure 60(b)(5)*

 "A Rule 60(b) motion for relief from judgment is an extraordinary remedy and may be

granted only in exceptional circumstances." *Jackson v. Los Lunas Cmty. Program*, 880 F.3d

1176, 1191-92 (10th Cir. 2018) (citations omitted). Federal Rule of Civil Procedure 60(b)(5)

permits relief from a final judgment or order if, among other considerations, "it is based on an

earlier judgment that has been reversed or vacated."[6] Relief is within the sound discretion of the

court, which possesses "a grand reservoir of equitable power to do justice in a particular case."

*Manzanares v. City of Albuquerque*, 628 F.3d 1237, 1241 (10th Cir. 2010) (quotation marks and

citation omitted). Because Rule 60(b) is equitable in nature, it is appropriate in the exercise of

discretion to consider whether the moving party has acted equitably. 12 Moore's Federal Practice

- Civil § 60.22[5] (2021).


## III. DISCUSSION

Two critical factors guide my consideration of the present motion for vacatur: (1)

whether compelling circumstances exist to justify the enforcement of an arbitral award that has

been set aside by a competent authority, and (2) whether Respondents have acted equitably. In

my assessment of the first factor, I address the narrow public policy exception to the principle of

comity under the New York Convention, applicable when enforcement of an arbitral award is

necessary to "vindicate fundamental notions of what is decent and just in the United States."

*Pemex*, 832 F.3d at 107 (citation and internal quotation marks omitted). I determine that the

application of the 2020 Bolivian court orders in this case would offend basic standards of justice.

*See TermoRio*, 487 F.3d at 939. Regarding the second factor, I conclude that parties cannot be

---

[6] CIMSA advocates for a constricted reading of Rule 60(b)(5) that does not permit vacatur in the arbitration context because relief under that rule is based on alterations to an earlier judgment and a "judgment is a judicial act of [a] *court*," not an arbitral tribunal. Resp. at 15 (emphasis added) (quoting 46 Am Jur. 2d Judgments § 1). This argument is unavailing. An arbitration is a legal action, culminating in a judgment albeit under another name. 1 Henry Campbell Black, *A Treatise on the Law of Judgments* § 1, at 2 (2d ed. 1902) ("An action is instituted for the enforcement of a right or the redress of an injury. Hence a judgment, as the culmination of the action declares the existence of the right, recognizes the commission of the injury, or negatives the allegation of one or the other."). Further, the generous language of Rule 60(b)(6), which authorizes this Court to set aside its prior judgment for "any other reason that justifies relief," undermines the foundation of CIMSA's arguments. Fed. R. Civ. P. 60(b)(6).

permitted to prolong foreign proceedings indefinitely. That is particularly so here, where a foreign high court had already issued final decisions in two nullification proceedings in favor of the judgment creditor when I confirmed the arbitral awards.

### 1. Compelling Circumstances

"[T]he parties' agreement demonstrates that the arbitration award became binding upon issuance," specifically, the Merits Award in September 2013 and the Damages Award in April 2015. *Grupo Cementos*, 970 F.3d at 1300. In the face of two binding awards against it, and despite its express waiver of "all motions to vacate, defenses and appeals," 2005 Agreement, cl. 29.2, GCC initiated nullification proceedings against both the Merits Award and the Damages Award. The nullification proceedings in the context of the Merits Award did not end favorably for GCC. *See Grupo Cementos*, 970 F.3d at 1298. In the proceedings challenging the Damages Award, GCC had some initial success when the Twelfth Judge nullified the award in late 2015 and when the PCT issued a final decision on November 7, 2016, dismissing CIMSA's Arbitral Amparo on procedural grounds. But then, in a final order dated December 16, 2016, the PCT considered the substance of CIMSA's constitutional claims and vacated the 2015 annulment order. The next month, the PCT confirmed that "it did not observe an apparent contradiction between the November 2016 PCT Decision and the December 2016 PCT Order." Gutierrez-Gantier Reply Decl. ¶ 24. Nearly two and a half years later, following lengthy confirmation proceedings in this Court, I held the Merits Award had not been set aside, and the Damages Award was binding under the New York Convention. Mem. Op. & Order at 19, 25. It was not until October 2020, that the tides turned in GCC's favor. At that time, the PCT revised its previous rulings, held that the two *amparos* were "parallel juridical mechanisms, whose

resolutions could have been contradictory," and vacated both the November 2016 decision and the December 2016 order. 2020 Procedural Order at 19.

GCC asserts that, through its 2020 Procedural Order, the PCT was rectifying a mistake made four years earlier. Allegedly, a judicial error occurred when the Third Chamber of the PCT issued SCP No. 1481 while entirely unaware of the holdings of the First Chamber from the previous month. Reply at 27-28. As a result of this oversight, GCC claims, the PCT failed to realize that SCP No. 1481 conflicted with SCP No. 1127. *Id.* "Simply put," GCC explains, "just like the U.S. Supreme Court, the PCT can revise its prior decisions." *Id.* at 27 (quotation marks omitted) (quoting Gutierrez-Gantier Reply Decl. ¶ 65). But the Supreme Court does not revise a prior decision in the same case years later; rather, it departs from the doctrine of *stare decisis* by overruling precedent set in *other cases* when there is special justification to do so. *See Gamble v. United States*, 139 S. Ct. 1960, 1969 (2019); *see also Payne v. Tennessee*, 501 U.S. 808, 828 (1991) ("Considerations in favor of *stare decisis* are at their acme in cases involving property and contract rights.").

For its part, CIMSA is adamant that the two *amparo* proceedings, and thus the two 2016 PCT orders, do not conflict. *See* Resp. at 23, ECF No. 183. CIMSA also asserts the unfavorable 2020 decisions do not merit comity because they were the product of corruption in the judiciary and bias against CIMSA's principal,[7] and were issued in flagrant violation of Bolivian

---

[7] CIMSA seeks to establish bias against its principal, Mr. Samuel Doria-Medina, by leaders of the Movimiento al Socialismo, or "MAS," describing Mr. Doria-Medina as "one of Bolivia's most vocal opponents against MAS." Resp. at 33. Numerous challenges inhere in an attempt to prove bias by a foreign court, and more so by several courts issuing a burst of interrelated opinions. While I make no findings on the issue of bias against Mr. Doria-Medina, I do note that CIMSA's assertions find support outside the confines of this case. The Organization of American States issued a statement noting the recent "abuse of judicial mechanisms" and a "lack of guarantees" in unrelated hearings against Mr. Doria-Medina. *See* Statement from the OAS General Secretariat on the Situation in Bolivia, Mar. 15, 2021, https://www.oas.org/en/media_center/press_release.asp?sCodigo=E-022/21 (last visited Apr. 30, 2021). I also cannot ignore the

constitutional law. GCC, brazen in its counterarguments, submits the testimony of an expert who disavows allegations of corruption based on his personal relationships with Bolivian judges and politicians. *See* Langer Reply Decl. ¶¶ 7-8, 24. Both parties discuss the minutiae of relevant Bolivian law and procedure.

Though close review of a foreign sovereign's judicial or political systems may at times be warranted, such an analysis is unnecessary here. For the purposes of ruling on this Motion to Vacate, I assume—without finding—that the 2020 Procedural Order overturned SCP No. 1481, and that the Twelfth Judge had authority to nullify the Damages Award.[8] I also assume both courts are "competent authorit[ies]" as defined by Article V(1)(e).

Though I do not consider the 2020 orders themselves to be "repugnant to fundamental notions of what is decent and just" in the United States, I do find that application of those orders through vacatur of this Court's prior Judgment would rise to that unacceptable level. *TermoRio*,

---

serendipitous timing of the 2020 Procedural Order. The Order is dated February 18, 2020, but it was not served on the parties until October 29, 2020, less than two weeks after a Presidential election and less than three months after the Tenth Circuit affirmed Judgment against GCC. Gutierrez-Gantier Reply Decl. ¶ 29. CIMSA makes much of the timing, claiming the elections "consolidate[ed] control of the judiciary." Resp. at 4. While the record does not contain sufficient evidence to establish foul play, had GCC pursued relief in the Bolivian courts on the grounds that ultimately led to the 2020 Procedural Order while the Motion to Confirm was still pending, the interests of finality would have been somewhat less compelling.

[8] I do nevertheless note that CIMSA provides good reason to doubt the Twelfth Judge's authority to re-issue her order annulling the Damages Award—a topic the PCT has not addressed. First, the Twelfth Judge offered no basis for her conclusion that the 2020 Procedural Order, an "interlocutory decision[] that cannot have a substantive impact on the parties' rights," required her to comply by re-issuing a nullification order. Asbun Resp. Decl. ¶ 73. The order declared that "all the actions undertaken after the issuance of the Resolution 01/2016 . . . are annulled and not subject to validation," but, unlike SCP No. 1481, it did not order the Twelfth Judge to issue a new decision. 2020 Procedural Order at 20. Second, CIMSA contends the Twelfth Judge lacked jurisdiction to issue the November 5, 2020 order:  Because she was not a party to the Arbitral Amparo proceedings—the very reason that *amparo* was dismissed—she was without "authority to act purportedly in 'compliance' with the 2020 Procedural Order," because "decisions on *amparos* only have effect as to the specific parties and alleged constitutional violations at issue." Asbun Resp. Decl. ¶ 75 (brackets omitted).

487 F.3d at 938; *see also Thai-Lao*, 864 F.3d at 183-84.[9] "Repugnant" is a fitting description of proceedings without end.

GCC contends that the December 2016 PCT order was not final because "there were still ongoing proceedings to set aside the award in Bolivia,"[10] and that the PCT has now issued a "final decision." Mot. to Vacate at 1-2. Accepting GCC's suggestion that finality requires a ruling while no challenges or appeals are pending would encourage an endless barrage of challenges to unfavorable arbitral awards or court orders. This is precisely what GCC has done in this case by pursuing every fathomable legal challenge. Previously, I found that the "[t]he PCT [had] already vacated the Twelfth Judge's annulment decision and ordered [her] to issue a new decision consistent with [its] judgment." Mem. Op. & Order at 14. At that time, it appeared that despite a final resolution, GCC would prolong proceedings as much as possible. *Id.* at 28-30. My prediction has come to pass, with proceedings only concluding after GCC lodged a successful challenge in May 2019. Consequently, while the PCT may have revised a prior decision and

---

[9] GCC maintains that the Second Circuit "affirmed vacatur in materially identical circumstances" in *Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*, 864 F.3d 172 (2d Cir. 2017). Mot. to Vacate at 11. Not so. In *Thai-Lao*, the court of primary jurisdiction, the Malaysian High Court, did not issue a final ruling in the set aside proceedings until more than a year after the district court had confirmed the award. *See Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*, 997 F. Supp. 2d 214, 216-17 (S.D.N.Y. 2014), *aff'd*, 864 F.3d 172 (2d Cir. 2017). Here, the PCT issued a final ruling vacating the damages annulment order two and a half years *before* I confirmed the award. Additionally, in *Thai-Lao* the Malaysian High Court set aside the arbitral award on a universally recognized ground, that the arbitrators had exceeded their jurisdiction. In this case, the 2020 Procedural Order reversed a well-reasoned decision by the PCT, thereby resuscitating the Twelfth Judge's decision to annul the Damages Award on two specious grounds: (1) the Arbitral Tribunal's failure to advise the parties that it would consider an e-mail during the damages phase as well as the merits phase of the proceeding, and (2) the lack of support for the Tribunal's statement that its damages calculation was "endorsed by the Tribunal's experience." Von Borries Resp. Decl. ¶ 5. Though it has now vacated its opinion, the PCT itself found the Twelfth Judge's reasoning inappropriate and highly flawed. *Id.* ¶ 13.

[10] GCC's own expert proclaims, however, that "PCT decisions . . . are final, binding and automatically enforceable. Gutierrez-Gantier Decl. ¶ 35.

found that the arbitral award is "*now* null and void," Mot. to Vacate at 2 (emphasis added), there

is no guarantee the PCT will not reverse course yet again. The Supreme Court has long

recognized "[p]ublic policy dictates that there be an end of litigation." *Federated Dep't Stores,*

*Inc. v. Moitie*, 452 U.S. 394, 401 (1981) (quoting *Baldwin v. Traveling Men's Assn.*, 283 U.S.

522, 525 (1931)).

      Finality is not only significant in my public policy analysis; it is also a value expressed in

the parties' contractual agreements. The 2005 Agreement states: "Any awards or orders issued

by the Arbitral Tribunal shall be final and binding on the Parties to the Arbitration, who hereby

expressly waive all motions to vacate, defenses and appeals against said award. The arbitral

award may be enforced in any court having competent jurisdiction over same or over the Parties

to the Arbitration or their assets." 2005 Agreement, cl. 29.2. The IACAC Rules to which the

parties submitted similarly provide: "The award shall be made in writing and shall be final and

binding on the parties and subject to no appeal." *See* 22 C.F.R. pt. 194, app. A, art. 29.2 (setting

forth the IACAC rules as amended April 1, 2002).[11]

---

[11] I continue to question whether the parties' contractual agreement not to pursue post-arbitral challenges trumps the provision of Bolivian law that permits parties to seek annulment in Bolivian courts after obtaining approval from the arbitral tribunal. "The choice of a particular place of arbitration should not facilitate . . . subterfuge by dint of an unusual or internationally unacceptable local rule." Jan Paulsson, *Enforcing Arbitral Awards Notwithstanding Local Standards Annulments*, 6 ASIA PAC. L. REV. at 2. The Tribunal concluded that Article 113 of the Bolivian Arbitration and Conciliation Law left it with no meaningful choice but to permit nullification proceedings. Sec. Von Borries Decl. ¶ 3. CIMSA asserts the Tribunal did not properly consider the question, and so it sought an answer from Bolivia's appellate courts by means of its 2015 Arbitral Amparo. *Id.* ¶ 6. The PCT dismissed the *amparo* on procedural grounds. *Id.* ¶ 8. The same question was raised in the 2016 Substantive Amparo but the PCT ruled in favor of CIMSA without addressing the issue. *Id.* ¶ 13. It was neither a condition precedent to my confirmation of the arbitral awards nor is it essential to the present denial of vacatur that I answer this question. I do, however, find it significant that by selecting Bolivia as the arbitral seat, the parties agreed to arbitrate in a country that is a signatory to the New York Convention, thereby subjecting them to the discretion of courts in other signatory States to enforce arbitral awards that have been set aside. *See* Domenico Di Pietro and Martin Platte, *Enforcement of International Arbitration Awards: The New York Convention of 1958,* at

Rule 60(b) "seeks to strike a delicate balance between two countervailing impulses: the desire to preserve the finality of judgments and the incessant command of the court's conscience that justice be done in light of *all* the facts." *Cessna Fin. Corp. v. Bielenberg Masonry Contracting, Inc.,* 715 F.2d 1442, 1444 (10th Cir. 1983) (citation and internal quotations and omitted). The argument for amending an order to correct an injustice loses force over time because "[a]n adjudication must at some time become final." *Pierce v. Cook & Co.*, 518 F.2d 720, 722 (10th Cir. 1975). Through its maneuvering, GCC ensured that an action to annul the Damages Award was pending for more than five years. But in the end, the PCT's revision of its December 2016 order was issued at a point when the interests in finality overshadow those of comity.

### 2. Considerations in Equity

My conclusion is reinforced by GCC's inequitable conduct throughout this litigation. First, I find that GCC has slept on its rights. Equitable relief is not available to a party that fails to act in a timely manner. *See Biodiversity Conservation Alliance v. Jiron*, 762 F.3d 1036, 1090-91 (10th Cir. 2014) (observing the maxim, "equity aids the vigilant and not those who slumber on their rights") (quoting *Kansas v. Colorado*, 514 U.S. 673, 687 (1995)); *see also Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000) (affirming denials of successive Rule 60(b) motions upon failure to appeal an underlying judgment and when arguments were previously available). Nearly four years passed before the PCT arrived at its amended conclusion, and its delay can be attributed to the intentionally belated filing of GCC's *queja* proceedings. GCC waited until May 9, 2019—until I had confirmed the award against them—to

---

169 (2001) (explaining the defense in Article V(1)(e) is "subject to the discretion of the enforcing Court).

initiate a new motion to enforce the November 2016 PCT Decision. *See* Von Borries Resp. Decl. ¶¶ 26-31. GCC has failed to explain why the motion to enforce was not filed shortly after the Substantive Amparo proceedings concluded, or even within two years of that event.[12] To state the obvious, GCC waited until its efforts to defend against enforcement in the United States were unsuccessful.

Second, GCC has prolonged the proceedings before this Court; it has frustrated service of process and has refused to carry out the arbitral award without delay. My ruling on CIMSA's Motion to Confirm was significantly delayed due to CIMSA's inability to effectuate service on GCC. Service was not successful because GCC's offices in Mexico could not be located at the headquarters' address printed on its website. *Grupo Cementos*, 970 F.3d at 1280. In an order authorizing alternative service the following year, I stated that "I will not abide Respondents' irksome and peevish attempts to frustrate service unnecessarily while they actively participate in the present litigation." Order Granting Mot. for Alternative Service at 2-3. Likewise, I will not allow GCC to benefit from that delay now. I also consider GCC's failure to "carry out the award without delay," in accordance with the IACAC rules. 22 C.F.R. pt. 194, app. A, art. 29.2. Even though GCC "does hundreds of millions of dollars of business [in the United States]," *Grupo Cementos*, 970 F.3d at 1280, it has repeatedly asked for a stay while refusing to post a supersedeas bond and has not made any effort to satisfy the award against it. GCC's actions before this court and in the Bolivian courts sway the equitable considerations decidedly against it and in CIMSA's favor.

---

[12] The Substantive Amparo proceedings terminated on either December 16, 2016, the date of the PCT Decision, or on January 4, 2017, the date of the Clarification Order. Von Borries Resp. Decl. ¶¶ 13, 15. As they are close in time, I need not commit to one.

## V. CONCLUSION

Relief pursuant to Rule 60(b) is extraordinary and only appropriate in exceptional circumstances. Where, as here, my previous order confirming an arbitral award was based on a final judgment in nullification proceedings from a court of primary jurisdiction, and given the years that passed without any revision to that judgment, relief under Rule 60(b) would be unjust, particularly when, in the intervening years, the Tenth Circuit affirmed my order in a published option. Respondents' Motion to Vacate Judgment (ECF No. 158) is therefore DENIED. Petitioner's Motion for Leave to File a Sur-reply is GRANTED (ECF No. 205).

DATED this 30th day of April, 2021.

JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE