IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-cv-02120-JLK

COMPAÑÍA DE INVERSIONES MERCANTILES S.A.,

      Petitioner,

v.

GRUPO CEMENTOS DE CHIHUAHUA, S.A.B. de C.V., and
GCC LATINOAMÉRICA, S.A. de C.V.,

      Respondents.

---

**ORDER GRANTING MOTION FOR TURNOVER ORDER (ECF NO. 124)**

---

Kane, J.

This matter is before me on the Post-Judgment Motion for Turnover Order Requiring Payment of Funds into Registry of Court (the "Turnover Motion") (ECF No. 124) filed by Petitioner/Judgment-Creditor Compañía de Inversiones Mercantiles S.A. ("CIMSA"). On March 26, 2019, Final Judgment entered in this case in favor of CIMSA and against Respondent/Judgment-Debtors Grupo Cementos de Chihuahua, S.A.B. de C.V. ("GCC S.A.B.") and GCC Latinoamérica, S.A. de C.V. ("GCC Latinoamérica," collectively "GCC") in the amount of $36,139,233 plus interest. CIMSA, a Bolivian corporation, now seeks an order requiring GCC S.A.B., a Mexican corporation, to turn over three categories of assets located in Mexico to the Registry of this Court in satisfaction of that Judgment.

GCC challenges my authority to issue the requested turnover order and requests a hearing on contested issues of Mexican law.[1] I find a hearing is unnecessary and grant CIMSA's motion

---

[1] In addition to oral argument, GCC has requested an opportunity to depose CIMSA's Mexican law expert. Resp. to Mot. to Reopen Proceedings at 7, ECF No. 150. The parties have collectively submitted six expert declarations, comprehensively addressing the relevant issues of

as to the assets controlled by GCC: publicly traded common stock held in GCC's corporate treasury; any funds held by GCC's wholly owned subsidiary Cementos de Chihuahua, S.A. de C.V. ("Cementos") acting as GCC's in-house bank; and interest payments due on nine intercompany loans to GCC subsidiaries.

## I. PROCEDURAL HISTORY[2]

In 2005, the parties executed a shareholder's agreement. In accordance with that agreement, any disputes were to be resolved by international arbitration and governed by the Inter-American Commercial Arbitration Commission. 2005 Agreement, cl. 29.1, ECF No. 62-2. A dispute arose under the agreement and arbitration proceedings commenced. The proceedings were bifurcated into a merits phase and a damages phase. In September 2013, a three-member arbitral tribunal (the "Tribunal") issued an award on the merits in favor of CIMSA (the "Liability Award"). GCC challenged the liability determination through Bolivian annulment proceedings, while the Tribunal adjudicated the issue of damages. In an attempt to stay the damages phase of the arbitration, GCC sought an injunction from a Mexican court. On December 3, 2014,[3] GCC Latinoamérica[4] obtained a preliminary injunction (the "Mexican Injunction") from the

---

Mexican law. Given the thoroughness of those declarations and the conclusions contained in this Order, the measures requested by GCC are unnecessary.

[2] The factual history of the underlying dispute and the arbitral proceedings on which it is based can be found in the Tenth Circuit's Opinion, *Compañía de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1275-80 (10th Cir. 2020), and in my previous Order Denying Motion to Vacate Judgment (ECF No. 214) on pages 2 to 12.

[3] Several submissions from the parties contain different dates. *See, e.g.*, Rivera Decl. ¶ 48 ("[O]n October 8, 2014, Respondents informed the Arbitral Tribunal that they had obtained an injunction in the Judicial District of Morelos, Chihuahua, Mexico. . . ."), ECF No. 65. As the Injunction itself is clearly dated December 3, 2014, I defer to it.

[4] Respondent GCC S.A.B. was not a party to the Mexican proceedings resulting in the Injunction. *See* Dec. 3, 2014 Mexican Injunction at 31 (original order followed by English translation), ECF No. 127-5.

Provisional Eighth Judge on Civil Matters in the Judicial District of Morelos, Chihuahua, Mexico. Lozano Decl. ¶¶ 7-9, ECF No. 127-2. GCC informed the Tribunal that a Mexican court had ordered suspension of the arbitral proceedings until the Bolivian annulment proceedings concluded, but the Tribunal determined the Mexican court lacked jurisdiction to issue the Injunction and elected to disregard it entirely. Rivera Decl. ¶ 48, ECF No. 65. The Tribunal issued a final award on damages (the "Damages Award") in April 2015. *Id.* ¶ 49. Five months later, CIMSA petitioned this Court to confirm the foreign arbitral awards. Mot. to Confirm, ECF No. 1.

I confirmed both arbitral awards after concluding the Liability Award had not been set aside in the Bolivian annulment proceedings and the Damages Award was binding under the New York Convention. Mem. Op. & Order at 19, 25, ECF No. 93. Judgment was entered on March 26, 2019 ("Final Judgment"). *See* Mar. 26, 2019 Final Judgment, ECF No. 94. Respondents appealed the Final Judgment to the Tenth Circuit Court of Appeals. While that appeal was pending, CIMSA moved to enforce the Judgment by filing its Turnover Motion. Through post-judgment discovery, CIMSA has identified three categories of assets that it contends GCC S.A.B. should pay into the Court Registry in satisfaction of the Final Judgment:

    (a) 6,205,205 of its publicly traded shares in its corporate treasury (the "GCC shares") with an approximate value of $49,640,000 USD;

    (b) Cash in the amount of $10,000 Mexican pesos, held by Mexican bank Banco Ve por Más, S.A. Institución de Banca Múltiple, Grupo Financiero Ve por Más ("BX+"), as well as short-term certificates of deposits ("CDs") held by BX+ and interest due on those certificates totaling $304,760,399 pesos, valued at approximately $15,200,000 USD, and cash in the amount of $28,716,285 pesos, held by Cementos as its "in-house bank," valued at approximately $1,430,000 USD; and

    (c) Amounts owed by nine subsidiaries in the amount of $4,364,822,000 pesos (the "Intercompany Receivables"), valued at approximately $223,400,000 USD.

*See* Mot. for Turnover at 1-2; Suppl. to Mot. for Turnover at 1-3, 7-10 (Public Entry at ECF No. 233; Restricted Doc. at ECF No. 223).

In its Response to the Turnover Motion, GCC insisted that the rules permitting a turnover order do not apply extraterritorially to property in foreign countries. *See* Resp. to Mot. for Turnover at 9-10, ECF No. 127. It further argued that the motion should be denied as a matter of international comity because the requested order would violate Mexican law. *Id.* at 7-9. Alternately, GCC urged me to stay consideration of CIMSA's Motion until the Tenth Circuit decided the pending appeal. I agreed to the stay and also granted GCC's Motion for Leave to File a Sur-Reply (ECF No. 140). The following month, CIMSA filed a Motion to Reopen the Proceedings Regarding its Post-Judgment Motion for Entry of a Turnover Order and for Leave to File a Supplemental Declaration (ECF No. 149). In its motion, CIMSA submitted arguments in response to GCC's Sur-reply to the Turnover Motion, effectively submitting a Sur-sur-reply, to which GCC has responded and CIMSA has replied.

On August 17, 2020, the Tenth Circuit affirmed my Order and Final Judgment. *See Compañía de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269 (10th Cir. 2020) (hereinafter *Grupo Cementos*). CIMSA's Motion to Reopen Proceedings is now moot given the Tenth Circuit's decision. GCC petitioned the Supreme Court of the United States for a writ of certiorari and requested that the Tenth Circuit stay issuance of its mandate pending the Supreme Court's ruling. The Tenth Circuit declined to do so. Order, No. 19-1151 (10th Cir. Oct. 8, 2020). Then, in November 2020, GCC filed a Motion to Vacate Judgment (ECF No. 158), claiming that recent Bolivian court orders had vacated the Damages Award. On April 30, 2021, I denied that motion, finding the exceptional relief of vacatur unwarranted, and GCC filed a Notice of Appeal. The Supreme Court denied GCC's petition for a

writ of certiorari two months later. In July 2021, shortly after the Supreme Court entered its order, CIMSA submitted a Supplemental Memorandum in Support of its Post-Judgment Motion for Entry of a Turnover Order (Public Entry at ECF No. 233; Restricted Doc. at ECF No. 223). GCC has submitted a Supplemental Response (ECF No. 229).

In its supplemental memorandum, CIMSA updates the Court on the status of ongoing post-judgment discovery, providing additional details regarding the amount and location of GCC's assets (as described in the list of assets above). CIMSA asserts that as of the date of its supplement, GCC's total outstanding judgment, including interest and costs, is $47,262,022.86, and it submits evidence that GCC's publicly traded shares and cash holdings are sufficient to cover that amount. *See* Suppl. to Mot. for Turnover at 2 n.2, 3-4. In response, GCC renews its argument that I am not authorized to issue the requested turnover order and alternately asserts I should stay consideration of the Turnover Motion until CIMSA exhausts its remedies in Mexico by seeking to enforce the Final Judgment there. GCC also informs the Court that the CDs held by BX+ and valued at approximately $15,000,000 U.S. dollars in October 2020—assets that CIMSA established had been invested and re-invested through 28-day certificates of deposit for years, *see* Mier y Teran Decl. ¶¶ 2-19, ECF No. 232—were no longer in GCC's possession but were instead being managed by Cementos, GCC's "in-house bank." Resp. to Suppl. to Mot. for Turnover at 4 n.5; Aguilar Collins Decl., ECF No. 229-5.

## II. LEGAL STANDARDS

A motion to enforce a money judgment is governed by Federal Rule of Civil Procedure 69(a). Rule 69(a)(1) permits a court to enter a turnover order "in aid of judgment or execution," provided that, in the absence of an appliable federal statute, it complies with the law and

procedures of the state where the court is located. *See United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1235 (10th Cir. 2000), *aff'd*, 532 U.S. 588 (2001). Because enforcement proceedings in this context are not pre-empted by federal statute, I apply Colorado law and procedure. Under the relevant state procedural rule, the court "may order any party or other person over whom the court has jurisdiction, to apply any property other than real property, not exempt from execution, whether in the possession of such party or other person, or owed the judgment debtor, towards satisfaction of the judgment." Colo. R. Civ. P. 69(g). "[Colorado Rule of Civil Procedure] 69 has been interpreted liberally to assist judgment creditors in enforcing final money judgments." *Isis Litig., L.L.C. v. Svensk Filmindustri*, 170 P.3d 742, 746 (Colo. App. 2007) (citing *Hudson v. Am. Founders Life Ins. Co.*, 160 Colo. 420, 426 (1966)). If a court has personal jurisdiction over a party, the location of its assets is irrelevant for purposes of a turnover order under Rule 69(g). *Wharf*, 210 F.3d at 1236.

## III. DISCUSSION

Ostensibly unfazed by my Judgment or the Tenth Circuit's Opinion, GCC has made no effort to satisfy the award entered against it. Instead, GCC has attempted to raise every plausible legal argument—and some implausible ones—against entry of the turnover order requested by CIMSA. As referenced above, GCC first claims the assets identified by CIMSA are exempt from execution; second, it contends the requested turnover order undermines international comity; third, it asserts the applicable rules of procedure do not apply extraterritorially; and fourth, it argues this Court lacks jurisdiction to enforce its own judgment pursuant to Colorado Rule of Civil Procedure 69(g). After considering each argument in turn, I conclude that neither U.S. law nor Mexican law prohibit enforcement of the Final Judgment through entry of a turnover order,

with one exception:  CIMSA has not established that I have jurisdiction over any of GCC's Mexican subsidiaries. As such, I do not include the total amounts owed to GCC for the Intercompany Receivables as assets subject to this Order.

### A. Assets Controlled by GCC Are Not Exempt from Execution

Under Colorado Rule of Civil Procedure 69(g), a court may not order turnover of property that is "exempt from execution." The parties dispute whether Colorado or Mexican law applies to determine what assets qualify as exempt. If it is the latter, the parties also dispute which Mexican laws are applicable. I first address the choice of law issue and find it appropriate to apply Mexican law to the exemption question. I then conclude that none of the assets requested in the Turnover Motion are exempt from execution under the applicable Mexican law.

As mentioned above, Colorado law dictates the nature and extent of execution proceedings following a judgment of this court. *See also* 12 Charles Alan Wright, et al., Fed. Prac. & Pro. § 3012 (3d ed. 2021). The State of Colorado has adopted the choice of law rules found in the Restatement (Second) of Conflict of Laws. *See AE, Inc. v. Goodyear Tire & Rubber Co.*, 168 P.3d 507, 509 (Colo. 2007). Consequently, post-judgment exemptions are determined by Colorado Revised Statutes § 13-54-102, "unless another state . . . has the dominant interest in the question of exemption. In that event, the local law of the other state will be applied." Restatement (Second) of Conflict of Laws § 132 (1971). Here, Mexico clearly has the dominant interest in the determination of whether GCC's property is exempt from execution. While neither party is domiciled in Colorado, GCC is domiciled in Mexico and all assets sought by the Turnover Motion are located in Mexico.

CIMSA points to Article 434 of the Mexican Federal Code of Civil Procedure, which enumerates specific assets exempt from "attachment," "such as family assets and wages of public servants" that, much like the Colorado statute, are "targeted to protect a debtor's personal property required for support." Reply to Mot. for Turnover at 3, ECF No. 139 (citation and internal quotation marks omitted). While the law does not mention exemptions for purposes of execution, CIMSA argues there is no distinction between attachment and execution because post-judgment attachment is simply the means to an end—execution. Gonzalez de Castilla Suppl. Decl. at 2, ECF No. 149-1 ("[P]ost-judgment attachment under [Mexican law] provides a means by which a judgment creditor may execute upon a judgment against assets of the judgment debtor.").

GCC counters that Article 434 applies only to pre-judgment or post-judgment attachment, and not to execution. *See* Lozano Suppl. Decl. ¶ 6, ECF No. 145-2. It asserts that there is "*no set list* of exempt assets" for purposes of execution in Mexico. Sur-reply to Mot. for Turnover at 3, ECF No. 145 (emphasis added). Providing no statutory authority and alluding only to comity grounds,[5] GCC urges me to conclude that because there is no set list of exemptions for execution specifically, "an asset is exempt from execution under Mexican law if execution would violate a Mexican statute or Mexican public policy."[6] *Id.* at 3-4. I am not persuaded that, due to the use of

---

[5] GCC's broad interpretation of Mexican exemption law—exempting any act that "would violate Mexican law or Mexican public policy"—coincides with its arguments regarding international comity. Lozano Suppl. Decl. ¶ 8, ECF No. 145-2. According to GCC, if turnover of its assets violates Mexican law or public policy, then those assets are exempt from execution and the order requiring turnover of those assets also contravenes international comity. I address these arguments as they relate to comity in the subsection that follows.

[6] GCC presents an alternative basis for this sweeping interpretation of Mexican exemption law. It cites to sub-section XV of Article 434 which includes "any other assets exempted by law" in the list of exemptions, suggesting that the phrase encompasses any execution that violates Mexican law or public policy. Sur-reply to Mot. for Turnover at 3-4. CIMSA's interpretation of this phrase is far more logical:  "That clause does not create a general exception for attachments. . . . Rather, it is a recognition that other statutes might exempt specific additional assets from

the word "attachment" in Article 434, Mexican law circumscribes assets exempt from execution pursuant to an unwritten, nebulous standard. Such a circumstance would leave Mexican litigants in dire need of clarity.

CIMSA's expert insists Article 434 enumerates assets exempt from both attachment and execution. Gonzalez de Castilla Suppl. Decl. at 3-4. I find his reasoning sound, and therefore rely on Article 434 to answer the question before me. That law exempts thirteen categories of assets from execution:

> 1.- assets expressly incorporated into the so-called Family Assets, 2.personal items, 3.- artisan's working instruments, 4.- agricultural equipment, 5.books and records of individuals rendering personal services , 6.- military equipment, 7.- instruments and equipment essential to the operation of a commercial or industrial facility, 8.- grains, 9.- *usufruct* itself but not the products derived therefrom, 10.- certain real property rights . . ., 11.- wages of public servants, 12.- life rent, 13.- ownership as member of a rural area under community ownership.

Gonzalez de Castilla Decl. at 7, ECF No. 139-1. As Article 434 does not include any of the assets identified in the Turnover Motion, they are not exempt from execution under Colorado Rule of Civil Procedure 69(g).

### B. The Turnover Order Does Not Violate Principles of International Comity

"[T]he threshold question in a comity analysis is whether there is in fact a true conflict between domestic and foreign law." *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 555 (1987) (Blackmun, J., concurring in part and dissenting in part). Absent a true conflict of law, voluntary forbearance in issuing a turnover order due to international comity concerns is not warranted. "No conflict exists . . . where a person subject to

---

attachment in particular circumstances." Gonzalez de Castilla Suppl. Decl. at 3. GCC has identified no Mexican statute, rule, or regulation that exempts its assets from attachment or execution.

regulation by two states can comply with the laws of both." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 799 (1993) (quoting Restatement (Third) of Foreign Relations Law § 403 cmt. e) (internal quotation marks omitted). That being the circumstance here, I find there is no true conflict of law and forbearance is not warranted.

GCC alleges three conflicts between Mexican law and U.S. law that counsel against issuance of a turnover order on international comity grounds: (1) A Mexican court could not enforce the Final Judgment by issuing the requested turnover order; (2) Mexican Treasury Shares of publicly traded companies cannot be used for any purpose other than issuance to new shareholders; and (3) the Mexican Injunction prohibits any transfer of funds to Colorado in satisfaction of the Bolivian arbitral awards.

I begin my comity analysis by considering whether a Mexican court's theoretical analysis of the present motion is relevant to a "true conflict" analysis. I next address the impact of Mexican securities law on the publicly traded shares held in GCC's corporate treasury. I conclude by assessing the impact of the Mexican Injunction on these proceedings. I find each of GCC's assertions of conflict to be unfounded and determine that GCC can comply with the present Turnover Order without violating Mexican law.

*1. A Mexican Court's Ability to Enforce the Judgment Through a Turnover Order is Irrelevant*

GCC claims conflicts of law exist because a Mexican court would not grant a Turnover Motion like the one pending before this Court. Underlying each of its arguments is the assumption that the Turnover Motion is akin to an action to enforce a foreign judgment in Mexico. Grounded in this assumption, GCC provides at least five reasons why Mexican law

would prohibit a court in Mexico from enforcing the Final Judgment through issuance of the

requested turnover order:

a.  A Mexican court would classify the Turnover Motion as an *in rem* action to enforce a foreign judgment and Article 1347-A.II. of the Mexican Code of Commerce confers Mexican courts with exclusive jurisdiction over *in rem* actions involving Mexican assets, *see* Resp. to Mot. for Turnover at 6;

b.  Article 1347-A.V. of the Mexican Code of Commerce provides that foreign judgments may only be enforced in Mexico when they are not subject to further appeal, *id.* at 6-7;

c.  Mexico is a signatory to the Inter-American Convention on Jurisdiction in the International Sphere for the Extraterritorial Validity of Foreign Judgments, which prohibits enforcement of a foreign judgment issued by a state other than the state in which the defendant's principal place of business is located, *see* Sur-reply to Mot. for Turnover at 8-9;

d.  A Mexican court could not issue the requested order because "Mexico does not have a turn-over rule," Second Lozano Suppl. Decl. ¶ 3(e), ECF No. 229-2; and

e.  In Mexico, a court would conclude that the Bolivian judiciary has annulled the damages award, and "[u]nder Mexican law, a foreign arbitration award that has been annulled . . . cannot be enforced in Mexico," Resp. to Suppl. To Mot. for Turnover at 3.

GCC's reasoning is flawed from the start. The Turnover Motion is not an action to

enforce a foreign judgment in Mexico, and so a Mexican court's ability to grant the motion is

irrelevant.

By way of example, consider GCC's treaty arguments (reason (c), above). GCC lists

Mexico as one of thirteen signatories to the Inter-American Convention on Jurisdiction in the

International Sphere for the Extraterritorial Validity of Foreign Judgments (the "La Paz

Convention"), May 24, 1984, 24 I.L.M. 468, *available at* http://www.oas.org/juridico/

english/treaties/b-50.html. For a foreign judgment to be enforceable under the La Paz

Convention, Article 1.A.1. requires a defendant's principal place of business to be that of the

state issuing the judgment. Lozano Suppl. Decl. ¶ 12. GCC contends that because its "principal

place of business is not in the United States, *enforcement of the judgment in Mexico* conflicts

with [Article 1.A.1.]," leading to a violation of Mexican law. Sur-reply to Mot. for Turnover at 9 (emphasis added). But the La Paz Convention has no relevance to these proceedings. First, while Mexico is a signatory to the Convention, the United States is not. Second, this is not an action to enforce a foreign judgment; it is an action to enforce a domestic judgment confirming a foreign arbitral award. Third, these enforcement proceedings are obviously not in Mexico.[7] Consequently, GCC's analysis is inapposite to the question at hand:  Would compliance with the requested turnover order require GCC to violate the La Paz Convention? It would not. The other four reasons buckle in the same manner.[8] International comity does not require a court of competent jurisdiction to consider whether its judgment is enforceable in another territory before enforcing that judgment, even if the enforcement concerns property located in that other territory. As such, the likely outcome of this Motion in proceedings before the Mexican judiciary is immaterial.

A U.S. district court with personal jurisdiction over a party has authority to direct that party to turn over foreign assets in post-judgment proceedings. *Wharf*, 210 F.3d at 1236. This Court has personal jurisdiction over GCC. The fact that a Mexican court might not have

---

[7] Even if they were, the La Paz Convention governs the extraterritorial validity of foreign judgments among States who have ratified the Convention, and the United States has not. *See* Yoav Oestreicher, *The Rise and Fall of the "Mixed" and "Double" Convention Models Regarding Recognition and Enforcement of Foreign Judgments*, 6 Wash. U. Glob. Stud. L. Rev. 339, 353 (2007). The Convention has only been ratified by Mexico and Uruguay.

[8] GCC's expert also cites Article 576 of the Mexican Federal Code of Civil Procedures as an authority that would prohibit a Mexican court from issuing the requested turnover order. According to that expert, Article 576 decrees that no foreign court can have "direct jurisdiction [over] an entity domiciled in Mexico or its assets located in Mexico." Lozano Suppl. Decl. ¶ 9. CIMSA's expert clarifies that Article 576 is only applicable to actions to enforce foreign judgments in Mexico. Gonzalez de Castilla Suppl. Decl. at 4 n.7. Since this is neither an action to enforce a foreign judgment nor an action brought in a Mexican court, Article 576 does not limit my authority.

authority to enforce this Court's judgment neither alters that fact nor creates a true conflict between Mexican and U.S. law.

### 2. Mexican Law Does Not Prohibit Turnover of GCC's Publicly Traded Shares

GCC comes closer to alleging a true conflict of law in relation to the shares held in its corporate treasury. Articles 54 & 56 of the Mexican Securities Act permit a publicly traded company to purchase a certain percentage of its own shares on the Mexican stock market. Gonzalez de Castilla Decl. at 7. When it does so, it must determine whether the repurchased shares will remain in its corporate treasury as a company asset or whether it will cancel the shares by proportionally reducing its equity. *Id.* When a company opts to reduce its equity, the repurchased shares convert to "Treasury Shares," which lose their economic value. *Id.* at 7-8; Lozano Suppl. Decl. ¶ 37.

GCC currently holds approximately 6.2 million shares of its own publicly traded common stock. *See* Mexican Banking and Securities Commission 2020 Annual Report, April 30, 2021, ECF No. 222-8. It maintains that these shares are Treasury Shares and argues, pursuant to Article 53 of the Mexican Stock Exchange Act, that they cannot be used for any purpose other than to be "placed in the stock exchange or cancelled." Lozano Suppl. Decl. ¶ 35. GCC further claims that the distinction between repurchased Treasury Shares and shares held in a corporate treasury is insignificant for purposes of the Turnover Motion because "[none of the repurchased shares] have an economic or legal value for the issuer." Second Lozano Suppl. Decl. ¶ 17.

CIMSA wholly disagrees. It asserts the repurchased shares have not been converted into Treasury Shares. In support of this assertion, CIMSA has submitted evidence that GCC routinely sells its repurchased shares on the open market. Second Gonzalez de Castilla Suppl. Decl. at 1-6

(Public Entry at ECF No. 234; Restricted Doc. at ECF No. 224). Brokerage statements reveal that GCC keeps its repurchased shares in at least two brokerage accounts where it has benefitted from increases in market value while also receiving financial profit from regular sales of its stock. *See* Oct. 2020 Actinver Account Statement, ECF No. 224-1 (showing market value increase of approximately 13 million Mexican pesos); Oct. 2020 GBM Account Statement, ECF No. 224-2 (documenting numerous sales of corporate stock); *see also* Second Gonzalez de Castillo Suppl. Decl. at 3-6 (interpreting and explicating brokerage statements). These statements provide compelling evidence that the shares are not Treasury Shares but are instead "freely-transferable assets in the market that . . . may be attached or executed upon for the payment of GCC's debts." Second Gonzalez de Castilla Suppl. Decl. at 2.

GCC's interpretation of the law governing Treasury Shares is highly implausible. It first asserts the shares may only be issued to shareholders in exchange for capital contributions. Resp. to Mot. for Turnover at 7. Later, it acknowledges that a court in Mexico can order the transfer of Treasury Shares. Sur-reply to Mot. for Turnover at 9. But it nevertheless maintains that the shares cannot be transferred to satisfy a judgment. *Id.* GCC presents no logical reason why a corporation would be permitted to place its repurchased shares on the stock exchange for purchase by a third-party and why a Mexican court would be permitted to order a transfer of those shares to a third-party, but the corporation would be prohibited from transferring the same shares to the same third-party in satisfaction of a foreign judgment.

Based on the record before me and the lack of evidence that GCC has cancelled its shares, I find that the shares at issue are not Treasury Shares but are instead freely transferable shares held in GCC's corporate treasury. Thus, ordering that GCC turn over those shares would not directly conflict with Mexican law and does not violate the principles of international comity.

*3. The Mexican Injunction Has Expired by Its Own Terms and Therefore Has No Bearing on the Turnover Motion*

As recounted above, GCC Latinoamérica obtained a preliminary injunction from a judge in Chihuahua, Mexico, which ordered suspension of the damages phase of the arbitral proceedings until the Bolivian annulment proceedings concluded. The Injunction also prohibited CIMSA from continuing or commencing any action seeking to confirm or enforce an award issued by the Tribunal. *See* Mexican Injunction at 44. There is no indication that the Mexican court proceedings continued beyond the preliminary order or that a permanent injunction exists.

GCC contends that issuance of the requested turnover order would contravene the Injunction. According to GCC, CIMSA is free to request that the Mexican court lift the Injunction but otherwise it will remain in effect until that court acts. *See* Sur-reply to Mot. for Turnover at 6. CIMSA, in turn, contends that the judge who granted the Injunction lacked jurisdiction under Mexican law to issue it. Reply to Mot. for Turnover at 17-18. CIMSA also argues that GCC Latinoamérica procured the Injunction in bad faith by "deliberately court[ing] legal impediments to the enforcement of a federal court's orders." *Id.* at 15 (quoting *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 60 (2d Cir. 2004) (internal quotation marks omitted). Since the Mexican Injunction is a foreign judicial act that is potentially implicated in these proceedings, a comity analysis of this alleged conflict would generally be required. *See Hilton v. Guyot*, 159 U.S. 113, 164 (1895) ("[Comity] is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation."). Because I find each of the parties' arguments unpersuasive, however, a comity analysis is not necessary here.

The parties have each sought to use the Mexican Injunction as a sword and a shield. In 2018, GCC accused CIMSA of ignoring the preliminary nature of the Injunction and asserted

that the Injunction would "remain in effect *only* until the annulment proceedings with respect to

the Liability Award have concluded." Reply to Mot. to Dismiss at 37, ECF No. 78 (emphasis

added). The following year, it argued that a "court order in Mexico remains in place and in effect

until a court annuls or revokes the order." Sur-Reply to Mot. for Turnover at 6 (citations and

internal quotation marks omitted).[9] For its part, CIMSA broadly referred to an "anti-suit

injunction" in 2018 without referencing its temporary nature, *see* Mot. to Authorize Alternative

Service at 11, ECF No. 43, but now CIMSA confidently asserts that the Injunction "expired upon

the conclusion of GCC's action to annul the [Liability] Award in Bolivia,"[10] Reply to Mot. for

Turnover at 8. The parties' equivocations on the substance and import of the Mexican Injunction

over the past four years are tiresome.

     I have reviewed a translation of the Injunction in its entirety.[11] GCC Latinoamérica

initiated proceedings in the Judicial District of Morelos, Chihuahua, Mexico, to request a

---

[9] GCC suggests it isn't equivocating now because in 2018 it implied that even if the annulment proceedings with respect to the Liability Award had concluded, an affirmative request in the Mexican court that the injunction be lifted was a firm requirement. Sur-reply to Mot. for Turnover at 6. It bases this argument on its past assertions that "CIMSA is . . . free to challenge" the Injunction and "free to request that it be lifted." Reply to Mot. to Dismiss at 2, 37, 40. But in each instance, GCC described a dichotomy of circumstances: CIMSA could request that the injunction be lifted, or the injunction would automatically expire upon the occurrence of either one of the two enumerated events (i.e., a final resolution on the request for injunctive relief or a conclusion to the Bolivian annulment proceedings, *see* Mexican Injunction at 43). In any case, GCC's assertions were too vague then to have any force now.

[10] This is a far cry from the "contrary position" that GCC describes in asserting that judicial estoppel precludes CIMSA's present theory. *See* Sur-Reply to Mot. for Turnover at 6-7. CIMSA did not "successfully argue the injunction was in effect" when opposing dismissal on grounds of *forum non conveniens*. *Id.* at 1. Instead, CIMSA relied on the *ex parte* nature of the Injunction and the Tribunal's conclusion that the Mexican court lacked jurisdiction to issue the Injunction as compelling evidence that Mexico was not a suitable alternative forum at that time. *See* Mot. to Confirm at 5, ECF No. 50; Reply to Mot. to Confirm at 35, ECF No. 73.

[11] Although the Injunction was also relevant to GCC's assertion that the action should be dismissed on the basis of *forum non conveniens* in 2018, only one translated paragraph of the Injunction was submitted to me at that time. *See* Resp. to Mot. to Confirm at 31-33, ECF No. 61; Translated Excerpt of Mexican Injunction, ECF No. 77-4. Relying on expert summaries of the Injunction, I found its existence and the circumstances surrounding it to be an augury of judicial

"provisional interim measure"—the clear equivalent of a stay pending appeal—of all proceedings relating to the Tribunal's Liability Award until resolution of the request for annulment of that award, which was proceeding through the Bolivian judiciary at the time. *See* Mexican Injunction at 34. GCC Latinoamérica also requested an injunction against the initiation of any action to enforce the Liability Award until the annulment proceedings concluded. *See id.* at 32. GCC Latinoamérica's requests were granted in full after the judge balanced the potential adverse impact of a stay against the potential harm to GCC Latinoamérica if CIMSA were to enforce the Liability Award before a resolution was reached in the annulment proceedings. The judge ordered GCC Latinoamérica to post a supersedeas bond of $1,500,000 Mexican pesos and ordered a total of four interim measures until the preliminary injunction became final or until the conclusion of the Bolivian annulment proceedings, "whichever happens first." *Id.* at 43. At no point does the Injunction state a party must affirmatively request that it be lifted; it only indicates that affirmative steps are necessary for it to become final. Language suggesting impermanency is pervasive throughout the order; the Injunction refers to itself as an "interim measure" more than thirty times.[12] The terms of the Mexican Injunction are evident, and no recourse to Mexican law is necessary.

---

barriers should CIMSA attempt to enforce the arbitral awards in Mexico. Although I previously determined that "the [I]njunction's scope likely is not limited to the [Liability] Award," I made that determination at a point when annulment proceedings related to the arbitral award on damages were still proceeding. *See* Order on Respondents' Cross-Motion to Dismiss at 17, ECF No. 82. All annulment proceedings have now concluded.

[12] GCC has publicly professed the limited duration of the Injunction. *See* June 23, 2017 Offering Memorandum at 123, ECF No. 44-7 ("On December 3, 2014 a tribunal in Chihuahua, Mexico provided a provisional remedy ordering CIMSA to refrain from enforcing any award issued in the arbitration proceedings until the pending appeals for annulment have been resolved."); *see also* Resp. to Mot. to Confirm at 15 n.11 ("Respondents . . . obtained an injunction in the Judicial District of Morelos, Chihuahua, Mexico, which ordered a stay of the arbitral proceedings until the annulment of the Liability Award had been decided, so as to avoid potentially unnecessary proceedings regarding the calculation of damages.")

In accordance with the Mexican Injunction, the conclusion of the annulment proceedings regarding the Liability Award triggered an automatic lifting of the Injunction. Both parties concede that the annulment proceedings have concluded. *See* Rivera Decl. ¶ 47 (GCC's concession); Reply to Mot. for Turnover at 2 (CIMSA's concession). No other outcome survives even minimal scrutiny because the purpose underlying the Mexican Injunction was to preserve GCC's right to appeal the Liability Award in Bolivia, and that right is now obsolete. As the Mexican Injunction has expired by its own terms, I do not need to consider the parties' arguments. I also need not consider principles of international comity because there is no conflict of law. The clear text of the Injunction provides the starting and ending point of my analysis.

In sum, principles of international comity do not stay my hand in issuing the requested turnover order. GCC's assertions that Mexican law prohibit an order requiring turnover of its publicly traded shares and that the Mexican Injunction prohibits turnover of any assets held in Mexico are not persuasive. Even if GCC could establish that CIMSA would be unable to enforce the Final Judgment in Mexico—and there is no reason whatsoever for me to make such a finding—that circumstance has no bearing on CIMSA's request that this Court enforce its own Judgment. As I find no true conflict between foreign and domestic law, a turnover order under the circumstances presented here does not threaten the comity of nations.

### C. The Presumption Against Extraterritoriality is Not Applicable

GCC's next challenge to issuance of the requested turnover order is that the presumption against the extraterritorial application of statutes prevents the governing procedural rules from applying to assets in Mexico.

Principles of extraterritoriality acknowledge a federal court's lack of authority to regulate conduct beyond a statute's reach. *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010). Twenty years ago, the Tenth Circuit considered the identical post-judgment enforcement rules at issue here and questioned whether an order issued pursuant to Colorado Rule of Civil Procedure 69(g) requiring turnover of foreign assets conflicts with principles of extraterritoriality. The Court determined conclusively that it does not:

> Extraterritoriality principles limit the United States' ability to hold a party legally accountable for conduct that occurred beyond its borders. Here, the district court merely directed a party over whom it had personal jurisdiction to turn over assets. The location of those assets is irrelevant. Once personal jurisdiction of a party is obtained, the District Court has authority to order it to "freeze" property under its control, whether the property be within or without the United States.

*Wharf*, 210 F.3d at 1236 (quoting *United States v. First National City Bank*, 379 U.S. 378, 384 (1965)) (internal citation and quotation marks omitted). In finding that the presumption against extraterritoriality did not apply, the Tenth Circuit differentiated procedural rules from statutes that "hold a party legally accountable." *Id.* at 1236. GCC acknowledges the relevance of the *Wharf* decision but argues the U.S. Supreme Court has abrogated its holding. Resp. to Mot. for Turnover at 9. GCC's premise is guided by a misapprehension of recent precedent. To expose the flaws in GCC's arguments, I first review the history of extraterritoriality jurisprudence and then consider the individual cases invoked by GCC.

The presumption against extraterritoriality has developed as a principle of statutory construction to help courts determine whether a statute regulates conduct abroad and to what extent. Initially, the presumption against extraterritoriality affirmed a basic tenet of U.S. law that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804). By the early 20th century, the Supreme Court turned its focus from its previous territorial analysis to one

concerned with a conflict of laws analysis and the comity of nations. *See American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 356 (1909), *overruled on other grounds*, *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 704-05 (1962). Following developments over the last century, there are now two primary rationales underlying the presumption against extraterritoriality:  (1) the protection against clashing laws which might result in international discord, *see Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013), and (2) the assumption that Congress is primarily concerned with domestic relations, *see RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2100 (2016).

In recent years, the Supreme Court has established a two-step framework for analyzing the extraterritorial application of statutes. First, a court must ask whether the statute gives clear guidance that it ought to be applied extraterritorially such that the presumption against extraterritoriality is rebutted. If the statute does not, then a court inquires in step two whether the case involves a domestic application of the statute. *RJR Nabisco*, 136 S. Ct. at 2101. If the presumption against extraterritoriality is rebutted at step one, the court must still determine the permissible scope of the statute's application abroad based on the limits imposed by Congress. *Id.*

GCC contends Supreme Court precedent has abrogated the Tenth Circuit's holding in *Wharf* in two ways. First, GCC relies on the assertion in *Republic of Argentina v. NML Capital* that "[o]ur courts generally lack authority in the first place to execute against property in other countries." 573 U.S. 134, 144 (2014). That statement, while true, is of no consequence here because CIMSA does not seek a writ of execution against property but rather an order directed at GCC, a party "over whom the court has jurisdiction." Colo. R. Civ. P. 69(g).[13]

---

[13] GCC's reliance on *NML Capital* is perplexing given that the Supreme Court was not applying the presumption against extraterritoriality. *NML Capital* considered whether the Foreign

Second, GCC conflates substance and process when it asserts that the presumption against extraterritoriality must now be applied "in all cases." Resp. to Mot. for Turnover at 9. Applying the two-step framework here, GCC argues that the presumption prohibits issuance of a turnover order because there is no clearly expressed intention of Congress to give the relevant rules of procedure extraterritorial effect. GCC's arguments are anchored to *Morrison v. National Australia Bank Ltd.* and its anchor will not hold tight. 561 U.S. 247 (2010). In *Morrison*, the Supreme Court considered the extraterritorial reach of § 10(b) of the Securities Exchange Act of 1934, finding it to be "a merits question." *Id.* at 254. After acknowledging that various courts of appeals had disregarded the presumption against extraterritoriality for "many decades," it clarified that the presumption must be applied "in all cases" requiring an extraterritoriality analysis. *Id.* at 255, 261. But that is beside the point. Both before and after *Morrison*, principles of extraterritoriality have been applied substantively—not procedurally—when a party seeks to hold another party legally accountable by giving federal legislation extraterritorial effect. *See Hetronic Int'l, Inc. v. Hetronic Germany GmbH*, No. 20-6057, 2021 WL 370222, at *9 (10th Cir. Aug. 24, 2021) (collecting cases). Here, CIMSA does not seek to establish legal accountability; it seeks to enforce a judgment procedurally.[14]

---

Sovereign Immunities Act of 1976 (the "FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq.*, limits the scope of post-judgment discovery of a foreign sovereign's extraterritorial assets. The Court determined that the FSIA permits post-judgment discovery of extraterritorial assets directed at third-party banks. Rather than supporting GCC's position, *NML Capital* reinforces the Tenth Circuit's determination that the presumption against extraterritoriality need not be applied to the rules governing post-judgment enforcement procedures, but rather to the statute on which the cause of action is based. *See Wharf*, 210 F.3d at 1235-36.

[14] Were I to apply the presumption against extraterritoriality to the facts of this case, the appropriate question would be whether the Federal Arbitration Act, codifying the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997 (the "New York Convention"), can be applied extraterritorially. *See* 9 U.S.C. § 201 *et seq.* Indeed it can—that is the very purpose of the New York Convention.

*RJR Nabisco* is paradigmatic of how the presumption against extraterritoriality has been applied substantively. 136 S. Ct. 2090 (2016). In that case, the Court considered the extraterritorial application of the substantive provisions of the Racketeer Influenced and Corrupt Organizations ("RICO") Act found in Section 1962, as well as the private civil remedy created by Section 1964 of that Act. *Id.* The Court explained that the two-step extraterritoriality framework must be applied "regardless of whether the statute in question regulates conduct, affords relief, or merely confers jurisdiction," referring, in turn, to the Securities Exchange Act, the RICO Act, and the Alien Tort Statute. *RJR Nabisco*, 136 S. Ct. at 2101. The Court's statement pertains to the analysis of substantive law. *RJR Nabisco*, like the other cases relied upon by GCC, does not mandate an analysis of procedural rules. *See also* Restatement (Fourth) of Foreign Relations Law: Jurisdiction § 203 cmt. a (Tentative Draft No. 3, 2017) ("The presumption against extraterritoriality applies to substantive provisions of federal statutes and to express and implied federal causes of action.").

The procedural rules at issue here—the same ones at issue in *Wharf*—provide a mechanism to compel GCC to take certain actions abroad. They are not concerned with the substantive regulation of conduct, they do not provide a cause of action, and they do not confer jurisdiction. Thus, the more recent cases cited by GCC do not abrogate the holding in *Wharf* and do not control here.

Having applied the Tenth Circuit's analysis from *Wharf* and found principles of extraterritoriality inapplicable, I go on to consider, once again, GCC's arguments that this Court lacks jurisdiction over it.

***D. Jurisdiction to Issue Turnover Order***

GCC claims I lack jurisdiction over it and its subsidiaries under Colorado Rule of Civil Procedure 69 and so am not authorized to issue a turnover order. While I reject the contention that I lack jurisdiction over GCC (again), I find merit in GCC's opposition to any exercise of jurisdiction over its subsidiaries.

*1. Jurisdiction Over GCC*

Long ago, I found it appropriate to exercise personal jurisdiction over Respondents pursuant to federal long-arm jurisdiction. *See* Order on Respondents' Cross-Motion to Dismiss at 18, ECF No. 82. Federal Rule of Civil Procedure 4(k)(2) permits a federal district court to exercise personal jurisdiction on the basis of a defendant's nationwide contacts with the United States, provided "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction." Fed. R. Civ. P. 4(k)(2)(A)–(B). The Tenth Circuit affirmed my exercise of jurisdiction. *Grupo Cementos*, 970 F.3d at 1300. And yet, GCC argues that I now lack jurisdiction to enforce the Judgment in this case. Resp. to Mot. for Turnover at 10-12. Its arguments quickly falter.

GCC points to the provision of Colorado Rule of Civil Procedures 69(g) that permits entry of a turnover order against a party "over whom the court has jurisdiction," and asserts the Rule is inapplicable because no Colorado state court has personal jurisdiction over Respondents. Thus, GCC claims this Court's expansive jurisdiction conferred by Rule 4(k)(2) has been effectively disabled by the federal rules' reliance on state rules of procedure for proceedings in aid of judgment. *See* Resp. to Mot. for Turnover at 11. This argument turns the objective of each rule on its head. I begin with the jurisdictional rule and then turn to the rules of enforcement.

The purpose of Rule 4(k)(2) was to close a loophole that otherwise permitted foreign defendants who possessed sufficient contacts with the United States as a whole to evade enforcement of federal law by limiting their contacts with any one state in order to avoid jurisdiction in all fifty. *See* Federal Rule of Civil Procedure 4(k)(2) advisory committee's note to 1993 amendment. GCC would have me find that in place of the original loophole, there now exists a substantial defect resulting in enforcement over certain foreign defendants in word alone—at least until the rules of procedure for all 50 states encompass language embracing federal long-arm jurisdiction. Such an outcome is preposterous. Without the ability to enforce a judgment, "the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution." *Peacock v. Thomas*, 516 U.S. 349, 356 (1996) (quotation omitted). I will not conclude that I possess jurisdiction over the merits of this dispute but lack jurisdiction over enforcement. On the contrary, I must protect the Judgment in this case.

I next consider the two rules that give muscle to that protection. Federal Rule of Civil Procedure 69(a) sets forth a system of procedure for federal district courts to apply in enforcing their judgments by pointing judges in this Court to Colorado Rule of Civil Procedure 69(g). Neither rule requires a jurisdictional analysis.[15] Instead, both rules presume jurisdiction has been established and that judgment has been entered pursuant to that jurisdiction. *See* § 69:5 Writ of Execution, 13 Colo. Prac., Civil Procedure Forms & Commentary § 69:5 (3d ed.) (Rule 69(g) "allows the court authority to enforce the judgment against any property in the possession of any person over which it *has obtained* jurisdiction." (emphasis added)).

---

[15] In any case, I would come to the same conclusion were I to conduct a jurisdictional analysis at this point in the proceedings. Federal Rule of Civil Procedure 69(a) requires application of state court procedure, "but a federal statute governs to the extent it applies." The Federal Rules, "hav[ing] the force and effect of a federal statute," would therefore again confer jurisdiction by means of Rule 4(k)(2). *Okla. Radio Assocs. v. F.D.I.C.*, 969 F.2d 940, 942 (10th Cir. 1992).

Presumably, Respondents have read the phrase "over whom the court has jurisdiction" in isolation. If "the court" in that phrase refers to a Colorado state court, as GCC argues it does, then any reference to "the court" in the Colorado Rules of Civil Procedure must do so as well. If that were true, Fed. R. Civ. P. 69(a) would require me to defer to a Colorado state court to issue subpoenas, make reasonable orders for mileage and expenses, and issue any orders enforcing my judgment. *See* Colo. R. Civ. Pro. 69(e)-(g). GCC bends logic past its breaking point. "The court" referred to in the Colorado Rule of Civil Procedure 69(g)—when applied pursuant to Federal Rule of Civil Procedure 69(a)—is the court with jurisdiction over the case, whether that jurisdiction be conferred by Federal Rule of Civil Procedure 4(k)(2) as it is here, or otherwise.

GCC's other jurisdictional arguments fall short. First, GCC asserts that this Court does not have jurisdiction over third parties who "possess[] its property abroad . . . for the benefit of GCC." Resp. to Suppl. to Mot. for Turnover at 10. But the Rule specifically addresses this situation and permits an order "to apply any property . . . not exempt from execution, whether in the possession of such party *or other person*, or owed the judgment debtor, towards satisfaction of the judgment." Colo. R. Civ. P. 69(g) (emphasis added). So, by way of example, this Court's lack of jurisdiction over GCC's in-house bank, Cementos, does not prohibit an order directing GCC to apply its cash holdings that are in Cementos' possession towards satisfaction of the judgment. Second, GCC relies on case law from a different circuit to argue that a turnover order "cannot be used to compel one entity to direct another entity, which is not subject to this state's personal jurisdiction, to deliver assets held in a foreign jurisdiction." *Id.* at 5 (quoting *Commonwealth of N. Mariana Islands v. Canadian Imperial Bank of Com.*, 990 N.E.2d 114, 120 (N.Y. 2013)) (internal quotation marks omitted). That may be true for a district court sitting in

New York which follows the separate entity rule.[16] But in Colorado, there is no separate entity rule and special proceedings are not required.

Having previously determined that these confirmation proceedings are an appropriate exercise of federal long-arm jurisdiction, I now find that, for the same reasons, Federal Rule of Civil Procedure 4(k)(2) permits me to exercise personal jurisdiction over GCC in enforcing the Judgment from those proceedings, and Colorado Rule of Civil Procedure 69(g) provides the procedural mechanism for me to do so.

*2. Jurisdiction Over GCC's Subsidiaries*

Though I most certainly have personal jurisdiction over GCC in this matter and in the enforcement of my Judgment, GCC is correct in its assertion that CIMSA has not established this Court's jurisdiction over its named subsidiaries. "[A] holding or parent company has a separate corporate existence and is treated separately from the subsidiary in the absence of circumstances justifying disregard of the corporate entity." *Benton v. Cameco Corp.*, 375 F.3d 1070, 1081 (10th Cir. 2004) (quoting *Quarles v. Fuqua Indus., Inc.*, 504 F.2d 1358, 1362 (10th Cir. 1974)) (internal quotation marks omitted). With the exception of Cementos, CIMSA has made no assertion that circumstances exist to justify a disregard of the corporate entity of the nine subsidiaries with whom GCC has loaned a significant quantity of funds. *See, e.g.*, Cementos Loan Agreement, ECF No. 124-4; *see also* ECF Nos. 124-5 (Materiales Industriales de Chihuahua), 124-7 (GCC Transporte), 124-9 (GCC Cemento), 124-11 (Urbanizaciones Contemporaneas), and 124-13 (GCC Concreto). As to Cementos, I previously determined that

---

[16] Pursuant to New York Civil Practice Law & Rules § 5225(b), a special proceeding is required to enforce a judgment against an asset of a judgment debtor held in the possession of a third party. *See Tire Eng'g & Distribution L.L.C. v. Bank of China Ltd.*, 740 F.3d 108, 110-11 (2d Cir. 2014).

there is a sufficiently close link between Cementos and GCC to "raise legitimate questions." Order Denying Mot. to Quash at 8, ECF No. 146 (quoting *Reg'l Dist. Council by and through Parker v. Mile High Rodbusters, Inc.*, 2019 WL 1856743, at *2 (D. Colo. Apr. 24, 2019)). I did not, however, find it necessary to determine its status as an alter ego. *Id.* at 8. Again, I do not find it necessary to do so here as the record establishes that the other assets identified by CIMSA are sufficient to satisfy the Judgment. Consequently, I do not find it appropriate to order turnover of the total amounts owed on the Intercompany Receivables. I do, however, order GCC to enforce the relevant interest payment provisions in the loan agreements and to turn over to the Court Registry all interest payments, to include both accrued interest and default interest, due on the loans as needed to satisfy the Judgment.[17] Additionally, should any portion of the Judgment remain unpaid as of the Maturity Date of any of the loan agreements, GCC is ordered to turn over that portion of the loan repayment to the Court Registry in satisfaction of the Judgment.

Having long ago determined that this Court has personal jurisdiction over GCC and having found that none of GCC's challenges to the present motion on the basis of Mexican exemption law, international comity, or principles of extraterritoriality have merit, I now grant CIMSA's motion for a turnover order. Pursuant to Colorado Rule of Civil Procedures 69(g), GCC is ordered to turn over to the Court Registry any portion of the following assets in an amount sufficient to satisfy the March 26, 2019 Final Judgment:

(a) 6,205,205 of the publicly traded shares held in its corporate treasury, or the cash received from the sales thereof;

(b) Cash held by Cementos de Chihuahua, S.A. de C.V. as GCC's "in-house bank"; and

(c) Any interest payments due on the loans owed to GCC by nine subsidiaries.

---

[17] By the terms of the Loan Agreements each Borrower is required to "pay interest accrued on the amount of the Loan outstanding to which such Interest Period relates," *see, e.g.*, 124-4 ¶ 3.2, and that duration of the interest periods may be no more than 12 months, *id.* ¶ 3.1.

Should GCC elect to satisfy the Judgment with other assets such as its Intercompany Receivables from Cementos, it is well within its rights to do so.

## IV. CONCLUSION

Petitioner's Post-Judgment Motion for Turnover Order Requiring Payment of Funds into Registry of Court (ECF No. 124) is therefore GRANTED IN PART and DENIED IN PART as reflected in this Order. CIMSA's Motion to Reopen the Proceedings Regarding its Post-Judgment Motion for Entry of a Turnover Order and for Leave to File a Supplemental Declaration (ECF No. 149) is DENIED IN PART as moot and GRANTED IN PART inasmuch as CIMSA's Supplemental Declaration has been received and considered by the Court. GCC is ORDERED to comply with the terms of this Order on or before November 9, 2021.

DATED this 10th day of September, 2021.

_John L. Kane_

JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE